**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **SAMUEL TROICE,** | § | |
| **MARTHA DIAZ,** | § | |
| **PAULA GILLY-FLORES,** | § | |
| **and PUNGA PUNGA FINANCIAL, LTD.** | § | |
| **individually and on behalf of a class** | § | |
| **of all others similarly situated** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **WILLIS OF COLORADO INC.,** | § | |
| **WILLIS GROUP HOLDINGS LTD.,** | § | |
| **AMY S. BARANOUCKY,** | § | |
| **ROBERT S. WINTER, and** | § | |
| **BOWEN, MICLETTE & BRITT, INC.** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT-CLASS ACTION**

NOW COME PLAINTIFFS, SAMUEL TROICE, MARTHA DIAZ, PAULA GILLY-FLORES, and PUNGA PUNGA FINANCIAL, LTD., individually and on behalf of a class of all others similarly situated, (collectively hereinafter "Plaintiffs"), and file this their Original Class Action Complaint against Defendants, WILLIS OF COLORADO INC., WILLIS GROUP HOLDINGS, LTD., AMY S. BARANOUCKY, ROBERT S. WINTER, and BOWEN, MICLETTE & BRITT, INC. (collectively hereinafter "Defendants"), and in support thereof would show the Court the following:

## I. <u>PREFACE</u>

1.

This putative class action is filed in representation of a class of defrauded Mexican investor

clients of Houston, Texas-based Stanford Financial Group ("Stanford Financial"). This action has been filed in this Court because it is related to Civil Action No. 309-CV-0298, *Securities & Exchange Commission v. Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management LLC, et al*., in the United States District Court for the Northern District of Texas– Dallas Division (the "SEC Action"). This action alleges participation by these Defendants in the massive investment fraud scheme perpetrated by the Stanford Financial Group and its principals from, by and through Texas that led to the intervention by the SEC in Texas and appointment of Ralph Janvey as Receiver.

## II.  PARTIES

2.

Plaintiff, SAMUEL TROICE, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

3.

Plaintiff, MARTHA DIAZ, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

4.

Plaintiff, PAULA GILLY-FLORES, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

5.

Plaintiff, PUNGA PUNGA FINANCIAL, LTD., is a Panamanian company with its principal place of business in Mexico City, Mexico which is wholly owned and controlled by Mexican citizens from Mexico City, Mexico.

6.

Additionally, this case seeks certification of a class of Mexican investors who purchased Certificates of Deposit and/or otherwise maintained investment accounts with Stanford International Bank Ltd. at any time from said company's inception to the present.

7.

Defendant Willis of Colorado Inc., ("Willis Colorado") is a corporation organized under the laws of Colorado.  Willis has engaged in business in the State of Texas, and maintains a designated agent for service of process in Texas.  Willis may be served by servings its registered agent, CT Corporation System, at 350 North St. Paul Street, Dallas, Texas 75201.

8.

Defendant Willis Group Holdings Ltd., ("Willis Group") is a corporation organized under the laws of Bermuda, with its principal place of business in the United Kingdom.  Willis has engaged in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in Texas.  Willis may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965).  Defendant may be served via its registered agent in Bermuda: Appleby, Canon's Court, 22 Victoria Street, Hamilton, Bermuda.

9.

Defendant, Amy S. Baranoucky, ("Baranoucky") is an individual and, upon information and belief, United States citizen, currently residing in 4295 Columbine Drive, Unit 8, Vail, CO 81657-4767.  Defendant Baranoucky may be served with process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.

10.

Defendant, Robert S. Winter, ("Winter") is an individual and, upon information and belief, United States citizen, currently residing in 10015 Olympia, Houston Texas 77042. Defendant Winter may be served with process by serving the Secretary of State by certified mail, return receipt requested, pursuant to Rules 106 and 108a of the Texas Rules of Civil Procedure.

11.

Defendant Bowen, Miclette & Britt, Inc. ("BMB") is a corporation organized under the laws of Texas. BMB may be served by servings its registered agent, CT Corporation System, at 350 North St. Paul Street, Dallas, Texas 75201.

## III.  SUBJECT MATTER JURISDICTION

12.

This Court has original jurisdiction over this proceeding pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action because this lawsuit constitutes a judicial proceeding against certain agents "related to the Receivership Estate". This Court has original jurisdiction over this proceeding, pursuant to 28 U.S.C. §1332(d)(2)(B) because this is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which all members of the Plaintiff class are citizens and residents of the Republic of Mexico and at least one Defendant (BMB) is a citizen of Texas.

## IV.  PERSONAL JURISDICTION

13.

This Court has personal jurisdiction over the non resident Defendants, Willis and Baranoucky, under the Texas Long Arm Statute. Defendant Willis Colorado has conducted continuous and systematic business in the State of Texas for many years and maintains a registered

agent for service of process in Texas for that reason, and is therefore subject to general jurisdiction. Defendant Willis Group has conducted continuous and systematic business in the State of Texas, both directly and via its subsidiaries, affiliates, and agents, for many years and therefore is subject to general jurisdiction. Furthermore, Willis Group, either directly or through its subsidiaries, affiliates and agents, including Baranoucky, has engaged in specific jurisdiction contacts with the State of Texas, specifically with the Stanford Financial group headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore has done business and committed torts, in part, in the State of Texas. Based on its general and specific contacts with the State of Texas, Defendant Willis Group has purposefully availed itself of the privilege of conducting activities within Texas and has established minimum contacts with the State of Texas under the Long Arm Statute.

14.

Defendant Baranoucky has engaged in specific jurisdiction contacts with the State of Texas, specifically with the Stanford Financial group headquartered in Houston, Texas, including the transmittal to Houston, Texas of the "safety and soundness" letters described herein and attached hereto as Exhibit "4", that give rise to Plaintiffs' causes of action, and therefore has done business and committed torts, in part, in the State of Texas. Based on her specific contacts with the State of Texas, Defendant Baranoucky has purposefully availed herself of the privilege of conducting activities within Texas and has established minimum contacts with the Texas under the Long Arm Statute.

## V.  VENUE

15.

Venue is mandatory in this Court pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action.

## VI.  **FACTUAL BACKGROUND**

### A.     **The Stanford Financial Empire**

16.

From the mid-1980s through February 2009, R. Allen Stanford ("Stanford"), a former gym owner from Mexia Texas, built a financial service empire that at its height boasted 30,000 customers in 130 countries allegedly managing $50 billion dollars in investment funds.  The empire was comprised of over 140 companies from across the globe that operated under the brand name "Stanford Financial" with its worldwide headquarters located in Houston, Texas.   The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial") included the main operating companies: Houston, Texas-based Stanford Group Company ("SGC") and Stanford Capital Management, LLC ("SCM"); Stanford International Bank ("SIB") and Stanford Trust (one in Louisiana and another in Antigua), all of which were controlled and managed from the United States, principally Houston, Texas.  In Mexico, Stanford Financial operated under the names Stanford Group Mexico S.A. and Stanford Fondos S.A. de C.V., both of which were ultimately owned by Stanford Financial and operated by David Nanes, who himself remained an officer of Houston, Texas-based SGC until 2009.

17.

Begun initially as an offshore banking operation in the mid-1980s, Stanford Financial grew over the years into a full service financial services group, offering clients private banking and U.S.-based broker dealer services worldwide from its headquarters base in Houston, Texas.  Stanford Financial gave all the appearances of a highly successful outfit, with lavish offices in some of the world's premier cities.  Stanford himself made the Forbes' list of the richest people in the world with a personal fortune estimated at $2.2 billion.

18.

The most important facet underlying the Stanford Financial empire, and the key to its success and sustainability, was the carefully crafted Stanford Financial image. The Stanford Financial image, cultivated over the years, was one of success, prestige, and, most importantly, safety and solidity. The Stanford Financial image was centered around and built upon money – the money Stanford Financial received from its investor clientele. With the money it received from its clients, Stanford Financial was able to project an image of success and solidity. From the marble and mahogany of the Houston headquarters, to the huge bonuses paid to lure and retain top producers, to the $500 lunches for clients in Mexico City, to the helicopters and private jets that flew the Stanford Financial executives (including David Nanes) around, Stanford Financial oozed money, thus lending an air of legitimacy to the Stanford "myth".

19.

Part of the Stanford legend was that Stanford Financial was a continuation of the insurance business begun by Stanford's grandfather, Lodis Stanford, during the Great Depression. Based on that connection, Stanford Financial boasted to the world that it had over 70 years history of growing and protecting people's wealth. Of course, this legend, like most of the Stanford image,[1] was false, as Stanford's father sold the old insurance business in 1983. Yet Stanford continued to foster that image of decades of family tradition and work ethic as late as a 2008 edition of the *Stanford Eagle* magazine.

20.

Charitable giving and sponsorships of sporting events and teams, as well as massive political contributions, constituted additional pillars supporting the Stanford Financial image. As with everything else, Stanford spent lavishly on philanthropic endeavors, giving to hospitals, theaters and

museums, and sponsoring sports teams and celebrities such as the Miami Heat and Vijay Singh, all with the objective, once again, of sustaining the Stanford Financial image. Stanford made a huge splash in the world cricket establishment in particular. Stanford also gave generously to political campaigns and urged his employees to do the same as well, to the tune of millions of dollars.

21.

Stanford Financial obtained the money it needed to perpetuate its image from one primary source: the sale of Certificates of Deposit from the Antiguan offshore bank wholly owned and controlled by Stanford himself – SIB. Clients who were introduced to the Stanford Financial group quickly found out that the main financial product being peddled by the group was the SIB CD. The SIB CDs were sold worldwide by a web of different Stanford Financial promoter companies whose sole function was the sale of the SIB CDs. By 2009, SIB had sold over $7.2 billion in CDs.

**B.      Stanford Financial's Operations in Mexico**

22.

Stanford opened its first company in Mexico, Stanford Group Mexico, S.A. de C.V. ("Stanford Mexico"), in January 1995. Stanford Mexico was a direct subsidiary of SGC in Houston. Stanford Mexico was set up specifically to serve as an unregistered "representative office" of Stanford Financial in Mexico and to sell SIB CDs to Mexican citizens in violation of Mexican law. Under the guidance and control of David Nanes, its President and CEO, Stanford Mexico grew rapidly by "head hunting" financial advisers and their books of client business from other companies. Stanford Mexico eventually opened branch offices in Monterrey and Puebla, Mexico. All of the financial advisers in the Stanford Mexico offices had one primary mission --- to sell SIB CDs for Stanford Financial. Like their counterparts in the United States, Stanford Mexico financial advisers were paid outsized commissions for the sale of the CDs.

---

1       Stanford's claim to be a descendent of the founder of Stanford University, a claim which he disseminated widely, was also false.

23.

David Nanes served as a senior executive and employee of Houston-based Stanford Group Company from 1997 through 2009. During his extensive service with various of the affiliated Stanford Financial entities, including his position as the President of Stanford Mexico, Nanes had knowledge of all of the intricacies of the worldwide operations of Stanford Financial.

24.

Since Houston was the administrative nerve center and principal base for the SIB worldwide sales force, all of the sales practices of Stanford Mexico were managed by Nanes under the overall direction, supervision, and control of the Houston offices of Stanford Financial. All of the sales practices, directives, techniques, strategies and reward programs were developed and crafted in Houston and disseminated down to Mexico to be implemented there by Nanes and his group. All of the sales promotional literature and materials for SIB, including the Spanish-language promotional materials, were created, printed, packaged and mailed from Stanford's Houston headquarters to Stanford Mexico in Mexico City to be utilized by the local Mexican sales force under Nanes' supervision and control. In addition, sales training for the Mexican sales force for SIB was conducted principally in Houston by Stanford Financial personnel (known to the Mexican financial advisers as the "Houston experience") like Oreste Tonarelli, Monica Manzanares and David Charner. In those training sessions, sometimes twice a year, the Mexican financial advisers were trained to sell the Stanford Financial image. The Stanford Financial "script" for why SIB was a safe and secure place to invest money was drilled and drilled again into their heads. The advisers were thereafter subjected to examinations to reinforce the script and sent back to Mexico to aggressively sell the SIB CDs.

25.

Nanes managed all aspects of the operations of Stanford Mexico and reported directly to Allen Stanford.  Under his direction, the financial advisers were charged with "*captacion*", which is a Spanish term for essentially "capturing" investment funds, for Stanford Financial.  The act of "*captacion*" for a foreign, offshore investment company or bank that is not properly registered in Mexico is illegal under Mexican law.  Under Nanes' direction, Stanford Financial did everything in its power to disguise and otherwise hide the illegal nature of Stanford Mexico's operations, including sales of SIB CDs by Stanford Fondos (created in 2005 to cater to the Mexican national market), which was specifically established to lend "cover" and an air of legitimacy to Stanford Mexico's operations and allow the Stanford Financial sales agents in Mexico to continue to sell the SIB CDs under the direction and control of Nanes.

26.

For the first decade of its existence, one of the principal ways that Nanes got investment funds from Plaintiffs and the Class out of Mexico was via private flights on Stanford-owned or chartered airplanes out of the Toluca, Mexico airport.  About once every month, Nanes and his team bundled large amounts (millions of dollars) of checks and cash from new Mexican investors, including checks drawn on U.S. bank accounts, and loaded them in briefcases to fly the money out of the Toluca airport to Houston or Antigua.[2]  This procedure, set up and authorized and implemented by Nanes, violated Mexican law.  In 2005 Stanford Mexico's human resources director, Veronica Spindola, was detained at the Toluca airport carrying some $5 million in checks bound for SIB.  After spending 90 days in detention, she was given an award for excellence in 2006 by Stanford Financial.[3]

27.

---

2 Gabriel Bauducco, *Imperio de Papel*, at 98 (2009).
3 *Id.*, at 115.

The other way Stanford Financial sold CDs in Mexico, also entirely illegal under Mexican law, was through SGC brokers from Houston or Miami. On a regular basis, SGC brokers from Houston and/or Miami traveled to Mexico City and other Mexican cities to solicit and sell SIB CDs and "*captar*" investments funds from Mexican citizens for Stanford Financial. The SGC brokers regularly flew to Mexico City and set themselves up in posh hotels, such as the Hotel Intercontinental in Polanco, and met with their Mexican clients to market and sell the SIB CDs, also in absolute violation of Mexican law. Nanes was intimately aware of this method of sales in Mexico and facilitated it.

28.

As part of the Stanford Financial sales process, Mexican citizens and residents like Plaintiffs were uniformly "sold" the Stanford Financial "image". They were uniformly informed by the Stanford Financial brokers and advisers, whether from Stanford Mexico or from SGC in Houston, that, *inter alia*, investments in the SIB CDs were safe and sound because SIB was part of the Stanford Financial group based in Houston, Texas and therefore subject to regulation by the United States government. Indeed many Mexican investors to this day never understood that they had invested in CDs issued by an Antiguan bank, but always thought their money was invested in Houston, Texas. Mexican investors like Plaintiffs were also told by Stanford Financial sales agents that the CDs issued by SIB were safer even than U.S. bank–issued CDs because Stanford Financial had unique Lloyds of London insurance policies in place that went above and beyond FDIC insurance; and that investments in the CDs were liquid and the CDs could be redeemed at any time because SIB, through Stanford Financial, invested the money in safe, secure and liquid assets.

### C.    Perpetuation of the Stanford Image -- the Root of the Fraud

29.

What attracted the investors from Mexico to Stanford Financial was the expertly crafted perception that Stanford Financial, including SIB, was (1) a United States-based operation and (2) was completely insured to such a level that investments in SIB CDs were safer and more secure than investments in CDs issued by U.S. banks insured by the FDIC.

30.

All of the Stanford Financial advisers from SGC who traveled to Mexico to sell the CDs for SIB, as well as the local Mexican sales agents for Stanford Mexico, were trained to intentionally "blur the lines" that separated SIB from the U.S. operations of Stanford Financial and to sell the image and perception that SIB was part and parcel of the Stanford Financial "group" based in Houston, Texas. And all of the Stanford sales agents, whether from SGC or from Stanford Mexico, were also trained to push and emphasize to Plaintiffs and the Class that their investments in SIB CDs were insured by Lloyd's of London and were therefore safer than deposits in U.S. banks.

31.

These representations were repeated in the promotional materials for Stanford Financial and SIB that were designed and generated in Houston and then handed to SGC advisers headed for sales presentations in Mexico or forwarded to Stanford Mexico for distribution directly to clients in Mexico under the supervision of Nanes. SIB itself never had a sales force or marketing or promotional arm in Antigua. The head of the global sales force for SIB was located in the United States, principally in Houston, Texas. See, e.g., June 12, 1996 letter from Stanford Financial vice president Rossana Roys, attached hereto along with certified English translation as **Exhibit "1"** and made a part hereof for all purposes (describing to a potential Monterrey, Mexico investor that Stanford Financial handles all of the promotional activities for SIB from its "purely American" base in Houston, Texas). Therefore all of the sales, marketing and promotional activities for Stanford

Financial and SIB occurred in Texas.

32.

The sales and promotional materials created in Texas and distributed uniformly in Mexico intentionally blurred the lines between Antigua-based SIB and the other U.S.-based Stanford Financial entities, including SGC, and intentionally created the false impression that SIB and Stanford Financial (SGC ) were one and the same and therefore that SIB enjoyed the same regulation and protections as a U.S.-regulated company. As the U.S. receiver has stated, "Stanford's financial advisors used the apparent legitimacy offered by U.S. regulation of Stanford's U.S. brokerage subsidiary in order to generate sales of SIBL CDs worldwide."[4]

33.

A true and correct sample of one example of the sales and promotional materials used in Mexico, along with certified English translation, is attached hereto as **Exhibit "2"**. This promotional piece distributed in Mexico falsely states that investments in SIB were more secure than investments in FDIC-insured U.S. banks. *Id.* The promotional materials described various "unique" insurance polices from Lloyd's that insured the clients' investments in SIB. *Id.* These and other promotional materials routinely utilized by Stanford Financial and distributed to its client base, including Plaintiffs and the Class, uniformly omitted to disclose the amounts of the coverage afforded by the referenced insurance policies, thereby intentionally creating the impression that the insurance policies provided coverage for all investments in SIB. *Id.*

---

4  "Report of the Receiver Dated April 23, 2009" in the SEC Action [docket #336], at 7.

34.

The promotional materials go on to describe how, in order to qualify for the insurance policies, SIB was audited annually by Lloyds, and was also subjected to annual risk analyses, which "*provides another safety element for the clients.*"  *Id.*

35.

In another Spanish language promotional piece circulated in Mexico, Stanford Financial described how, "*in order to guarantee and provide higher security to its clients*", SIB had a special insurance policy that covered SIB's financial transactions "*in case of loss, fraud or theft*".  A true and correct sample of said promotional piece used in Mexico is attached hereto as **Exhibit "3"**.  It goes on to say that "[*t*]*his policy is extremely hard to acquire and few banks are able to satisfy the requirements to obtain it.*" *Id.*  It then lists Defendant BMB as the "administrator" of the insurance policies for SIB.  *Id.*

36.

The Spanish-language promotional materials also intentionally blurred the lines between SIB and SGC in order to create the impression in the minds of the average investor that SIB was insured by SIPC.  *See* Exhibit "2".  The promotional literature belittles the protections afforded by the FDIC, and then clearly and unambiguously suggests that SIB was guaranteed and insured by the NASD and SIPC, going so far as to state in bold letters that "*Stanford International Bank is probably the only International Bank that offers this type of security to its clients*".  *Id.*

37.

The attached Spanish-language promotional materials, and other similar materials, were created by the Stanford Financial marketing team in Houston, Texas and approved and authorized by David Nanes for distribution in Mexico and for use by Stanford Mexico sales agents in the sale of

SIB sales.

38.

Stanford's sales agents and promotional materials were not enough, however. To complete the fraudulent sales pitch, particularly regarding the safety and soundness of an investment in SIB, Stanford needed "back up". He got it from Stanford Financial's insurance brokers.

**D.      Defendants Willis and BMB's Participation in Stanford's Fraud**

39.

Defendants Willis and BMB became willing participants in the perpetuation of the Stanford fraud. Apparently at the request of Stanford Financial, Willis and BMB over the years (and apparently every year) provided Stanford Financial in Houston with certain "safety and soundness" letters for SIB with the clear intention that they be used for marketing purposes to retain or obtain actual and prospective clients for SIB. See true and correct copies of 1996, 1998, 1999, 2001, 2002 and 2004 letters from BMB, signed by Robert S. Winter, and the 2005, 2006 and 2008 letters from Willis, signed (with the exception of the 2008 letter) by Amy S. Baranoucky, attached as **Exhibit "4"** hereto and made a part hereof for all purposes. In doing so, both Willis and BMB crossed the line from being mere insurance brokers for the Stanford Financial group, to joining the Stanford Financial/SIB sales force, essentially acting as sales agents for the Texas-based investment company. Willis in particular, put its internationally known and respected brand name behind Stanford Financial and SIB, thereby lending recognition and credibility to Stanford Financial and SIB and supporting its sales efforts.

40.

The "safety and soundness" letters are remarkable in that they all use identical language to describe SIB. The letters tout SIB as being, *inter alia*, "*professional*" and comprised of "*first class*

*business people*".  *Id.*  The BMB and Willis letters also proclaim that SIB is insured by various Lloyd's insurance policies, "placed" by Defendants for SIB.  Like the Spanish-language SIB promotional materials described above, the BMB and Willis letters uniformly omit to disclose the amounts of the coverage afforded by the referenced insurance policies, thereby (and when coupled with the SIB promotional materials) intentionally creating the impression that the insurance policies provided coverage for <u>all</u> investments in SIB.

41.

Also similar to the SIB promotional materials attached hereto, the BMB and Willis letters represent that the Lloyd's policies were only issued because SIB had "qualified" for said policies by undergoing (and apparently passing) "***<u>stringent</u> Risk Management Review[s] conducted by an outside audit firm***" (emphasis added).  *Id.*

42.

These letters, which were clearly designed and intended by Defendants to be distributed to Plaintiffs and other actual and prospective investors in Stanford Financial/SIB, contain untruths and omissions of material facts directed at Plaintiffs with the purpose of promoting and selling SIB and its CD products to Plaintiffs.  Defendants Willis and BMB had no reasonable basis to make the statements contained in the letters because they knew or should have known (and were therefore reckless in communicating information to the contrary) that SIB did not undergo "stringent" annual Risk Management reviews, and that any reviews were not conducted by an "outside" audit firm, but rather were conducted by a one man "mom and pop" audit shop in Antigua that was dominated completely by Allen Stanford and Stanford Financial to the extent that it was not "outside" or independent at all.

43.

Moreover, as the insurance brokers for Stanford Financial, Defendants Willis and BMB knew that SIB was part of the Stanford Financial group and was being operated from Houston, Texas, and that the SIB CD products were being marketed and sold by Stanford Financial from by and through Houston, Texas.  All communications between Willis and/or BMB and Stanford Financial or SIB flowed through Houston, Texas, and the letters attached in Exhibit "4" were all routed by Defendants to Stanford Financial personnel in Houston, Texas with full knowledge that the letters were designed to be used by Stanford Financial in Houston Texas to promote and sell SIB CDs to clients in, *inter alia*, Mexico.  Therefore both BMB and Willis were generally aware that they were involved assisting a group that was impermissibly operating as an investment company selling unregistered securities from, by and through Houston, Texas.

44.

In creating and submitting these letters into the stream of commerce, with full knowledge of their intended use, Defendants Willis and BMB actively and materially aided Stanford Financial to perpetrate the massive Ponzi scheme now alleged by the SEC.  Indeed, the letters attached as Exhibit "4" constitute fraud by omission because they intentionally omit material facts, including the scope of coverage of the referenced insurance policies, and the fact that Defendants had "no idea" one way or the other when, or even whether, the alleged "Risk Management reviews" were conducted, or whether they were "stringent" by any definition.  Moreover, to the extent that the letters refer to an "outside audit firm" performing the reviews, the letters omit to mention that the reviews were conducted by a one man "mom and pop" accounting firm in Antigua that had strong and long lasting personal connections to Allen Stanford himself such that the supposedly "independent" audit firm was in reality completely dominated by Stanford and Stanford Financial.

45.

Even worse, the letters issued by BMB completely fail to mention that the signatory thereto, Robert S. Winter, was in fact **a member of the Board of Directors of SIB**. Instead the BMB letters give the distinct impression that BMB is a wholly unrelated company providing an unbiased outside "opinion" about SIB.

46.

Certainly, BMB and Willis, in distributing these letters to Stanford Financial with the clear understanding that they would be redistributed to clients, engaged in severely reckless and misleading conduct designed with one goal in mind --- to advance the business goals of their client Stanford Financial. BMB and Willis also consistently, year after year, allowed their names to be mentioned prominently in SIB's Annual Reports, alongside Allen Stanford and Jim Davis and the rest of the SIB Board of Directors and the Management of SIB, therefore lending more legitimacy to the overall operations of Stanford Financial and SIB.

47.

David Nanes participated directly in the approval for use in Mexico of the language included in the Stanford Financial promotional materials described herein, and also authorized the use of said promotional materials in Mexico. Nanes also personally delivered or caused to be delivered to Plaintiffs Troice, Diaz and Punga the Willis and/or BMB letters attached hereto. Nanes knew at all times that the information contained in the letters was misleading and omitted material facts but Nanes caused the letters to be distributed to Plaintiffs, and to the Class in Mexico generally, in order to perpetuate the Stanford Financial fraud and mislead investors into believing that all of the investments in SIB were insured.

### E.    The Stanford Reality

48.

The reality of the Stanford Financial empire was that it was nothing but a massive, worldwide Ponzi scheme.  The Stanford Financial companies operated together as a single business joint enterprise dedicated to the fraudulent sale of SIB CDs, which sales were the lifeblood of the entire enterprise.  The master manipulator and salesman, Stanford reached new heights in terms of creating and perpetrating the ultimate "confidence" scam on a global level.

49.

Allen Stanford's personal history, by itself, was cause enough to question the veracity of the image he created for the Stanford Financial empire.  His first business, a chain of Waco, Texas-based gyms called "Total Fitness", collapsed into bankruptcy in 1982.  Allen Stanford declared personal bankruptcy as well in 1984 and was discharged from $13.6 million in obligations.[5]  Stanford fled to the Cayman Islands where he became a scuba diving instructor.  It was there that he met Dutch ex pat Frans Vingerhoedt, who introduced him to the world of offshore banking.

50.

By 1985 Stanford opened his first bank, Guardian International Bank ("Guardian"), on the tiny (12,000 residents) Caribbean island of Montserrat, which at that time was known mostly for its extremely lax banking regulations.  Virtually all of the banks that were opened in Montserrat in the 1980s were "paper" banks dedicated to fraud.  In fact David Marchant, the editor of "Offshore Alert", was quoted as stating that "the only reason you opened a bank in Montserrat was to commit fraud."[6]

---

5       *BusinessWeek*, March 5, 2009, "Stanford's Rocky Start."
6       As quoted in Bryan Burroughs, "*Pirate of the Caribbean*", Vanity Fair, at 81 July 2009.

51.

It was at that time, in the late 1980s, that Stanford began the charade linking his new offshore banking business to the insurance business his grandfather had run in Mexia in the 1930s, creating the illusion for investors that the Stanford Financial companies had been in the finance business for decades, instead of just a couple of years. By 2008 even most Stanford Financial employees believed the myth that Stanford Financial had been in business for over 70 years.

52.

Guardian served as the starting point roadmap for the eventual creation of the Stanford Financial empire. Stanford established representative offices for Guardian in Miami and Houston, under the name of Guardian International Investment Services, designed to cater to wealthy Latin American clients.[7]  Stanford brought in his old college roommate James Davis to help run operations. Guardian offered CDs with rates typically 2-3% above the average rates available in the market, all with the confidentiality associated with offshore private banking.

53.

By 1989 the banking system in Montserrat came under investigation by British and U.S. authorities. Guardian came under scrutiny for possible drug money laundering, and so Stanford began looking for other locations for his bank. In December 1990 Stanford incorporated Guardian in Antigua. By May 1991 Stanford's banking charter was revoked by Montserrat. So Stanford moved his banking operations to Antigua, and simply continued the same basic business plan that had proven so profitable for Stanford in Montserrat. Stanford eventually changed the name of the bank from Guardian to Stanford International Bank ("SIB") in 1994.

54.

Once established in Antigua, Stanford quickly set about establishing a symbiotic relationship

with the local government.  In return for political cover, Stanford eventually became a major source of funding for the entire island, loaning hundreds of millions of dollars to the Antiguan government over the years.  Stanford even bought the Antiguan newspaper, the Antiguan Sun.  By 2004, the island government owed Stanford Financial over $87 million – nearly half of its annual tax revenues. In that same year, SIB had grown to over $3 billion in deposits.

55.

So tight was the relationship between Stanford and the Antiguan government that, when Stanford Financial was accused of money laundering in 1999, the Antiguan government turned to Stanford himself to rewrite the country's banking laws.  Stanford and his agents were then named to the commission, the Antiguan Financial Services Regulatory Commission ("FSRC"), created and charged with supervising Antigua's banks.  Stanford then used the new commission to wrest control of Antigua's offshore banking industry from the Government.  As a result, the U.S. State Department issued an advisory to U.S. banks to scrutinize all financial transactions coming in or out of Antigua for evidence of money laundering.[8]

56.

Jonathan Winer, then-head of the State Department's Bureau for International Narcotics and Law Enforcement Affairs, said at the time that Antigua is "one of the most attractive financial centers in the Caribbean for money launderers", and that "Antigua has long been one of the worst regulated offshore centers in the world."[9]  Winer was recently quoted as saying that when he asked an Antiguan banking official in the late 1990s why anyone would choose that country for banking as opposed to New York, London, Tokyo or Paris:  "he scratched his head and after a while he said 'I

---

7       *BusinessWeek*, Feb. 24, 2009, "Did Court Ruling Prolong Stanford Probe?"
8        *Houston Chronicle*, July 16, 2000, Banker drawing scrutiny / Houstonian's Antigua empire raises questions
9       Statement to the US Congressional House Committee on Banking Financial Services, Jonathon Winer, US State Department, June 11, 1998.

guess would have to be the secrecy…I'd say it's the secrecy plus the lack of standards or real controls."[10]

57.

Antigua's well deserved reputation for corruption and lax banking regulations is borne out by the recent criminal indictment of Leroy King ("King"), Stanford's good friend and the former head of Antigua's FSRC, as well as the allegations contained in the SEC's Second Amended Complaint in the SEC Action, the allegations of which are incorporated herein by reference.  The criminal indictment alleges that for years King, while acting as the CEO of the Antiguan FSRC, accepted bribes from Stanford and/or his associates in return for ensuring that the FSRC "looked the other way" and did not properly perform its regulatory functions or supervise SIB.  Indeed after the Stanford scandal broke, King was widely quoted in the press as describing the FSRC's previous regulatory attitude toward SIB as a "Friday afternoon cocktail".  As alleged by the Justice Department and the SEC, King even stooped to serving as Stanford's "inside man" in terms of relaying information to Stanford concerning the SEC's investigations of Stanford Financial and SIB from 2005 all the way until 2009.

58.

Stanford Financial began to grow exponentially beginning in 2000.  In 2001, Stanford filed for an SEC Regulation D exemption to allow Stanford Financial to sell SIB CDs to U.S. residents through SGC brokers in the United States. Stanford thereafter began the practice of "head hunting" for U.S. brokers and financial advisers, paying enormous signing bonuses to financial advisers to leave their jobs at other firms and transfer their book of clients over to Stanford Financial.  Once at Stanford Financial, these same financial advisers were then pressured into promoting and selling SIB CDs to their clients, and were rewarded with outsized bonuses or fired, sued to recover the bonuses

---

10       "Stanford arrives for his Houston hearing", By MARY FLOOD and TOM FOWLER HOUSTON CHRONICLE, June 24, 2009.

and blackballed in the industry if they refused to cooperate and sell the CDs. Fueled by this influx of veteran brokers and investment advisers, Stanford Financial grew from 6 branch offices in the United States to more than 25 between 2004 and 2007.

59.

From 2000 to 2008 Stanford Financial grew into a high-powered sales and marketing juggernaut. The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars". In order to market and sell the SIB CDs, Stanford established a commission structure that provided huge incentives for the Stanford Financial brokers and financial advisers, including those in Mexico, to "push" the SIB CDs on investors like Plaintiffs. SIB paid disproportionately large commissions to its Stanford Financial brokers and advisers for the sale of CDs; they received a 1 % commission upon the sale of the CDs, and were eligible to receive as much as a 1 % trailing commission throughout the term of the CD. Stanford Financial used this generous commission structure to recruit established financial advisers to the firm, and to reward those advisers for aggressively selling the CDs to investors.

60.

Beginning in 2003 Stanford's strategic plan to lure top financial advisers away from their employers to work for Stanford Financial began to back-fire as several U.S. advisers renounced their new position with Stanford and lodged complaints with FINRA f/k/a the NASD, including charges that Stanford Financial was running a massive Ponzi scheme. Some of the advisers were fired for refusing to promote and sell the SIB CDs to their clients. Between 2003 and 2006 over a dozen Stanford Financial advisers and employees, including Leyla Basagoitia in 2003 and Lawrence J. DeMaria in 2006, were discharged or resigned amid allegations of fraudulent practices at Stanford

Financial.

61.

The ultimate reality of Stanford Financial is that it was, at all times, illegally operating an investment company hedge fund or mutual fund from, by and through Houston, Texas in the guise of operating an offshore bank in Antigua. In essence, SIB, acting through the Stanford Financial international network of brokers and advisers, lured ("*captaba*") money from investors like Plaintiffs; gave them an "IOU" piece of paper called a "Certificate of Deposit" in return; and then pooled all of the investors' money together to make investments in various illiquid and high risk assets worldwide – the very definition of an investment company. As such, in reality Stanford Financial was selling "shares" in an unregistered investment company to Plaintiffs and others from, by and through Houston, Texas. As a result of that reality, the SEC has alleged that SIB and SGC violated the §7(d) of the Investment Company Act. SIB was never registered or authorized to operate as an investment company in the United States, a fact that was never disclosed to Plaintiffs or the Class in Mexico, who were consistently and uniformly told verbally and via the Stanford Financial promotional materials that SIB was part and parcel of the Stanford Financial group based in Houston, Texas, authorized and regulated by the SEC and FINRA and backed by SIPC and Lloyd's of London insurance coverage.

62.

Besides the fraud committed on Plaintiffs and the Class based on the marketing of Stanford Financial and SIB as being one and the same and completely insured, Stanford Financial also touted the high liquidity of SIB's investment portfolio. For example, in its marketing materials, Stanford Financial emphasized the importance of the liquidity of the SIB CD, stating, under the heading "Depositor Security," that the bank focuses on "maintaining the highest degree of liquidity as a

protective factor for our depositors" and that the bank's assets are "invested in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks." Likewise, Stanford Financial trained its advisers to stress liquidity in their marketing pitches to prospective investors, telling the brokers and advisers that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients…"  To ensure that depositors could redeem their CDs, Stanford, through its brokers and advisers, assured the investor clients that SIB's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice.  But in fact, nearly 80% of SIB's investments were concentrated in high-risk, illiquid categories: (1) unsecured loans to Allen Stanford in the amount of $1.6 billion; (2) private equity and (3) real estate.

63.

Contrary to Stanford Financial's representations (both verbal and via the promotional materials) to Plaintiffs and the Class regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the bank's portfolio were misappropriated by SIB's sole shareholder, Allen Stanford, and used by him to acquire private equity and real estate.  In fact, at year-end 2008, the largest segments of the bank's portfolio were: (i) undocumented "loans" to Mr. Stanford; (ii) private equity; and (iii) over-valued real estate.  By February 2009, Mr. Stanford had misappropriated at least $1.6 billion of investor money through bogus personal loans and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled solely by himself, including massive investments in real estate and other private business ventures in Antigua.  The rest of the money from investors was just blown by Stanford on creating and perpetuating the image charade with

lavish offices, outsized bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and employees, and the other accoutrements necessary to shore up the Stanford Financial image of wealth, power and prestige.

64.

As alleged in the SEC Second Amended Complaint and in the criminal Indictment of Allen Stanford and the others, Stanford and his CFO Jim Davis "fabricated the performance of the bank's investment portfolio and lied to investors about the nature and performance of the portfolio. Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the financial statements. Using a pre-determined return on investment number, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn. Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank investments. SIB's financial statements and annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and Kuhrt. Stanford and Davis signed these falsified financial statements."[11]

65.

At the end of the day, the entire Stanford Financial empire was dominated completely by one man—Allen Stanford. Although SIB purported to have an independent board of directors, an investment committee, a chief investment officer and teams of global portfolio advisers and analysts, in truth and in fact the vast majority of the bank's assets were managed exclusively by Mr. Stanford and his right hand man and former college roommate Jim Davis.

66.

In running the Stanford Financial empire from the United States, Stanford and Davis

surrounded themselves with a close-knit circle of family, friends and confidants.  The SIB Board of Directors included Stanford's 81 year old father and his 85 year old friend, O.Y. Goswick, a former rancher who was listed in Stanford Financial's annual reports as being somehow in charge of SIB's "investments", but who in reality, according to his own son, did not have sufficient financial knowledge to understand SIB's operations and had suffered a stroke in 2000 that left his ability to communicate "nonexistent".[12]

67.

Moreover nepotism predominated within Stanford Financial, where the upper level management team was comprised of a tightly linked web of friends and family of Stanford and Davis.  Just as Stanford brought in his old friend Davis, Davis in turn brought in his protégé, the young Laura Pendergest-Holt, whom Davis had met at the Mississippi Baptist church where Davis was a Sunday school teacher.  In turn, Perndergest-Holt's cousin Heather Sheppard was an "equity specialist" at Stanford Financial, while her sister's husband, Ken Weeden, was Stanford Financial's managing director for investments and research. Jim Davis' brother in law, Danny Bogar, served as SGC's President and ran Stanford Financial's operations for the entire United States.  Davis' son Zack also worked for Stanford Financial as an "equity specialist".

68.

Pendergest-Holt's resume, in particular, was an instant red flag.  As the Chief Investment Officer allegedly in charge of investments for SIB and overseeing an $8 billion portfolio, she had no real business or finance education or training.  Lawrence Lieberman, senior managing director at Orion Group, an executive recruiter firm for the money management industry, was quoted as saying that Pendergest-Holt was hired for the position as Chief Investment Officer probably because

---

11      SEC Second Amended Complaint, at ¶4.
12      Jamie Stengle, "*Dad, 81, to Stanford:  'Do the Right Thing'*", Associated Press, February 20, 2009.

Stanford and Davis "needed someone they could trust and not someone who could pick stocks".[13] Davis recruited Pendergest-Holt to work at Stanford Financial in 1997 when she was a recent 22 year old college graduate from Mississippi State, where she earned a degree in Math. She quickly worked her way up the ranks from research analyst to managing director of research and investments until she became Chief Investment Officer when she was 30 years old, all with no degree or background in finance whatsoever. According to Lieberman, Stanford "may not have wanted a legitimate CIO because that person might have asked a lot more questions and not played ball".[14]

69.

The same is true of the lead accountants for Stanford Financial, both of whom were recently indicted as well. As alleged in the Indictment and the SEC's Second Amended Complaint, Gilberto Lopez was the Chief Accounting Officer for Stanford Financial, and yet he was not a licensed CPA. Mark Kuhrt, also indicted, served as the Global Controller for Stanford Financial, and yet was not a licensed CPA either. These two non-CPAs were in charge of accounting for a global financial services company with (allegedly) $50 billion "under advisement".

70.

By year-end 2008, Stanford Financial had sold approximately $7.2 billion worth of SIB CDs by touting: (i) the bank's safety and security; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States. It was at the end of 2008, in the midst of the worldwide financial meltdown, that Stanford Financial began to stumble.

71.

---

[13]     Ana Driver and Svea Herbst-Bayliss, "*Stanford's CIO's Fast Path to Top a Red Flag*", Reuters, March 8, 2009.
[14]     Id.

As alleged by the SEC and the United States Justice Department, in order to cover up a hole in SIB's balance sheet that would cause it to fall below minimum capital requirements, in 2008 Stanford and Davis concocted a bogus $541 million shareholder equity infusion by manufacturing a series of fraudulent "roundtrip" real estate deals whereby Stanford took a piece of property he purchased for $63 million and transferred it to some entities who "booked" it at $3.2 billion and then transferred shares in those entities back to SIB.  In Mexico, Nanes went even further with the fraud by telling the Stanford Mexico sales force that Stanford had made this capital infusion because Stanford Financial was preparing to receive large sums of money from certain foreign governments and central banks and therefore needed more shareholder equity to support this massive increase in deposit funds.[15]   Of course, this was just a lie.

72.

In October 2008, Venezuelan financial analyst Alex Dalmady performed a rudimentary review of SIB's returns over the years as a favor for a friend.  In December 2008 Stanford Financial's clearing firm, Pershing, informed Stanford Financial that it would no longer process wire transfers from SGC to SIB for the purchase of CDS.  Stanford Financial began suffering liquidity problems that prevented SIB from complying with client requests for transfers of funds.  This had a huge impact on the ability of the financial advisers at Stanford Mexico to keep clients pacified.

73.

In January 2009, in the wake of the Madoff scandal, Dalmady published his findings in a Venezuelan magazine under the title "Duck Tales", which was then re-published in various blog postings.  Dalmady concluded that Stanford Financial was nothing but another Ponzi scheme – a Ponzi "duck".  The cat was out of the bag.  As the pressure mounted in Mexico, Nanes continued to lie to his own employees at Stanford Mexico about what was going on at Stanford Financial, telling

---

15    Bauducco, *Imperio de Papel*, at 136-142.

them that the reason for the liquidity crisis was because Stanford had made the decision to refund $1 billion to all of the U.S. investors in SIB CDs.[16]

74.

The U.S. federal authorities then issued subpoenas to Stanford Financial.  In advance of a deposition before the SEC, Stanford Financial officials met with outside counsel in Miami on February 4, 2009.  Two days later, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt sent Allen Stanford an e-mail, copying David Nanes as well, that reads in part, that "*things are starting to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a strategy to give preference to certain wires to people of influence in certain countries, if not we will see a run on the bank next week …[w]e all know what that means.  There are real bullets out there with my name on, David's name and many others and they are very real…[w]e are all in this together.*"    See true and correct copy of e-mail dated February 6, 2009 from Frans Vingerhoedt to Allen Stanford and David Nanes, attached hereto as **Exhibit "5"** (originally attached as Exhibit "A" to the Receiver's Appendix to Response to Examiner's Report and Recommendation No. 1 in the SEC Action [docket 442]).

75.

On February 17, 2009 the United States Securities and Exchange Commission ("SEC") filed a Complaint against SGC and SIB, as well as against Mr. Stanford and Mr. Davis, in the U.S. District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering proportions". The SEC obtained an injunction and froze the assets of the Stanford Financial group and appointed a receiver, Ralph Janvey to liquidate the companies.  On that very same day, Nanes fled Mexico.

76.

The SEC, through its Second Amended Complaint, has now alleged a fraud of shocking magnitude.  The SEC alleges that Stanford, together with his co-conspirators, engineered and carried out

---

16      *Id.*

a decades-long scheme to convert Plaintiffs' and the Class' investments in Stanford Financial and SIB into his own personal "piggy bank" to fund his extravagant lifestyle, including paying for his private harem of women and their children; a fleet of jets; yachts; and mansions in several different countries. On June 18, 2009 Stanford, Pendergest-Holt, Lopez, Kuhrt and King were indicted on 21 counts including wire and mail fraud, obstruction of an SEC investigation and money laundering.

### VII.  PLAINTIFFS' INVESTMENTS

77.

All Plaintiffs invested in the Stanford Financial charade by purchasing CDs issued by SIB. Over the years that Plaintiffs purchased and maintained investments in SIB CDs, Plaintiffs were repeatedly and uniformly told, either directly by Stanford Financial representatives or via Stanford Financial promotional materials, that, *inter alia*:  (1) an investment in SIB CDs was safer than investing in U.S. banks because SIB did not make loans but instead invested in safe and highly liquid instruments; (2) SIB and Stanford Financial were U.S.-based businesses regulated by the U.S. Government; and (3) that an investment in SIB CDs was completely safe and secure because it was guaranteed and insured by Lloyd's.

78.

During the time that Plaintiffs purchased and maintained investments in SIB CDs, Stanford Financial sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*:  (1) SIB was not regulated by the U.S. Government;  (2) Plaintiffs' investments in SIB CDs were not insured; (3) SIB was operating illegally as an unregistered investment company soliciting and selling unregistered securities by, from and through Houston, Texas and (4) that SIB was not invested in safe secure and liquid instruments.

79.

Based on the representations and omissions of material fact made to Plaintiffs repeatedly and uniformly over the years, both in person by Stanford Financial sales representatives and via Stanford Financial promotional materials, Plaintiffs decided to invest money in, and maintain investments in, the SIB CDs.

80.

**Samuel Troice**

Plaintiff Samuel Troice first invested in SIB CDs through Stanford Mexico in 1997. Troice dealt directly with David Nanes. Nanes always promoted the SIB CDs to Troice and to Troice the CDs appeared to be the only investment product offered by Stanford Financial. In making the initial decision to invest with Stanford Financial, Troice received information from Nanes regarding Stanford Financial's operations as a whole, and also was informed by Nanes that investments in SIB were insured. Troice relied on those statements in making the decision to invest in the CDs and in deciding to maintain his investments in SIB CDs over the years.

81.

On many occasions over the years he maintained investments in the SIB CDs, Troice asked Nanes if the CDs were guaranteed by the FDIC, and Nanes explained that the CDs were not FDIC insured but did carry other types of insurance, including insurance covering fraud. On at least four (4) separate occasions when Troice met with Nanes to renew or buy new CDs and the discussions turned to insurance, Nanes picked up the telephone and called someone at Stanford Mexico to deliver to Troice the insurance "safety and soundness" letters from Defendants BMB and Willis, attached as Exhibit "4". Troice received said letters from Defendants BMB and Willis and relied on said letters as "peace of mind" regarding the stability and solidity of his investments in SIB.

82.

Over the years Troice maintained an excellent relationship with Nanes, considered him a friend, and saw him regularly.  In 2008, with the world financial markets in disarray, Troice asked Nanes about the strength of SIB and Nanes responded that SIB was in excellent condition and that because the bank was not a regular commercial bank it was able to continue to pay higher interest rates.  Troice even had a 9:00 am meeting with Nanes on February 17, 2009, the very day the SEC intervened into Stanford Financial.  When the talk again turned to SIB, Nanes reassured Troice that everything was well with the bank and that the bank was solid.  Of course, Nanes knew full well on that day and before that the bank was facing massive liquidity issues and had ceased making transfers of funds to clients and was under SEC investigation.  Nanes fled Mexico later that day.

83.

**Martha Diaz**

Plaintiff Diaz and her husband Homero invested in Stanford Financial via Stanford Mexico since approximately 1996 and had direct dealings with Nanes every year regarding their investments in Stanford Financial.  During those annual or semi-annual meetings with Nanes from 1996 through 2009, Nanes always convinced Diaz and her husband to invest and reinvest in the SIB CDs by touting the bank's safety and solidity and the fact that the investments were insured.  In making their decisions to invest in Stanford Financial every year from 1996 to 2009, Diaz and her husband were provided with copies of the BMB and Willis "safety and soundness" letters by Nanes.  Nanes himself delivered, or caused to be delivered, to Plaintiff Diaz and her husband the BMB or Willis letters every year from 1998 through 2008.

84.

In August 2008, Plaintiff Diaz and her son met with David Nanes because her Fixed CD  was about to come due on August 25, 2008.  Nanes convinced Diaz to exchange her Fixed CD for a Flex CD, and then switched it to Fixed CD 15 days later (September 9, 2008).  At that time, Diaz asked

Nanes whether she should diversify her investment to make sure it was protected and insured, and Nanes told her there was no reason to do so because SIB was very strong and insured. Diaz then asked what jurisdiction would apply to the SIB CDs in case of any problems, and Nanes responded that the United States because the corporate headquarters of Stanford Financial was based in Houston.

85.

**Paula Gilly Flores**

Plaintiff Paula Gilly Flores("Gilly") invested her inheritance from her grandmother with Stanford Financial. On or about September 2007 SGC broker Miguel Valdez, who previously had been employed by Chase Bank in Houston where he had handled Gilly's grandmother's accounts for ten years, traveled to Puebla Mexico from Houston, Texas to meet Gilly and her mother. Valdez explained that he had joined SGC and set about trying to convince Gilly and her mother to transfer their investments in Chase, which were set to expire in October 2007, over to Stanford Financial. Valdez knew at all times that Gilly and her mother did not want to be invested in any risky instruments or in the stock market and only wanted to be invested in safe and secure, fixed income investments.

86.

Even though Stanford Mexico had an office in Puebla, Valdez did not want to meet with Gilly and her mother at the Stanford Mexico offices; indeed he told Gilly that Stanford Mexico sold different products than SGC. Rather Valdez insisted that they meet at the Hotel Villa Florida en Puebla. At that meeting, in mid September 2007, Valdez provided Gilly and her mother with the Spanish language promotional materials for Stanford Financial and SIB similar to the ones attached hereto and represented to Gilly and her mother that (1) an investment in SIB CDs was safer than investing in U.S. banks because SIB did not make loans but instead invested in safe and highly liquid instruments; (2) SIB and

Stanford Financial were U.S.-based businesses regulated by the U.S. Government; and (3) that an investment in SIB CDs was completely safe and secure because it was guaranteed and insured by Lloyd's. During this sales presentation in Mexico, Valdez omitted to inform Gilly that (1) SIB was not regulated by the U.S. Government; (2) her investments in SIB CDs were not insured; (3) SIB was operating illegally as an unregistered investment company selling unregistered securities from Houston, Texas and (4) that SIB was not invested in safe secure and liquid instruments.

87.

Based on the representations made to Gilly and her mother by Valdez and via the promotional materials, she and her mother decided to invest the totality of the inheritance from her grandmother in SIB CDs. On or about October 9, 2007, when the Chase investment matured, Gilly and her mother invested all of it in SIB CDs.

88.

**Punga Punga Financial, Ltd.**

Plaintiff Punga is a Panamanian corporation whose principal place of business is in Mexico wholly owned by Mexican citizens from Mexico City. In 1998, the principal of Punga was introduced to David Nanes by a friend. Nanes solicited Punga's principal as a client for Stanford Financial but he initially refused. Thereafter, and because Punga's business was located right next to Stanford Mexico's offices in Mexico City, Punga's principal saw Nanes almost daily. In 1999 Nanes finally convinced Punga's principal to invest in SIB CDs.

89.

Punga thereafter received the BMB and/or Willis letters every single year that it maintained investments with Stanford Financial, and continued to invest in SIB CDs per the advice of Nanes and maintained the relationship over the years with Stanford Financial through Nanes or his

assistants.  Every two or three months over the next eight or nine years and until the SEC's intervention into Stanford, the principal of Punga met with Nanes to discuss Punga's investments in Stanford.  Every single time that they met, Nanes represented to Punga's principals that Stanford Financial and SIB were solid and were growing rapidly.  And the only product that Nanes ever tried to sell to Punga were the SIB CDs.  Nanes promoted the SIB CDs aggressively as being fully insured.

90.

Nanes took advantage of the recurring economic problems and currency devaluations in Mexico to promote and sell Stanford Financial in Mexico – Nanes even admitted to Punga's principal that in times of economic crisis in Mexico was when he "captured" the most money for Stanford Financial.  Nanes's main argument for convincing Punga to invest with Stanford Financial was that SIB was completely insured against fraud.  As part of that sales pitch, at the initiation of Punga's investments in SIB CDs, and every year thereafter, Nanes sent the "safety and soundness" letters from Defendants BMB and Willis attached hereto as Exhibit "4" to Punga's principals.  These letters gave a great level of comfort to Punga's principal and caused Punga to greatly increase its investments with Stanford Financial over the years.

91.

Over the years Punga's principal came to trust Nanes and they developed a friendship.  On one occasion, Nanes invited Punga's principal to Miami on a private Stanford Financial jet.  On that trip Punga's principal noticed that Nanes had changed a lot as a person from the time that they had first met;  Nanes appeared to live in another "surreal" world of money and power.  But based on the trust and confidence that had grown between the principals of Punga and Nanes, and based on Nanes' representations and the letters from Defendants, Punga increased the amount of money it had

invested in Stanford Financial.  Every time one of the SIB CDs matured, Nanes met with Punga's

principals to convince them to reinvest in more SIB CDs.

92.

In September 2008, as the world financial crisis grew, Punga's principal met with Nanes on

several occasions to discuss Stanford Financial and Nanes assured Punga's principal that Stanford

Financial and SIB was "stronger than ever".  Punga's CDs matured in January 2009, and Punga's

principal decided not to reinvest in Stanford Financial.  Nevertheless, Nanes called and urged

Punga's principal to reinvest in the CDs, even offering Punga a "preferential" interest rate.  Nanes

mentioned that Stanford Financial was under a vicious attack from a crazy Venezuelan who was

defaming Stanford Financial, but that the group was stronger than ever, and, at any rate Stanford

Financial carried the insurance policies which were still in force and which protected against fraud.

Punga's principal finally succumbed to Nanes' entreaties and reinvested the CD proceeds a week

before the SEC intervention.  Even when they met on February 15, 2009, two days before the

intervention, Nanes assured Punga's principal that SIB was doing well and had not been affected by

the financial turmoil affecting the rest of the world.

## VIII.  PLAINTIFF CLASS

93.

Plaintiffs are all citizens and residents of Mexico who, in many cases, invested their life

savings and retirement funds with Stanford Financial (through SIB) because they considered

Stanford Financial a safe investment company because it was allegedly "based" in the United States

and therefore subject to U.S. laws and regulations.  In reliance on Stanford Financial's fraudulently

crafted "image" as a Texas-based financial services group, and in further reliance on the illusion of

safety and security via Lloyd's insurance coverage fostered by Stanford Financial with the Defendants' material assistance, Plaintiffs transferred hundreds of millions of dollars to Stanford for investment in SIB CDs.

94.

Throughout this time period, and up until the SEC intervention into Stanford Financial in February 2009, Plaintiffs continued to receive monthly account statements from Stanford showing that their money had been invested in the SIB CDs and were in fact profitable. Throughout this time period, and up until the SEC intervention in February 2009, Plaintiffs continued to receive, or were shown, the fraudulent letters from Defendants Willis and BMB attesting to SIB's security, solvency and solidity. At no time were Plaintiffs ever advised that Stanford Financial had invested their money in risky, "illiquid" ventures similar to a hedge fund, or that SIB had no real insurance that would protect Plaintiffs' investments. Instead Plaintiffs were led to believe by Stanford Financial and Defendants that an investment in SIB was safer than any other investment in the market because it was underwritten by Lloyd's of London based on "stringent" annual risk management audits conducted by outside audit firms. Now Plaintiffs stand to lose all of their investments.

## IX. CLASS ALLEGATIONS

95.

Plaintiffs request this case be certified as a class action pursuant to FRCP 23. Over 3,000 Mexican investors have money invested with Stanford Financial through SIB. The number of affected investors are so numerous that joinder of all members is impracticable. There are common questions of law and fact that are common to the class and these common questions predominate over individual issues. The Named Plaintiffs' claims are typical of the class claims. The Named

Plaintiffs have no interest adverse to the interests of other members of the Class. The Named Plaintiffs will fairly and adequately protect the class' interests. The Named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international litigation.

96.

Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses:

    i.    All Mexican citizens and legal residents, or entities owned or controlled by Mexican citizens or legal residents, that held investment accounts with SIB as of February, 2009 and whose claims have been recognized and authorized by the Receiver; and

    ii.    Such other classes or sub-classes as the Court may determine.

    Excluded from the class are:

    a.    Defendants, and their employees and agents; and

    b.    Any officer, director, employee, or promoter of Stanford Financial, including SIB and Stanford Mexico, as those entities have been defined herein

97.

The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy. Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be

assisted by a class action mechanism.

## X.    STATUTE OF LIMITATIONS DEFENSES

### Discovery Rule/Inquiry Notice

98.

The SEC filed an action against Allen Stanford and SIB *et al.* on February 17, 2009, and on that same day the Receiver was appointed.   Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial, SIB or Defendants until then.   Moreover, the wrongful acts and conspiracy by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Defendants' role in Stanford's fraud until now.

## XI.  CLASS CAUSES OF ACTION

### (THE FOLLOWING CAUSES OF ACTION ARE PLEAD ON BEHALF OF ALL PLAINTIFFS INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED)

#### A.  PRIMARY VIOLATIONS OF THE TEXAS SECURITIES ACT

##### 1.  SALES OF SECURITIES THROUGH UNTRUTHS OR OMISSIONS

99.

Section 33(A) of the Texas Securities Act provides civil liability for persons who sell securities by means of untrue statements or omissions.  As alleged by the SEC, the SIB CDs qualify as "Securities" under the relevant securities law jurisprudence Defendants qualify as "sellers" under the Act because they acted as the agents of Stanford Financial and SIB in the chain of the selling process by communicating misleading information about SIB to the general public in Mexico with the goal of selling SIB CDs, and but for Defendants' participation, Stanford Financial could not have sold the SIB CDs to Plaintiffs.

100.

Defendants sold the SIB securities to Plaintiffs using untruths or omissions. In particular, Defendants, acting as the agents of Stanford Financial and SIB, created and sent into the stream of commerce the letters described herein which informed the general public that, *inter alia*, SIB was "*professional*" and comprised of "*first class business people*"; and that the Lloyd's insurance policies procured by Defendants for SIB were only issued because SIB had undergone "*stringent Risk Management Review[s] conducted by an outside audit firm*". These letters, which were clearly designed and intended by Defendants to be distributed to Plaintiffs as potential investors in SIB, contain untruths and omissions of material facts directed at Plaintiffs with the purpose of promoting and selling SIB and its CDs to Plaintiffs. Defendants had no reasonable basis to make these statements because they knew or should have known (and were therefore reckless in communicating information to the contrary) that SIB did not undergo "stringent" annual Risk Management reviews, and that any reviews were not conducted by an outside audit firm, but rather were conducted by a one man audit shop in Antigua that was dominated completely by Stanford and SIB to the extent that it was not "outside" at all. At the very least, in creating and submitting these letters into the stream of commerce to be directed at Plaintiffs, Defendants omitted material facts, including the fact that Defendants had no idea one way or another whether the Risk Management reviews were stringent or not, and that said reviews were conducted by a one man "mom and pop" accounting firm in Antigua dominated by Stanford and SIB.[17]

101.

Furthermore, primary liability for violations of the Texas Securities Act attaches to Defendants based on a duty to disclose that arose when said Defendants chose to speak to the public

---

[17]    An omitted fact is material if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor, in that it would have been viewed by the reasonable investor as significantly altering the total mix of available information used in

regarding Stanford Financial and SIB.  In choosing to accept Stanford Financial's and SIB's request to act as their agents in making and circulating in Mexico the representations concerning SIB contained in the letters described herein, Defendants assumed a duty to disclose all of the information they knew about Stanford Financial and SIB and not to make partial disclosures that might, and did, convey a false impression about SIB.  A Defendant may not deal in "half-truths" and Willis and BMB had more access to information regarding Stanford and SIB than Plaintiffs did, and clearly had an incentive to market and sell SIB to Plaintiffs so that SIB, and hence Stanford Financial, could continue in business and continue contracting Defendants' services.  Moreover, Defendants were clearly on notice that the investing public in Mexico, where these letters were circulated, would and did rely on Defendants' statements in making their investment decisions concerning buying the CDs offered by Stanford Financial and SIB; indeed the very purpose of the letters was to influence the investors' decision-making process in terms of SIB.

102.

As a result of Defendants' conduct, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last SIB account statement and the amount Plaintiffs may receive from the receivership distribution.

### B.  AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT

#### 1.  SALES OF UNREGISTERED SECURITIES

103.

Defendants are liable as "aiders" for sales of unregistered securities to Plaintiffs.  In particular, by their actions described herein, Defendants materially aided Stanford Financial and SIB

---

deciding whether to invest.  See, e.g., *Bridwell v. State*, ___ S.W.3d ____, 2008 WL 467271 (Tex.App.-Dallas 2008).

to sell unregistered securities to Plaintiffs from, by and through Texas.  As argued by the SEC in its original Complaint, the CDs offered and sold by Stanford Financial and SIB, with Defendants' participation, constitute "securities" under the relevant securities law jurisprudence.  By agreeing to assist Stanford Financial and SIB to sell and promote investment products, Defendants actively joined the Stanford Financial sales force and therefore knew or should have known that they were acting as links in the chain of selling unregistered securities to Plaintiffs from, by and through Texas.  But for Defendants' participation, Stanford Financial and SIB could not have sold unregistered securities to Plaintiffs from, by and through Texas.

104.

None of the CDs sold to Plaintiffs were ever registered with the Texas Securities Commission and therefore they were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act.  As a result of Defendants' conduct in materially aiding Stanford Financial and SIB to sell unregistered securities from, by and through Texas, Plaintiffs have lost their investments.  Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

2. SALES OF SECURITIES BY UNREGISTERED DEALERS

105.

Defendants aided and abetted SIB and the Stanford Financial Group in the sale of securities to Plaintiffs from, by and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act.  Specifically, and as alleged herein, Defendants knew or should have known that Stanford Financial, through SIB, was functioning as an unregistered investment company, selling hedge or mutual fund participation units

from, by and through Texas to investors and then pooling its customers' money together to make illiquid, speculative investments.

106.

Stanford Financial and SIB, an investment company not organized or otherwise created under the laws of the United States or of a State, directly or indirectly, singly or in concert with others, including Defendants, made use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to offer for sale, sell, or deliver after sale, securities of which SIB was the issuer, without obtaining an order from the Texas State Securities Board permitting it to register as an investment company organized or otherwise created under the laws of a foreign country and to make a public offering of its securities by use of the mails and means or instrumentalities of interstate commerce.

107.

Defendants intentionally and actively aided and abetted Stanford Financial to operate as an illegal hedge or mutual fund in Texas and sell securities from, by, and through Texas, by means of the conduct described herein.  With full knowledge that Stanford Financial was selling securities from, by, and through Texas, and that Stanford Financial and SIB were for all practical purposes being operated and "run" from Texas, Defendants aided and abetted and perpetuated Stanford Financial and SIB's violations of the Texas Securities Act by continuing to provide the letters herein described for the known purpose of luring new customers like Plaintiffs to Stanford Financial and SIB and selling them the worthless CDs.

108.

In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendants acted with the intent to perpetuate the sale of securities by an

unregistered dealer, or acted with reckless disregard for the truth or the law. In fact, in their zeal to assist SIB, an offshore bank operating completely outside the regulatory purview of U.S. securities and banking laws, to sell its debt obligation securities from, by, and through Texas via Stanford Financial, Defendants acted with wanton and arrogant disregard for the protections afforded by the Texas Securities Act. As a result of Defendants' conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments. Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

3. UNTRUTH OR OMISSION

109.

Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially aided Stanford Financial and its principals in the sale of securities through the use of untrue representations or materially misleading omissions. In particular, and as set forth in the SEC's Amended Complaint, Stanford Financial was a massive Ponzi scheme that was perpetuated by the continued sales of the SIB CDs to unsuspecting investors like Plaintiffs. In particular, Stanford Financial told Plaintiffs, verbally (through Defendants) and through written marketing materials prepared and disseminated via Stanford Financial's Houston office, that their money was being invested in safe, liquid investments, which was a material misstatement because the money was not invested in safe, liquid investments, but rather was pooled together with other investors' money and used to finance Stanford Financial's principals' profligate lifestyles and to invest in long term, illiquid and high risk investments like private equity and real estate. Moreover, Stanford Financial omitted to inform Plaintiffs that it was selling them unregistered securities and that it was

operating as an unregistered, illegal mutual fund in violation of the Investment Company Act and the Texas Securities Act.

110.

With knowledge of the above, or with reckless disregard for the truth, Defendants materially aided Stanford Financial's sales of securities through the use of untruths and materially misleading omissions, including the circulation of the letters described herein.  All of Defendants caused the fraudulent insurance letters to be generated, distributed through Stanford Financial's offices in Houston, Texas and circulated to Plaintiffs and the Class of investors in Mexico, with full knowledge that the purpose of the letters was to lure investors like Plaintiffs and the Class to invest money in the SIB CDs through Stanford Financial.  Said conduct was designed to perpetuate the Stanford Financial "myth" regarding the safety and security of the SIB CDs, and to support the marketing, promotional and sales activities described herein.  Defendants' actions as described herein allowed Stanford Financial and SIB to continue to sell securities to Plaintiffs from, by and through Texas using untruths and materially misleading omissions.

111.

In performing the acts described herein to aid and abet the sale of securities through the use of untruths and materially misleading omissions, Defendants acted with the intent to perpetuate the sale of securities by Stanford Financial, or acted with reckless disregard for the truth or the law.  In fact, Defendants acted with wanton and arrogant disregard for the truth and for the protections afforded by the Texas Securities Act by engaging in the conduct described herein.  Defendants' actions in aiding and abetting Stanford Financial's fraud caused Plaintiffs to enter into transactions or maintain their investments with SIB.  As a result of Defendants' conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading

omissions, Plaintiffs have lost their investments. Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### 4. CO-CONSPIRATOR LIABILITY

112.

Defendants are jointly and severally liable as co-conspirators for Stanford Financial and SIB's primary violations of the Texas Securities Act. In particular, Defendants knowingly combined together to assist Stanford Financial to operate as an unregulated, unregistered investment company/dealer, and to sell unregistered securities from, by and through the State of Texas. As described herein, Defendants took various overt acts designed to assist Stanford Financial and SIB to accomplish the goal of selling CDs from, by and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas. Defendants' conspiracy with Stanford Financial to violate the Texas Securities Act is a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### C. PARTICIPATION IN A FRAUDULENT SCHEME

113.

By their conduct described herein, Defendants participated with Stanford Financial and SIB in a fraudulent scheme, making Defendants directly liable for fraud. In particular, Defendants made the conscious decision to participate in the scheme by joining the Stanford Financial sales force to market, promote and advertise SIB to prospective clients in order to assist and enable Stanford Financial to continue to sell SIB CDs based on the misrepresentations that they were fully insured.

Defendants' actions in participating in the fraudulent scheme are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in Stanford Financial as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### D.  CIVIL CONSPIRACY

#### 114.

Defendants conspired with each other and with Allen Stanford, SIB, Stanford Financial, SGC, and David Nanes to commit the wrongful conduct described herein, including fraud and violations of the Texas Securities Act.  Defendants are each responsible for all wrongdoing done by each and the other members of the conspiracy, including Allen Stanford, SIB, Stanford Financial, SGC, and David Nanes, in furtherance of the unlawful conspiracy and enterprise.

#### 115.

Together with Allen Stanford, SIB, Stanford Financial, SGC, and David Nanes, the Defendants conceived, participated in, and implemented a common enterprise to sell SIB CDs for the pecuniary benefit of Stanford and Stanford Financial and, thereby, Defendants.  The object of the conspiracy was to market and promote Stanford Financial and SIB and so assist said entities to sell the SIB CDs in a massive Ponzi scheme.   There was a meeting of the minds between all Defendants and Allen Stanford, SIB, Stanford Financial, SGC, and David Nanes as to the object to be accomplished and the means for carrying out the scheme, namely the creation and circulation of the letters described herein to facilitate the sale of the CDs to unsuspecting investors such as Plaintiffs.

#### 116.

During all relevant times, Defendants, in furtherance of the conspiracy and/or aiding or abetting Allen Stanford, SIB, Stanford Financial, SGC, and David Nanes in furtherance of the

common enterprise, engaged in specific overt acts as described herein, being the creation and transmittal of the "safety and soundness" letters into the stream of commerce. Each of the Defendants engaged in overt acts in furtherance of the Stanford Financial CD conspiracy and effectuated their illicit scheme through and with the assistance and cooperation of Allen Stanford, SIB, Stanford Financial, SGC, and David Nanes.

117.

Defendants conspired to conduct, and participated in conduct including violations of securities laws and fraud. To wit, over the span of over ten years, Defendants, in conspiracy with Allen Stanford, SIB, Stanford Financial, SGC, and David Nanes, knowingly participated in marketing and promoting the sale, from, by and through Texas, of the SIB CDs designed to facilitate the misapplication of fiduciary property via a massive Ponzi scheme, as described herein. Defendants' participation in the conspiracy proximately caused Plaintiffs to lose their investments.

## XII.  INDIVIDUAL CAUSES OF ACTION

### (THE FOLLOWING CAUSES OF ACTION ARE PLEAD AGAINST ALL DEFENDANTS ON behalf OF PLAINTIFFS TROICE, DIAZ AND PUNGA INDIVIDUALLY ONLY)

### A.  COMMON LAW FRAUD

118.

Defendants' representations as described herein and contained in the "safety and soundness" letters attached hereto as Exhibit "4" constitute common law fraud, which caused Plaintiffs Troice, Diaz and Punga damages for which they should recover by law. Defendants, in the course of their business relationships with Stanford Financial, made material representations to Plaintiffs via the "safety and soundness" letters which Defendants knew and intended, or had reason to expect, would eventually be transmitted to Stanford Financial investors such as Plaintiffs. Defendants and their

employees and agents knowingly made the misrepresentations contained in the "safety and soundness" letters, and/or recklessly made the representations contained in said letters as positive assertions without any knowledge of their truth. Acting on behalf of Stanford Financial and at its behest, Defendants created and transmitted the letters with the intention that they reach investors like Plaintiffs and with the intention that investors like Plaintiffs act upon the representations by investing in, or continuing to maintain investments in, SIB CDs. Plaintiffs received the "safety and soundness" letters created and transmitted by Defendants and justifiably relied upon them, and based upon them and the information provided by Stanford Financial, formed the belief that the SIB CDs were insured. As a direct and proximate result of Plaintiffs' reliance on Defendants' fraudulent misrepresentations, Plaintiff suffered damages, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

## B.  NEGLIGENT MISREPRESENTATION

### 119.

Defendant's representations as described herein and contained in the "safety and soundness" letters attached hereto as Exhibit "4" constitute negligent misrepresentations, which caused Plaintiffs Troice, Diaz and Punga damages for which they should recover by law. Defendants, in the course of their business relationships with Stanford Financial in which Defendants had a pecuniary interest, supplied false information to Stanford Financial with full knowledge, and indeed intending, or in the alternative fully expecting, that said information would be transmitted to investors like Plaintiffs Troice, Diaz and Punga, who in turn would rely on and be guided by said information in making their own investment decisions. Defendants and their employees and agents did not exercise reasonable care or competence in obtaining or communicating the false information to Plaintiffs via

Stanford Financial.  Plaintiffs Troice, Diaz and Punga all received and relied on the "safety and soundness" letters transmitted by Defendants and were justified in relying on Defendants' false representations contained therein.  As a direct and proximate result of Plaintiffs' reliance on Defendants' negligent misrepresentations, Plaintiff suffered damages, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### XIII.  JOINT ENTERPRISE/SINGLE BUSINESS ENTERPRISE

120.

A joint enterprise or single business enterprise existed between the various companies within the Stanford Financial group, all of which operated as, and were marketed and sold to the investing public as, Stanford Financial.   The joint enterprise or single business enterprise consisted of, *inter alia*, SGC, SIB, SCM, Stanford Trust Louisiana, Stanford Trust Antigua, Stanford Group Mexico and Stanford Fondos.  There existed an express or implied agreement between the above described entities and their principals concerning the establishment and administration of the joint enterprise/single business enterprise; a common purpose to be carried out by the above described entities and their principals, being the reaping of fees and profits from the illicit activities of the joint enterprise/single business enterprise; a community of pecuniary interest among the above described entities and their principals; and the above described entities and their principals shared in the management and direction of the joint enterprise/single business enterprise.  Thus, a joint enterprise or single business enterprise existed between and among the above described entities and their principals, which is responsible for the fraudulent acts described herein, making them all jointly and severally liable for the fraudulent acts described herein.

### XIV.  ALTER EGO

121.

Defendant Willis Group is directly liable for the acts and omissions of Willis Colorado as described herein for the reason that Willis Colorado is the alter ego of Willis Group and a conduit by which Willis Group conducted the business, including the schemes, described herein. Specifically, Willis Group owns, controls, and dominates Willis Colorado to such an extent that Willis Colorado in reality functions as a mere division or branch of Willis Group. Indeed Willis Group and all of its subsidiaries, including Willis Colorado, operate as one single unified worldwide business unit or single business enterprise, all operating under the Willis Group brand, international trademark or tradename and logo, which is prominently displayed on all of the Willis Group entities' correspondence. Willis Group controls the manner in which its subsidiaries, such as Willis Colorado, are perceived by the public and therefore intentionally creates the impression in the minds of third parties that Willis is one unified, global entity that acts as a single unit. Indeed Willis Group's own website touts its "Glocal" approach to client service, in which Willis Group "combines" its global resources to offer the "full benefit of every service that Willis offers" worldwide.

122.

Willis Group and all of its subsidiaries operate as a single economic unit under a "One Flag culture" centered on its Client Advocate and Glocal service model, and as a result of those business strategies Willis Group effectively dominates, formulates, directs and controls all of its subsidiaries' operations under the Willis worldwide umbrella. Willis' "One Flag" approach "guarantees" that all of Willis' worldwide employees, wherever they are located, "work as part of one cohesive team". For all effective purposes, and certainly for purposes of this lawsuit, Willis Colorado and Willis Group are one and the same because that is the perception that Willis seeks to create in the minds of

third parties worldwide, including Plaintiffs.

## XIII.  <u>AGENCY</u>

### 123.

Defendants acted at all times as the agents of Stanford Financial and SIB.  Nanes acted at all times as an agent of Stanford Financial and SIB in Mexico in operating and managing Stanford Mexico with the sole objective of promoting and selling Stanford Financial and SIB products in Mexico.  Defendants Willis and BMB acted as the agents of Stanford Financial and SIB in creating and circulating the letters described herein with the sole objective of promoting and selling Stanford Financial and SIB and their products in Mexico.

### 124.

Furthermore Defendant Willis Colorado acted at all times as the agent of Willis Group, including with respect to its general and specific jurisdictional contacts with the State of Texas, under the theories of actual, apparent and agency by estoppel.  Willis Group has purposefully created the appearance of authority that Willis Colorado acts on behalf of Willis Group by allowing Willis Colorado, as well as its other subsidiary companies, to prominently display the Willis Group brand, international trademark or tradename and logo on all of its correspondence.  Willis Group controls the manner in which its subsidiaries, such as Willis Colorado, are perceived by the public and therefore intentionally creates the impression in the minds of third parties that Willis is one unified, global entity that acts as a single unit.  Indeed Willis Group's own website touts its "Glocal" approach to client service, in which Willis Group "combines" its global resources to offer the "full benefit of every service that Willis offers" worldwide.

## XVI.  <u>RESPONDEAT SUPERIOR</u>

### 125.

Defendants Willis and BMB are liable for the tortious acts of their employees, including without limitation, Amy S. Baranoucky (Willis) and Robert S. Winter (BMB), and all contacts with the State of Texas by those employees should be attributed to the specific employees' principals for purposes of the personal jurisdiction analysis. All of these employees (including without limitation Amy S. Baranoucky [Willis] and Robert S. Winter [BMB]) were acting within the course and scope of their employment with Defendants, and in furtherance of their respective principals' businesses, when they engaged in the wrongful conduct described herein.

## XVII.  ACTUAL DAMAGES

126.

Plaintiffs and the Class have suffered the loss of well in excess of $1 billion that was proximately caused by the wrongful conduct of Defendants described herein. In addition, Plaintiffs are entitled to recover their just and reasonable attorneys' fees, for it would be inequitable not to award such fees to them. Plaintiffs have retained the undersigned attorneys and have agreed to pay them a reasonable attorneys' fee for their work.

127.

The exact amount of maximum damages proximately caused by Defendants' wrongful conduct is unknown, but Plaintiffs believe that those damages exceed $1 billion.

## XVIII.  PUNITIVE DAMAGES

128.

The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code. Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

129.

All conditions precedent to filing this Complaint have been met.

## XVII.  **JURY DEMAND**

130.

Plaintiffs demand a trial by jury.

## **PRAYER**

WHEREFORE, Plaintiffs pray the Defendants be summoned to answer this Complaint, that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the classes and sub-classes as set forth in each cause of action hereof recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Plaintiffs pray for such other relief to which they may be justly entitled.

Respectfully submitted,

**CASTILLO SNYDER, P.C.**
300 Convent Street, Suite 1020
San Antonio, Texas 78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210


By: s/ Edward C. Snyder
      EDWARD C. SNYDER
      State Bar No. 00791699
      esnyder@casnlaw.com
      JESSE R. CASTILLO
      State Bar No. 03986600
      jcastillo@casnlaw.com


**LEAD CLASS COUNSEL AND
ATTORNEYS IN CHARGE
FOR PLAINTIFFS
AND THE PUTATIVE CLASS**

Douglas J. Buncher
State Bar No. 03342700
Nicholas A. Foley
State Bar No. 07208620
**NELIGAN FOLEY, LLP**
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301
dbuncher@neliganlaw.com
nfoley@neliganlaw.com

**STRASBURGER & PRICE, LLP**
300 Convent Street, Suite 900
San Antonio, Texas 78205
Telephone: (210) 250-6000
Facsimile: (210) 250-6100


By: s/ Edward F. Valdespino
      EDWARD F. VALDESPINO
      State Bar No. 20424700
      edward.valdespino@strasburger.com
      ANDREW L. KERR
      State Bar No. 11339500
      andrew.kerr@strasburger.com

      DAVID N. KITNER
      State Bar No. 11541500
      david.kitner@strasburger.com
      STRASBURGER & PRICE, LLP
      901 Main Street, Suite 4400
      Dallas, Texas 75202
      Telephone: (214) 651-4300
      Facsimile: (214) 651-4330