### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SAMUEL TROICE, | § | |
| MARTHA DIAZ, | § | |
| PAULA GILLY-FLORES, | § | |
| PUNGA PUNGA FINANCIAL, LTD., | § | |
| MANUEL CANABAL, | § | |
| DANIEL GOMEZ FERREIRO, and | § | |
| PROMOTORA VILLA MARINO, C.A. | § | |
| individually and on behalf of a class | § | |
| of all others similarly situated | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:09-cv-01274-L |
| | § | |
| WILLIS OF COLORADO INC., | § | |
| WILLIS LTD.; | § | |
| WILLIS GROUP HOLDINGS LTD., | § | |
| AMY S. BARANOUCKY, | § | |
| ROBERT S. WINTER, and | § | |
| BOWEN, MICLETTE & BRITT, INC. | § | |
| | § | |
| Defendants. | § | |

---

### PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT
---

NOW COME PLAINTIFFS, SAMUEL TROICE, MARTHA DIAZ, PAULA GILLY-FLORES, PUNGA PUNGA FINANCIAL, LTD., MANUEL CANABAL, DANIEL GOMEZ FERREIRO and PROMOTORA VILLA MARINO, C.A., individually and on behalf of all others similarly situated, (collectively hereinafter "Plaintiffs"), and file this their Third Amended Class Action Complaint against Defendants, WILLIS OF COLORADO INC., WILLIS LTD., WILLIS GROUP HOLDINGS, LTD., AMY S. BARANOUCKY, ROBERT S. WINTER, and BOWEN, MICLETTE & BRITT, INC. (collectively hereinafter "Defendants"), and in support thereof would show the Court the following:

## I. **PREFACE**

1.      This putative class action is filed in representation of a class of defrauded investor clients of Houston, Texas-based Stanford Financial Group ("Stanford Financial").  This action has been filed in this Court because it is related to Civil Action No. 309-CV-0298, *Securities & Exchange Commission v. Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management LLC, et al.*, in the United States District Court for the Northern District of Texas– Dallas Division (the "SEC Action").  This action alleges participation by these Defendants in the massive investment fraud scheme perpetrated by the Stanford Financial Group and its principals from, by and through Texas that led to the intervention by the SEC in Texas and appointment of Ralph Janvey as Receiver.

## II. **PARTIES**

2.      Plaintiff, SAMUEL TROICE, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

3.      Plaintiff, MARTHA DIAZ, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

4.      Plaintiff, PAULA GILLY-FLORES, is a citizen of the Republic of Mexico residing in the Republic of Mexico.

5.      Plaintiff, PUNGA PUNGA FINANCIAL, LTD., is a Panamanian company with its principal place of business in Mexico City, Mexico which is wholly owned and controlled by Mexican citizens from Mexico City, Mexico.

6.      Plaintiff, MANUEL CANABAL, is a citizen of the Venezuela residing in the Venezuela.

7.      Plaintiff, DANIEL GOMEZ FERREIRO, is a citizen of the Venezuela residing in

the Venezuela.

8.     Plaintiff, PROMOTORA VILLA MARINO, C.A., is a Venezuelan company with its principal place of business in Venezuela which is wholly owned and controlled by Venezuelan citizens.

9.     Additionally, this case seeks certification of a class of all investors who had purchased and still held Certificates of Deposit and/or otherwise maintained deposit accounts with Stanford International Bank Ltd. as of February 2009, and, in the alternative, seeks certification of (i) a class of all Latin American investors who had purchased and still held Certificates of Deposit and/or otherwise maintained deposit accounts with Stanford International Bank Ltd. as of February 2009;  and, in the further alternative, (ii)separate classes of Venezuelan and Mexican investors who had purchased and still held Certificates of Deposit and/or otherwise maintained deposit accounts with Stanford International Bank Ltd. as of February 2009;  and, in the further alternative, (iii) a class of all investors who had purchased and still held Certificates of Deposit and/or otherwise maintained deposit accounts with Stanford International Bank Ltd. as of February 2009, and who had received or were shown copies of the insurance letters issued by Defendants as described herein.

10.     Defendant Willis of Colorado Inc., ("Willis Colorado") is a corporation organized under the laws of Colorado.  Willis has engaged in business in the State of Texas, and maintains a designated agent for service of process in Texas.  Willis Colorado has been served with process and has filed responsive pleadings in this action.

11.     Defendant Willis Ltd. ("Willis London") is a corporation organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom.  Willis London has engaged in business in the State of Texas, but does not maintain a regular place of business or a

designated agent for service of process in Texas. Willis London may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965). Willis London may be served at its home office address in London: 51 Lime Street, London EC3M 7DQ, England.

12.     Defendant Willis Group Holdings Ltd., ("Willis Group") is a corporation organized under the laws of Bermuda, with its principal place of business in the United Kingdom. Willis Group has engaged in business in the State of Texas, but does not maintain a regular place of business or a designated agent for service of process in Texas. Willis Group has been served with process and has filed responsive pleadings in this action.

13.     Defendant, Amy S. Baranoucky, ("Baranoucky") is an individual and, upon information and belief, United States citizen, currently residing in Bermuda. Defendant Baranoucky has been served with process and has filed responsive pleadings in this action.

14.     Defendant, Robert S. Winter, ("Winter") is an individual and, upon information and belief, United States citizen, currently residing in 10015 Olympia, Houston Texas 77042. Defendant Winter has been served with process and has filed responsive pleadings in this action.

15.     Defendant Bowen, Miclette & Britt, Inc. ("BMB") is a corporation organized under the laws of Texas. BMB has been served with process and has filed responsive pleadings in this action.

### III.  **SUBJECT MATTER JURISDICTION**

16.     This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(d)(2)(B) because this is a class action in which the amount in controversy exceeds $5,000,000.00 and is a class in which some members of the Plaintiff class are citizens and residents of Mexico and Venezuela and at least one Defendant (BMB) is a citizen of Texas. Furthermore,

pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action, this lawsuit constitutes a judicial proceeding against certain agents "related to the Receivership Estate".

## IV.  <u>PERSONAL JURISDICTION</u>

17.     This Court has personal jurisdiction over the non resident Defendants, Willis Colorado, Willis London, Willis Group, and Baranoucky, under the Texas Long Arm Statute. Defendant Willis Colorado has conducted continuous and systematic business in the State of Texas for many years and maintains a registered agent for service of process in Texas for that reason, and is therefore subject to general jurisdiction.  Defendant Baranoucky has been registered as an insurance broker with the Texas State Board of Insurance for many years, and still retains said registration. Defendant Willis Group has conducted continuous and systematic business in the State of Texas, both directly and via its subsidiaries, affiliates, and agents (including Willis Colorado and Baranoucky), for many years and therefore is subject to general jurisdiction.  To wit, Willis Group has, since at least 2005 (if not before), maintained offices and employees in Austin and Houston, Texas under the direction and control of Willis Group employee Tom Patrick.  See February 14, 2005 Willis Group Press Release, attached hereto as Exhibit "6".  Moreover, in 2008 Willis Group consummated a merger with U.S. insurance brokerage company Hilb Rogal & Hobbs ("HRH"), which Willis Group announced would double Willis Group's North American revenues and substantially improve Willis Group's position in important areas in North America including, *inter alia*, the State of Texas.  Through said merger, Willis acquired offices in Houston, Dallas, San Antonio, Amarillo and McAllen, Texas.

18.     Furthermore, Willis Group, either directly or through its subsidiaries, affiliates and agents, including Willis London, Willis Colorado and Baranoucky, has engaged in specific jurisdiction contacts with the State of Texas, specifically with the Stanford Financial group

headquartered in Houston, Texas, that give rise to Plaintiffs' causes of action, and therefore has done business and committed torts, in part, in the State of Texas.  Since at least 2005, if not before, Willis Group, directly and through Willis London, Willis Colorado and Baranoucky, served as the insurance broker and risk manager for the Stanford Financial group headquartered in Houston, Texas, and in that capacity engaged in extensive, almost daily, contacts with Stanford Financial personnel based in Houston, Texas to service said Texas-based client for over 4 years.   In conjunction with the provision of its professional insurance brokerage services to Stanford Financial, upon information and belief, Willis Group, acting through Willis London and Baranoucky, performed underwriting services on the entire Stanford Financial group and obtained and secured certain Lloyd's of London insurance policies for Stanford Financial, all of which involved multiple trips to Houston, Texas by Willis employees and almost daily e-mail and telephone contact for over 4 years.  As part of the provision of such services to its client, Willis Group, acting through Willis London, also authorized and approved the issuance of the "safety and soundness" letters by its subsidiary and agents Willis Colorado and Baranoucky at issue in the instant lawsuit, which letters Willis Group knew were issued and delivered to Stanford Financial in Houston, Texas.   Based on its general and specific contacts with the State of Texas, Defendant Willis Group acting as and through Willis London, Willis Colorado and Baranoucky, has purposefully availed itself of the privilege of conducting activities within Texas and has established minimum contacts with the State of Texas under the Long Arm Statute.

19.    Defendants Willis London, Willis Colorado and Baranoucky have engaged in specific jurisdiction contacts with the State of Texas, specifically with the Stanford Financial group headquartered in Houston, Texas, including the transmittal to Houston, Texas of the "safety and soundness" letters described herein and attached hereto as Exhibit "4", that give rise to Plaintiffs'

causes of action, and therefore said Defendants have done business and committed torts, in part, in the State of Texas.  Based on their specific contacts with the State of Texas, Defendants Willis London, Willis Colorado and Baranoucky have purposefully availed themselves of the privilege of conducting activities within Texas and have established minimum contacts with the State of Texas under the Long Arm Statute.

## V.  VENUE

20.     Venue is mandatory in this Court pursuant to ¶9 of the Amended Order Appointing Receiver in the SEC Action.

## VI.  FACTUAL BACKGROUND

### A.     The Stanford Financial Empire

21.     From the mid-1980s through February 2009, R. Allen Stanford ("Stanford"), a former gym owner from Mexia Texas, built a financial service empire that at its height boasted 30,000 customers in 130 countries managing billions of dollars in investment funds.  The empire was comprised of over 140 companies from across the globe, all of which were ultimately owned by Stanford himself, that operated under the brand name "Stanford Financial" with its worldwide headquarters located in Houston, Texas.  The conglomeration of Stanford companies (hereinafter collectively referred to as "Stanford Financial") included the main operating companies: Houston, Texas-based Stanford Group Company ("SGC"); Stanford International Bank ("SIB");  and Stanford Trust (one in Louisiana and another in Antigua), all of which were controlled and managed from the United States, principally Houston, Texas.  In Mexico, Stanford Financial operated under the names Stanford Group Mexico S.A. and Stanford Fondos S.A. de C.V., while in Venezuela Stanford Financial operated under the names Stanford Group Venezuela, C.A. and Stanford Group Venezuela Asesores de Inversion, C.A.  Both of those foreign companies were also

controlled and managed from the United States, principally Houston, Texas.

22.     Begun initially as an offshore banking operation in the mid-1980s, Stanford Financial grew over the years into a full service financial services group, offering clients private banking and U.S.-based broker dealer services worldwide from its headquarters base in Houston, Texas.  Stanford Financial gave all the appearances of a highly successful outfit, with lavish offices in some of the world's premier cities.  Stanford himself made the Forbes' list of the richest people in the world with a personal fortune estimated at $2.2 billion.

23.     The most important facet underlying Stanford Financial, and the key to its success and sustainability, was the carefully crafted Stanford Financial image.  The Stanford Financial image, cultivated over the years, was one of success, prestige, and, most importantly, safety and solidity.  The Stanford Financial image was centered around and built upon money – the money Stanford Financial received from its investor clientele.  With the money it received from its clients, Stanford Financial was able to project an image of success and solidity.  From the marble and mahogany of the Houston headquarters, to the huge bonuses paid to lure and retain top producers, to the $500 lunches for clients in Mexico City, to the helicopters and private jets that flew the Stanford Financial executives around, Stanford Financial oozed money, thus lending an air of legitimacy to the Stanford "myth".

24.     Part of the Stanford legend was that Stanford Financial was a continuation of the insurance business begun by Stanford's grandfather, Lodis Stanford, during the Great Depression.  Based on that connection, Stanford Financial boasted to the world that it had over 70 years history of growing and protecting people's wealth.  This legend, like most of the Stanford image,[1] was false, as Stanford's father sold the old insurance business in 1983.  Yet Stanford continued to foster

---

[1]     Stanford's claim to be a descendent of the founder of Stanford University, a claim which he disseminated widely, was also false.

that image of decades of family tradition and work ethic as late as a 2008 edition of the *Stanford Eagle* magazine.

25.     Charitable giving and sponsorships of sporting events and teams, as well as massive political contributions, constituted additional pillars supporting the Stanford Financial image.  As with everything else, Stanford spent lavishly on philanthropic endeavors, giving to hospitals, theaters and museums, and sponsoring sports teams and celebrities such as the Miami Heat and Vijay Singh, all with the objective, once again, of sustaining the Stanford Financial image. Stanford made a huge splash in the world cricket establishment in particular.  Stanford also gave generously to political campaigns and urged his employees to do the same as well, to the tune of millions of dollars.

26.     Stanford Financial obtained the money it needed to perpetuate its image from one primary source:  the sale of Certificates of Deposit ("CDs") from the Antiguan offshore bank wholly owned and controlled by Stanford himself – SIB.  Clients who were introduced to the Stanford Financial group quickly found out that the main financial product being peddled by the group was the SIB CD.  The SIB CDs were sold worldwide by a web of different Stanford Financial promoter companies whose sole function was the sale of the SIB CDs.  By 2009, SIB had sold over $7.2 billion in CDs.  The vast majority of these CDs were sold to investors in Latin America, including roughly $3 billion sold in Mexico and Venezuela alone.

## B.     Stanford Financial's Operations in Mexico and Venezuela

27.     Stanford Financial opened its first company in Mexico, Stanford Group Mexico, S.A. de C.V. ("Stanford Mexico"), in January 1995.  Stanford Mexico was a direct subsidiary of SGC in Houston and indirectly owned by Allen Stanford.  The Venezuelan subsidiaries of Stanford Financial (hereinafter "Stanford Venezuela") were also indirectly owned by Allen Stanford.

Stanford Mexico and Stanford Venezuela were set up specifically to serve as unregistered "representative offices" of Stanford Financial in their respective countries with one primary purpose:  to sell SIB CDs to Mexican and Venezuelan citizens in violation of the laws of the respective countries.  Stanford Financial's Mexico and Venezuelan operations grew rapidly by "head hunting" bankers and other financial advisers and their books of client business from other banks and trust companies.  Stanford Mexico eventually opened branch offices in Monterrey and Puebla, Mexico.  All of the financial advisers ("FAs") in the Stanford Mexico and Stanford Venezuela offices had one primary mission --- to sell SIB CDs for Stanford Financial.  Like their counterparts in the United States, Stanford's Mexican and Venezuelan FAs were paid outsized commissions for the sale of the CDs.

28.     David Nanes served as a senior executive and employee of Houston-based Stanford Group Company from 1997 through 2009 during the same time period that he served as President of Stanford Mexico.   Upon information and belief, Nanes consistently drew his Stanford Financial/Stanford Mexico salary from SGC or one of the other U.S.-based Stanford entities from 1995 through 2009.

29.     Since Houston was the administrative nerve center and principal base for the Stanford Financial/SIB worldwide sales force, all of the sales practices of Stanford Mexico and Stanford Venezuela were managed under the overall direction, supervision, and control of the Houston offices of Stanford Financial.  In fact, all of the foreign FAs for Stanford Financial, including all of the members of the sales forces of Stanford Mexico and Stanford Venezuela, were required to sign employment contracts with their Stanford Financial employers in their home countries that called for Texas law to apply.  And the Stanford Financial foreign FAs, including those in Mexico and Venezuela, were also required to sign "Foreign Associate Service

Agreements" with SGC, which also called for the application of Texas law.

30.     From at least 1995 (if not before) through 2009, all of the sales practices, directives, techniques, strategies and reward programs for Stanford Financial were developed and crafted in Houston and disseminated down to Mexico and Venezuela to be implemented there.  All of the sales force training manuals, promotional literature and marketing materials for SIB, including the Spanish-language promotional materials, were created, printed, packaged and mailed from Stanford's Houston headquarters to Stanford Mexico in Mexico City and Stanford Venezuela in Caracas, to be utilized by the local FAs under the overall supervision of Stanford Financial executives in the United States.  In addition, mandatory sales training for the Mexican and Venezuelan FAs was conducted principally in Houston (known to the Latin American financial advisers as the "Houston experience") by Stanford Financial personnel like Oreste Tonarelli, Monica Manzanares and David Charner.  In those mandatory training sessions, sometimes twice a year, the Latin American FAs were trained to sell the Stanford Financial image.  The Stanford Financial "script" for why SIB was a safe and secure place to invest money, as set forth in the training manuals and reinforced "live" in Houston, was drilled and drilled again into their heads. The FAs were thereafter subjected to examinations to reinforce the script and sent back to their home countries to aggressively sell the SIB CDs.

31.     Nanes managed all aspects of the operations of Stanford Mexico and reported directly to Allen Stanford.  Under his direction, the financial advisers were charged with "*captacion*", which is a Spanish term for essentially "capturing" investment funds, for Stanford Financial.  The act of "*captacion*" for a foreign, offshore investment company or bank that is not properly registered in Mexico is illegal under Mexican law.  Under information and belief, it is also illegal under Venezuelan law.  Stanford Financial did everything in its power to disguise and

otherwise hide the illegal nature of Stanford Mexico's operations, including sales of SIB CDs by Stanford Fondos (created in 2005 to cater to the Mexican national market), which was specifically established to lend "cover" and an air of legitimacy to Stanford Mexico's operations and allow the Stanford Financial sales agents in Mexico to continue to sell the SIB CDs.

32.     For the first decade of its existence, one of the principal ways that Stanford Mexico got investment funds from Mexican investors out of Mexico was via private flights on Stanford-owned or chartered airplanes out of the Toluca, Mexico airport.  About once every month, Nanes and his team bundled large amounts (millions of dollars) of checks and cash from new Mexican investors, including checks drawn on U.S. bank accounts, and loaded them in briefcases to fly the money out of the Toluca airport to Houston or Antigua.[2]  This procedure violated Mexican law.  In 2005 Stanford Mexico's human resources director, Veronica Spindola, was detained at the Toluca airport carrying some $5 million in checks bound for SIB.  After spending 90 days in detention, she was given an award for excellence in 2006 by Stanford Financial.[3]

33.     The other way Stanford Financial sold CDs in Mexico and Venezuela, also entirely illegal under the laws of the respective countries, was through SGC brokers from Houston or Miami, and through unlicensed sales agents operating from offices in Houston, San Antonio and Miami under the name "Stanford Fiduciary Investor Services" (hereinafter "SFIS"), which upon information and belief was a "d/b/a" of Stanford Trust Ltd., the Antiguan trust company.  On a regular basis, SGC brokers and unregistered SFIS sales agents from Houston, San Antonio and/or Miami traveled to Mexico City, Caracas and other Mexican and Venezuelan cities to solicit and sell SIB CDs and "*captar*" investments funds from Mexican and Venezuelan citizens for Stanford Financial.  SGC brokers and unlicensed SFIS sales agents regularly flew to Mexico City and set

---

2 Gabriel Bauducco, *Imperio de Papel*, at 98 (2009).
3 *Id.*, at 115.

themselves up in posh hotels, such as the Hotel Intercontinental in Polanco, and met with their Mexican clients to market and sell the SIB CDs, also in absolute violation of Mexican law.  The SGC brokers and SFIS sales agents also regularly sold CDs to foreign, including Mexican, investors directly out of the SGC Houston office, and also sold CDs to foreign, primarily Mexican investors, out of the SFIS offices in Houston and San Antonio, Texas.  SGC brokers and SFIS agents did the same thing for Venezuelan clients: selling the CDs to Venezuelan investors through the SGC or SFIS offices in Miami and other cities in Florida.

34.    As part of the Stanford Financial sales process, investors like Plaintiffs were uniformly "sold" the Stanford Financial "image".  From at least 1995 (if not before) through 2009, investors like Plaintiffs were uniformly informed by the Stanford Financial FAs, as well as via the Stanford Financial marketing materials created in and disseminated from Houston, Texas, that, *inter alia*, investments in the SIB CDs were safe and sound because SIB was part of the Stanford Financial group based in Houston, Texas and therefore subject to regulation by the United States government.  Indeed many Mexican and Venezuelan investors to this day never understood that they had invested in CDs issued by an Antiguan bank, but always thought their money was invested in Houston, Texas.  Investors like Plaintiffs were also uniformly told by Stanford Financial FAs, both verbally and in writing via the Stanford Financial marketing materials created in and disseminated from Houston, Texas, that the CDs issued by SIB were safer even than U.S. bank–issued CDs because Stanford Financial had unique Lloyds of London insurance policies in place that went above and beyond FDIC insurance;  and that investments in the CDs were liquid and the CDs could be redeemed at any time because SIB, through Stanford Financial, invested the money in safe, secure and liquid assets.  These exact, uniform sales representations are contained almost verbatim in the Stanford Financial Training Manuals and in the Stanford Financial sales and

marketing materials regularly and uniformly distributed to the investors between 1995 and 2009.

**C.     Perpetuation of the Stanford Image -- the Root of the Fraud**

35.     What attracted investors to Stanford Financial was the expertly crafted perception that Stanford Financial (including SIB) was (1) a United States-based operation subject to regulated by the U.S. Government; and (2) that SIB carried multiple insurance policies designed to ensure that investments in SIB CDs were safer and more secure than investments in CDs issued by U.S. banks insured by the FDIC.   Indeed, Stanford Financial developed internal policies company-wide for its sales staff to use SIB's insurance policies as marketing tools and to "spin" the existence of insurance policies covering certain aspects of SIB's business to make it appear as if SIB held depositor insurance.

*1.     The Stanford Pitch:  "United States Operation"*

36.     All of the Stanford Financial FAs were trained to "blur the lines" that separated SIB from the U.S. operations of Stanford Financial and to sell the image and perception that SIB was part and parcel of the Stanford Financial "group" based in Houston, Texas and regulated by the United States Government.   All of the Stanford Financial FAs, whether from SGC or from the Stanford Financial offices in Mexico and Venezuela, were also trained to push and emphasize to Plaintiffs and the Class that their investments in Stanford Financial/SIB were insured by Lloyd's of London and/or other prominent insurers and were therefore safer than deposits in U.S. banks. Indeed, this latter representation was contained almost verbatim in the Stanford Financial Training Manuals.

37.     These representations were repeated in the promotional materials for Stanford Financial and SIB that were designed and generated in Houston and then handed to SGC advisers headed for sales presentations in Mexico and Venezuela or forwarded to Stanford Financial's

offices in Mexico City and Caracas for distribution directly to clients in those countries.  SIB itself never had a sales force or marketing or promotional arm in Antigua.  The head of the global sales force for SIB was located in the United States, principally in Houston, Texas.  See, e.g., June 12, 1996 letter from Stanford Financial vice president Rossana Roys, attached hereto along with certified English translation as **Exhibit "1"** and made a part hereof for all purposes (describing to a potential Monterrey, Mexico investor that Stanford Financial handles all of the promotional activities for SIB from its "purely American" base in Houston, Texas).  Therefore all of the sales, marketing and promotional activities for Stanford Financial for the sale of the SIB CDs occurred in Texas from at least 1995 through 2009.

38.     The sales and promotional materials created in Texas and distributed uniformly throughout the world intentionally blurred the lines between Antigua-based SIB and the other U.S.-based Stanford Financial entities, including SGC, and intentionally created the false impression that SIB and Stanford Financial (including SGC) were one and the same and therefore that SIB enjoyed the same regulation and protections as a U.S.-regulated company.  As the U.S. Receiver has stated, "Stanford's financial advisors used the apparent legitimacy offered by U.S. regulation of Stanford's U.S. brokerage subsidiary in order to generate sales of SIBL CDs worldwide."[4]

2.     *Stanford Financial's Use of Insurance as a Marketing Tool*

39.     Stanford Financial purchased and used insurance policies as marketing tools to sell the SIB CDs.  Indeed, Stanford Financial purchased many insurance policies, and paid millions of dollars in annual premiums (by 2007 Stanford Financial was paying out $17 million in premiums *per year* for its insurance program), not because the insurance was necessary, but because it assisted sales production, i.e., assisted the FAs to sell SIB CDs, particularly in Latin America.   Since the CDs were issued by an offshore private bank and obviously did not enjoy FDIC protection,

Stanford determined in the early or mid-1990s that private insurance coverage on SIB could be used to create the illusion that the SIB CDs were insured.   As Professor Joseph Long has noted in his treatise on state securities laws published by West, private banks that offer CDs without FDIC insurance face a marketing dilemma:

> These banks and other financial institutions are forced to compete in the market place for the investor's dollar and generally suffer a competitive disadvantage from this lack of government sponsored or mandated insurance. In an effort to improve their image of solvency, stability, and generally respectability, and to gain investor acceptance in the eyes of the general public, it is not unforeseen that some of these companies may, in the future, offer CDs and other types of interests which are insured against loss through private insurance companies or consortiums or some sort of co-operative insurance arrangement.

40.     See Joseph C. Long, BLUE SKY LAW §2:28 (West 2003).  Professor Long goes on to emphasize the risks to the investor inherent in the marketing of insurance for such "private bank" CDs:

> The investor ought not be required to attempt to evaluate the true worth of any offered insurance coverage in an informational vacuum.  To properly evaluate the effect of this insurance upon his risk of loss, the investor needs information about the terms and extent of the insurance coverage as well as information about the strength and solvency of the insurance company providing it.  This is the type of information that can and should be provided through the normal securities registration process.

41.     *Id.*  Of course, since Stanford Financial never registered the CDs as securities in the United States or in Texas, the only information available to the investors concerning the insurance coverage for SIB was the information that was ultimately provided by Stanford through Defendants.

42.     An example of how Stanford purchased and used insurance policies as a marketing tool, and how Stanford routinely informed its insurance brokers of this marketing strategy, is demonstrated by Stanford's 2006 decision to purchase Excess SIPC coverage for SGC's brokerage operations.  In September 2006, Barbara Fortin, a former BMB employee who in January 2003

---

4  "Report of the Receiver Dated April 23, 2009" in the SEC Action [docket #336], at 7.

became head of Stanford's insurance program, wrote to Roddy Graham, who worked in conjunction with BMB as a broker to procure various lines of insurance for Stanford in the London market, and informed him that Stanford was looking to purchase Excess SIPC insurance to use as "a marketing tool".    Later, in Mr. October 2006 and as part of her efforts to get the Stanford Insurance Committee to approve the purchase of Excess SIPC coverage, Fortin wrote to CFO Jim Davis (who chaired the insurance committee) to advise him that various other broker/dealer firms had procured Excess SIPC coverage and that Stanford's prospects and clients had noticed this and asked if Stanford also carried the insurance.  Another member of the Stanford Insurance Committee (and former head of SGC), AJ Rincon, e-mailed Fortin and Davis that "*our competitors are getting a lot of great bragging rights from having purchased this product, catering to the fear of the investors. They are also capitalizing on the piggy back on the Lloyds name.*"   Later, Fortin e-mailed Allen Stanford and Jim Davis regarding Excess SIPC coverage and noted that even AJ Rincon had approved it, and that Rincon "*would not vote to purchase ANY insurance that wasn't absolutely needed to increase production*".

43.    In 2004, Stanford Financial also increased the limits on its Blanket Bond coverage specifically to attract a new group on high net worth investors from Memphis.   This marketing necessity was communicated to BMB broker Richard Lee in May 2004, who sent an e-mail to Barbara Fortin and Gil Lopez providing an update on pricing for the increase in insurance limits and noted that he thought the information was urgent "*since Stanford needed this coverage to finalize the signing up of some new clients to the High Net Worth Team in Memphis.*"

*44.*    Stanford Financial routinely touted the insurance policies covering SIB in its marketing materials.  A true and correct sample of one of the sales and promotional materials used in Mexico and Venezuela from roughly 1995 through 2009, along with certified English translation,

is attached hereto as **Exhibit "2"**.  This promotional piece distributed in Mexico and Venezuela falsely states that investments in SIB were more secure than investments in FDIC-insured U.S. banks.  *Id.*  The promotional materials described various "unique" insurance polices from Lloyd's that insured the clients' investments in SIB.  *Id.*  These and other promotional materials routinely utilized by Stanford Financial and uniformly distributed to its client base, including Plaintiffs and the Class, uniformly omitted to disclose the amounts of the coverage afforded by the referenced insurance policies, thereby intentionally creating the impression that the insurance policies provided coverage for <u>all</u> investments in SIB, which was false.  *Id*.

45.     The promotional materials go on to describe how, in order to qualify for the insurance policies, SIB was audited annually by Lloyds, and was also subjected to annual risk analyses, which "*provides another safety element for the clients*."  *Id.*

*46.*     In another Spanish language promotional piece circulated in Mexico and Venezuela from roughly 1995 through 2009, Stanford Financial described how, "*in order to guarantee and provide higher security to its clients*", SIB had a special insurance policy that covered SIB's financial transactions "*in case of loss, fraud or theft*".   A true and correct sample of said promotional piece used in Mexico and Venezuela is attached hereto as **Exhibit "3"**.  It goes on to say that "[*t*]*his policy is extremely hard to acquire and few banks are able to satisfy the requirements to obtain it*."  *Id.*  It then lists Defendant BMB as the "administrator" of the insurance policies for SIB.  *Id*.

47.     The Spanish-language promotional materials also intentionally blurred the lines between SIB and SGC in order to create the impression in the minds of the average investor that SIB was insured by SIPC.  *See* Exhibit "2".  The promotional literature belittles the protections afforded by the FDIC, and then clearly and unambiguously suggests that SIB was guaranteed and

insured by the NASD and SIPC, going so far as to state in bold letters that "*Stanford International Bank is probably the only International Bank that offers this type of security to its clients*".  *Id.*

48.     The attached Spanish-language promotional materials, and other similar materials, were created by the Stanford Financial marketing team in Houston, Texas and then approved and authorized for distribution in Mexico and Venezuela and for use by Stanford Financial FAs in the sale of SIB CDs in those and other countries.

49.     Stanford Financial's FAs and promotional materials were not enough, however.  To complete the fraudulent sales pitch, particularly regarding the safety and soundness of an investment in SIB, Allen Stanford needed "back up".  He got it from Stanford Financial's insurance brokers, who agreed to participate in a fraudulent and misleading insurance letter distribution campaign that was designed to assist Stanford to market SIB to actual and prospective purchasers of the SIB CDs.

**D.     Defendants' Participation in Stanford's Fraud:  The Insurance Endorsement Letters**

50.     Defendants became willing participants in Stanford's fraudulent use of insurance to market and peddle the worthless CDs.  Defendant Winter was the "Insurance Specialist" for all of Stanford Financial and also a member of the Board of Directors for SIB, for which he received a $30,000 a year salary.   The other Defendants acted as the risk managers and insurance brokers for the Stanford Financial group, rendering professional services to Stanford Financial over the years as insurance agents, brokers, risk managers and/or insurance consultants.   From the early 1990s all the way until Stanford's collapse in 2009, Defendants performed insurance assessments on virtually every aspect of Stanford Financial's business operations around the world, from its banking and brokerage business; Caribbean airlines; Antiguan newspaper publishing business;  and Stanford's Caribbean real estate development projects, and in that capacity Defendants gained extensive

knowledge of Stanford's global operations.  Indeed, perhaps no other third party had as much knowledge of Stanford Financial's worldwide operations as BMB and Willis, precisely because it was their job, as insurance and risk managers, to have a thorough understanding of Stanford Financial's operations.   As a result of the provision of these professional insurance services, both BMB and (at least as of 2005) Willis Group were regularly listed in Stanford Annual Reports as the Stanford Financial group's "Insurance and Risk Managers".  In serving in such professional capacity, both BMB and Willis engaged in regular and systematic, indeed almost daily, contacts with Stanford Financial personnel in Houston, Texas.

51.     As part of the rendering of professional services as the Insurance and Risk Managers for Stanford Financial, BMB and then Willis annually provided Stanford Financial in Houston with certain insurance endorsement letters for SIB - describing insurance policies for SIB, touting SIB's credentials and otherwise endorsing SIB - with the clear intention that said letters be used by Stanford Financial for marketing purposes to retain or obtain actual and prospective clients for SIB.  Willis in particular, put its internationally known and respected brand name behind Stanford Financial and SIB, thereby lending recognition and credibility to Stanford Financial and SIB and supporting its sales efforts.

52.     Most incredibly, Defendants prepared and sent these endorsement letters, the text of which was actually written by Stanford employees, year after year with the addressee of the letters and the date of the letters left **in blank**, to be filled in later by Stanford Financial employees, as part of a fraudulent scheme to make investors believe that the letters were being sent by Defendants in a personalized manner directly to the individual investors.  Defendants even provided Stanford with Defendant's own letterhead envelopes, so that Stanford could package the letters in the Defendants' envelopes to make them look like they were being delivered directly by Defendants to the

individual investors. Thus investors mistakenly believed that they were receiving the endorsement letters independently of Stanford and directly from BMB and/or Willis.

### 1. Defendant Bowen's Relationship with Stanford Financial

53.     BMB's relationship with Stanford Financial went back many years, as BMB, and Defendant Bob Winter in particular, acted as the "Insurance Specialist" for the Stanford Financial group of companies from at least the early 1990s and all the way until the SEC shut Stanford down in 2009. BMB employees, including Bob Winter, Chris Taylor, and Barbara Fortin (until she left the employment of BMB and became a full time Stanford Financial employee in January 2003) regularly attended meetings of the Stanford Financial Insurance Committee, headed by Stanford CFO Jim Davis, which held meetings on a quarterly basis beginning in 2001. BMB employee Stephanie Guidry generally oversaw the Stanford account relationship and was a close personal friend of Barbara Fortin.

54.     From the early 1990s until 2009, BMB served as the risk management consultants for all of Stanford Financial's operations and also procured all of the insurance (until Willis took over some lines from 2004 through 2008) for Stanford's global operations, including financial institutions package (domestic and global), business automobile, workers comp., excess liability, insolvency/excess insolvency, commercial umbrella, marine, airline, commercial yacht, blanket crime, D&O, cargo, travel accident, corporate aviation, coin & bullion, property, general liability, political risk, employment practices liability, errors and omissions, professional liability, blanket bond, excess wrap, and loss prevention coverages. As part of its role as the risk managers for Stanford Financial, BMB was involved in risk underwriting on Stanford's operations and had to know its customer and understand its overall operations. BMB was provided with direct access to Stanford's operations, including the key entities' (like SIB and SGC) financials; had an in depth

understanding of Stanford Financial's business; and knew how each entity within the Stanford

entity was constituted, who owned it, and what each company did.  Throughout its tenure as the risk

managers/insurance brokers for Stanford Financial, BMB looked at, analyzed and provided

insurance for every single company in the Stanford Financial group, including underwriting and

procuring insurance for Allen Stanford's Antiguan newspaper; for his Antiguan Airlines (Caribbean

Sun and Caribbean Star); his Antiguan Restaurants;  Antiguan Cricket Stadium;  Antiguan Athletic

Club; Antiguan yachts; Antiguan resort, golf and hotel projects, and, most importantly, his Antigua

Banks (SIB and Bank of Antigua).  In doing so, BMB was provided with access to Stanford

Financial's operational and financial information on a yearly basis, as Stanford Financial grew

exponentially from the sale of the SIB CDs.

     55.    Until Willis took over the Financial Lines coverages in 2004, Bowen also handled

the Financial Lines of insurance coverage that provided insurance coverage for SIB.  The Financial

Lines typically included separate insurance policies for:  Directors & Officers coverage; Financial

Institutions Professional Errors & Omissions coverage; Bankers Blanket Bond;  Blended Wrap;

Insolvency coverage;  and Excess FDIC.  The Financial policies had one year terms, and expired in

August of each year.  As part of the underwriting for the Financial Lines coverage, BMB and the

underwriters visited the Houston headquarters of Stanford Financial and also visited SIB in Antigua

every year.

     56.    Like Willis, BMB was also involved in the underwriting process and procured

insurance for Stanford's massive investments in extensive real estate development projects in the

Caribbean, primarily Antigua.  For example, in February 2004, following a "proposal meeting"

with BMB, Stanford's head of insurance (and former BMB employee) Barbara Fortin sent an e-

mail to BMB employee Rick Tucker requesting that he check on certain insurance issues, and

informed BMB that Stanford's Guiana Island resort project off the coast of Antigua was estimated to cost **$895 million**, which included construction of an airport hangar, an all suites resort hotel with beach pavilion, a marina big enough to accommodate 70 boats, a golf course, equestrian center, and 19 luxury homes.  In 2007 BMB procured insurance coverage for the majority of Stanford's Antiguan properties, including Stanford's cricket fields and stadium, and the Maiden Island resort project.   As part of the underwriting for said insurance, BMB personnel traveled to Antigua on various occasions to tour Stanford's vast Caribbean real estate holdings, including Barnacle Point, Cedar Valley Springs, the Sugar Mill Hotel project, and the Maiden Island and Guiana Island resort projects.

*57.*    Based on its experience analyzing the risk on, and procuring the insurance for, Stanford's Caribbean holdings, BMB knew that Stanford was investing and spending money heavily on real estate in Antigua and elsewhere in the Caribbean and that, as a result, a large portion of Stanford Financial's overall asset base was located in the Caribbean, and that Allen Stanford had spent hundreds of millions of dollars in Antigua, and was looking to spend hundreds of millions of dollars more finalizing his development plans for such projects as Maiden Island and Guiana Island.  Based on its knowledge of Stanford Financial's business model, obtained as a result of years of experience analyzing the risk on, and procuring the insurance for, every single entity in the Stanford Financial empire (including SIB), as well as based on Robert Winter's position on the Board of Directors of SIB, BMB knew that the money Allen Stanford was spending buying up assets in Antigua came from the SIB investors, and knew that Stanford's rampant spending on Antiguan real estate development projects was not consistent with what was being disclosed to SIB's clients.

        2.    *Defendant Willis' Relationship with Stanford Financial*

58.     In July 2004, the Stanford Financial Insurance Committee decided to switch the Financial Lines coverage away from BMB and First City and over to Wills Group.  At that time in 2004, Stanford Financial had just $20 million in maximum insurance coverage through the Financial Lines insurance as security to cover over $2 billion in deposits at SIB.

59.     Stanford Financial was familiar with Willis Group because Willis had been providing insurance coverage for Stanford's Caribbean Airlines – Caribbean Sun and Caribbean Star – since at least 2002.  In December 2002, the Stanford Insurance Committee discussed the need to have an insurance specialist company provide an audit on all insurance coverage in place for the Stanford group of companies.  The Committee specifically charged one of its members to get in touch with Willis Group so that someone from Willis could attend the January 2003 meeting of the Stanford Insurance Committee.  Thereafter, a Willis Group employee, Bill Rose, attended the January 2003 Stanford Insurance Committee meeting held in Houston and made a presentation about the range of services offered by Willis Group.

60.     Thereafter Willis Group, fronted by Willis London, made a proposal to the Stanford Financial group of companies in June, 2003 to perform a risk review for Stanford Financial.  =The Willis proposal provided that, for a $20,000 fee (which would be deducted from any brokerage commissions if Willis was eventually hired by Stanford to broker its insurance needs), Willis would conduct a "comprehensive review of all appropriate SFG operations" with the objective of understanding the overall organization and identifying Stanford Financial's risk profile.  Some of the areas Willis identified that it would review included:  (i) Stanford's primary products and services; and (ii) Stanford's customers.

61.     In closing the proposal, Willis offered to enter into a type of financial partnership with Stanford, including allowing Stanford to sell its financial products to Willis employees and

also proposing to enter into an agreement with Stanford "for the purpose of lead sharing/cross referencing commercial and personal prospects of mutual interest and benefit to both organizations".

62.     Shortly thereafter, during a Stanford Insurance Committee meeting in August 2003, Barbara Fortin proposed that, if Stanford decided to hire the Willis Group, then they should consider working directly with Willis London and not with Willis' local Texas office.  Another member of the Insurance Committee raised the issue of jurisdictional problems in working directly with the Willis London office.  Jim Davis responded that he would talk with senior management at Willis Group to inquire about their ability to work with Stanford directly from London.

63.     In June 2004, Christopher London, who was at that time Willis Group's Chief Operating Officer, Global Specialties, visited Houston to meet with Jim Davis and Barbara Fortin to discuss the transfer of the Financial Lines coverage for Stanford Financial from BMB over to Willis.  During those meetings, the Stanford representatives discussed Stanford's Caribbean real estate development projects with Mr. London.  In his follow up June 22, 2004 e-mail to Davis and Fortin, which attached a Willis proposal entitled "Overview of Financial Lines Marketing Process" for Stanford, Chris London referenced that he would have another Willis London representative follow up with Fortin on the Antigua property insurance issues.  He closed by stating that Willis looked forward to "partnering [with] the Stanford Financial Group."

64.     The Willis proposal attached to Mr. London's June 22, 2004 e-mail included a chart entitled  "Willis Service Team for Stanford", which had Mr. London at the head as the Account Director, and Amy Baranoucky and Doug Ogilvie underneath him as Client Advocates for Stanford, evidencing that Baranoucky would work under the direction of Willis London on the Stanford account.  A decision was made to have Baranoucky act as the "middle man" in the Willis-

Stanford relationship due, in part, to perceived jurisdictional issues as well as due to the time differences between Texas and London.   Baranoucky thereafter acted as the agent for Willis London/Willis Group in all dealings with Stanford Financial, including the preparation, execution and mailing of the insurance endorsement letters in dispute.

65.     By July 2004, the Stanford Insurance Committee made the decision to switch all of its Financial Lines of coverage over to Willis Group.   Willis London established a structure whereby Defendant Amy Baranoucky would be the client contact for Stanford Financial, but that Baranoucky would work under the direction of Doug Ogilvie and other representatives of Willis London.   Willis London committed to perform all of the insurance underwriting procedures and marketing work for Stanford Financial through its employees like James Hunt, Duncan Holmes, Patrick Caine, and (eventually) Mark Payne, who thereafter performed the bulk of the work for Stanford Financial.   By letter dated July 6, 2004 signed by Jim Davis, Stanford Financial appointed Willis as its sole and exclusive broker for the following insurance coverages: (1) Blanket Bond; (2) Blended Wrap; (3) D&O; (4) Errors & Omissions; (5) Employment Practices Liability; (6) Excess Blanket Bond; and (7) Fiduciary Liability.

66.     For its work brokering the insurance coverages for Stanford Financial over the next 4 years, Willis earned a 20% commission of the insurance premiums paid out by Stanford each year.   Willis informed Stanford that the 20% commission would be divided between the various Willis entities as follows:  (1) Willis London:  13%; (2) Willis Group: 6%;  (3) Willis Colorado: 1%.   Over the next few years, between 2004 and 2008, Willis earned hundreds of thousands of dollars per year in insurance brokerage commissions from Stanford Financial for its Financial Lines.

67.     As part of its work in procuring the Financial Lines coverage for Stanford Financial

in the summer of 2004, Willis requested and received from Stanford, on or about July 7, 2004: (1) copies of SIB annual reports and financial statements; (2) SGC's investment adviser registration (form ADV) with the SEC; (3) and a sampling of the various Stanford entities' (including SIB's) promotional materials.  Also, on August 2, 2004 Fortin confirmed to Baranoucky that Allen Stanford owned "100% of everything", i.e., 100% of all of the various Stanford entities that comprised the Stanford Financial group of companies. Fortin also disclosed to Willis that over 50% of the revenues for the Stanford group came from the sale of SIB CDs.  Also in July 2004, Fortin disclosed to Baranoucky that Stanford Financial was expanding across the United States by raiding and headhunting "high powered", "high net worth" brokers away from other brokerages, particularly in the South, and wanted some kind of insurance protection from lawsuits by the former employers of the brokers, as Stanford had already been sued by UBS when it stole the high net worth "Santi group" from the UBS Memphis office.

68.     Every year thereafter, from 2005 through 2008, Stanford Financial provided Willis with its financial statements, including audited financial statements for SGC and the financial statements and Annual reports for SIB.  Willis also received information on a wide variety of Stanford Financial's operations, including issues surrounding its purchases of banks in Venezuela, Panama and its purchase of a broker dealer in Ecuador.  Willis also received information from Stanford on SEC compliance issues and legal claims, including the claims files for the FAs that quit and sued or were sued by Stanford, including Charles Satterfield (who accused Stanford of deceiving the SEC); as well as the files on Leyla Basagoitia and Lawrence J. DeMaria, both of whom accused Stanford of running a massive Ponzi scheme.

69.     In December 2004, Willis London employee Doug Ogilvie was designated as the Willis "Client Advocate" for Stanford Financial.   Ogilvie provided Stanford Financial with the

Willis "Client Bill of Rights", which states that "Willis' global resources and services are committed to understanding the client's company."  The Willis "Client Advocate" model requires that the Willis Client Advocate for a particular client "know the client's business" and "keep the Willis team thoroughly briefed on the client".

70.     In December 2004, Barbara Fortin recommended to the Stanford Insurance Committee that Willis representatives travel to Antigua to have a better understanding of Stanford's business needs in order to develop an overall insurance plan for Stanford.  As a result, in late January or early February 2005, representatives of Willis London, including Doug Ogilvie, Patrick Caine, and Duncan Holmes, along with Baranoucky, traveled to Antigua to personally view some of the ongoing real estate development projects, including Stanford's massive resort projects, the Maiden Island project and the Guiana Island project, which the Willis representatives personally toured.  These projects contemplated massive construction of hotels and resort facilities, airstrips, marinas and golf courses on some of the outlying islands around Antigua.  Little did the SIB investors know that their money was being used to invest in Caribbean resort projects.

71.     As part of that January 2005 trip to Antigua, and due to the "confidential nature" of the Stanford resort projects, Jim Davis requested that Willis London sign a Confidentiality Agreement with Stanford Financial designed to keep the details of Stanford's Caribbean real estate development projects secret.  Willis agreed and actually prepared a Confidentiality Agreement and sent it to Stanford in Houston for approval.  On January 25, 2005, Fortin forwarded the Willis Confidentiality Agreement to Stanford General Counsel Mauricio Alvarado for review, with the note that "[w]e want the underwriters to keep information regarding our Antigua business plans confidential".  Alvarado approved the Willis Confidentiality Agreement and the agreement was signed between Willis London and Stanford Financial Group (Houston, Texas) on or about

February 5, 2005.

72.     On July 8, 2005, Willis London sent Fortin in Houston Willis' draft Underwriting Information Presentation for Stanford's real estate development projects in Antigua.  As part of its underwriting for the Stanford development projects, Willis London received detailed information from Stanford's Fortin, including details concerning the scope and nature of the various projects and the anticipated amounts of money Stanford planned to invest in the projects.  As just an example, in August-October 2005 Fortin provided Willis London with a summary cost analysis for some five real estate development projects in Antigua (including the Maiden Island project), which together contemplated an investment by Stanford of over *$333 million*.  At that time, SIB had total investor deposits of roughly $3 billion, which Willis London knew because it performed the financial underwriting for the Financial Lines of insurance for, *inter alia*, SIB.  Thus Willis London knew that Stanford was investing over 10% of its investment portfolio in risky illiquid Antiguan real estate projects.  It was also in October 2005 that Fortin disclosed to Willis London another "huge" Stanford real estate project, valued at $150 million, that was going to be developed in the United States.

73.     Since Willis London was familiar with Stanford's overall business operations, its business model, products, customer base, and its promotional materials and disclosures to its investors which touted liquidity above all else, Willis London knew that Stanford was essentially running a real estate development fund and that Stanford's investments in Antiguan and other real estate projects were not being disclosed to Stanford Financial's investor clients.  Willis London also knew that Stanford's development activities were highly secretive.  Besides signing a Confidentiality Agreement on the projects, Fortin also informed Willis in February 2006 that, as to the Guiana Island project, "everything is very secret", and "only Mr. Stanford and the architect

know what is going on".

74.     Willis continued to expand its insurance business with Stanford, working with Stanford on various insurance lines including political risk insurance and other insurance lines to cover Stanford's expanding international (particularly Latin American) operations.  In March 2005 Willis sent Stanford a presentation regarding Willis' International Capabilities.  In that presentation, Willis promoted its "One Flag" culture, which Willis described as meaning "that we work together as a single team across all our Business Units, to deliver value to the client.  In this way our client partnership model becomes a unique strength".  Over the years, Willis London employees Doug Ogilvie, James Hunt, Duncan Holmes, along with Willis Colorado employee Amy Baranoucky, regularly traveled to Houston, including to attend the quarterly meeting of the Stanford Financial Insurance Committee (chaired by CFO Jim Davis).

3.     *Defendants' Participation in the Insurance Letter Distribution Campaign*

75.     Defendants aided and abetted and assisted Stanford Financial to create and perpetuate the myth that investments in SIB were insured.   Defendants assisted this segment of Stanford's fraud by creating and distributing the insurance endorsement letters described herein. See true and correct sample copies of 1996, 1998, 1999, 2001, 2002 and 2004 letters from BMB, signed by Robert S. Winter, and sample copies of the 2005, 2006 and 2008 letters from Willis, signed (with the exception of the 2008 letter) by Amy S. Baranoucky, attached as **Exhibit "4"** hereto and made a part hereof for all purposes.  BMB and Willis both knew that the text of these letters was written by Stanford and yet BMB and then Willis agreed to print the letters out on their respective letterhead, leaving the name of the recipient and his or her address, as well as the date of the letter, in blank.  The letters were printed in blank because both BMB and Willis knew that Stanford intended to fill in the individual recipient investor's name and address and the date in

order to create the impression that BMB and Willis had created the letter especially for that investor, independently of Stanford.

76.     The "safety and soundness" letters issued by Defendants are remarkable in that they all use identical language to describe SIB.  Indeed, the text of the letters was actually written in the early 1990s either by SIB Board Member Winter or by another Stanford Financial employee in Houston, Gilberto Lopez, who has since been indicted by the U.S. Justice Department.  The text of the letters thereafter remained virtually unchanged over the years, to such a sloppy extent that the text of the letters regarding duration of insurance coverage remained the same even through different years.

77.     The letters tout SIB as being, *inter alia*, "*professional*" and comprised of "*first class business people*".  *Id.*  The BMB and Willis letters also proclaim that SIB is insured by various Lloyd's insurance policies, "placed" by Defendants for SIB.  Like the Spanish-language SIB promotional materials described above, the BMB and Willis letters uniformly omit to disclose the most important term of the insurance policies described in the letters --- being the actual amounts of the coverage afforded by the referenced insurance policies ---  thereby (and when coupled with the misleading SIB promotional materials as well as the fact that the letters were personally directed to individual investors) intentionally creating the misleading impression that the insurance policies provided coverage for the recipient investor's investments in SIB.  Also similar to the SIB promotional materials attached hereto, the BMB and Willis letters represent that the Lloyd's policies were only issued because SIB had "qualified" for said policies by undergoing (and apparently passing) "*stringent Risk Management Review[s] conducted by an outside audit firm*" (emphasis added).  *Id.*

78.     The letters were signed by Winter, a member of the SIB Board of Directors, on

behalf of BMB every year from at least 1996 through 2004, and provided to employees of Stanford Financial in Houston to be disseminated throughout the world.  BMB agreed to provide the insurance endorsement letters sometime in the early 1990s.  As a member of the Board of Directors, Winters knew that the purpose of the letters was to help market and sell SIB CDs.  And his company BMB also knew that.  As just one example, in October 2003, a Venezuelan SIB investor sent a letter to BMB directly, asking BMB whether his money would be safe at SIB in case anything ever happened.  The BMB employee who received the letter, Stephanie Guidry, who was the BMB Account Manager for Stanford, forwarded the letter on to Barbara Fortin at Stanford with this note – "*do I just send him one of the SIB letters?*"  Fortin responded by telling Guidry to inform the SIB customer to contact his FA to request an insurance letter.  On another occasion, in February 2004, Fortin e-mailed Guidry at BMB asking for more letters because the previous batch "did not print well".  Guidry printed out the letters and sent them to Winters to sign.  In thanking Guidry for getting the new batch of letters out on an expedited basis, Fortin apologized for making BMB re-do the letters, and said *"they are fine as far as I am concerned, but the Financial Consultants are complaining the [sic] it looks like we doctored them.*"

79.     Once Barbara Fortin, who had decades of experience in the insurance industry, joined Stanford Financial and was put in charge of the Stanford insurance portfolio in 2003, she immediately became familiar with, and was placed in charge of, the insurance letter distribution program.  Despite her thirty (30) years in the industry (and despite her having previously worked at BMB), she had never seen letters like these and found them to be highly unusual and irregular.  As a result, she questioned Winter about the letters and what they were being used for.  He informed her that they were used to "provide comfort" to Stanford Financial's international customers about the safety and security of SIB.

80.      Between 1996 and 2003, BMB provided literally thousands of insurance endorsement letters to Stanford Financial, all of them with the date and addressee intentionally left blank, and all of them signed by Bob Winter, with full knowledge that Stanford was going to send the letters on to its clients.   And, at the request of Stanford, BMB even agreed to modify the letters to tailor them to more discerning clients.   Thus BMB eventually devised two (2) separate endorsement letters:  one that just generally described the insurance policies, and a second one that also provided the rating (A.M. Best) information on the issuer.   BMB also agreed on at least one occasion in 2004 to tailor the letter to cover a separate Stanford entity – Stanford's Ecuadorian brokerage firm.   An Ecuadorian FA requested a BMB letter from Fortin for the brokerage firm "Stanford Group Casa de Bolsa".   Fortin responded by e-mail dated April 12, 2004 and authorized the issuance of the letter but noted that they would have to change the name from SIB to the brokerage firm, and that to do so she would have to request it from BMB.   The next day Stanford Financial shipped out the letter signed by Winter endorsing "Stanford Group Casa de Bolsa" and describing the same insurance policies covering SIB.

81.      Even after BMB transferred the endorsement letter campaign to Willis, it was still receiving correspondence from SIB clients.   In February 2005, another Venezuelan client of SIBL wrote to BMB that he had received one of the BMB insurance letters in 2003 and wanted to get a copy of the 2005 coverage letter.   Guidry forwarded the request from the SIB client to Fortin, who instructed Guidry to notify the client that he "*should contact client services at SIBL to request a new letter*".

82.      When Stanford Financial switched insurance brokers from BMB to Willis, naturally they also switched the insurance endorsement letter writing campaign from BMB to Willis as well.   On Monday August 9, 2004, various representatives of Willis London, including Doug Ogilvie and

Patrick Caine, along with Amy Baranoucky from Willis Colorado, traveled to Houston to meet with Davis, Fortin and other members of the Stanford Insurance Committee to finalize the quotes on the Financial Lines of insurance for 2004/2005.  At that meeting, Davis and Fortin discussed the insurance letter program and requested that Willis assist Stanford with the issuance of the letters. Upon information and belief, the Willis representatives asked the Stanford representatives as to the purpose of the letters, and the Stanford representatives responded that it was for marketing purposes.   The Stanford representatives further informed Willis that Stanford would provide the full text for the letters and that all Willis had to do was sign the letters in blank and in bulk, and ship them to Stanford.  The Willis representatives, including Doug Ogilvie of Willis Ltd., agreed that Willis Colorado would provide the letters on Willis Colorado letterhead, but with the addressee and the date left in blank, as part of servicing the Stanford account.

83.     At some point during the week following the August 9th meeting in Houston, Stanford employees caused the text of the BMB insurance letters to be delivered to Baranoucky for her to use to prepare the new insurance letters on Willis letterhead.   The following Monday, August 16, 2004, Baranoucky e-mailed Fortin at Stanford to inform her that:

> "[h]aving not anticipated your request for the letters, we have run out of letterhead. We ordered more but it won't arrive until tomorrow.  As such, can I print the letters tomorrow after receiving the letterhead and overnight to you for delivery on Wednesday?  If this isn't acceptable, I can create "homemade" letterhead using our color printer, it just won't be on nice bond paper.  Let me know what your preference is".

Fortin responded to Baranoucky as follows:  "[h]ow many letters can you do with your current supply of letterhead?  Do what you can and send the balance once the additional letterhead is available.  I also need envelopes".   Baranoucky replied later that same day and told Fortin that she had run out the letterhead as she was printing the first letters, but that, at any rate (and reflecting her knowledge that the letters were to be sent in blank): "all of the ones that I had printed had the

*date on anyhow, so I have tossed them and so will have to start new once the letterhead arrives tomorrow*".   Baranoucky also confirmed that she would send along "*1 blank letter size* [Willis] *envelope per letter issued*".

84.    The next day, August 17, 2004, Baranoucky wrote Fortin, with copy to Doug Ogilvie in London, to inform that she was going to overnight the letters and to thank Fortin for her patience "*as we learn how to service your account to your satisfaction*".   Later that same day, Baranoucky discovered that BMB had made a practice of sending two differently worded letters, and so she wrote to Fortin yet again:   "*[s]eems there are two letters for Stanford International Bank. Which one would you like for me to use or do you need them both?*"   Fortin replied that "*we use both SIBL letters depending on the situation.*"

85.    On August 17, 2004, Baranoucky sent, with Willis London's explicit approval, the first batch of blank Willis Colorado insurance letters, along with Willis envelopes, to Stanford Financial in Houston, with full knowledge that said letters were to be used by Stanford Financial to market SIB and the SIB CDs to prospective investors, with Stanford filling in the dates and the recipients' names and addresses for each letter.

86.    A month later, on September 21, 2004, Fortin e-mailed Baranoucky, with copy to Patrick Caine of Willis London, that she needed 30 more of the SIB insurance letters overnighted to Houston.   Baranoucky responded that she would print the letters out immediately and overnight them.

87.    Three weeks later, on October 15, 2004, Fortin forwarded a Word document containing the Spanish translation of the insurance letter to Baranoucky, and asked Baranoucky: "*[w]ould you mind putting it on Willis letterhead and sending me 25 copie*s".   Baranoucky responded "I would be happy to print these out", and asked if Fortin needed them to be overnighted,

to which Fortin responded in the affirmative.

88.     Every year thereafter, from 2005 through 2008, Willis Colorado, with the authorization of Willis London, repeated this procedure and repeatedly signed (in blank) and shipped packages of the insurance letters (as many as 7 different ones according to a August 11, 2006 e-mail from Baranoucky to Fortin) to Stanford in Houston knowing that the letters were to be used for marketing SIB CDs to clients.

89.     There is no question that Willis knew that Stanford was using these letters to send to SIB clients.  In an August 11, 2006 e-mail from Baranoucky to Fortin, with copy to Doug Ogilvie at Willis Ltd., the reference line reads "Client letters", and in the e-mail Baranoucky states that in looking through her files, "*we issued seven different client letters for you last yea*r".   She goes on to state that she had updated the letters and asks Fortin if "*these are the letters you would like issued this year and if so, how many of each*?"   Fortin replied that she wanted Baranoucky to issue all the letters and ship 35 original copies of the SIBL letters with Spanish versions.   Having not received the letters, Fortin wrote to Baranoucky on August 24, 2006 that "[*w*]*e need the letters ASAP.  We have already started receiving requests and must get them out*".   Once she received the letters from Baranoucky, Fortin wrote back complaining that the "*letters sent do not leave room for us to put client address on them.  Can you please send another batch and move the letter down as far as you can on the page*?"   She therefore instructed Baranoucky to get as many batches of the SIB letter done as quickly as possible and then reformat the rest for delivery as soon as possible.

90.     In fact, some SIB clients even called Baranoucky in Colorado to ask about the insurance coverage for SIB and request evidence of the insurance.   On April 16, 2006 Baranoucky e-mailed Fortin that a SIB client had called her asking for evidence of insurance.   Baranoucky told Fortin:  "As always, I direct these requests to you."  Fortin replied:  "[p]lease have the client call his

financial adviser".

### 4.   The Insurance Letters are Misleading and Fraudulent

91.     The insurance endorsement "safety and soundness" letters prepared and shipped to Stanford by Defendants over the years were clearly designed and intended by Defendants to be distributed to Plaintiffs and other actual and prospective investors in Stanford Financial/SIB, and contain untruths and omissions of material facts directed at Plaintiffs with the purpose of promoting and selling SIB and its CD products to Plaintiffs.  Defendants Willis and BMB had no reasonable basis to make the statements contained in the letters because they knew or should have known (and were therefore reckless in communicating information to the contrary) that SIB was violating a host of laws and not disclosing material facts about its investments to its clients, and also knew that SIB did not undergo "stringent" annual Risk Management reviews, and that any reviews were not conducted by a reputable audit firm.   The letters also misleadingly suggest that the risk management reviews were done on an annual basis, because the letters were issued annually and discuss insurance policies that were issued annually, and the letters state that in order to qualify for the policies SIB had to undergo the risk management reviews.

92.     The only "risk management" audit conducted on SIB by *any* third party was a limited scope review performed only <u>once</u>, in 2003, by a one-man operation in Florida called "Stogniew & Associates" that resulted in a flimsy, "whitewash" report full of disclaimers.  Yet BMB issued the letters from 1996 to 2003 without ever even seeing any risk management review of any kind.  And, upon information and belief, Baranoucky blindly signed the Willis letters from 2004 through 2007 or 2008 without ever having seen the 2003 Stogniew report.  Baranoucky in particular signed the letters endorsing SIB despite her knowledge that (1) the text of the letters was written by someone at Stanford and (2) without having verified any of the letters' content.

Defendants just recklessly issued the Stanford-written letters from 1996 through 2008 in order to help Stanford lure investor clients to purchase the bogus offshore CDs.

93.     What is perhaps most fraudulent about the letters is the fact that they were sent to SIB investors at all.  None of the insurance policies listed in the letters actually cover or provide insurance for any SIB investor/depositor.  Investors like Plaintiffs were not Defendants' clients, were not the insured beneficiaries of the policies, nor were they additional insureds, and there is no logical reason why Defendants could think that depositor/investors in SIB should receive such letters, unless the letters were designed to mislead the recipients into believing the listed insurance (with names like "Excess FDIC" and "Banker Blanket Bond") somehow applied to them or protected their particular investments in the Bank.

94.     The letters are also fraudulent because, as described above, the text of the letters was actually written by employees of Stanford Financial, and yet both BMB and Willis conspired with Stanford Financial to create the false impression in the minds of investors that the letters were issued by BMB and Willis *independently of Stanford*.  The clear intent of the insurance letter distribution program described herein, with Defendants signing and shipping the letters to Stanford with the ultimate recipient, and even the date of the letter, left in blank, was to deceive investors into believing that the letters had in fact been especially prepared by Defendants and sent to each individual investor, such that the letters constituted, in the minds of the individual investors who received them, an ***independent endorsement*** of Stanford Financial and SIB and the insurance coverage for SIB made by two independent and (in the case of Willis) well known and prestigious insurance brokerage firms.  This intent was fraudulent from conception and the investors were never told that, in fact, the insurance letters they thought came from BMB and Willis had in fact originated from Stanford itself, such that the letters only really constituted endorsements of

Stanford by Stanford itself.  Even worse, the letters issued by BMB completely fail to mention that the signatory thereto, Robert S. Winter, was in fact a member of the Board of Directors of SIB. Instead the BMB letters give the distinct impression that BMB is a wholly unrelated company providing an unbiased outside "opinion" about SIB.

95.     Moreover the most important term of any insurance policy is the dollar amount of the coverage, and that vital term was intentionally omitted for each of the policies listed in the letters sent every year to actual and prospective SIB investors.  Since SIB was grossly underinsured based on total deposits (over $7 billion by 2009) versus total insurance ($50 million), Stanford Financial was adamant about keeping the actual dollar level of insurance coverage a secret from the investors and others.   Fortin and others on the Insurance Committee consistently made a point of informing other Stanford employees about the confidential nature of Stanford's insurance program, and Stanford was very careful to keep actual insurance certificates that revealed the size of the policies under lock and key.  Fortin even stated on several occasions that the revelation of the true level of insurance coverage on SIB could cause damage to Stanford.   On August 20, 2004, a SIB client wrote BMB directly requesting additional information about SIB's "depository insolvency" insurance that was listed in one of the BMB insurance letters.   As usual Stephanie Guidry at BMB forwarded this request on to Fortin, who responded by instructing Guidry that:  "*whenever you get a request for insurance information, of any kind, from a client, please refer them back to us.  Do not release any information without our prior approval.*"

96.     As a result, no investor knew that the maximum coverage SIB had under its "Excess FDIC" policy was $20 million – to cover over $7 billion in deposits.  And no investor ever knew that the maximum coverage SIB ever had at any time was $50 million – again, to cover over $7 billion in deposits – a coverage ratio of less than 1 percent.  As the risk managers and insurance

brokers for all of Stanford Financial, Defendants had full knowledge that SIB was grossly underinsured, and yet continued to send the insurance letters describing insurance policies, but intentionally omitting the amounts of coverage, every year to SIB investors.  The omission of the insurance coverage amounts in the letters constitutes a clear intent to deceive on the part of Defendants, designed to make the recipient of each letter believe that his individual investment was insured and protected, because, after all, if the insurance described in the letter *didn't* apply to the individual investor's investment in SIB, then why was the investor receiving the letter?

97.     Even many of the Latin American FAs believed that the insurance letters evidenced that their clients' investments in SIB CDs were wholly insured.  As an example, on May 22, 2002 Mexican FA Raquel Alperstein e-mailed Houston requesting an "*Insurance letter where it is mentioned that the FDIC covers all the Bank investments that exceed $100,000*".  Without attempting to correct Ms. Alperstein's understanding of the coverage, Houston promptly sent one of the Bowen letters referencing that SIB carried "Excess FDIC Insurance" so that she could provide the letter to a prospective client in Mexico City.  Another Mexican FA wrote to Houston on April 26, 2002 requesting insurance letters for three prospects "*to let them know about the insurance that SIB has with some insurance companies to protect all the deposits made by each of our customers*".  The three letters were shipped to Mexico the next day.

98.     Moreover, as the insurance brokers for Stanford Financial, Defendants knew that SIB was part of the Stanford Financial group and was being operated from Houston, Texas, and that the SIB CD products were being marketed and sold by Stanford Financial from, by and through Houston, Texas.  All communications between Willis and/or BMB and Stanford Financial flowed through Houston, Texas, and the letters attached in Exhibit "4" were all routed by Defendants to Stanford Financial personnel in Houston, Texas with full knowledge that the letters were designed

to be used by Stanford Financial in Houston Texas to promote and sell SIB CDs to clients throughout the world, including, *inter alia*, in Mexico and Venezuela.

99.     Certainly, Defendants, in distributing these letters to Stanford Financial with the clear understanding that they would be redistributed to clients, engaged in severely reckless and misleading conduct designed with one goal in mind --- to advance the business goals of their client Stanford Financial.

*5.*     The Insurance Letter Distribution Campaign in Action

100.     Every year from the mid-1990s through 2008, Stanford Financial distributed hundreds, if not thousands of these misleading insurance letters worldwide.   The procedure involved Stanford FAs from Venezuela, Mexico, Colombia, Ecuador and elsewhere writing to Stanford Financial personnel in Houston (such as Patricia Maldonado (1998-99), Cynthia Adames (2000-2002) and then Barbara Fortin (2003-2007)) to request copies of the letters for one or more actual or prospective clients.   The requesting FA informed Houston of the name of the client and the address, so that the Houston staff could take the blank letter provided by Bowen or Willis and fill in the name and address of the recipient, as well as the date, in order to make the letter appear "personal."   Both BMB and Willis also provided their own firm letterhead envelopes to Stanford personnel in Houston so that the Stanford personnel could "package" the insurance letters to make it appear as if the letters came directly from BMB or Willis to the client, thus enhancing the illusion of an "independent" opinion by an outside insurance brokerage firm.

101.     On many occasions FAs would, within the same request, request insurance letters for as many as a dozen clients (one FA requested letters for 20 clients in one request in 2002), and Houston would package and FedEx the letters immediately, typically the same day or next day.   In 2001 alone over 500 BMB insurance letters were shipped from Houston to Latin America via

FedEx at the request of Stanford FAs in countries such as Venezuela, Mexico, Ecuador and Colombia.  Another 400 BMB insurance letters were shipped into Latin America in the *first half* of 2002 *alone*.  At some point in time, believed to be in 2002, Stanford and Davis imposed a requirement that the insurance letters could only be sent to potential clients that had a least $1 million to invest in SIB and who requested the insurance letters as a condition of deposit.  The vast majority of the requests for insurance letters in 2002 and thereafter came from FAs who referenced that the targeted prospective clients were looking to invest anywhere from $1 million to $10 million each in SIB.  And despite the change in the protocol for distribution of the insurance letters, several top producing FAs were able to secure a waiver of the requirement for long time SIB clients who required proof of insurance as a condition of continued investment in SIB.

102.    The use of the insurance letters as marketing tools became prolific after 1999 when a copy of the insurance endorsement letter was included in the Stanford Financial training materials for the FAs.   The Stanford FAs were indoctrinated on how to use the letters to market and sell the SIB CDs to new clients.   Many of the requests for letters from the field requested the insurance letters from "*our*" Financial Specialist, referencing Robert Winters, who always signed the letters on Bowen letterhead as "Financial Specialist".   Evidencing the widespread use of the insurance letters by the FAs, Stanford-Houston employee Patricia Maldonado, who was in charge of the distribution of the letters from 1998 to 2000, responded via e-mail dated June 7, 2000 to a Latin American FA's request for the letters as follows:   "*I think I know why these are so popular these days.   A training manual for the F/Cs included a copy of this letter.   **So now everyone is 'Insurance Letter Happy'**"*.

103.    Typical of such a request from an FA is a request made by Venezuelan FA Jane Butler, who e-mailed Patricia Maldonado on May 18, 2000 requesting insurance letters for five

different clients, as follows: "*I am in need of those famous insurance letters that are most helpful*

*for marketing in Venezuela*".   Another Venezuelan FA, Vanessa Barreto, wrote to Cynthia Adames

(who was in charge of the letter distribution from 2001-2002) at Stanford Financial's headquarters

in Houston on November 5, 2001 to request a Bowen insurance letter as follows:

> *Due to a prospect's request I would like, if it is possible, a signed letter*
> *which describes the insurance programs that secure SIB's funds.  This is for*
> *a prospect who is interested in something in writing that certifies him of*
> *these insurances and assures him of the bank's security.*

104.    The insurance letters worked incredibly well for the Latin American FAs in selling

the SIB CDs.  In requesting the letters from Houston, Latin American FAs frequently noted that the

investor's receipt of the insurance letter was the only thing standing between the investor agreeing

to close a deal and investing his money in the SIB CDs.  Other FAs wrote to Houston requesting

letters and informing that the prospective client would not invest without a copy of the insurance

letter.  As a result, the FAs regularly thanked the insurance letter distributors from the Houston

office for sending the letters.  One Latin American FA, Nicolay Del Salto, wrote to Cynthia Adame

on February 26, 2002 that: "[*t*]*he info you have sent to my prospects in the past has been extremely*

*helpful and just wanted to let you [sic] how much that increases our credibility*".  Other Latin

American FAs wrote to express their gratitude at how much the letters helped them to market SIB

to prospective customers.

105.    Of course, and given the commission incentives paid to the FAs by Stanford

Financial to sell the SIB CDs, the FAs took additional measures to get the word out to all of their

prospective customers that the SIB CDs were insured, including re-using the insurance letters over

and over again.  Once received by the FAs in Latin America, the insurance letters were like loaded

guns ready to be used on anyone at anytime.  All the FAs had to do (and did do repeatedly) was

"white-out" the intended recipient's name and then re-use the same letter with a different client. Many of the Latin American FAs had Houston send them insurance letters addressed to themselves (i.e., addressed to the FA) at their local branch office, so that they could make copies of the letter and distribute it out to as many clients as they wanted.  Other Latin American FAs simply kept a copy of the insurance letter in their desk drawer and showed it to prospective customers. Furthermore, on at least one occasion, in March 2004, an FA contacted Barbara Fortin to request an insurance letter for a client who did not meet the $1 million profile, but in making the request the FA informed Fortin that the client had several friends who did have over $1 million to invest and that if the FA could just get the insurance letter to his client, he was confident that his clients' friends would also invest in SIB.  Ms. Fortin authorized the shipment of the insurance letter to the FA's client the next day.  Slowly but surely, the word spread throughout Latin America that the SIB CDs were insured by Lloyds of London.

### E.    The Stanford Reality

106.    The reality of the Stanford Financial empire was that it was nothing but a massive, worldwide Ponzi scheme.  The Stanford Financial companies operated together as a single business joint enterprise dedicated to the fraudulent sale of SIB CDs, which sales were the lifeblood of the entire enterprise.  The master manipulator and salesman, Allen Stanford reached new heights in terms of creating and perpetrating the ultimate "confidence" scam on a global level.  Stanford became a true international financial pirate, absolutely intent on operating an outlaw investment company from his Caribbean safe haven completely outside the regulatory confines of the laws of any country, whether the United States, Antigua, Mexico or elsewhere.  Indeed Stanford Financial violated the laws of virtually every country it operated in, including the United States, Mexico, Venezuela and Antigua.   Stanford's repeated commission of regulatory fraud in various countries

enabled and fostered the growth of SIB's CD sales.

107.    Allen Stanford's personal history, by itself, was a red flag and cause enough to question the veracity of the image he created for the Stanford Financial empire. His first business, a chain of Waco, Texas-based gyms called "Total Fitness", collapsed into bankruptcy in 1982. Allen Stanford declared personal bankruptcy as well in 1984 and was discharged from $13.6 million in obligations.[5]  Stanford fled to the Cayman Islands where he became a scuba diving instructor. It was there that he met Dutch ex pat Frans Vingerhoedt, who introduced him to the world of offshore banking.

108.    By 1985 Stanford opened his first bank, Guardian International Bank ("Guardian"), on the tiny (12,000 residents) Caribbean island of Montserrat, which at that time was known mostly for its extremely lax banking regulations. Virtually all of the banks that were opened in Montserrat in the 1980s were "paper" banks dedicated to fraud. In fact David Marchant, the editor of "Offshore Alert", was quoted as stating that "the only reason you opened a bank in Montserrat was to commit fraud."[6]

109.    It was at that time, in the late 1980s, that Stanford began the charade linking his new offshore banking business to the insurance business his grandfather had run in Mexia in the 1930s, creating the illusion for investors that the Stanford Financial companies had been in the finance business for decades, instead of just a couple of years. By 2008 even some Stanford Financial employees believed the myth that Stanford Financial had been in business for over 70 years.

110.    Guardian served as the starting point roadmap for the eventual creation of the Stanford Financial empire. Stanford established representative offices for Guardian in Miami and Houston, under the name of Guardian International Investment Services, designed to cater to

---

5       *BusinessWeek*, March 5, 2009, "Stanford's Rocky Start."
6       As quoted in Bryan Burroughs, "*Pirate of the Caribbean*", Vanity Fair, at 81 July 2009.

wealthy Latin American clients.[7]   Stanford brought in his old college roommate James Davis to help run operations.  Guardian offered CDs with rates typically 2-3% above the average rates available in the market, all with the confidentiality associated with offshore private banking.

111.     By 1989 the banking system in Montserrat came under investigation by British and U.S. authorities.  Guardian came under scrutiny for possible drug money laundering, and so Stanford began looking for other locations for his bank.  In December 1990 Stanford incorporated Guardian in Antigua.  By May 1991 Stanford's banking charter was revoked by Montserrat.  So Stanford moved his banking operations to Antigua, and simply continued the same basic business plan that had proven so profitable for Stanford in Montserrat.  Stanford eventually changed the name of the bank from Guardian to Stanford International Bank ("SIB") in 1994.

112.     Once established in Antigua, Stanford quickly set about establishing a symbiotic relationship with the local government.  In return for political cover, Stanford eventually became a major source of funding for the entire island, loaning hundreds of millions of dollars to the Antiguan government over the years.  Stanford even bought the Antiguan newspaper, the Antiguan Sun.  By 2004, the island government owed Stanford Financial over $87 million – nearly half of its annual tax revenues. In that same year, SIB had grown to over $3 billion in deposits.

113.     So tight was the relationship between Stanford and the Antiguan government that, when Stanford Financial was accused of money laundering in 1999, the Antiguan government turned to Stanford himself to rewrite the country's banking laws.  Stanford and his agents were then named to the commission, the Antiguan Financial Services Regulatory Commission ("FSRC"), created and charged with supervising Antigua's banks.  Stanford then used the new commission to wrest control of Antigua's offshore banking industry from the Government.  As a result, the U.S. State Department issued an advisory to U.S. banks to scrutinize all financial transactions coming in

---

7      *BusinessWeek*, Feb. 24, 2009, "Did Court Ruling Prolong Stanford Probe?"

or out of Antigua for evidence of money laundering.[8]

114.    Jonathan Winer, then-head of the State Department's Bureau for International Narcotics and Law Enforcement Affairs, said at the time in 1999 that Antigua is "one of the most attractive financial centers in the Caribbean for money launderers", and that "Antigua has long been one of the worst regulated offshore centers in the world."[9]   Winer was recently quoted as saying that when he asked an Antiguan banking official in the late 1990s why anyone would choose that country for banking as opposed to New York, London, Tokyo or Paris:  "he scratched his head and after a while he said 'I guess would have to be the secrecy…I'd say it's the secrecy plus the lack of standards or real controls.'"[10]

115.    Antigua's well deserved reputation for corruption and lax banking regulations is borne out  by the Plea Agreement entered by Stanford CFO Jim Davis ("Davis Plea"), as well as by the June 18, 2009 federal grand jury Indictment of *inter alia*, Allen Stanford, Laura Pendergest-Holt, and Leroy King ("King"), Stanford's good friend and the former head of Antigua's FSRC (the "Indictment").  The Davis Plea and Indictment allege that for years King, while acting as the CEO of the Antiguan FSRC, accepted bribes from Stanford and/or his associates in return for ensuring that the FSRC "looked the other way" and did not properly perform its regulatory functions or supervise SIB.  King even entered into a bizarre Voodoo-like "blood brother" ritual with Allen Stanford in which he agreed to forever be bound to Allen Stanford.  As part of the blood brother relationship and bribery, King became Stanford's regulatory spy and "inside man" in terms of relaying information to Stanford concerning the SEC's investigations of Stanford Financial and SIB

---

8        *Houston Chronicle*, July 16, 2000, Banker drawing scrutiny / Houstonian's Antigua empire raises questions
9        Statement to the US Congressional House Committee on Banking Financial Services, Jonathon Winer, US State Department, June 11, 1998.
10       "Stanford arrives for his Houston hearing", By MARY FLOOD and TOM FOWLER HOUSTON CHRONICLE, June 24, 2009.

from 2005 all the way until 2009.  All of this was just part and parcel of Stanford's broader conspiracy to keep his Ponzi scheme alive by evading and obstructing regulation of SIB's activities at every turn and in every county.

116.    Stanford Financial began to grow exponentially beginning in 2000, thanks in large part to Defendants' insurance endorsement letters, the distribution of which became prolific in 1999.  In 2001, Stanford filed for an SEC Regulation D exemption to allow Stanford Financial to sell SIB CDs to U.S. "accredited investors" in the United States (of course, Stanford continued to rampantly sell CDs to Latin Americans from its offices in Texas and Miami regardless of whether they were "accredited" or not).  Stanford thereafter began the practice of "head hunting" for U.S. brokers and financial advisers, paying enormous signing bonuses to financial advisers to leave their jobs at other firms and transfer their book of clients over to Stanford Financial.  Once at Stanford Financial, these same FAs were then pressured into promoting and selling SIB CDs to their clients, and were rewarded with outsized bonuses or fired, sued to recover the bonuses and blackballed in the industry if they refused to cooperate and sell the CDs.  Fueled by this influx of veteran brokers and investment advisers, Stanford Financial grew from 6 branch offices in the United States to more than 25 between 2004 and 2007.

117.    From 2000 to 2008 Stanford Financial grew into a high-powered sales and marketing juggernaut.  Stanford Financial began an intensive television advertising campaign in the United States designed to promote the sale of the CDs.  The different Stanford Financial sales offices competed with each other for CD sales, and developed team names like "Money Machine", "Aztec Eagles" (the Mexico team) and "Superstars".  In order to market and sell the SIB CDs, Stanford established a commission structure that provided huge incentives for the Stanford Financial FAs, including those in Latin America, to "push" the SIB CDs on investors like Plaintiffs.  SIB paid

disproportionately large commissions to its FAs for the sale of CDs; they received a 1 % commission upon the sale of the CDs, and were eligible to receive as much as a 1 % trailing commission throughout the term of the CD.  Stanford Financial used this generous commission structure to recruit established financial advisers to the firm, and to reward those advisers for aggressively selling the CDs to investors.

118.    Beginning in 2003 Stanford's strategic plan to lure top financial advisers away from their employers to work for Stanford Financial began to back-fire as several U.S. advisers renounced their new position with Stanford and lodged complaints with FINRA f/k/a the NASD, including charges that Stanford Financial was running a massive Ponzi scheme.  Some of the advisers were fired for refusing to promote and sell the SIB CDs to their clients. Between 2003 and 2006 over a dozen Stanford Financial advisers and employees, including Leyla Basagoitia in 2003 and Lawrence J. DeMaria in 2006, were discharged or resigned amid allegations of fraudulent practices at Stanford Financial.  Defendants were aware of some or all of these claims.

119.    The ultimate reality of Stanford Financial is that it was, at all times, illegally operating an investment company from, by and through Houston, Texas in the guise of operating an offshore bank in Antigua.  In essence, Stanford Financial, acting through its international network of companies and FAs, lured money from investors like Plaintiffs; gave them an "IOU" piece of paper called a "Certificate of Deposit" in return; and then pooled all of the investors' money together to make investments in various illiquid and high risk assets worldwide, including massive investments in Antiguan real estate.  None of the investors' money was segregated and all investor money was commingled and then sprinkled as equity investments throughout the various companies that comprised Stanford Financial.  As such, in reality Stanford Financial was operating as an outlaw, illegal investment company, not registered under the Investment Company Act, and selling

its internal product securities to Plaintiffs and others from, by and through Houston, Texas.  Section

47(b) of the Investment Company Act provides:

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this Act.  15 U.S.C. § 80a-46.

120.     Stanford Financial was never registered or authorized to operate as an investment

company in the United States, a fact that was never disclosed to Plaintiffs or the Class, who were

consistently and uniformly told verbally and via the Stanford Financial promotional materials that,

e.g. the Stanford Financial group based in Houston, Texas was authorized and regulated by the SEC

and FINRA and backed by SIPC and Lloyd's of London insurance coverage.  Plaintiffs and other

investors were never told the material fact that the acts of Stanford Financial and its unregistered

investment company were *void as a matter of law* under Section 47 of the Investment Company

Act.

121.     Besides the fraud committed on Plaintiffs and the Class based on the marketing of

Stanford Financial and SIB as being one and the same and that Stanford Financial was regulated by

and in full compliance with U.S. law, as well as false and misleading representations that

investments in the CDs were insured, Stanford Financial also touted the high liquidity of SIB's

investment portfolio.  For example, in its marketing materials distributed to Plaintiffs and the Class

from at least 1995 through 2009, Stanford Financial emphasized the importance of the liquidity of

the SIB CD, stating, under the heading "Depositor Security," that the bank focuses on "maintaining

the highest degree of liquidity as a protective factor for our depositors."  None of that was true.

Likewise, Stanford Financial trained its advisers to stress liquidity in their marketing pitches to

prospective investors, telling the brokers and advisers that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients…"  To ensure investors would buy the CDs, Stanford Financial, through its FAs, assured the investor clients that SIB's investments were liquid and diversified, and therefore that the CDs themselves were highly liquid and could be redeemed with just a few days notice.  But in fact, nearly 80% of SIB's investments were concentrated in high-risk, illiquid categories: (1) unsecured loans to Allen Stanford in the amount of $1.8 billion; (2) private equity investments in non-public companies; and (3) investments in Stanford Financial companies with real estate holdings, including extensive real estate holdings in Antigua and elsewhere in the Caribbean.

122.   Contrary to Stanford Financial's representations (both verbal and via the promotional materials) to Plaintiffs and the Class regarding the liquidity of its portfolio from 1995 through 2009, significant portions of SIB's portfolio were misappropriated by SIB's sole shareholder, Allen Stanford, and used by him to invest heavily in Caribbean real estate development ventures.   In fact, by 2008, Stanford Financial was essentially a real estate development fund, a fact which Defendants new and which was never disclosed to Plaintiffs or the Class.  At year-end 2008, the largest segments of the bank's portfolio were: the "loans" to Mr. Stanford and over-valued real estate, primarily in the Caribbean.  By February 2009, Mr. Stanford had misappropriated at least $1.8 billion of investor money through bogus personal loans and "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled solely by himself, including massive investments in real estate and other private business ventures in Antigua.  The rest of the money from investors was just blown by Stanford on creating and perpetuating the image charade with lavish offices, outsized bonuses and commissions paid to lure and retain top performing sales personnel, extravagant special events for clients and

employees, and the other accoutrements necessary to shore up the Stanford Financial image of wealth, power and prestige.  None of this was disclosed to Plaintiffs and the Class.

123.     As alleged in the Davis Plea and in the criminal Indictment of Allen Stanford and the others, Stanford and his CFO Jim Davis "fabricated the performance of the bank's investment portfolio and lied to investors about the nature and performance of the portfolio.  Gilberto Lopez and Mark Kuhrt, accountants for Stanford-affiliated companies, fabricated the financial statements.  Using a pre-determined return on investment number, typically provided by Stanford or Davis, Lopez and Kuhrt reverse-engineered the bank's financial statements to report investment income that the bank did not actually earn.  Information in SIB's financial statements and annual reports to investors about the bank's investment portfolio bore no relationship to the actual performance of the bank investments.  SIB's financial statements and annual reports to investors were prepared, drafted and approved by Stanford, Davis, Lopez and Kuhrt.  Stanford and Davis signed these falsified financial statements."[11]

124.     At the end of the day, the entire Stanford Financial empire was dominated completely by one man—Allen Stanford – and Defendants knew it.   Although SIB purported to have an independent board of directors, an investment committee, a chief investment officer and teams of global portfolio advisers and analysts, in truth and in fact the vast majority of the bank's assets (including the Antiguan real estate projects) were managed exclusively by Mr. Stanford and his right hand man and former college roommate Jim Davis.

125.     In running the Stanford Financial empire from the United States, Stanford and Davis surrounded themselves with a close-knit circle of family, friends and confidants.  The SIB Board of Directors included Stanford's 81 year old father and his 85 year old friend, O.Y. Goswick, a former rancher who was listed in Stanford Financial's annual reports as being somehow in charge of SIB's

"investments", but who in reality, and according to his own son, did not have sufficient financial knowledge to understand SIB's operations and had suffered a stroke in 2000 that left his ability to communicate "nonexistent".[12]   Defendants ignored all of these red flags in their zeal to assist Stanford Financial sell more CDs.

126.     Moreover nepotism predominated within Stanford Financial, where the upper level management team was comprised of a tightly linked web of friends and family of Stanford and Davis.  Just as Stanford brought in his old friend Davis, Davis in turn brought in his protégé, the young Laura Pendergest-Holt, whom Davis had met at the Mississippi Baptist church where Davis was a Sunday school teacher.  In turn, Perndergest-Holt's cousin Heather Sheppard was an "equity specialist" at Stanford Financial, while her sister's husband, Ken Weeden, was Stanford Financial's managing director for investments and research. Jim Davis' brother in law, Danny Bogar, served as SGC's President and ran Stanford Financial's operations for the entire United States.  Davis' son Zack also worked for Stanford Financial as an "equity specialist".

127.     Pendergest-Holt's resume, in particular, was an instant red flag.  As the Chief Investment Officer allegedly in charge of investments for SIB and overseeing an $8 billion portfolio, she had no real business or finance education or training.  Lawrence Lieberman, senior managing director at Orion Group, an executive recruiter firm for the money management industry, was quoted as saying that Pendergest-Holt was hired for the position as Chief Investment Officer probably because Stanford and Davis "needed someone they could trust and not someone who could pick stocks".[13]  Davis recruited Pendergest-Holt to work at Stanford Financial in 1997 when she was a recent 22 year old college graduate from Mississippi State, where she earned a degree in

---

11      SEC Second Amended Complaint, at ¶4.
12      Jamie Stengle, "*Dad, 81, to Stanford:  'Do the Right Thing'*", Associated Press, February 20, 2009.
13      Ana Driver and Svea Herbst-Bayliss, "*Stanford's CIO's Fast Path to Top a Red Flag*", Reuters, March 8, 2009.

Math.  She quickly worked her way up the ranks from research analyst to managing director of research and investments until she became Chief Investment Officer when she was 30 years old, all with no degree or background in finance whatsoever.  According to Lieberman, Stanford "may not have wanted a legitimate CIO because that person might have asked a lot more questions and not played ball".[14]

128.    The same is true of the lead accountants for Stanford Financial, both of whom were recently indicted as well.  As alleged in the Indictment and the SEC's Second Amended Complaint, Gilberto Lopez was the Chief Accounting Officer for Stanford Financial, and yet he was not a licensed CPA.  Mark Kuhrt, also indicted, served as the Global Controller for Stanford Financial, and yet was not a licensed CPA either.  These two non-CPAs were in charge of accounting for a global financial services company with (allegedly) $50 billion "under advisement".

129.    By year-end 2008, Stanford Financial had sold approximately $7.2 billion worth of SIB CDs to Plaintiffs and the Class by touting: (i) the bank's safety and security, including that invested funds were insured; (ii) consistent, double-digit returns on the bank's investment portfolio; and (iii) high return rates on the CD that greatly exceeded those offered by commercial banks in the United States.  It was at the end of 2008, in the midst of the worldwide financial meltdown, that Stanford Financial began to stumble.

130.    As alleged by the SEC and the United States Justice Department, in order to cover up a hole in SIB's balance sheet that would cause it to fall below minimum capital requirements, in 2008 Stanford and Davis concocted a bogus $541 million shareholder equity infusion by manufacturing a series of fraudulent "roundtrip" real estate deals whereby Stanford took a piece of Antiguan property (believed to be the Maiden Island and Guiana Island projects Defendants helped underwrite the insurance on) he purchased for $63 million and transferred it to some entities who

---

[14]    *Id.*

"booked" it at $3.2 billion and then transferred shares in those entities back to SIB.  In Mexico, David Nanes went even further by telling the Stanford Mexico sales force that Stanford had made this capital infusion because Stanford Financial was preparing to receive large sums of money from certain foreign governments and central banks and therefore needed more shareholder equity to support this massive increase in deposit funds.[15]

131.    In December 2008 Stanford Financial's clearing firm, Pershing, informed Stanford Financial that it would no longer process wire transfers from SGC to SIB for the purchase of CDs. Stanford Financial began suffering liquidity problems that prevented SIB from complying with client requests for transfers of funds.  This had a huge impact on the ability of the FAs at Stanford Financial to keep clients pacified.   Nevertheless the Stanford Financial FAs were ordered to continue to sell the CDs and bring in new money.

132.    In January 2009, in the wake of the Madoff scandal, Venezuelan financial analyst Alex Dalmady performed a rudimentary review of SIB's returns over the years, taken from SIB's Annual Reports (the same ones Defendants reviewed every year), as a favor for a friend, and then published his findings in a Venezuelan magazine under the title "Duck Tales", which was then re-published in various blog postings.  Dalmady concluded that Stanford Financial was nothing but another Ponzi scheme – a Ponzi "duck".  The cat was out of the bag.  As the pressure mounted in Mexico, Nanes continued to lie to his own employees at Stanford Mexico about what was going on at Stanford Financial, telling them that the reason for the liquidity crisis was because Stanford had made the decision to refund $1 billion to all of the U.S. investors in SIB CDs.[16]

133.    The U.S. federal authorities then issued subpoenas to Stanford Financial.  In advance of a deposition before the SEC, Stanford Financial officials met with outside counsel in Miami on

---

15      Bauducco, *Imperio de Papel*, at 136-142.
16      *Id.*

February 4, 2009.  Two days later, on February 6, 2009, Allen Stanford's old friend Frans Vingerhoedt

sent Allen Stanford an e-mail, copying David Nanes as well, that reads in part, that "*things are starting

to unravel quickly on our side in the Caribbean and Latin America…[w]e need to come up with a

strategy to give preference to certain wires to people of influence in certain countries, if not we will see

a run on the bank next week …[w]e all know what that means.  There are real bullets out there with my

name on, David's name and many others and they are very real…[w]e are all in this together*."   See

true and correct copy of e-mail dated February 6, 2009 from Frans Vingerhoedt to Allen Stanford and

David Nanes, attached hereto as **Exhibit "5"** (originally attached as Exhibit "A" to the Receiver's

Appendix to Response to Examiner's Report and Recommendation No. 1 in the SEC Action [docket

442]).

134.     On February 17, 2009 the United States Securities and Exchange Commission ("SEC")

filed a Complaint against SGC and SIB, as well as against Mr. Stanford and Mr. Davis, in the U.S.

District Court for the Northern District of Texas, alleging a "massive Ponzi scheme of staggering

proportions".  The SEC obtained an injunction and froze the assets of the Stanford Financial group and

appointed a receiver, Ralph Janvey to liquidate the companies.  On that very same day, Nanes fled

Mexico.

135.     The SEC, through its Second Amended Complaint, has alleged a fraud of shocking

magnitude.  The SEC alleges that Stanford, together with his co-conspirators, engineered and carried

out a decades-long scheme to convert Plaintiffs' and the Class' investments in Stanford Financial and

SIB  into his own personal "piggy bank" to fund his extravagant lifestyle, including paying for his

private harem of women and their children; a fleet of jets; yachts; and mansions in several different

countries, as well as funding all of the massive Caribbean real estate projects Stanford had dreamed up

but never disclosed to the investors.  On June 18, 2009 Stanford, Pendergest-Holt, Lopez, Kuhrt and

King were indicted on 21 counts including wire and mail fraud, obstruction of an SEC investigation and money laundering.  Jim Davis has since pled guilty to, *inter alia*, securities fraud.

## VII.  **PLAINTIFFS' INVESTMENTS**

136.     All Plaintiffs invested in the Stanford Financial charade by purchasing CDs or placing their money in other depository accounts with SIB.  Over the years that Plaintiffs purchased and maintained investments in SIB, Plaintiffs were repeatedly and uniformly told, either directly by Stanford Financial FAs or via Stanford Financial promotional materials, that, *inter alia*:  (1) an investment in SIB was safer than investing in U.S. banks because SIB did not make loans; (2) SIB and Stanford Financial were U.S.-based businesses regulated by the U.S. Government; and (3) that an investment in SIB was completely safe and secure because it was guaranteed and insured by Lloyd's, was audited by an "outside" audit firm and subjected to regular, "stringent" risk management examinations.  All of this was false.

137.     During the time that Plaintiffs purchased and maintained investments in SIB, Stanford Financial sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*: (1) SIB was not regulated by the U.S. or any other government; (2) Plaintiffs' investments in SIB were <u>not</u> insured; (3) Stanford Financial was operating illegally as an unregistered investment company (whose contracts were thus void under § 47 of the Investment Company Act) soliciting and selling unregistered securities by, from and through Houston, Texas; (4) that SIB was investing its clients' money in speculative Caribbean real estate ventures; (5) that SIB was audited by a one man "mom and pop" audit shop under the control of Allen Stanford; and (6) SIB was not subjected to stringent risk management examinations that allowed it to qualify for the insurance policies.

138.     Based on the representations and omissions of material fact made to Plaintiffs repeatedly and uniformly over the years, both in person by Stanford Financial FAs and via Stanford

Financial promotional materials, Plaintiffs decided to invest money in, and maintain investments in, the SIB CDs from at least 1996 through 2009.

139.   **Samuel Troice -** Plaintiff Samuel Troice first invested in SIB CDs through Stanford Mexico in 1997.  Troice dealt directly with David Nanes.  Nanes always promoted the SIB CDs to Troice as the only investment product offered by Stanford Financial.  In making the initial and subsequent decisions to invest and reinvest with Stanford Financial, Troice received the Stanford Financial marketing materials regarding Stanford Financial's operations as a whole, including that it was a Houston, Texas-based financial services conglomerate, and also was informed by Nanes that his investments in SIB were insured.   Troice also annually received and relied upon the insurance letters from BMB and Willis described herein.  Troice understood those letters as providing an independent endorsement of SIB by reputable insurance brokerage companies, and as evidencing that his investments in SIB were insured.   Troice was never informed that (i) Stanford actually wrote the text of the letters and that Defendants had simply rubber stamped what Stanford had sent them; or (ii) that SIB only had very limited insurance coverage that would not protect his investments.   Troice relied on the statements and omissions made in those letters in making the decision to invest in the CDs and in deciding to maintain his investments in (i.e., repurchase) SIB CDs every year until 2009.  Troice did not sell any "covered" securities to purchase SIB CDs.

140.   On many occasions over the years he maintained investments in the SIB CDs (1997-2009), Troice asked Nanes if the CDs were guaranteed by the FDIC, and Nanes explained that the CDs were not FDIC insured but did carry other types of insurance, including insurance covering fraud and theft.  On at least four (4) separate occasions over the years between 1997 and 2009 when Troice met with Nanes to renew or buy new CDs and the discussions turned to insurance, Nanes picked up the telephone and called someone at Stanford Mexico to deliver to Troice the insurance

"safety and soundness" letters from Defendants BMB and Willis, attached as Exhibit "4".  Troice received said letters from Defendants BMB and Willis and relied on said letters regarding the stability and safety of his investments in SIB.  In reliance on said letters, Troice continued to reinvest more money into the CDs by repurchasing CDs every year over the years 1997-2009.  Had he been told the truth, i.e., that the letters were purely fabricated by Stanford and rubber stamped by Defendants, and that there was no insurance coverage for his investments whatsoever, Troice never would have purchased CDs from SIB.

141.    Over the years Troice maintained an excellent relationship with Nanes, considered him a friend, and saw him regularly.  In 2008, with the world financial markets in disarray, Troice asked Nanes about the strength of SIB and Nanes responded that SIB was in excellent condition and that because the bank was not a regular commercial bank it was able to continue to pay higher interest rates.  Troice even met with Nanes at 9:00 am on February 17, 2009, the very day the SEC intervened into Stanford Financial.  When the talk again turned to SIB, Nanes once again reassured Troice that everything was well with the bank and that the bank was solid.  Of course, Nanes knew full well on that day and before that the bank was facing massive liquidity issues and had ceased making transfers of funds to clients and was under SEC investigation.  Nanes fled Mexico later that day.

142.    **Martha Diaz -** Plaintiff Diaz and her husband invested in Stanford Financial via Stanford Mexico since approximately 1996 and had direct dealings with Nanes every year regarding their investments in Stanford Financial because Diaz renewed her investments in the CDs on an annual basis.  During those annual or semi-annual meetings with Nanes from 1996 through 2009, Nanes always convinced Diaz and her husband to invest and reinvest in (i.e., repurchase) the SIB CDs on an annual basis by touting the bank's safety and solidity and the fact that the

investments were insured.  In making their decisions to invest in Stanford Financial every year from 1996 to 2009, Diaz and her husband were provided with copies of the standard Stanford Financial marketing materials as well as copies of the BMB and Willis "safety and soundness" letters.  Nanes himself delivered, or caused to be delivered, to Plaintiff Diaz and her husband the BMB or Willis letters every single year from 1998 through 2008, and in reliance on those letters Diaz repurchased the CDs every year.  Diaz and her husband understood those letters as providing an independent endorsement of SIB by reputable insurance brokerage companies, and as evidencing that their investments in SIB were insured.  Diaz and her husband were never informed that (i) Stanford actually wrote the text of the letters and that Defendants had simply rubber stamped what Stanford had sent them; or (ii) that SIB only had very limited insurance coverage that would not protect his investments.  Had they been told the truth, i.e., that the letters were purely fabricated by Stanford and rubber stamped by Defendants, and that there was no insurance coverage for their investments whatsoever, Diaz never would have purchased CDs from SIB.  Diaz did not sell any "covered" securities in order to purchase the SIB CDs.

143.    In August 2008, Plaintiff Diaz and her son met with David Nanes because her Fixed CD  was about to come due on August 25, 2008.  Nanes convinced Diaz to exchange her Fixed CD for a Flex CD, and then switched it to Fixed CD 15 days later (September 9, 2008).  At that time, Diaz asked Nanes whether she should diversify her investment to make sure it was protected and insured, and Nanes told her there was no reason to do so because SIB was very strong and insured. Diaz then asked what jurisdiction would apply to the SIB CDs in case of any problems, and Nanes responded that the United States because the corporate headquarters of Stanford Financial was based in Houston.

144.    **Paula Gilly Flores -** Plaintiff Paula Gilly Flores("Gilly") invested her inheritance from

her grandmother with Stanford Financial.  On or about September 2007 SGC-Houston broker Miguel

Valdez, who previously had been employed by Chase Bank in Houston where he had handled Gilly's

grandmother's accounts for ten years, traveled to Puebla Mexico from Houston, Texas to meet Gilly

and her mother.  Valdez explained that he had joined SGC and set about trying to convince Gilly and

her mother to transfer their deposit accounts in Chase, which were set to expire in October 2007, over

to Stanford Financial.  Valdez knew at all times that Gilly and her mother did not want to be invested in

any risky instruments or in the stock market and only wanted to be invested in safe and secure, deposit

investments.

145.    Even though Stanford Mexico had an office in Puebla, Valdez did not want to meet with

Gilly and her mother at the Stanford Mexico offices; indeed he told Gilly that Stanford Mexico sold

different products than SGC.   Instead, Valdez insisted that they meet at the Hotel Villa Florida en

Puebla.   At that meeting, in mid September 2007, Valdez provided Gilly and her mother with the

Spanish language promotional materials for Stanford Financial and SIB similar to the ones attached

hereto and represented to Gilly and her mother that (1) an investment in SIB CDs was safer than

investing in U.S. banks because SIB did not make loan; (2) SIB and Stanford Financial were U.S.-

based businesses regulated by the U.S. Government; and (3) that an investment in SIB CDs was

completely safe and secure because it was guaranteed and insured by Lloyd's.  During this sales

presentation in Mexico, Valdez omitted to inform Gilly that (1) SIB was not regulated by the U.S.

Government; (2) her investments in SIB CDs were not insured; (3) SIB was operating illegally as an

unregistered investment company (whose contracts were thus void under Section 47 of the Investment

Company Act) selling unregistered securities from Houston, Texas and (4) that SIB was not invested in

safe secure and liquid instruments.

146.    Based on the representations made to Gilly and her mother by Valdez and via the

promotional materials, including the representations and omission of material fact concerning the existence of insurance for the CDs, she and her mother decided to invest the totality of the inheritance from her grandmother in SIB CDs.  On or about October 9, 2007, Gilly invested all of her inheritance in SIB CDs.  Gilly did not sell any "covered" securities in order to purchase the SIB CDs.

147.    **Punga Punga Financial, Ltd. -** Plaintiff Punga is a Panamian corporation whose principal place of business is in Mexico and which is wholly owned by Mexican citizens from Mexico City.  In 1998, the principal of Punga was introduced to David Nanes by a friend.  Nanes solicited Punga's principal as a client for Stanford Financial but he initially refused.  Thereafter, and because Punga's business was located right next to Stanford Mexico's offices in Mexico City, Punga's principal saw Nanes almost daily.  In 1999 Nanes finally convinced Punga's principal to invest in SIB CDs.

148.    Punga thereafter received the BMB and/or Willis letters every single year that it maintained investments with Stanford Financial, and in reliance on those letters Punga Punga continued to renew (i.e., repurchase) the SIB CDs year after year from 1999 through 2009 and maintained the relationship over the years with Stanford Financial through Nanes or his assistants. Every two or three months over the next eight or nine years and until the SEC's intervention into Stanford, the principal of Punga met with Nanes to discuss Punga's investments in Stanford Financial.  Every single time that they met, Nanes represented to Punga's principals that Stanford Financial and SIB were solid, insured, and were growing rapidly.   Nanes promoted the SIB CDs aggressively as being fully insured.

149.    Nanes took advantage of the recurring economic problems and currency devaluations in Mexico to promote and sell Stanford Financial in Mexico.  Nanes even admitted to Punga's principal that in times of economic crisis in Mexico was when he "captured" the most

money for Stanford Financial.   Nanes's main argument for convincing Punga to invest with
Stanford Financial every year from 1999 through 2009 was that SIB was completely insured against
fraud.   As part of that sales pitch, at the initiation of Punga's investments in SIB CDs, and every
year thereafter, Nanes sent the "safety and soundness" letters from Defendants BMB and Willis
attached hereto as Exhibit "4" to Punga's principal.   Punga's principals understood those letters as
providing an independent endorsement of SIB by reputable insurance brokerage companies, and as
evidencing that their investments in SIB were insured.   Punga's principals were never informed that
(i) Stanford actually wrote the text of the letters and that Defendants had simply rubber stamped
what Stanford had sent them; or (ii) that SIB only had very limited insurance coverage that would
not protect his investments.    Had they been told the truth, i.e., that the letters were purely
fabricated by Stanford and rubber stamped by Defendants, and that there was no insurance coverage
for their investments whatsoever, Punga's principals never would have purchased CDs from SIB.
These letters gave a great level of comfort to Punga's principal and in reliance on the letters Punga
greatly increased its investments with Stanford Financial over the years by purchasing more CDs.

150.    Over the years Punga's principal came to trust Nanes and they developed a
friendship.   On one occasion, Nanes invited Punga's principal to Miami on a private Stanford
Financial jet.   On that trip Punga's principal noticed that Nanes had changed a lot as a person from
the time that they had first met;  Nanes appeared to live in another "surreal" world of money and
power.   But based on the trust and confidence that had grown between the principals of Punga and
Nanes, and based on Nanes' representations and the letters from Defendants, Punga increased the
amount of money it had invested in Stanford Financial.   Every time one of the SIB CDs matured,
Nanes met with Punga's principals to convince them to renew (i.e., repurchase) the SIB CDs.   Part
of Nanes' sales tactic every was to provide the BMB or Willis letters to Punga, and in reliance on

those letters, Punga continued to purchase SIB CDs every year.  Punga did not sell any "covered" securities in order to purchase the SIB CDs.

151.     In September 2008, as the world financial crisis grew, Punga's principal met with Nanes on several occasions to discuss Stanford Financial and Nanes assured Punga's principal that Stanford Financial and SIB were "stronger than ever".  Punga's CDs matured in January 2009, and Punga's principal decided not to reinvest in Stanford Financial.  Nevertheless, Nanes called and urged Punga's principal to renew the CDs, even offering Punga a "preferential" interest rate.  Nanes mentioned that Stanford Financial was under a vicious attack from a crazy Venezuelan (Dalmady) who was defaming Stanford Financial, but that the group was stronger than ever, and, at any rate Stanford Financial carried the insurance policies which were still in force and which protected against fraud.  Nanes reminded Punga's principal of the insurance letters he had provided every year as evidence that Punga's investments in the SIB CDs were insured.  Punga's principal finally succumbed to Nanes' entreaties and reinvested the CD proceeds into purchasing new SIB CDs just one week before the SEC intervention.  Even when they met on February 15, 2009, two days before the intervention, Nanes assured Punga's principal that SIB was doing well and had not been affected by the financial turmoil affecting the rest of the world.

152.     **Manuel Canabal -** Plaintiffs Canabal, Ferreiro and Promotora all invested in the SIB CDs through Stanford Venezuela at various times in the late 1990s and 2000s.  Plaintiff Canabal's Stanford Venezuela FA always promoted the SIB CDs to Canabal and to Canabal the CDs appeared to be the only investment product offered by Stanford Financial.  In making the initial decision to invest with Stanford Financial, Canabal received information, including the uniform Stanford Financial marketing materials described herein, from his Stanford FA regarding Stanford Financial's operations as a whole, and also was informed by his Stanford FA that

investments in SIB were insured.  Canabal relied on those statements in making the decision to invest in the CDs and in deciding to maintain his investments in SIB CDs over the years.  Canabal did not sell any "covered" securities in order to purchase the SIB CDs.

153.     Canabal asked his Stanford Financial Advisor if the CDs were guaranteed by the FDIC, and the advisor explained that the CDs were not FDIC insured but did carry other types of insurance, including insurance covering fraud.  On several occasions over the years, Canabal's advisor delivered to Canabal the insurance "safety and soundness" letters from Defendants BMB and Willis, attached as Exhibit "4".  Canabal received said letters from Defendants BMB and Willis and relied on said letters as "peace of mind" regarding the stability and safety of his investments in SIB.  Canabal understood those letters as providing an independent endorsement of SIB by reputable insurance brokerage companies, and as evidencing that their investments in SIB were insured.  Canabal was never informed that (i) Stanford actually wrote the text of the letters and that Defendants had simply rubber stamped what Stanford had sent them; or (ii) that SIB only had very limited insurance coverage that would not protect his investments.  Had he been told the truth, i.e., that the letters were purely fabricated by Stanford and rubber stamped by Defendants, and that there was no insurance coverage for their investments whatsoever, Canabal never would have purchased CDs from SIB.

154.     **Daniel Gomez Ferreiro -** Plaintiff Daniel Gomez Ferreiro ("Ferreiro") invested in Stanford Financial via Stanford Venezuela.  During his meetings with his Stanford FA his advisor always convinced Ferreiro to invest and reinvest in the SIB CDs by touting the bank's safety and solidity and the fact that the investments were insured.  In making his decisions to invest in Stanford Financial Ferreiro was provided with copies of the BMB and Willis "safety and soundness" letters and relied on them in making the decision to purchase and repurchase the CDs

over the years.  Ferreiro understood those letters as providing an independent endorsement of SIB

by reputable insurance brokerage companies, and as evidencing that their investments in SIB were

insured.  Ferreiro was never informed that (i) Stanford actually wrote the text of the letters and that

Defendants had simply rubber stamped what Stanford had sent them; or (ii) that SIB only had very

limited insurance coverage that would not protect his investments.   Had he been told the truth, i.e.,

that the letters were purely fabricated by Stanford and rubber stamped by Defendants, and that there

was no insurance coverage for their investments whatsoever, Ferreiro never would have purchased

CDs from SIB.  Ferreiro did not sell any "covered" securities in order to purchase the SIB CDs.

155.    **Promotora Villa Marino, C.A. -** Plaintiff Promotora Villa Marino, C.A.

("Promotora") is a Venezuelan corporation whose principal place of business is in Venezuela and

which is wholly owned by Venezuelan citizens from Venezuela.  The principal of Promotora was

solicited as a client for Stanford Financial.

156.    Promotora thereafter received the BMB and/or Willis letters every single year that it

maintained investments with Stanford Financial, and continued to invest in SIB CDs per the advice

of its Stanford Financial Advisor and maintained the relationship over the years with Stanford

Financial through its Stanford Financial Advisor.  The Stanford Financial Advisor promoted the

SIB CDs aggressively as being fully insured.

157.    As part of the sales pitch, at the initiation of Promotora's investments in SIB CDs,

and every year thereafter, Promotora's Stanford Venezuela FA sent to Promotora the "safety and

soundness" letters from Defendants BMB and Willis, one of which is attached hereto as Exhibit "4"

to Promotora's principal.   Promotora's principals understood those letters as providing an

independent endorsement of SIB by reputable insurance brokerage companies, and as evidencing

that their investments in SIB were insured.  Promotora's principals were never informed that (i)

Stanford actually wrote the text of the letters and that Defendants had simply rubber stamped what Stanford had sent them; or (ii) that SIB only had very limited insurance coverage that would not protect his investments.  Had they been told the truth, i.e., that the letters were purely fabricated by Stanford and rubber stamped by Defendants, and that there was no insurance coverage for their investments whatsoever, Promotora's principals never would have purchased CDs from SIB.  These letters gave a great level of comfort to Promotora's principal and caused Promotora to continue to invest with Stanford Financial over the years.  Promotora did not sell any "covered" securities in order to purchase the SIB CDs.

## VII.  PLAINTIFF CLASS

158.    Plaintiffs and the Class are persons who, in many cases, invested their life savings and retirement funds with Stanford Financial through SIB because they considered Stanford Financial a safe investment because it was allegedly "based" in the United States and therefore subject to U.S. laws and regulations.  In reliance on Stanford Financial's fraudulently crafted "image" as a Texas-based financial services group, and in further reliance on the illusion of safety and security via Lloyd's insurance coverage fostered by Stanford Financial with the Defendants' material assistance, Plaintiffs and the Class collectively transferred billions of dollars to Stanford Financial for investment in the SIB CDs.  Without the money that continually flowed into Stanford Financial on a constant basis from at least 1995 through 2009, the Stanford Financial Ponzi scheme could not have flourished because a Ponzi scheme depends for its survival on constant infusions of new money.  By their conduct alleged herein in assisting Stanford Financial to create and perpetuate the illusion of insurance coverage for investments in SIB, Defendants materially aided Stanford Financial to lure new investment money to flow into the Ponzi scheme from 1996 through 2008, thereby sustaining the Ponzi scheme and making them jointly liable for all of the losses

suffered by the investors like Plaintiffs and the Class that wound up holding the Stanford Financial "bag" in February, 2009.

159.    Throughout this time period, and up until the SEC intervention into Stanford Financial in February 2009, Plaintiffs and the Class continued to receive monthly account statements from Stanford Financial showing that their money had been invested in the SIB CDs and were in fact profitable.  They also continued to receive SIB Annual Reports and other promotional materials, all of which omitted to inform that Stanford Financial was in reality operating an unregistered investment company operating as a Caribbean real estate development fund. Throughout this time period, and up until the SEC intervention in February 2009, Plaintiffs and others continued to receive, or were shown or informed about, the fraudulent letters from Defendants Willis and BMB attesting to SIB's security, solvency and solidity.  Throughout the years, Stanford FAs uniformly used the illusion of insurance coverage for the SIB CDs in their marketing pitches to clients.  At no time were Plaintiffs or the Class ever advised that Stanford Financial had invested their money in risky, "illiquid" ventures like the Caribbean real estate development projects (although Defendants were aware of same);  or that SIB had no real insurance that would protect Plaintiffs' investments (although Defendants were aware of same);  or that the only "oversight" SIB was subjected to was a one man "mom and pop" audit firm in Antigua that was completely dominated by Stanford.  Instead, and lacking the type of information that might be gained from a full regulatory disclosure, Plaintiffs and the Class were led to believe by Stanford Financial and Defendants that an investment in SIB was safer than any other investment in the market because it was underwritten by Lloyd's of London based on "stringent" annual risk management audits conducted by outside audit firms, all of which was false and misleading.  Now Plaintiffs and the Class stand to lose all of their investments.

# VIII.  CLASS ALLEGATIONS

160.    Plaintiffs request this case be certified as a class action pursuant to FRCP 23. Thousands of investors still had money invested in the SIB CDs and other depository accounts at Stanford Financial through SIB as of February 2009.  The numbers of affected investors are so numerous that joinder of all members is impracticable.  There are common questions of law and fact that are common to the class and these common questions predominate over individual issues. The Named Plaintiffs' claims are typical of the class claims.  The Named Plaintiffs have no interest adverse to the interests of other members of the Class.  The Named Plaintiffs will fairly and adequately protect the class' interests.  The Named Plaintiffs have retained counsel experienced and competent in the prosecution of class action and complex international securities litigation.

161.    Pursuant to FRCP 23(a) and (b)(3), the Court should certify the following classes and subclasses:

   i.  All persons or entities that had purchased and still held CD or other depository accounts with SIB (excluding purchasers of shares in SGC's SAS mutual fund program) as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action; and

   ii.  Such other classes or sub-classes as the Court may determine.

     Excluded from the class are:

    a.  Defendants, and their employees and agents; and

    b.  Any officer, director, employee, or promoter of Stanford Financial, including SIB, SGC, Stanford Mexico and Stanford Venezuela as those entities have been defined herein

162.    The court should certify the class pursuant to FRCP 23(b)(3) because questions of

law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Indeed, this is a case of "fraud created the market" and fraud on the regulators because Stanford's fraud could not have existed or flourished were it not for the fraud Stanford committed on regulators around the world and the fraud Stanford committed by misleading investors into believing that their investments in SIB were insured.  The Class Plaintiffs and the Class relied on the integrity of the market in deciding to invest in the SIBL CD's.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

163.     Pleading in the alternative, Plaintiffs, on their own behalf and on behalf of a class of all those similarly situated, request that the Court certify a class composed of all Latin American citizens and legal residents, or entities owned or controlled by Latin American citizens or legal residents, that had purchased and still held CDs or other depository accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action, and such other classes or sub-classes as the Court may determine, but excluding Defendants, and their employees and agents; and any officer, director, employee, or promoter of Stanford Financial, including SIB, SGC and Stanford Mexico or Venezuela, as those entities have been defined herein. The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.   Indeed, this is a case of "fraud created the market" and fraud on the regulators because Stanford's fraud could not have existed or flourished were it not for the fraud Stanford committed on regulators around the world and the fraud Stanford committed by

misleading investors into believing that their investments in SIB were insured. The Class Plaintiffs

and the Class relied on the integrity of the market in deciding to invest in the SIBL CD's. Many of

the investors who are class members have amounts invested which are too small to justify the cost

and expense of individual litigation and can only be assisted by a class action mechanism.

164.    Pleading in the alternative only, Plaintiffs SAMUEL TROICE, MARTHA DIAZ,

PAULA GILLY-FLORES and PUNGA PUNGA FINANCIAL, LTD, on their own behalf and on

behalf of a class of all those similarly situated, request that the Court certify a class composed of all

Mexican citizens and legal residents, or entities owned or controlled by Mexican citizens or legal

residents, that had purchased and still held CDs or other depository accounts with SIB as of

February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action,

and such other classes or sub-classes as the Court may determine, but excluding Defendants, and

their employees and agents; and any officer, director, employee, or promoter of Stanford Financial,

including SIB, SGC and Stanford Mexico, as those entities have been defined herein. The court

should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the

members of the class predominate over any questions affecting only the individual members, and a

class action is superior to the other available methods for the fair and efficient adjudication of the

controversy. Indeed, this is a case of "fraud created the market" and fraud on the regulators

because Stanford's fraud could not have existed or flourished were it not for the fraud Stanford

committed on regulators around the world and the fraud Stanford committed by misleading

investors into believing that their investments in SIB were insured. The Class Plaintiffs and the

Class relied on the integrity of the market in deciding to invest in the SIBL CD's. Many of the

investors who are class members have amounts invested which are too small to justify the cost and

expense of individual litigation and can only be assisted by a class action mechanism.

165.     Pleading in the alternative, Plaintiffs MANUEL CANABAL, DANIEL GOMEZ FERREIRO and PROMOTORA VILLA MARINO, C.A., on their own behalf and on behalf of a class of all those similarly situated, request that the Court certify a class composed of all Venezuelan citizens and legal residents, or entities owned or controlled by Venezuelan citizens or legal residents, that had purchased and still held CDs or other depository accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action, and such other classes or sub-classes as the Court may determine, but excluding Defendants, and their employees and agents; and any officer, director, employee, or promoter of Stanford Financial, including SIB, SGC and Stanford Venezuela, as those entities have been defined herein.  The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.  Indeed, this is a case of "fraud created the market" and fraud on the regulators because Stanford's fraud could not have existed or flourished were it not for the fraud Stanford committed on regulators around the world and the fraud Stanford committed by misleading investors into believing that their investments in SIB were insured. The Class Plaintiffs and the Class relied on the integrity of the market in deciding to invest in the SIBL CD's.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

166.     Pleading in the alternative, Plaintiffs, on their own behalf and on behalf of a class of all those similarly situated, request that the Court certify a class composed of all investors who had purchased and still held CDs or other depository accounts with SIB as of February, 2009 and whose claims are recognized and authorized by the Receiver in the SEC Action,  and who had received or

were shown copies of the insurance letters issued by Defendants as described herein, and such other classes or sub-classes as the Court may determine, but excluding Defendants, and their employees and agents; and any officer, director, employee, or promoter of Stanford Financial, including SIB, SGC and Stanford Mexico or Venezuela, as those entities have been defined herein.  The court should certify the class pursuant to FRCP 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only the individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.   Indeed, this is a case of "fraud created the market" and fraud on the regulators because Stanford's fraud could not have existed or flourished were it not for the fraud Stanford committed on regulators around the world and the fraud Stanford committed by misleading investors into believing that their investments in SIB were insured. The Class Plaintiffs and the Class relied on the integrity of the market in deciding to invest in the SIBL CD's.  Many of the investors who are class members have amounts invested which are too small to justify the cost and expense of individual litigation and can only be assisted by a class action mechanism.

## IX.      STATUTE OF LIMITATIONS DEFENSES

### Discovery Rule/Inquiry Notice

167.      The SEC filed an action against Allen Stanford and SIB *et al.* on February 17, 2009, and on that same day the Receiver was appointed.  Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial, SIB or Defendants until then.  Moreover, the wrongful acts and conspiracy by Defendants were inherently undiscoverable, and Plaintiffs were not aware of facts that would have put them on inquiry notice as to Defendants' role in Stanford's fraud until now.

## X.   CLASS CAUSES OF ACTION

(The Following Causes of Action are Plead on behalf of All Plaintiffs Individually and on Behalf of a Class of All Others Similarly Situated)

## A. Primary Violations of the Texas Securities act

### 1. Sales of Securities through Untruths or Omissions

168.     Section 33(A) of the Texas Securities Act provides civil liability for persons who sell securities by means of untrue statements or omissions.  As alleged by the SEC, the SIB CDs qualify as "Securities" under the relevant securities law jurisprudence.  Defendants qualify as "sellers" under the Act because they acted as the soliciting agents of Stanford Financial and SIB in the chain of the selling process by communicating misleading information about SIB to the general public around the globe with the goal of selling SIB CDs, and but for Defendants' participation, Stanford Financial could not have sold the SIB CDs to Plaintiffs.  In acting as Stanford Financial and/or SIB's sales agents, Defendants were motivated to serve their own financial interests or those of Stanford Financial and/or SIB.

169.     Defendants sold the SIB securities to Plaintiffs using untruths or omissions.  In particular, Defendants, acting as the agents of Stanford Financial and SIB, created and sent into the stream of commerce the letters described herein which informed the general public that, *inter alia*, SIB was "*professional*" and comprised of "*first class business people*"; and that the Lloyd's insurance policies procured by Defendants for SIB were only issued because SIB had undergone "*stringent Risk Management Review[s] conducted by an outside audit firm.*"  These letters, which were clearly designed and intended by Defendants to be distributed to Plaintiffs and others as potential investors in SIB, contain untruths and omissions of material facts directed at Plaintiffs and others with the purpose of promoting and selling SIB and its CDs to Plaintiffs and others. Defendants had no reasonable basis to make these statements because they knew or should have

known (and were therefore reckless in communicating information to the contrary) that SIB did not undergo "stringent" annual Risk Management reviews, and that any reviews were not conducted by an outside audit firm, but rather were conducted by a one man shop in Florida that performed a limited scope review in 2003 that resulted in a flimsy three page risk management report full of disclaimers.  Furthermore, Defendants omitted to disclose in the letters that the text of the letters was in fact written by Stanford and not by Defendants and that Defendants had simply printed and signed the letters on Defendants' letterhead at Stanford's request and also omitted to disclose the insurance policy limits for each of the policies listed in the letters, thereby making the letters misleading.[17]   Defendants knew all of this, but issued the Stanford-written letters anyway from 1996 through 2008 in order to lure investors like Plaintiffs to purchase the bogus offshore CDs.

170.    At the very least, in agreeing to place Stanford-written text on their corporate letterheads and creating and submitting these letters into the stream of commerce to be directed at Plaintiffs, Defendants intentionally or recklessly omitted material facts, including the scope of coverage of the referenced insurance policies, and the fact that Defendants had "no idea" one way or the other when, or even whether, the alleged "Risk Management reviews" were conducted, or whether they were "stringent" by any definition.  In fact, had Defendants ever bothered to actually read the risk management review, they would have known that the review was perfunctory and extremely limited in scope and the resulting report was full of disclaimers.

171.    Furthermore, primary liability for violations of the Texas Securities Act attaches to Defendants based on a duty to disclose that arose when said Defendants chose to speak to the public

---

[17]        An omitted fact is material if there is a substantial likelihood that it would have assumed actual significance in the deliberations of a reasonable investor, in that it would have been viewed by the reasonable investor as significantly altering the total mix of available information used in deciding whether to invest.  *See, e.g.*, *Bridwell v. State*, S.W.3d, 2008 WL 467271 (Tex. App.--Dallas 2008, no pet. hist.).

regarding Stanford Financial and SIB.  In choosing to accept Stanford Financial's and SIB's request to act as their agents in making and circulating the representations concerning SIB insurance contained in the "safety and soundness" letters described herein, Defendants assumed a duty to disclose **all** of the information they knew about Stanford Financial and SIB, including the amounts of the insurance policies, and not to make partial disclosures that might, and did, convey a false impression about SIB.  A Defendant may not deal in "half-truths" and Defendants had more access to information regarding Stanford and SIB than Plaintiffs did, and clearly had an incentive to market and sell SIB to Plaintiffs so that SIB, and hence Stanford Financial, could continue in business and continue contracting Defendants' services.  Moreover, Defendants were clearly on notice that the investing public at large (and particularly investors in Latin America), to whom these letters were circulated, would and did rely on Defendants' statements in making their investment decisions concerning buying the CDs offered by Stanford Financial and SIB; indeed the very purpose of the letters, known to Defendants, was to influence the investors' decision-making process in terms of SIB.

172.    As a result of Defendants' conduct, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission.  Alternatively, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last SIB account statement and the amount Plaintiffs may receive from the receivership distribution.

### B.  AIDING AND ABETTING VIOLATIONS OF THE TEXAS SECURITIES ACT

#### 1.  SALES OF UNREGISTERED SECURITIES

173.    Defendants are liable as "aiders" for sales of unregistered securities to Plaintiffs.  In particular, by their actions described herein, Defendants provided substantial assistance to SIB and Stanford Financial in the marketing and sales process for the sale of the CDs to Plaintiffs and others and materially aided Stanford Financial and SIB to sell unregistered securities to Plaintiffs from, by

and through Texas.  As argued by the SEC in its original Complaint, the CDs offered and sold by Stanford Financial and SIB, with Defendants' participation, constitute "securities" under the relevant securities law jurisprudence, primarily the *Reves* test, precisely because the CDs were not insured by the FDIC, or guaranteed by any similar government regulatory insurance regime.  By agreeing to assist Stanford Financial and SIB to sell and promote investment in these securities products, Defendants actively joined the Stanford Financial sales force and therefore knew or should have known that they were acting as links in the chain of selling unregistered securities to Plaintiffs from, by and through Texas.  But for Defendants' participation, Stanford Financial and SIB could not have sold unregistered securities to Plaintiffs from, by and through Texas.

174.    Defendants had general awareness that they were assisting in the sale of unregistered securities from, by and through Texas.  Defendants knew that Stanford Financial was based in Texas and was selling CDs issued by an offshore bank it controlled from Texas, and knew that SIB did not function as a regular bank making loans but, rather, invested the CD proceeds in a private investment portfolio.  Defendants also knew that the CDs being peddled to Latin Americans and other non-U.S. citizens and residents directly from Houston, Texas had not been registered with the SEC or TSSB, because Defendants knew that SIB had filed for a limited Reg. D exemption for certain "accredited" U.S. investors only.

175.    Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in blindly signing letters prepared by an employee at Stanford Financial in Houston attesting to the safety and soundness of SIB with full knowledge that the purpose of the letters was to lure more investors to purchase unregistered securities from SIB.  In assisting a Houston-based enterprise in the sale of unregistered securities, Defendants were, at the very least, subjectively conscious of a risk of illegality.  None of the CDs sold to Plaintiffs were ever

registered with the Texas State Securities Board and therefore they were sold to Plaintiffs as unregistered securities in violation of the Texas Securities Act.  In assisting Stanford Financial and SIB in the sales and marketing process to sell the unregistered securities from, by and through Texas, Defendants acted intentionally or with reckless disregard for the truth and the law.  As a result of Defendants' conduct in materially aiding Stanford Financial and SIB to sell unregistered securities from, by and through Texas, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission.   In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

176.   Moreover, and despite SGC's scheme to evade compliance with the Texas Act by claiming a Reg D exemption, the global offering of CDs by Houston-based Stanford Financial to "accredited" U.S. investors was in fact an unregistered public offering made in violation of Article 581 of the Texas Act.   It was an integrated offering under Texas securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from registration:

a.      The integrated offering involved general solicitation. This general solicitation by Stanford Financial through SGC and its U.S. affiliates, agents and brokers, as well by the foreign financial advisors, included general public advertisements, publicly distributed magazine articles and other communications and media published in print in Houston, Texas and distributed broadly for general distribution in the United States and abroad to offerees and purchasers of the CDs.

b.      The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas and Florida, of Stanford Financial's products, including the CDs.

c.      The integrated offering involved seminars and meetings conducted in the United States (including Texas and Florida), Mexico and Venezuela and elsewhere in Latin America.  The integrated offering was conducted through the use of sales seminars, "road shows," and meetings directed at potential offerees and purchasers.

d.  The integrated offering involved offers to thousands of offerees and purchases by thousands of offerees involving sums of money far in excess of that disclosed to the SEC in SIB's Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of Texas and Florida residents or those otherwise subject to Texas or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of Stanford Financial.

e.  The aggregate size of the sales of CDs during this period was approximately $7.2 billion. The aggregate size of the sales in Texas from this period was at least several hundred millions of dollars. The aggregate size of the sales in Florida from this period was at least several hundred millions of dollars.

f.  The offering was made to investors with whom Stanford Financial/SGC had no pre-existing relationship, through brokers or affiliates of Stanford Financial who were paid substantial and excessive undisclosed commissions in connection with the CDs.

g.  The offering was made to persons who did not qualify as "accredited United States investors"; and far more than 35 persons who did not qualify as "accredited United States investors" purchased the CDs; indeed the vast majority, at least $6 billion of the CDs, were sold to foreign citizens that did not qualify as "accredited United States investors".

## 2. SALES OF SECURITIES BY UNREGISTERED DEALERS

177.   Defendants aided and abetted SIB and Stanford Financial in the sale of securities to Plaintiffs from, by and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act.  Specifically, and as alleged herein, Defendants knew or should have known that Stanford Financial was selling securities from, by and through Texas to investors and then pooling its customers' money together to make illiquid, speculative investments.  Stanford Financial made these sales without registering with the Texas State Securities Board as a dealer under Section 12(A).

178.   Defendants intentionally and actively aided and abetted Stanford Financial to operate in and from Texas to sell securities from, by, and through Texas, by means of the conduct described herein. With full knowledge that Stanford Financial was, directly or through its web of alter ego companies, including SIB, acting as an unregistered securities "dealer" in Texas selling securities from, by, and through Texas, and that Stanford Financial/SIB were being operated and

"run" from Texas, Defendants aided and abetted, materially and substantially assisted, and perpetuated Stanford Financial and SIB's violations of the Texas Securities Act by continuing to provide the letters herein described for the known purpose of luring new customers like Plaintiffs to Stanford Financial and selling them the worthless CDs.

179.   Defendants had general awareness that they were assisting the sales by an unregistered "dealer" of unregistered securities from, by and through Texas.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in blindly signing letters written by Stanford Financial employees attesting to the safety and soundness of SIB with full knowledge that the purpose of the letters was to lure more investors to invest in Stanford Financial/SIB.  In assisting the sale of securities through a Houston-based enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality.  In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Defendants acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law.  In fact, in their zeal to assist Stanford Financial, acting through an offshore bank operating completely outside the regulatory purview of U.S. securities and banking laws, to sell securities from, by, and through Texas, Defendants acted with wanton and arrogant disregard for the protections afforded by the Texas Securities Act.  As a result of Defendants' conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission.  In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### 3. UNTRUTH OR OMISSION

180.    Defendants, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial and SIB and their principals in the sale of securities through the use of untrue representations or materially misleading omissions, and also aided and abetted the fraudulent practices of registered investment advisers in violation of the TSA.  In particular, and as set forth in the Davis Plea, Stanford Financial was a massive Ponzi scheme that was perpetuated by the continued sales of the SIB CDs to unsuspecting investors like Plaintiffs.  Stanford Financial led Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial's Houston office (including Defendants "safety and soundness" letters), to believe that their money was being invested in safe, liquid investments that were insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and used to finance Stanford Financial's principals' profligate lifestyles and to invest in long term, illiquid and high risk investments including real estate development projects in Antigua and elsewhere in the Caribbean.  Moreover, Stanford Financial omitted to inform Plaintiffs that it was selling them unregistered securities and that it was operating as an unregistered, uninsured, illegal Caribbean real estate development investment company fund in violation of the Investment Company Act and the Texas Securities Act.

181.    Defendants had general awareness that they were involved in improper activity and that they were assisting the sale of unregistered securities from, by and through Texas.  With knowledge that Stanford Financial and SIB, acting in concert as an unregistered investment company, were misleading investors about the scope and nature of its investments (including not disclosing the scope of investments in speculative Caribbean real estate development projects) as

well as the scope and nature of insurance coverage and the extent of oversight over SIB, and with reckless disregard for the truth and the law, Defendants provided substantial assistance to SIB and Stanford Financial in the marketing and sales process, including the circulation of the letters described herein, and thereby materially aided the sales of securities through the use of untruths and materially misleading omissions.  Defendants were all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct in blindly signing letters attesting to the safety and soundness of SIB with full knowledge that the purpose of the letters was to lure more investors to purchase SIB's securities.  In assisting the sale of securities through a Houston-based enterprise, Defendants were, at the very least, subjectively conscious of a risk of illegality.

182.   All of the Defendants caused the fraudulent insurance letters to be generated, distributed through Stanford Financial's offices in Houston, Texas and circulated to Plaintiffs and the Class of investors, with full knowledge, or with reckless disregard for the truth, that the contents of the letters were false and misleading, and that the purpose of the letters was to deceive investors about the scope and nature of insurance coverage as well as the degree of oversight of SIB required to obtain the insurance coverage, in order to lure investors like Plaintiffs and the Class to invest money in the SIB CDs through Stanford Financial.  Said conduct was designed to perpetuate the Stanford Financial "myth" regarding the safety and security of the SIB CDs, and to support the marketing, promotional and sales activities described herein.  In short, Defendants' actions as described herein allowed Stanford Financial and SIB to continue to sell securities to Plaintiffs from, by and through Texas using untruths and materially misleading omissions.

183.   In performing the acts described herein to aid and abet the sale of securities through the use of untruths and materially misleading omissions, Defendants acted with the intent to perpetuate the sale of securities by Stanford Financial, or acted with reckless disregard for the truth

or the law.  In fact, Defendants acted with wanton and arrogant disregard for the truth and for the protections afforded by the Texas Securities Act by engaging in the conduct described herein. Defendants' actions in aiding and abetting Stanford Financial's fraud caused Plaintiffs to enter into transactions or maintain their investments with SIB.  As a result of Defendants' conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission.  In the alternative, Defendants' violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

### 4. CO-CONSPIRATOR LIABILITY

184.     Defendants are jointly and severally liable as co-conspirators for Stanford Financial and SIB's primary violations of the Texas Securities Act.  In particular, Defendants knowingly combined together and with others at Stanford Financial to assist Stanford Financial to sell unregistered securities from, by and through the State of Texas using untrue representations or materially misleading omissions pertaining to insurance coverage for SIB.  As described herein, Defendants took various overt acts designed to assist Stanford Financial to accomplish the goal of selling CDs from, by and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas.  One of those acts was the Defendants' agreement with Stanford Financial that Defendants would sign the letters at issue in this case on Defendants' own letterhead with full knowledge that (1) the text of the letters had been prepared by Stanford Financial and (2) that the contents of the letter were misleading and omitted material facts. Defendants' conspiracy with Stanford Financial to violate the Texas Securities Act is a proximate

cause of rescission and/or actual damages to Plaintiffs, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### C. Participation in a Fraudulent Scheme

185.    By their conduct described herein, Defendants aided and abetted and participated with Stanford Financial and SIB in a fraudulent scheme, making Defendants directly liable for fraud.  In particular, Defendants made the conscious decision to participate in the scheme by joining the Stanford Financial sales force to market, promote and advertise SIB to prospective clients in order to assist and enable Stanford Financial to continue to sell SIB CDs based on the misrepresentations that investments in SIB were fully insured because SIB was subject to "stringent" audits and risk management reviews.  Defendants knew at all times that this statement was false, yet they signed the letters anyway and allowed said letters to be distributed to Stanford Financial clients with full knowledge that the letters were being used to generate more investments in Stanford Financial.  Defendants' actions in participating in the fraudulent scheme are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in Stanford Financial as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### D. Civil Conspiracy

186.    Defendants conspired with each other and with Allen Stanford, SIB, Stanford Financial, SGC, and others to commit the wrongful conduct described herein, including fraud and violations of the Texas Securities Act.  Defendants are each responsible for all wrongdoing done by each other and the other members of the conspiracy, including Allen Stanford, SIB, Stanford Financial, SGC, and others, in furtherance of the unlawful conspiracy and enterprise.

187.    Together with Allen Stanford, SIB, Stanford Financial, SGC, and others, the Defendants conceived, participated in, and implemented a common enterprise to use insurance as a marketing tool to sell SIB CDs for the pecuniary benefit of Stanford and Stanford Financial and, thereby, Defendants.  The object of the conspiracy was to market and promote Stanford Financial and SIB and so assist said entities to sell the SIB CDs throughout the world using untruths and omissions of material facts pertaining to insurance coverage for SIB.  There was a meeting of the minds between all Defendants and Allen Stanford, SIB, Stanford Financial, SGC, and others as to the object to be accomplished, being the sale of SIB CDs, and the means for carrying out the scheme, namely the creation and circulation of the letters described herein to facilitate the sale of the CDs to unsuspecting investors such as Plaintiffs.

188.    During all relevant times, Defendants, in furtherance of the conspiracy and/or aiding or abetting Allen Stanford, SIB, Stanford Financial, SGC, and others in furtherance of the common enterprise, engaged in specific overt acts as described herein, being the creation and transmittal of the "safety and soundness" letters into the stream of commerce.  Each of the Defendants engaged in overt acts in furtherance of the Stanford Financial CD conspiracy and effectuated their illicit scheme through and with the assistance and cooperation of Allen Stanford, SIB, Stanford Financial, SGC, and others.

189.    Defendants conspired to conduct, and participated in conduct including violations of securities laws and fraud.  To wit, over the span of over ten years, Defendants, in conspiracy with Allen Stanford, SIB, Stanford Financial, SGC, and others, knowingly participated in marketing and promoting the sale, from, by and through Texas, of the SIB CDs as described herein. Defendants' participation in the conspiracy proximately caused Plaintiffs to lose their investments and Defendants are jointly and severally liable for the conduct of Allen Stanford, SIB, Stanford Financial, SGC, and others and the harm said companies and individuals caused to Plaintiffs and the Class.

# XI.  INDIVIDUAL CAUSES OF ACTION

(THE FOLLOWING CAUSES OF ACTION ARE PLEAD AGAINST ALL DEFENDANTS ON BEHALF OF PLAINTIFFS TROICE, DIAZ, PUNGA, CANABAL, FERREIRO AND PROMOTORA INDIVIDUALLY ONLY)

## A. MISREPRESENTING THE BENEFITS OF INSURANCE POLICIES — TEX. INS. CODE § 541.051(1).

190.    Defendants committed unfair or deceptive acts or practices in the business of insurance when they made, issued, and circulated statements misrepresenting the benefits or advantages promised by an insurance policy. In the alternative, the Defendants caused such statements to be made, issued or circulated. Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs. Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs. Defendants knowingly committed the complained of acts and are therefore liable to the Plaintiffs for treble damages.

## B.  MISREPRESENTING THE NAME OR TITLE OF INSURANCE POLICIES --TEX INS. CODE §541.051(4)

191.    Defendants committed an unfair or deceptive act or practice in the business of insurance when they used a name or title of a policy or class of policies that misrepresented the true nature of the policy or class of policies.  Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs.  Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs.  Defendants knowingly committed the complained of acts and are therefore liable to the Plaintiffs for treble damages.

## C.  FALSE INFORMATION AND ADVERTISING —TEX. INS. CODE § 541.052.

192.    Defendants committed an unfair or deceptive act or practice in the business of insurance when they made, published, disseminated, circulated, and placed before the public certain advertisements, announcements, and statements. These advertisements, announcements, and statements contained untrue, deceptive and misleading assertions, representations and statements regarding the business of insurance and regarding a person in the conduct of the person's insurance business. In the alternative, the Defendants caused such statements to be published, disseminated, circulated, and placed before the public. Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs. Defendants

are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs.  Defendants knowingly committed the complained of acts and are therefore liable to the Plaintiffs for treble damages.

### D.  MISREPRESENTATION OF A POLICY OF INSURANCE — TEX. INS. CODE § 541.061.

193.    Defendants committed an unfair or deceptive act or practice in the business of insurance by misrepresenting insurance policies when they made untrue statements of material fact, failed to state material facts necessary to make other statements not misleading considering the circumstances under which the statements were made, and making statements in a manner that would mislead a reasonably prudent person to a false conclusion of material fact. Defendants' unfair or deceptive acts and practices were a producing cause of actual damages to the Plaintiffs. Defendants are liable to the Plaintiffs for the actual damages sustained by the Plaintiffs. Defendants knowingly committed the complained of acts and are therefore liable to the Plaintiffs for treble damages.

### E.  COMMON LAW FRAUD

194.    Defendants' representations as described herein and contained in the "safety and soundness" letters attached hereto as **Exhibit "4"** constitute common law fraud, which caused Plaintiffs Troice, Diaz, Punga, Canabal, Ferreiro and Promotora damages for which they should recover by law.  Defendants, in the course of their business relationships with Stanford Financial, made material representations and omitted material facts in the insurance endorsement letters which Defendants knew and intended, or had reason to expect, would eventually be transmitted to Stanford Financial investors such as Plaintiffs.  Defendants and their employees and agents knowingly and intentionally made the misrepresentations or omissions contained in the "safety and soundness" letters, and/or recklessly made the representations and omissions contained in said letters as positive assertions without any knowledge of their truth.  Acting on behalf of Stanford

Financial and at its behest, Defendants created and transmitted the letters with the intention that they reach investors like Plaintiffs and with the intention that investors like Plaintiffs act upon the representations and omissions by investing in, or continuing to maintain investments in, SIB CDs. Plaintiffs received the "safety and soundness" letters created and transmitted by Defendants and justifiably relied upon them, and based upon them and the information provided by Stanford Financial, formed the belief that their investments in the SIB CDs were insured.  As a direct and proximate result of Plaintiffs' reliance on Defendants' fraudulent misrepresentations and omissions, Plaintiff suffered damages, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

### F.  NEGLIGENT MISREPRESENTATION

195.   Defendant's representations as described herein and contained in the "safety and soundness" letters attached hereto as **Exhibit "4"** constitute negligent misrepresentations, which caused Plaintiffs Troice, Diaz, Punga, Canabal, Ferreiro and Promotora damages for which they should recover by law.  Defendants, in the course of their business relationships with Stanford Financial in which Defendants had a pecuniary interest, supplied false information to Stanford Financial with full knowledge, and indeed intending, or in the alternative fully expecting, that said information would be transmitted to investors like Plaintiffs Troice, Diaz, Punga, Canabal, Ferreiro and Promotora, who in turn would rely on and be guided by said information in making their own investment decisions.  Defendants and their employees and agents did not exercise reasonable care or competence in obtaining or communicating the false information to Plaintiffs via Stanford Financial.  Plaintiffs Troice, Diaz and Punga, Canabal, Feriero, and Promotora all received and relied on the "safety and soundness" letters transmitted by Defendants and were justified in relying on Defendants' false representations contained therein.  As a direct and proximate result of

Plaintiffs' reliance on Defendants' negligent misrepresentations, Plaintiff suffered damages, being the difference between their investments in SIB as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

## G.  NEGLIGENCE/GROSS NEGLIGENCE

196.    In the alternative, Defendants committed various acts and/or omissions of negligence which were a proximate cause of Plaintiffs' damages.  Such acts and/or omissions violated the standard of care and the duty owed by an insurance broker, agent or consultant or risk manager exercising reasonable prudence to ensure that insurance letters sent to third parties provide an accurate and proper description of the type and amounts of existing insurance coverages available to its client, as well as the type of professional services the insurance broker, agent or consultant or risk manager provides to its client.

197.    Each of these acts and/or omissions, singularly or in combination with others, constitute negligence and each proximately caused the incident made the basis of this action and damages sustained by Plaintiffs.  Moreover, the negligence of Defendants in violating the standard of care, as set out above, constitutes negligence as a matter of law.

198.    Defendants' actions and inaction also constitute gross negligence.  Defendants' wrongful acts were aggravated by the kind of conduct which, when viewed objectively from Defendants' perspective at the time the acts occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiffs and others.  Defendants were subjectively aware of the risks involved, but proceeded with conscious indifference to their duties and to the rights and welfare of Plaintiffs.  As a result Plaintiffs seek exemplary damages for Defendants' gross negligence.

## H.  NEGLIGENT RETENTION/NEGLIGENT SUPERVISION

199.    Defendants are directly liable to Plaintiffs for negligent retention and supervision of their employees Winter and Barnoucky.  At all times described herein, Winter and Barnoucky were employees of BMB and Willis, respectively.  Defendants owed a duty to Plaintiffs, as recipients of

the letters in issue, to use ordinary care in the hiring, supervision and retention of their agents and employees.  Defendants knew or should have known that Winter and Barnoucky were preparing, signing and transmitting the "safety and soundness" letters to Plaintiffs and other Stanford Financial clients, and knew or should have known the contents and purpose of the letters.  Moreover BMB knew or should have known that Winters also served on the SIB Board of Directors.  As a result, Defendants breached their duty owed to Plaintiffs by not exercising ordinary care in the hiring, supervision and retention of Winters and Barnoucky.  Defendants' breach of their duties and failure to supervise has proximately caused damages to Plaintiffs.

## XII.  JOINT ENTERPRISE/SINGLE BUSINESS ENTERPRISE

200.    A joint enterprise or single business enterprise existed between the various companies within the Stanford Financial group, all of which operated as, and were marketed and sold to the investing public as, Stanford Financial.  The joint enterprise or single business enterprise consisted of, *inter alia*, SGC, SIB, SCM, Stanford Trust Louisiana, Stanford Trust Antigua, Stanford Group Mexico, Stanford Fondos, Stanford Venezuela, and Stanford Fiduciary Investor Services.  There existed an express or implied agreement between the above described entities and their principals concerning the establishment and administration of the joint enterprise/single business enterprise; a common purpose to be carried out by the above described entities and their principals, being the reaping of fees and profits from the illicit activities of the joint enterprise/single business enterprise; a community of pecuniary interest among the above described entities and their principals; and the above described entities and their principals shared in the management and direction of the joint enterprise/single business enterprise.  Thus, a joint enterprise or single business enterprise existed between and among the above described entities and their principals, which is responsible for the fraudulent acts described herein, making them all jointly and

severally liable for the fraudulent acts described herein.

201.    A joint enterprise or single business enterprise (at least for jurisdictional purposes) existed between the various companies within the Willis Group that provided services to Stanford Financial.   Willis Group, Willis London, Willis Colorado, and other Willis entities operate as a joint enterprise or single business enterprise.  All of the companies within the Willis group centrally report and share resources and allocate costs across business segments as opposed to across corporate lines.   Indeed the chief executive officers of the Willis group of companies carry titles like ""Group General Counsel" (Donald Bailey); "Group President" (Grahame J. Millwater); "Group Chief Financial Officer" (Patrick Regan);  Group Director of Human Resources (Susan Sztuka);  and "Group Chief Operating Officer" (Timothy D. Wright).  There existed an express or implied agreement between the above described entities and their principals concerning the establishment and administration of the joint enterprise/single business enterprise; a common purpose to be carried out by the above described entities and their principals, being the reaping of fees and profits from the illicit activities of the joint enterprise/single business enterprise; a community of pecuniary interest among the above described entities and their principals; and the above described entities and their principals shared in the management and direction of the joint enterprise/single business enterprise. Indeed Willis Group, Willis London, and Willis Colorado actually agreed upon a fixed fee split between them for servicing the Stanford account, with 13% to Willis London;  6% to Willis Group;  and 1% to Willis Colorado.  Thus, a joint enterprise or single business enterprise existed between and among the above described entities and their principals, which is responsible for the fraudulent acts described herein, making them all jointly and severally liable for the fraudulent acts described herein.

## XIII.  ALTER EGO

202.    Defendant Willis Group is directly liable for the acts and omissions of Willis London as described herein for the reason that Willis London is the alter ego of Willis Group and a conduit by which Willis Group conducted the business, including the schemes, described herein. Specifically, Willis Group owns, controls, and dominates Willis London to such an extent that Willis London has no separate interests of its own and in reality functions as a mere division, instrumentality or branch of Willis Group.  Indeed Willis Group and all of its subsidiaries, including Willis London and Willis Colorado, operate as one single unified worldwide business unit or single business enterprise, all operating under the Willis Group brand, international trademark or tradename and logo, which is prominently displayed on all of the Willis Group entities' correspondence including the "safety and soundness" Letters described herein.  Willis Group controls the manner in which its subsidiaries, such as Willis London and Willis Colorado, are perceived by the public, including controlling said entities' use of the Willis brand name, and therefore intentionally creates the impression in the minds of third parties that Willis is one unified, global entity that acts as a single unit.  Indeed Willis Group's own website touts its "Glocal" approach to client service, in which Willis Group "combines" its global resources to offer the "full benefit of every service that Willis offers" worldwide.

203.    As part of its global branding strategy, Willis Group and all of its subsidiaries operate as a single economic unit under a "One Flag culture" centered on its Client Advocate and Glocal service model, and as a result of those business strategies Willis Group effectively dominates, formulates, directs and controls all of its subsidiaries', including Willis London and Willis Colorado's, operations under the Willis worldwide umbrella, creating an extensive overlap of corporate and operational and public perceptional interdependency. Willis' "One Flag" approach "guarantees" that all of Willis' worldwide employees, wherever they are located, "work as part of

one cohesive team." For all effective purposes, and certainly for purposes of this lawsuit, Willis London, Willis Colorado and Willis Group are one and the same because that is the perception that Willis seeks to create in the minds of third parties worldwide, including Plaintiffs.

204.    Furthermore, the entities within the Stanford Financial group of companies, including SIB, SGC, STC, Stanford Mexico, and Stanford Venezuela, all acted as the alter ego of each other and of Allen Stanford, and Plaintiffs hereby adopt the alter ego arguments made by the U.S. receiver in his Response to the Antiguan Liquidators' December 3 Supplemental Brief, in the related case pending before this Court styled *In re Stanford International Bank Ltd*., C.A. No. 3-09-CV-0721-N (docket #61) at pps. 11-16.

## XIV. <u>AGENCY</u>

205.    Defendants acted at all times as the agents of Stanford Financial and SIB.  In agreeing to sign the "safety and soundness" letters as Stanford Financial's insurance brokers, Defendants agreed to serve as Stanford Financial's agents in the marketing process for the sales of the SIB CDs.  In preparing the text of the "safety and soundness" letters and asking Defendants to execute them for subsequent distribution to Plaintiffs and the Class, Stanford Financial authorized Defendants to act for them and subject to their control.  As such, Stanford Financial had the right to control both the means and the details of Defendants' actions with respect to the "safety and soundness" letters.  Nanes acted at all times as an agent of Stanford Financial in Mexico in operating and managing Stanford Mexico with the sole objective of promoting and selling the Stanford Financial CD products in Mexico.  Defendants Willis and BMB acted as the agents of Stanford Financial and SIB in creating and circulating the letters described herein with the sole objective of promoting and selling Stanford Financial and SIB and their products worldwide.

206.    Furthermore Defendant Willis Colorado and Baranoucky acted at all times as the

agent(s) of Willis London and Willis Group in dealing with Stanford Financial, including with respect to their general and specific jurisdictional contacts with the State of Texas, under the theories of actual, apparent and agency by estoppel.  Defendant Willis London, in turn, acted at all times as the agent(s) of Willis Group, including with respect to their general and specific jurisdictional contacts with the State of Texas, under the theories of actual, apparent and agency by estoppel.  Willis London acts as the general agent of Willis Group and effectuates and carries out all of Willis Group's business.  Moreover, Willis Group has purposefully created the appearance of authority that Willis Colorado and Baranoucky act on behalf of Willis Group by allowing Willis Colorado (as well as its other subsidiary companies) and Baranoucky to prominently display the Willis Group brand, international trademark or tradename and logo on all of their correspondence.  Willis Group controls the manner in which its subsidiaries, such as Willis Colorado, are perceived by the public and therefore intentionally creates the impression in the minds of third parties that Willis is one unified, global entity that acts as a single unit.  Indeed Willis Group's own website touts its "Glocal" approach to client service, in which Willis Group "combines" its global resources to offer the "full benefit of every service that Willis offers" worldwide.  As an employee of this global, cohesive and consolidated single business joint enterprise, Baranoucky also acted as a direct agent of Willis Group with regard to the allegations made herein.

## XV. **RESPONDEAT SUPERIOR**

207.    Defendants Willis and BMB are liable for the tortious acts of their employees, including without limitation, Amy S. Baranoucky (Willis) and Robert S. Winter (BMB), and all contacts with the State of Texas by those employees should be attributed to the specific employees' principals for purposes of the personal jurisdiction analysis.  Amy S. Baranoucky [Willis] and Robert S. Winter [BMB] were acting within the course and scope of their employment with

Defendants, and in furtherance of their respective principals' businesses, when they engaged in the wrongful conduct described herein.  David Nanes was at all times acting within the course and scope of his employment with Houston-based SGC and/or Stanford Financial, and in furtherance of said companies' respective  businesses, when he engaged in the wrongful conduct described herein.

## XVI.  ACTUAL DAMAGES

208.     Plaintiffs and the Class have suffered the loss of well in excess of $7 billion that was proximately caused by the wrongful conduct of Defendants described herein.  Because a Ponzi scheme depends for its survival on constant and continuous infusions of new money to pay off old investors and so lure new ones, Defendants are liable for all of the losses suffered by Plaintiffs and the Class because Defendants served as key links in the Ponzi sales and marketing chain by issuing the letters described herein in order to assist Stanford Financial lure new infusions of investor money.  But for Stanford Financial's false assurances regarding insurance reinforced by these letters, countless investors like Plaintiffs would never have invested in the CDs and therefore the Ponzi scheme would have collapsed.  Instead, and as a direct result of the utilization of Defendants' endorsement letters, Stanford grew exponentially between 1999 and 2007.  Moreover Defendants are jointly and severally liable for the injury caused by Allen Stanford, Stanford Financial and SIB under Texas common law of joint and several liability as well as under the Texas Securities Act.  In addition, Plaintiffs are entitled to recover their just and reasonable attorneys' fees, for it would be inequitable not to award such fees to them.  Plaintiffs have retained the undersigned attorneys and have agreed to pay them a reasonable attorneys' fee for their work.

209.     The exact amount of maximum damages proximately caused by Defendants' wrongful conduct is unknown, but Plaintiffs believe that those damages exceed $7 billion.

## XVII.  PUNITIVE DAMAGES

210.    The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code.  Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendants and to deter similar conduct of others in the future.

211.    All conditions precedent to filing this Complaint have been met.

## XVIII.  <u>JURY DEMAND</u>

212.    Plaintiffs demand a trial by jury.

## <u>PRAYER</u>

WHEREFORE, Plaintiffs pray the Defendants be summoned to answer this Complaint, that this action be certified as a class action, and that the case be tried before a jury and that upon final judgment the classes and sub-classes as set forth in each cause of action hereof recover their damages as alleged herein, including their actual damages, punitive damages, and their costs and expenses of suit, including reasonable attorneys' fees.  Plaintiffs pray for such other relief to which they may be justly entitled.

Respectfully submitted,

| | |
|---|---|
| **CASTILLO SNYDER, P.C.** | **STRASBURGER & PRICE, LLP** |
| 300 Convent Street, Suite 1020 | 300 Convent Street, Suite 900 |
| San Antonio, Texas  78205 | San Antonio, Texas 78205 |
| Telephone: (210) 630-4200 | Telephone:  (210) 250-6000 |
| Facsimile: (210) 630-4210 | Facsimile: (210) 250-6100 |

By:  s/ Edward C. Snyder
      EDWARD C. SNYDER
      State Bar No. 00791699
      esnyder@casnlaw.com
      JESSE R. CASTILLO
      State Bar No. 03986600
      jcastillo@casnlaw.com

**LEAD CLASS COUNSEL AND**
**ATTORNEYS IN CHARGE**
**FOR PLAINTIFFS**
**AND THE PUTATIVE CLASS**

Nicholas A. Foley
State Bar No. 07208620
Douglas J. Buncher
State Bar No. 03342700
**NELIGAN FOLEY, LLP**
Republic Center
325 N. St. Paul, Suite 3600
Dallas, Texas  75201
Telephone: (214) 840-5320
Facsimile: (214) 840-5301
dbuncher@neliganlaw.com
nfoley@neliganlaw.com

      EDWARD F. VALDESPINO
      State Bar No. 20424700
      edward.valdespino@strasburger.com
      ANDREW L. KERR
      State Bar No. 11339500
      andrew.kerr@strasburger.com

      DAVID N. KITNER
      State Bar No. 11541500
      david.kitner@strasburger.com
      STRASBURGER & PRICE, LLP
      901 Main Street, Suite 4400
      Dallas, Texas  75202
      Telephone: (214) 651-4300
      Facsimile: (214) 651-4330

## CERTIFICATE OF SERVICE

      I hereby certify that on this 1st day of April, 2011.  I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to all counsel of records, each of whom have consented in writing to accept this Notice as service of this document by Electronic means.


      s/  Edward C. Snyder