UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SAMUEL TROICE, *et al.*, individually and on behalf of a class of all others similarly situated, | § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 3:09-cv-01274-N |
| v. | § § § | *In re: Stanford Entities Securities Litigation MDL 2099* |
| WILLIS OF COLORADO INC., et al., | § § | |
| Defendants. | § § | |

## WILLIS AND AMY BARANOUCKY'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

T. Ray Guy
Texas Bar No. 08648500
Sandra Y. Fusco
Texas Bar No. 24069744
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201-6950
Telephone:  (214) 746-7700
Facsimile:  (214) 746-7777

OF COUNSEL:
Jonathan D. Polkes
Joshua S. Amsel
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

**ATTORNEYS FOR DEFENDANTS WILLIS OF COLORADO, INC. AND WILLIS LIMITED**

Mark D. Manela
State Bar No. 12894500
Manela Law Firm
440 Louisiana Street, Suite 2300
Houston, Texas  77002
Telephone:  (713) 240-4843
Facsimile:  (713) 228-6138

**ATTORNEY FOR DEFENDANT
AMY S. BARANOUCKY**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ............................................................................................... 10

I.      Plaintiffs Seek to Certify a Worldwide Class of More Than 17,000 Investors Based on Stanford's Alleged Marketing Scheme ........................................................................... 10

II.     The Evidence Shows that Stanford's Financial Advisors Communicated with Each Investor Privately and Individually ............................................................................... 11

III.    The Evidence Shows that Stanford Published Non-Uniform Marketing Materials ............... 13

IV.     Willis's Alleged Role in Stanford's Scheme is Limited to Creating Letters .......................... 14

V.      The Record Demonstrates the Willis Letters Only Went to a Very Small Minority of the Proposed Class ........................................................................................................... 16

VI.     Plaintiffs Put Forth No Evidence of the Purported Significance of the Willis Letters to Stanford's Scheme ...................................................................................................... 18

ARGUMENTS AND AUTHORITIES .................................................................................. 19

I.      Legal Standards for Class Certification .............................................................................. 19

        A.      Plaintiffs Must Prove Six Elements for Their Proposed Rule 23(b)(3) Class Action ................................................................................................................ 20

        B.      The Court Must Conduct a "Rigorous Analysis" and Plaintiffs Must Establish with Evidentiary Proof That Rule 23 Is Satisfied .......................................... 20

II.     Plaintiffs Have Not Established the Prerequisites of Rule 23(a) ......................................... 22

        A.      Plaintiffs Fail to Demonstrate Commonality .................................................... 22

        B.      Plaintiffs' Claims Are Not Typical of the Proposed Class ................................. 29

        C.      The Proposed Class Representatives Are Not Adequate Representatives .................. 31

III.    Plaintiffs Have Not Proved the Additional Requirements of Rule 23(b)(3) ......................... 34

        A.      Individual Inquiries Predominate Over Common Questions ................................. 35

                1.      Stanford's Oral Communications About Insurance Coverage for the CDs Were Verbal and Therefore Non-Uniform ................................................. 36

                2.      Individual Inquiries Regarding the Written Disclosures Will Be Required ................................................................................................ 43

                3.      Plaintiffs' Experiences with Stanford Are Unique and Individualized .......... 49

        B.      Plaintiffs Fail to Demonstrate That a Class Action "Is Superior ........................ 51

                1.      The Large Alleged Value of Individual Claims Defeats Superiority ............... 51

                        a.      The average claim of an investor who received a Willis letter is over $1 million, and, even for those

who did not receive a letter, the damages at issue are
significant. ................................................................................53

b.   The vast majority (or all) of those who potentially
received a Willis letter have already brought individual
suits. ......................................................................................55

2.   A Class Action Is Not Superior Given the Significant Risk That
Foreign Jurisdictions Would Not Recognize a Judgment................................56

CONCLUSION AND REQUESTED RELIEF................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. Citgo Petroleum Corp.,*
   151 F.3d 402 (5th Cir. 1998) ................................................................................52

*In re Alstom SA Sec. Litig.,*
   253 F.R.D. 266 (S.D.N.Y. 2008) ..........................................................................57

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997) ........................................................................................ 35, 51

*Andrews v. Chevy Chase Bank,*
   545 F.3d 570 (7th Cir. 2008) ................................................................................52

*Anheuser-Busch Cos., Inc. v. Summit Coffee Co.,*
   858 S.W.2d 928 (Tex. App.—Dallas 1993, writ denied) .....................................49

*Ansari v. New York Univ.,*
   179 F.R.D. 112 (S.D.N.Y. 1998) .................................................................... 57, 58

*Berger v. Compaq Computer Corp.,*
   257 F.3d 475 (5th Cir. 2001) ................................................................................31

*Buettgen v. Harless,*
   263 F.R.D. 378 (N.D. Tex. 2009) .........................................................................58

*Burkett v. Bank of Am., N.A.,*
   No. 1:10CV68-HSO-JMR, 2012 WL 3811741 (S.D. Miss. Sept. 4, 2012) ..........36

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ..............................................................................................19

*Calpetco 1981 v. Marshall Exploration, Inc.,*
   989 F.2d 1408 (5th Cir. 1993) ........................................................................ 40, 49

*Carrera v. Bayer Corp.,*
   727 F.3d 300 (3d Cir. 2013) ........................................................................... 19, 25

*Castano v. American Tobacco Co.,*
   84 F.3d 734 (5th Cir. 1996) ............................................................................ 49, 52

*Comcast v. Behrend,*
   133 S. Ct. 1426 (2013) .............................................................................. 5, 20, 21

*Crescendo Invs., Inc. v. Brice,*
    61 S.W.3d 465 (Tex. App.—San Antonio 2001, pet. denied) ...................................................... 40, 49

*Duperier v. Texas State Bank,*
    28 S.W.3d 740 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) .................................... 46, 49

*Dvorin v. Chesapeake Exploration, LLC,*
    Civil Action No. 3:12-CV-3728-G, 2013 WL 6003433 (N.D. Tex. Nov. 13, 2013) ...................... 23

*In re Enron Corp.,*
    490 F. Supp. 2d 784 (S.D. Tex. 2007) ....................................................................................... 49

*In re Enron Corp.,*
    529 F. Supp. 2d at 692 n.43, 725 .......................................................................................... 31, 32

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l,*
    No. H-05-3394, 2008 WL 7356272 (S.D. Tex. Nov. 24, 2008) ........................................................ 37

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) .................................................................................................................. 26

*Gene & Gene LLC v. BioPay LLC,*
    541 F.3d 318 (5th Cir. 2008) ..................................................................................................... 47

*Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.,*
    97 S.W.3d 779 (Tex. App.—Dallas 2003), *rev'd in part,* 161 S.W.3d 482 (Tex. 2005) ...................... 49

*Grainger v. State Sec. Life Ins. Co.,*
    547 F.2d 303 (5th Cir. 1977) ..................................................................................................... 36

*Granader v. McBee,*
    23 F.3d 120 (5th Cir. 1994) ....................................................................................................... 49

*Griffin v. GK Intelligent Sys., Inc.,*
    196 F.R.D. 298 (S.D. Tex. 2000) .......................................................................................... 31, 52

*Gyarmathy & Assoc., Inc. v. TIG Ins. Co.,*
    No. Civ. A 3:02-CV-1245, 2003 WL 21339279 (N.D. Tex. June 3, 2003) ............................ 3, 8, 41

*Hall v. F.E.R.C.,*
    691 F.2d 1184 (5th Cir. 1982) ................................................................................................... 12

*Halliburton Co. v. Erica P. John Fund, Inc.,*
    134 S. Ct. 2398 (2014) .............................................................................................................. 48

*Hancock v. Chicago Title Ins. Co.,*
    263 F.R.D. 383 (N.D. Tex. 2009), *aff'd,* 636 F.3d 699 (5th Cir. 2011) ............................................ 21

*Hansberry v. Lee,*
  311 U.S. 32 (1940) ...................................................................................................................... 19

*Inland Royalty Co. v. Heruth,*
  No. 05-99-01684-CV, 2000 WL 792406 (Tex. App.—Dallas June 21, 2000, no pet.) ........... 47, 48

*Italian Cowboys Partners v. Prudential Ins.,*
  341 S.W.3d 323 (Tex. 2011) ..................................................................................................... 46

*Johnson v. Arkema, Inc.,*
  685 F.3d 452 (5th Cir. 2012) ..................................................................................................... 27

*Karnes v. Fleming,*
  Civil Action No. H-07-0620, 2008 WL 4528223 (S.D. Tex. July 31, 2008) ..................................... 31

*Keyes v. Guardian Life Ins. Co. of Am.,*
  194 F.R.D. 253 (S.D. Miss. 2000) ............................................................................................... 37

*In re Kosmos Energy,*
  299 F.R.D. 133 (N.D. Tex. 2014) ......................................................................................... 22, 48

*In re LifeUSA Holding Inc.,*
  242 F.3d 136 (3d Cir. 2001) ....................................................................................................... 37

*Mabary v. Hometown Bank, N.A.,*
  Civ. No. 4:10-cv-2936, 2011 WL 5864325 (S.D. Tex. Nov. 22, 2011) ........................................ 52

*Madison v. Chalmette Refining, L.L.C.,*
  637 F.3d 551 (5th Cir. 2011) ..................................................................................................... 21

*Martin v. Home Depot U.S.A., Inc.,*
  225 F.R.D. 198 (W.D. Tex. 2004) .............................................................................................. 48

*Nguyen v. Excel Corp.,*
  197 F.3d 200 (5th Cir. 1999) ..................................................................................................... 19

*Nichols v. Mobile Board of Realtors, Inc.,*
  675 F.2d 671 (5th Cir. 1982) ..................................................................................................... 35

*Ogden v. AmeriCredit Corp.,*
  225 F.R.D. 529 (N.D. Tex. 2005) .............................................................................................. 31

*In re Park Cent. Global Litig.,*
  No. 3:09-cv-765-M, 2014 WL 4261950 (N.D. Tex. Aug. 25, 2014) ...................................... 36, 49

*Paull v. Capital Res. Mgmt., Inc.,*
  987 S.W.2d 214 (Tex. App.—Austin 1999, writ denied) ............................................................ 47

*Peltier Enterprises, Inc. v. Hilton,*
    51 S.W.3d 616 (Tex. App.—Tyler 2000, pet. denied) ...................................................47

*Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.,*
    482 F.3d 372 (5th Cir. 2007) ...........................................................................................48

*Robinson v. Texas Auto. Dealers Ass'n,*
    387 F.3d 416 (5th Cir. 2004) ...........................................................................................21

*Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.,*
    319 F.3d 205 (5th Cir. 2003) ..................................................................................35, 48

*Shivangi v. Dean Witter Reynolds, Inc.,*
    825 F.2d 885 (5th Cir. 1987) ...........................................................................................36

*Simms v. Jones,*
    296 F.R.D. 485 (N.D. Tex. 2013) ....................................................................................35

*Simon v. Merrill Lynch, Pierce, Fenner & Smith,*
    482 F.2d 880 (5th Cir. 1973) .................................................................................*passim*

*Estate of Sowell v. United States,*
    198 F.3d 169 (5th Cir. 1999) ...........................................................................................28

*Sterling Trust Co. v. Adderley,*
    168 S.W.3d 835 (Tex. 2005) ...........................................................................................49

*M.D. ex rel. Stukenberg v. Perry,*
    675 F.3d 832 (5th Cir. 2012) ..................................................................................21, 23

*Sun v. United States,*
    No. 93-1399, 1994 WL 144643 (5th Cir. 1994) .............................................................12

*Texas Instruments Inc. v. Citigroup Global Mkts., Inc.,*
    266 F.R.D. 143 (N.D. Tex. 2010) ....................................................................................47

*Ticknor v. Rouse's Enters., L.L.C.,*
    No. 14–30550, 2014 WL 6440397 (5th Cir. Nov. 18, 2014) ...........................35, 39, 47, 52

*Transp. Ins. Co. v. Faircloth,*
    898 S.W.2d 269 (Tex. 1995) ...........................................................................................46

*In re Vivendi Universal, S.A.,*
    242 F.R.D. 76 (S.D.N.Y. 2007) ................................................................................57, 61

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ..........................................................................................*passim*

*Warren v. Reserve Fund, Inc.*,
   728 F.2d 741 (5th Cir. 1984) .......................................................................... 30

*Weatherly v. Deloitte & Touche*,
   905 S.W.2d 642 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.) ............... 49

*In re Westcap Enterprises*,
   230 F.3d 717 (5th Cir. 2000) .......................................................................... 46

*Young v. United States*,
   181 F.R.D. 344 (W.D. Tex. 1997) .................................................................... 58

**Statutes**

Tex. Rev. Civ. Stat. art. 581-33A(2) .......................................................... 30, 46, 48, 49

**Other Authorities**

Fed. R. Civ. P. 23(a) ...................................................................................... *passim*

Fed. R. Civ. P. 23(a)(2) ...................................................................................... 5, 22

Fed. R. Civ. P. 23(a)(3) ............................................................................................ 6

Fed. R. Civ. P. 23(a)(4) ............................................................................................ 7

Fed. R. Civ. P. 23(b)(3) ................................................................................... passim

William B. Rubenstein, Newberg on Class Actions § 4:88 (5th ed. 2014) ................................ 20

Defendants Willis of Colorado, Inc., Willis Limited, and Amy S. Baranoucky (together, Willis) respectfully submit this opposition to Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel (the Motion).

## PRELIMINARY STATEMENT

The seven named Plaintiffs claim they were defrauded by their Stanford financial advisors (FAs) into believing that the certificates of deposit (CDs) they bought from Stanford International Bank, Ltd. (SIB) were protected by FDIC-like insurance. Plaintiffs claim that, had they known the CDs were not insured, they would not have bought them. Plaintiffs claim that Willis, Stanford's third-party insurance broker, aided in that insurance marketing scheme by providing letters to Stanford (not to Plaintiffs) that set forth certain lines of insurance that Stanford had purchased for its own corporate operations (not for the protection of CD purchasers). Plaintiffs allege that the letters were misleading and were available to the Stanford FAs to potentially show to CD purchasers to help convince them to purchase or keep their CDs.

The five proposed Class Representatives[1] seek to represent a class against Willis consisting of more than 17,000 victims of Stanford's Ponzi scheme, each of whom, it is alleged, was defrauded in exactly the same way through the use of uniform false representations that the CDs were insured. These allegedly uniform false representations, however, do not come from the Willis letters themselves. Rather, Plaintiffs seek to certify a class based on the allegedly uniform *oral* representations made by hundreds of different Stanford FAs over several years, who may or may not have used the Willis letters (or any other marketing materials for that matter). In fact, although the

---

[1] Although the Motion, as written, seeks the appointment of all seven named Plaintiffs as class representatives, two of those Plaintiffs—Paula Gilly-Flores and Promotora Villa Marino, C.A.—are no longer seeking such appointment. (*See* APP. at 971, 974.)

An appendix in support of Willis's opposition to Plaintiffs' Motion is being filed contemporaneously herewith. Citations to Willis's appendix are denoted as "APP. at __" and refer to the specific page of the consecutively-numbered appendix. Citations to deposition testimony further contain page/line notations in brackets.

five proposed Class Representatives allege that they were duped by their FAs into believing their CD purchases were insured, they *admit* that they have no idea whether the other 17,000-plus putative class members were similarly duped by their FAs (or anyone else for that matter) into believing the CDs were insured. In other words, based on the record evidence, it is entirely possible that the vast majority of the 17,000-plus other proposed class members purchased their CDs without any representations by a Stanford FA or anyone else about insurance and without any belief or understanding that the CDs were insured, and, further, may very well have understood the CDs were *not* insured, but bought them anyway.

Based on this lack of evidence, Plaintiffs cannot possibly meet the Rule 23 requirements to have a class certified. Unsupported allegations are meaningless in the context of a class certification motion under Rule 23. Instead, to certify a class, the United States Supreme Court requires a plaintiff to demonstrate by a preponderance of the evidence that the elements of Rule 23 have been proved. It similarly requires that the district court undertake a probing inquiry of the evidence and make findings of fact that the plaintiff has met its burden. The principal *evidence* in the record here, however, is what the five proposed Class Representatives testified they were told by three Stanford FAs in their own, private, closed-door meetings about how *they* claim to have been duped by *their* particular FA. Plaintiffs also submitted 85 untested declarations from U.S-based investors, vaguely claiming that they were generally misled by their FAs about insurance (although none of them claim to have ever seen a Willis letter or even knew of Willis at all).[2] But there were several hundred Stanford FAs who sold CDs to *17,000-plus* putative class members in more than 100 countries over the course of eight years. The named Plaintiffs and declarants together constitute approximately 0.5% of the 17,000-plus members of the proposed class. There is no evidence as to

---

[2] In addition, as discussed below, there are 225 other investors claiming to have seen a Willis letter, who would not be members of this proposed class action because they have brought individual lawsuits.

what the other 99.5% of investors in the proposed class were told by their FAs, what the circumstances were, or whether their experiences were at all in common with those of the proposed Class Representatives.

And, fatal to Plaintiffs' Motion is the fact that the proposed Class Representatives have admitted that they have no idea what each of the 17,000-plus other people in the proposed class were told by their FAs in those tens of thousands of meetings. They do not know if any of those 17,000-plus people were told that the CDs were insured, or if any of them believed that the CDs were insured, or if any of them invested because they believed the CDs were insured. Indeed, the proposed Class Representatives admitted on the record that other putative class members (i) may well have been told different things by their FAs and (ii) may have been shown different marketing materials, some of which clearly disclosed that the CDs were *not* insured, and (iii) may have believed that the CDs were *not* insured. And, critically, each of the proposed Class Representatives admitted that to find out the answers to any of those questions—what other FAs told other investors; what the other investors understood about CD insurance from their private meetings; and what disclosures other investors read—you would have to ask *each and every* proposed class member *individually*.

These admissions preclude class certification because an action, such as this one, based on individual alleged oral misrepresentations, "cannot be maintained as a class action." *Simon v. Merrill Lynch, Pierce, Fenner & Smith*, 482 F.2d 880, 882 (5th Cir. 1973). Indeed, this Court itself has denied class certification in nearly identical circumstances. In *Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*, No. Civ. A 3:02-CV-1245, 2003 WL 21339279, at *1 (N.D. Tex. June 3, 2003), notwithstanding the movant's allegations of uniform written disclosures, the Court denied class certification because, as here, "the record reflects that at least some potential class members received varying representations from their brokers above and beyond what is contained in the [written materials]." *Id.* at *3. The

record here shows that the proposed Class Representatives have made the same admissions: they received private, unrecorded, individual oral communications from their Stanford FAs—above and beyond any Willis letter or other written material—and it is these oral communications that Plaintiffs now claim were misleading. Accordingly, whether viewed through the prism of commonality, typicality, predominance, or any other requirement of Rule 23, the proposed Class Representatives' on-the-record admissions show that this is a class that cannot possibly be certified consistent with controlling law.

Nor can Plaintiffs resuscitate their claims by suggesting that the Willis letters are the common glue that holds the class together. Plaintiffs have long alleged that Willis's letters were a cornerstone of the Ponzi scheme and that the scheme would not have survived without them. The Court accepted those *allegations* for purposes of denying defendants' motions to dismiss. But now that class discovery is complete, the record demonstrates that Plaintiffs never had any basis to make those assertions. As Plaintiffs and the Receiver admit, they have no idea how many Willis letters were provided by the Stanford FAs to members of the putative class. In fact, they have offered no evidence and done no analysis that shows who among the investors received letters, when they were received, whether the investors purchased CDs before or after receiving the letters (or not at all) and, if so, when and in what amount, or what anyone who received a letter actually understood the letter to mean (including whether any members of the putative class correctly understood that the CDs were not insured). Nor have Plaintiffs offered any evidence or performed any analyses tracing the funds from those investors' purchases to substantiate their speculation that the letters were the linchpin of the Ponzi scheme. Simply put, Plaintiffs have done no analysis and have no "evidentiary proof"—facts, statistics, or otherwise—that supports Plaintiffs' speculation that the Willis letters were the sustaining force behind Stanford's fraud and essential to its propagation. In fact, the record evidence here shows that Plaintiffs can only demonstrate that, at most, 225 individuals out of the

17,000-plus proposed class members ever saw a Willis letter (all of whom have already instituted their own individual actions and, thus, would not be part of any certified class). As the principal of named Plaintiff Punga Punga Financial, Ltd. (Punga) admitted, the vast majority of investors who did not receive a Willis letter are in a different position from those who did: those investors "would have to file a suit regarding something else."

Moreover, Plaintiffs *concede* that even the very small number of investors who claim they *did* receive letters based their understandings about the insurance applicable to the CDs on what their respective Stanford FAs told them, not on anything stated in the Willis letters themselves. After all, as Plaintiffs also concede, the Willis letters do not say on their face that the CDs were insured, or even mention the CDs at all, and Plaintiffs have no idea specifically who among the proposed class actually saw a Willis letter. Further, Plaintiffs claim that the letters were misleading because they *omitted* to state that the CDs were *not* covered by insurance, but this only demonstrates that *Stanford's* oral communications are central to this case: omissions are actionable only to the extent that they make what was actually said misleading (in this case, by the Stanford FAs). In other words, the Willis letters can only be misleading if intentionally misused by the Stanford FAs, who, unlike Willis, directly communicated with investors and allegedly made affirmative verbal misrepresentations about insurance.

In short, at class certification, Plaintiffs must demonstrate—and this Court must find—"evidentiary proof" that the factual allegations and legal questions raised are capable of class treatment. *Comcast v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Considering the proposed Class Representatives' binding admissions and other record evidence, this Court cannot make the necessary on-the-record factual findings to support the "rigorous" Rule 23 requirements.

*First*, Plaintiffs cannot meet the prerequisite that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As the Supreme Court recently reiterated in *Wal-Mart*

*Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), at class certification, Plaintiffs must show, *with "significant proof,"* that they "suffered the same injury"—*i.e.*, Plaintiffs must show that the defendants' conduct caused them the same harm, and in the same way, so that there are common answers to common questions. *See id.* at 2551 (citation omitted). On this record and in light of the admissions made by the proposed Class Representatives that the alleged misrepresentations were in material part verbal and made in private, it is simply not possible for the Court to conclude that such commonality exists. Plaintiffs themselves admit that there will not be common answers to core questions concerning what the thousands of FAs told the tens of thousands of individual investors in private meetings; what questions those individual investors asked; what answers they received; what, if any, marketing materials they received or reviewed; and what understandings about the CDs or any insurance related to the CDs the investors came away with. Moreover, at an equally fundamental level, there is no evidence that upwards of 99% of the proposed class ever even received a Willis letter, so the significance of the Willis letter is not something the thousands of putative class members share in common. Plaintiffs concede, too, that there is no evidence demonstrating how the lion's share of investors who did not receive a letter suffered the same injury, in the same way, as the tiny fraction that did. In the end, the issues of law and fact critical to Plaintiffs' claims against Willis are not only unsupported by evidence, but are also way too varied to be amenable to common, class-wide resolution.

*Second*, for many of the same reasons, the proposed Class Representatives cannot show that their claims and defenses are "typical" of the putative class. Fed. R. Civ. P. 23(a)(3). Most damaging to Plaintiffs' efforts to establish typicality are the on-the-record binding admissions that *there is no way to know, without asking each and every one of the absent class members,* whether what the proposed Class Representatives were told in their private meetings with their Stanford FAs was typical of what the thousands upon thousands of absent class members were told. Based on this

admission alone, class certification would be inappropriate. And, although Plaintiffs *allege* that FAs made "uniform" oral representations based on a common training manual, there is no *evidence* supporting that each of the hundreds of FAs across eight years of time and more than 100 countries had access to the same manual, or used it in the same manner, if at all. Rather, there is a complete absence of evidence in the record that would demonstrate the typicality of the alleged misrepresentations. And, although six of the seven named Plaintiffs claim to have received Willis letters, the evidence in the record here demonstrates that, at most, only the other 225 investors who have brought individual suits may have received one as well. Accordingly, to the extent the proposed Class Representatives' claims rest on alleged misrepresentations or omissions concerning the Willis letters, their claims are by definition atypical of the class they purportedly represent.

*Third*, the proposed Class Representatives cannot show that they are "adequate" representatives of the putative class. Fed. R. Civ. P. 23(a)(4). To the contrary, the evidence shows that the proposed Class Representatives have only rudimentary knowledge of the facts and theories alleged in their complaint, and have instead relied on their attorneys to formulate and articulate their allegations. Courts have held that such "derivative" knowledge is insufficient for class certification. For example, Plaintiff Diaz, who does not speak English, could not name the defendants she sued in this action nor confirm that the information in her English-language declaration was accurate. Plaintiff Gomez demonstrated a gross misunderstanding of Plaintiffs' theory of the case by mistakenly believing this is an insurance coverage action. Mr. Gomez further testified that he communicated with his attorneys primarily through Plaintiff Canabal and signed whatever document Mr. Canabal put in front of him. And Mr. Canabal could not identify the Mexican Plaintiffs, and erroneously believed some of the named Plaintiffs were American. Plaintiff Troice mistakenly believed he was representing a class consisting only of recipients of Willis letters. Similarly, as noted above, Plaintiff Punga's principal went so far as to explain that individuals who did not receive a

Willis letter would *not* be part of the class and would have to file a separate lawsuit. Put simply, the named Plaintiffs here do not have sufficient knowledge of the basic facts underlying this action—or even of the relief they are seeking through the instant class certification motion—to adequately serve as class representatives.

*Fourth*, for many of these same reasons, Plaintiffs cannot satisfy the additional requirements of Rule 23(b)(3), including that "questions of law or fact common to the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Although Plaintiffs assert that the entire putative class received a "uniform" sales pitch and "uniform" communications concerning Stanford investments, the *evidence* shows the opposite. Indeed, this Court denied the defendants' motions to dismiss in part because "there are too many factual issues surrounding the manner of distribution of the disclosure statements, including which investors received the statements and in what format." (*See* APP. at 921 [Order on Mot. to Dismiss at 12].) Discovery has not only confirmed this Court's observation, but also exposed a host of additional individual factual issues that predominate over common issues, including:

- As Plaintiffs concede, to the extent they were misled, it was based on information orally communicated to them by their Stanford FAs in private meetings, and the only way to know what was said in the tens of thousands of meetings between the Stanford FAs and the other 17,000-plus members of the putative class is to ask each investor individually. As the Fifth Circuit held in *Simon*, it is virtually impossible to certify a class based on oral misrepresentations, *see* 482 F.2d at 882, a reality this Court itself recognized in denying class certification in *Gyarmathy*, a case on all fours with this one, *see* 2003 WL 21339279, at *3;

- There is no way to determine what written disclosures an investor received without asking each investor individually, and discovery has demonstrated that the written disclosures were dissimilar, with some being completely inconsistent with the notion that the deposits were insured. Indeed, several Plaintiffs admitted they would not have invested if they received certain of the disclosures that were sent to other investors;

- Each individual investor has unique and varying levels of direct experience dealing with Stanford and, thus, will have a different basis from which to evaluate the statements made by the FAs and in the Willis letters. Notably, Stanford FAs told several of the Plaintiffs that CD proceeds were being used to invest in real estate—something this Court found to be one of the most important "red flags" of wrongdoing, which caused it to permit the case to survive

the motions to dismiss. However, two of the Plaintiffs (themselves real estate developers) even toured some of Stanford's real estate developments in Antigua and received in-person presentations from several senior Stanford executives, including the President of SIB. Accordingly, each individual's experience with Stanford will vary and will have to be individually explored.

In sum, given the overwhelming predominance of these individual inquiries, there is no evidentiary basis for this Court to make the factual findings required to support class certification.

*Fifth*, Plaintiffs cannot satisfy the other Rule 23(b)(3) requirement that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). For one thing, the class action device was created to give parties an incentive to bring claims collectively when it would otherwise be cost-prohibitive to bring an individual action because of the small amount in controversy. This is not such a case. The evidence establishes that Stanford generally would not consider sending insurance letters to investors who had less than $1 million to invest. And many (if not all) of the investors who claim they *did* receive a Willis letter are pursuing individual actions against Willis. Those individual actions would be allowed to proceed even if no class were certified here.

In addition, Plaintiffs cannot meet their burden to show that the class action device is "superior" for this proposed worldwide class because they cannot show that the relevant foreign courts would respect a U.S. class-action judgment. Rather, the evidence shows the opposite: countries like Venezuela, Columbia, and Mexico—home to 71% of the putative class members (*see* Pls.' Br. at 35)—would likely *not* give preclusive effect to a class-action judgment in this action, leaving Willis unfairly exposed to re-litigating these issues in other countries (most of which are openly hostile to the U.S. and its litigants) if Willis achieves a favorable outcome here.

Moreover, the approximately 225 individuals who claim to have received Willis insurance letters have ongoing lawsuits that will be unaffected by the outcome of Plaintiffs' Motion. If class certification is denied—as on this record we respectfully submit it must be—any

putative class member that wishes to join those lawsuits would be free to do so. The only issue here is whether it is lawful and proper to force Willis to defend against more than 17,000 individuals who will never have to appear in discovery or in court, who will never have their cases tested, who may never have even heard of Willis (let alone received a Willis letter) or been misled about whether the CDs were insured, and who—as Plaintiffs in this class action have admitted—could have radically different accounts of what they were told by their Stanford FAs.

## RELEVANT BACKGROUND

### I.    Plaintiffs Seek to Certify a Worldwide Class of More Than 17,000 Investors Based on Stanford's Alleged Marketing Scheme

Plaintiffs allege that Stanford, through its FAs, "used the illusion of insurance coverage for the SIBL CDs in their marketing pitches to clients." (Third Am. Compl. (TAC) ¶¶ 106, 159.) Plaintiffs allege that Stanford (not Willis) induced investors to purchase the SIB CDs by misrepresenting that the "SIB CDs were safe and sound because SIB was part of the Stanford Financial group based in Houston, Texas and therefore subject to regulation by the United States government." (*Id.* ¶ 34.) Plaintiffs allege that Stanford's representations were false because Stanford was "nothing but a massive, worldwide Ponzi scheme." (*Id.* ¶ 106.)

Plaintiffs also allege that Stanford—not Willis—affirmatively misrepresented that the SIB CDs carried deposit insurance. Specifically, Plaintiffs claim that "Stanford FAs uniformly used the illusion of insurance coverage for the SIB CDs in their marketing pitches to clients." (*Id.* ¶ 159.) Each named Plaintiff claims to have been told by Stanford salesmen that the CDs were insured. (*See, e.g., id.* ¶ 139 ("Troice . . . was informed by [Stanford executive David] Nanes that his investments in SIB were insured."), ¶ 142 ("Nanes always convinced Diaz and her husband to invest" in the CDs "by touting . . . the fact that the investments were insured."); *see also id.* ¶¶ 148, 152, 154 (similar allegations concerning Plaintiffs Punga, Canabal and Gomez).) Further, Plaintiffs allege that

Stanford distributed uniform written marketing materials that were misleading in regard to insurance coverage. (*Id.* ¶¶ 34, 44.)

*Willis is conspicuously and entirely absent from all of these allegations.* Nevertheless, Plaintiffs seek to certify a worldwide class of more than 17,000 investors against Willis[3] irrespective of when they bought a CD and whether they knew the CDs were not insured. (*See* Pls. Br. at 20–21.)[4]

## II.  The Evidence Shows that Stanford's Financial Advisors Communicated with Each Investor Privately and Individually

The proposed Class Representatives testified that their Stanford FAs—*not Willis*—affirmatively misrepresented that the SIB CDs carried deposit insurance. (*See, e.g.*, APP. at 531, 535 [Troice Dep. dated Feb. 2, 2015 (Troice) Tr.152:25-153:11, 167:20-22]; APP. at 564 [Diaz Dep. dated Feb. 4, 2015 (Diaz) Tr. 52:14-22].) Further, the 85 untested declarations from U.S. investors submitted by Plaintiffs also affirmatively assert: "*My Stanford FA led me to believe*, verbally, and/or via written materials, that my investments in the SIBL CDs were insured." (*See* Pls.' Br., Ex. 13 (emphasis added).) Other than the named Plaintiffs and the additional declarants—together constituting a miniscule proportion (0.5%) of the proposed class—there is no evidence in this case as to what, if anything, the other members of the 17,000-plus proposed class were told by their FAs about insurance. Further, Plaintiffs provide no evidence establishing that Willis had any involvement

---

[3] Plaintiffs have two surviving class claims for which they seek to certify a class against Willis: (1) aiding and abetting violations of the Texas Securities Act (TSA); and (2) participation in a fraudulent scheme. (*See* APP. at 923-27 [Order on Mot. to Dismiss at 14-18].)

[4] Plaintiffs also seek three alternative classes of individuals who held SIB CDs as of February 2009 comprised of (i) Latin American investors, (ii) Mexican investors, and (iii) Venezuelan investors. (*See* Pls.' Br. at 20-21.) These proposed sub-classes (or any sub-classes) are also defective in light of the admissions and facts described more fully throughout which show that this case is based on the verbal misrepresentations of Stanford's FAs and that there are no "uniform" oral or written representations for any class of investor. Rather, as admitted by the proposed Class Representatives, each individual investor has to be examined and cross-examined to determine what verbal representations their FA may or may not have made to them, what version of written materials they may or may not have saw, and how that information affected each investor.

whatsoever in directing Stanford's FAs to make representations of any kind. Indeed, not one of the 85 declarants claims to have ever even heard of Willis at all. (*See id.*)

In addition, the Class Representatives testified that the Stanford FAs made these representations in person during meetings that took place *privately* with their FAs. (*See, e.g.*, APP. at 515-16 [Troice Tr. 89:17-25; 91:11-14]; APP. at 564 [Diaz Tr. 52:3-10]; APP. at 873 [Punga Punga Financial, Ltd. Dep. dated Feb. 25, 2015 (Green) Tr. 92:24-93:6].) *Each and every proposed Class Representative admitted that he, she, or it did not know and could not possibly guess what various Stanford FAs told each of the 17,000-plus other investors, what questions investors asked, or what responses were given during these closed-door meetings.* (*See* APP. at 541-42 [Troice Tr. 193:15-21, 194:20-195:7]; APP. at 571, 588-89 [Diaz Tr. 81:2-18, 148:19-151:15]; APP. at 782 [Canabal Dep. dated Feb. 23, 2015 (Canabal) Tr. 129:16-24]; APP. at 845 [Gomez Dep. dated Feb. 24, 2015 (Gomez) Tr. 146:15-147:17]; APP. at 879-80 [Green Tr. 117:13-118:13].) *The proposed Class Representatives further admitted that the only way to determine what investors were told by their FAs is to ask each individual investor.* (*See id.*)

Plaintiffs therefore provide no evidence for their claim that "Stanford's insurance scheme was carried out through . . . uniform sales pitches by Stanford's financial advisor sales force." (Pls.' Br. at 2.).[5] Indeed, the opposite is true: it is now indisputable based on the record before the Court for this Motion that Stanford's FAs met one-on-one with individual investors, made oral representations to each of them, and that there is no record as to what was said in those meetings.

---

[5] Nor may Plaintiffs rely on the administrative law judge's initial decision in *Bolgar*, which found that SIB's disclosures discussing its insurance "were literally true but misleading." Willis was not present in that proceeding and therefore such findings have no evidentiary value and cannot be used by Plaintiffs to satisfy their burden of proof. *See Sun v. United States*, No. 93-1399, 1994 WL 144643, at *2 (5th Cir. 1994); *Hall v. F.E.R.C.*, 691 F.2d 1184, 1194 (5th Cir. 1982).

III.    **The Evidence Shows that Stanford Published Non-Uniform Marketing Materials**

In addition, contrary to Plaintiffs' claim that Stanford perpetrated its insurance scheme "through uniform marketing materials and brochures" (*see* Pls.' Br. at 2), the Stanford marketing materials and disclosures produced thus far contain widely varying statements regarding the security of the CD investments and the insurance applicable to those investments, some of which actually disclose that investors' CD deposits were not insured. For example, Stanford published the following statements, each in separate marketing materials:

- The insurance coverage held by SIBL includes . . . Bankers' Blanket Bond, Directors' and Officers' Liability, and Errors and Omissions Liability coverages. We also maintain Depository Insolvency Insurance. We maintain excess FDIC and Depository Insolvency insurance, currently in the amount of US$20 million, for each of our major U.S. and foreign correspondent banks. The latter insurance protects us against the possible insolvency of specified financial institutions where we may place our own funds. *This insurance does not insure customer deposits and is not the equivalent of the FDIC insurance offered on deposits at many institutions in the United States.* (APP. at 196 (emphasis added).)

- Investment Risk . . . You may lose your entire investment (principal and interest) under circumstances where we may be financially unable to repay those amounts. (APP. at 37.)

- Conservation of principal . . . on the CD deposits [is] dependent upon returns in our investment portfolio. . . . If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD. . . . There is no guarantee investors will receive interest distributions or the return of their principal. (APP. at 217, 223.)

Some investors saw these documents and some did not. (*See* APP. at 425 (investor email); APP. at 545 [Troice Tr. 207:4-21]; APP. at 781, 785 [Canabal Tr. 124:8-17; 138:20-23]; APP. at 881 [Green Tr. 124:15-24].) And other marketing materials distributed to certain investors lacked these statements altogether. (*See, e.g.,* APP. at 60.) Moreover, the record is clear that Stanford distributed the materials differently to different investors. (*See* APP. at 871 [Green Tr. 84:21-85:6] (Green received marketing materials from his FA, David Nanes, and reviewed magazines and brochures at Stanford's Mexico City office when he was waiting to see Mr. Nanes); APP. at 832-33 [Gomez Tr. 97:10-17, 98:9-19] (Gomez discarded marketing materials after receiving them during in person

meetings with his FA, Freddy Fiorillo, or by courier); APP. at 529 [Troice Tr. 142:7-143:23] (Troice received marking materials personally from his FA, David Nanes, and saw other Stanford brochures and magazines in the Mexico City office, but was not given them); APP. at 575 [Diaz Tr. 94:20-96:5] (Diaz received marketing materials from her FA by mail); APP. at 780 [Canabal Tr. 119:23-121:4] (Canabal received and was shown (without being given) marketing materials from both Tony Courtois and Freddy Fiorillo, some of which were thrown away).

Further, as with Stanford FAs' oral representations, Plaintiffs provide no evidence establishing that Willis had any involvement whatsoever in creating or approving Stanford's marketing materials.

## IV.   Willis's Alleged Role in Stanford's Scheme is Limited to Creating Letters

Willis is an insurance broker that places lines of commercial insurance for its clients with various independent insurance companies. In August 2004, seven years after the start of the class period, Willis began serving as Stanford's insurance broker for Directors and Officers Liability and Banker's Blank Bond policies.[6] (*See* APP. at 287 [Baranoucky Dep. dated Oct. 7, 2010 (Baranoucky) Tr. 91:11-19].) In accordance with industry custom, Willis was paid a standard commission (a percentage of Stanford's insurance premiums) by Stanford's insurers (not by Stanford) for procuring those policies. (*See* TAC ¶ 66.) Willis's compensation was not connected in any way to the sale of the SIB CDs.

---

[6] Directors and Officers Liability insurance is generally intended to protect directors and officers against allegations of wrongful conduct when they are acting as company executives. A Banker's Blanket Bond is a fidelity bond that is intended to protect a bank against losses from a variety of criminal acts carried out by employees. *See, e.g., Property, Casualty and Liability Insurance—Professional and Director Liability,* Investopedia, http://www.investopedia.com/exam-guide/cfp/property-casualty-liability-insurance/cfp9.asp (last visited Mar. 18, 2015); *Banker's Blanket Bond,* Investopedia, http://www.investopedia.com/terms/b/bankers-blanket-bond.asp (last visited Mar. 18, 2015). Neither type of insurance protects—or even purports to protect—investment products, like the CDs at issue here, from financial losses.

In approximately August 2004, very shortly after Willis became Stanford's insurance broker, Stanford employee Barbara Fortin (who was responsible for insurance matters for SIB) requested that Amy Baranoucky (an employee of an affiliated Willis entity) send letters to Stanford listing certain insurance policies that Willis had placed on Stanford's behalf. (*See* APP. at 290 [Baranoucky Tr. 101:17-103:4].) In response, Ms. Baranoucky sent Stanford letters stating the following (with non-substantive variations):

> We are the insurance broker for Stanford International Bank and find them to be first class business people. We have placed the following coverages that are currently in effect:
>
>> 1. Directors and Officers Liability Insurance with Lloyds of London (Expiration 8/15/05);
>>
>> 2. Bankers Blanket Bond with Lloyds of London (Expiration 8/15/05);
>
> All of these coverages have been in effect for various terms for the past six to twelve years; however, no representations can be made that such coverages will remain in effect.
>
> In order to qualify for the above coverages, the Bank underwent a stringent Risk Management Review conducted by an outside audit firm.
>
> We have found that all our dealings with the Bank have been conducted in a professional and satisfactory manner.

(*See, e.g.,* APP. at 180.) Over the next two years, Willis sent similar letters to Stanford—never to putative class members—at Ms. Fortin's request, which accurately identified the coverages Willis had obtained for Stanford.

Notably, as every proposed Class Representative admitted, *the letters said nothing about the SIB CDs or deposit insurance.* (*See* APP. at 513 [Troice Tr. 81:20-23] (admitting letters did not state his investments were insured); APP. at 872 [Green Tr. 88:15-89:4] (admitting that letters did not state SIB had special private insurance that was better than FDIC insurance); *see also* APP. at 583 [Diaz Tr. 129:13-17]; APP. at 840 [Gomez Tr. 128:5-11]; APP. at 769 [Canabal Tr. 76:14-23].)

The evidence demonstrates that *Stanford*—not Willis—subsequently presented unknown numbers of these letters to certain investors. The proposed Class Representatives confirm that they never communicated directly with, or received letters from, Willis. (*See* APP. at 509 [Troice Tr. 62:11-13]; APP. at 778-79 [Canabal Tr. 113:24-114:10]; APP. at 847 [Gomez Tr. 156:16-19]; APP. at 876 [Green Tr. 104:17-105:8].)

On August 6, 2007, Ms. Fortin informed Ms. Baranoucky that she did not want any more letters and that "[Stanford was] trying to do away with this process." (APP. at 206.) Thus, the only period during which Willis sent the letters to Stanford was August 2004 to August 2007.

## V.     The Record Demonstrates the Willis Letters Only Went to a Very Small Minority of the Proposed Class

Plaintiffs and the Receiver admit that they have no idea how many Willis letters were provided by the Stanford FAs to members of the putative class. They have offered no evidence and done no analysis that shows who among the investors received letters and when they were received.

The evidence shows that Willis produced, at most, only a few hundred letters over a short time period, not the thousands upon thousands of letters for numerous years that Plaintiffs have long speculated. In particular, Ms. Baranoucky testified to creating approximately 100 letters a year between 2004 and 2006, and that Stanford stopped requesting letters altogether one year later (in 2007). (*See* APP. at 293, 313 [Baranoucky Tr. 115:11-116:4, 195:1-6]; APP. at 206.) Moreover, the documents reflect (and Plaintiffs have alleged) that it was Stanford's policy to distribute letters only to high-value investors who had at least $1 million to invest and conditioned their investment on receiving a letter. (*See* APP. at 11, 20 [Stanford emails]; *see also* TAC ¶ 101 (noting "the insurance letters could only be sent to potential clients that had a [sic] least $1 million to invest in SIB").)

The evidence thus demonstrates that only a small number of individuals ever received or saw a Willis letter. In fact, Ms. Baranoucky's testimony and Stanford's undisputed policy is entirely consistent with the number of individual plaintiffs who have stepped forward and asserted

individual claims based on a Willis letter. Two hundred and twenty-five (225) individual plaintiffs in nine other actions have alleged—in vague and as yet untested allegations—that they received a Willis letter. No one else has ever claimed to have seen a Willis letter, including, notably, not one of the 85 additional declarants identified by Plaintiffs. (*See* Pls.' Br., Ex. 13.) Thus, not only are Plaintiffs unable to demonstrate that more than 225 other individuals received a Willis letter, the evidence strongly suggests that the actual number of other people seeing a letter is limited to 225.

Yet, Plaintiffs seek to certify a class against Willis that includes more than 17,000 investors from over 100 different countries.[7] (*See* Pls.' Br. at 35.) Some of those investors purchased CDs *before* Willis sent letters to Stanford; some purchased CDs *after* Stanford ceased asking Willis for letters. (*See, e.g.*, Pls.' Br., Ex. 13.) A small fraction of the proposed class members received Willis letters, but there is no evidence that the rest—upwards of 99%—did. More importantly, the proposed Class Representatives acknowledge there is no way to determine, as an evidentiary matter, short of asking each of the 17,000-plus investors individually, who among the proposed class received letters and readily admit that they do not know how many Stanford investors received a Willis letter. (*See* APP. at 539-40 [Troice Tr. 185:22-186:4]; APP. at 586 [Diaz Tr. 140:13-16]; APP. at 795 [Canabal Tr. 180:19-181:2]; APP. at 844 [Gomez Tr. 144:3-6]; APP. at 878 [Green Tr. 111:16-19].)

In a "responsive" declaration put forward by one of Plaintiffs' experts, Professor Edward F. Sherman claims "there is evidence a *very large number* of persons actually received, saw, or learned the contents of the Willis letters." (*See* Prof. Sherman Resp. Decl. at 3-4 (emphasis added).) However, Professor Sherman says nothing about what "a very large number" actually means, and he fails to cite any actual evidence supporting his vague estimate. Of course, Professor Sherman's mere

---

[7] The proposed class is defined as "those investors whose claims have been allowed by the Receiver." (Pls.' Br. at 23.) Plaintiffs assert that there are 17,023 such investors (out of the approximately 18,000 investors who ever purchased an SIB CD). (*Id.* at 3, 23.)

say-so that a "very large number" exists is not evidence, and cannot meet Plaintiffs' burden of proof. The actual evidence shows that only the "230" plaintiffs noted by Professor Sherman,[8] who have brought individual claims, can be identified on this record as having some connection to a Willis letter; not the 17,000-plus proposed class members sought to be certified by Plaintiffs.

## VI.   Plaintiffs Put Forth No Evidence of the Purported Significance of the Willis Letters to Stanford's Scheme

Plaintiffs have also *alleged* that the Willis letters were essential to luring in new investors and for perpetuating Stanford's Ponzi scheme. (*See* TAC ¶ 180.) They further *allege* that "Stanford's fraud could not have existed or flourished were it not for . . . the fraud Stanford committed by misleading investors into believing that their investments in SIB were insured." (*Id.* ¶ 162.). However, both Plaintiffs and the Receiver have offered zero *evidence*—and have admitted that they have no analysis to offer—regarding the claim that the Willis letters were the sustaining force behind Stanford's fraud and essential to its propagation. Plaintiffs admit that they do not know, nor, indeed, have they even undertaken any analysis to determine, (i) how many investors received Willis letters, (ii) how many people who received the letters chose to invest, (iii) of those who did invest, how much they invested, (iv) how funds invested by letter recipients were used by Stanford, or (v) what the funds' economic impact was on the Ponzi scheme. (*See* APP. at 520 [Troice Tr. 106:4-108:13]; APP. at 588 [Diaz Tr. 146:16-21]; APP. at 795-96 [Canabal Tr. 181:20-182:16]; APP. at 844 [Gomez Tr. 144:3-9].)[9]

---

[8] Professor Sherman identifies the number of plaintiffs in the nine other suits as being 230, not 225. This appears to be a mere oversight or difference in how Professor Sherman is adding up the plaintiffs in the other cases, and the difference is inconsequential, but noted here for clarity.

[9] The Receiver, after testifying that he too has no "personal" knowledge of these issues, (*see, e.g.,* APP. at 887 [Janvey Dep. dated Mar. 5, 2015 (Janvey) Tr. 12:2-20]), claimed privilege over, and intends to maintain as confidential, anything his counsel (or others working under his direction, including his forensic accountants at FTI) has or has not done to investigate them. (*See, e.g.,* APP. at 887-89, 891, 904 [Janvey Tr. 12:21-14:10, 17:22-20:8, 26:10-29:23, 79:6-80:10].) Having chosen to hide behind privilege, the Receiver and, in turn, Plaintiffs are precluded from making any further

Again, the only evidence in the record with regard to how many people received a Willis letter, in addition to six (of seven) of the named Plaintiffs, is the 225 individuals that have sued Willis in individual actions. Indeed, the 85 additional persons who submitted declarations in support of Plaintiffs' Motion (*see* Pls.' Br., Ex. 13) do not claim to have seen a Willis letter or to have known about Willis at all. Plaintiffs thus do not offer a shred of proof—and the burden is entirely theirs—that anyone beyond these 225 other people already suing in individual lawsuits received a letter, and they admit that they have done no analysis in this regard, notwithstanding that they, their counsel, and the Receiver control all of the relevant records. Rather, the allegations they have made are always that Willis sent the letters to Stanford, and Stanford passed them on to the investors. How many people Stanford provided the Willis letters to is a question only the Receiver and Plaintiffs can answer. The reality is they simply do not know.

## ARGUMENTS AND AUTHORITIES

### I.   Legal Standards for Class Certification

Class actions are an "*exception* to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979) (emphasis added). This is because due process mandates that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). Further, a defendant has its own due process right "to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates [that] right or masks individual issues." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013).

---

showing regarding, among other things, the prevalence of the Willis letters and the role they played, if any, in Stanford's fraud. *See, e.g.*, *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 n. 18 (5th Cir. 1999) (a party may not "at once, employ the privilege as both a sword and a shield. . . . Attempts at such improper dual usage of the privilege result in waiver by implication."). Indeed, as already discussed, the record before the Court on these issues is completely barren.

## A. Plaintiffs Must Prove Six Elements for Their Proposed Rule 23(b)(3) Class Action

To overcome the usual rule of individual litigation,[10] a party seeking to maintain a class action must satisfy the requirements of Federal Rule of Civil Procedure 23. At the threshold, the movant must first demonstrate four "prerequisites": "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In addition, a party moving for class certification must show that the proposed class action satisfies one of the prongs of Rule 23(b). Plaintiffs here attempt to certify a class under Rule 23(b)(3), (*see* Pls.' Br. at 22, 27), which requires that a movant establish two additional requirements (consecutively numbered here) for a class action to be maintained: (5) that "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (6) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

## B. The Court Must Conduct a "Rigorous Analysis" and Plaintiffs Must Establish with *Evidentiary Proof* That Rule 23 Is Satisfied

Unlike the standards governing a motion to dismiss, "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores,* 131 S. Ct. at 2551. Rather, at class certification, a party must "affirmatively demonstrate" their compliance with each requirement of the Rule and "[a]ctual, not presumed, conformance . . . remains indispensable." *Id.* (citation omitted). This means the movant must not only "be prepared to prove" that, "in fact," the Rule 23(a) prerequisites are met, but also demonstrate "through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp.*, 133 S. Ct. at 1432. The party seeking certification has the burden to establish that all

---

[10] *See* William B. Rubenstein, Newberg on Class Actions § 4:88 (5th ed. 2014).

the requirements of Rule 23 are met by a "preponderance of the evidence." *Hancock v. Chicago Title Ins. Co.*, 263 F.R.D. 383, 387 (N.D. Tex. 2009), *aff'd*, 636 F.3d 699 (5th Cir. 2011).

As a corollary to the movant's burden to come forward with evidence, it is incumbent upon a court at the class certification stage to conduct a rigorous analysis of the record and make findings of fact that Rule 23 has been satisfied. In other words, a district court must "probe behind the pleadings before coming to rest on the certification question," and "certification is proper only if the trial court is satisfied, after a *rigorous analysis*, that the prerequisites of [the rule] have been satisfied." *Comcast Corp.*, 133 S. Ct. at 1432 (emphasis added) (editing and citations omitted). Indeed, the Fifth Circuit has not hesitated to reverse a district court's certification of a class when it has failed to conduct a "rigorous analysis" beyond the pleadings. *See M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 842 (5th Cir. 2012).

Such an analysis will often "overlap with the merits of the plaintiff's underlying claim…because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp.*, 133 S. Ct. at 1432. Thus, "[t]o make a determination on class certification, a district court must conduct an *intense factual investigation*," *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 420-21 (5th Cir. 2004) (emphasis added), and the "court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 554-55 (5th Cir. 2011) (citation omitted). This type of analysis is required because "[t]he plain text of Rule 23 requires the court to '*find*,' not merely assume, the facts favoring class certification." *Id.* (emphasis added).

In sum, as Judge Boyle of this Court succinctly summarized the Supreme Court's recent guidance:

Going forward, the clear directive to plaintiffs seeking class certification—in any type of case—is that they will face a rigorous analysis by the federal courts, will not be

> afforded favorable presumptions from the pleadings or otherwise and must be prepared to prove *with facts*—and by a preponderance of the evidence—their compliance with the requirements of Rule 23.

*In re Kosmos Energy*, 299 F.R.D. 133, 139 (N.D. Tex. 2014) (emphasis in original).

As explained below, Plaintiffs are plainly incapable of meeting this directive: they have not established three of the four Rule 23(a) prerequisites, nor have they fulfilled the additional requirements under Rule 23(b)(3) to show that common inquiries "predominate" over individual ones and that a class action is a "superior" method of resolving this dispute.

## II.   Plaintiffs Have Not Established the Prerequisites of Rule 23(a)

Plaintiffs have failed to demonstrate by a preponderance of the evidence that the proposed class meets three of the four prerequisites of Rule 23(a): commonality, typicality and adequacy. As explained in more detail below, Plaintiffs have admitted in discovery that this is an oral misrepresentation case; a case based on what 17,000-plus investors were told by hundreds of different FAs in tens of thousands of private meetings over the course of eight years. It is, as Plaintiffs themselves have described it, not one based on Willis's letters. As the proposed Class Representatives each testified in binding deposition testimony, because these communications were oral and private, understanding what happened at any of the other tens of thousands of private meetings requires individual examination of each one. The law simply does not allow a class to be certified on this record.

### A.   Plaintiffs Fail to Demonstrate Commonality

Plaintiffs cannot satisfy the Rule 23(a) prerequisite that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Although Plaintiffs inexplicably characterize the commonality requirement as an "un-demanding test," (Pls.' Br. at 23), the Supreme Court has confirmed it is subject to the same "rigorous analysis" as any of the other Rule 23 requirements. *See Wal-Mart,* 131 S. Ct. at 2552. Indeed, as the Fifth Circuit has observed, *Wal-Mart* "heightened the

standards for establishing commonality." *M.D. ex rel. Stukenberg*, 675 F.3d at 839. It is no longer

enough to merely assert, as Plaintiffs do here (Pls.' Br. at 23), that "there are questions of law or fact

common to the class and that resolution of at least one issue" will affect the class.[11] Rather, as

dictated by the Supreme Court:

> Commonality requires the plaintiff to demonstrate that the class members "have
> suffered the same injury." . . . This does not mean merely that they have all suffered
> a violation of the same provision of law. . . . Their claims must depend upon a
> common contention. . . . That common contention, moreover, must be of such a
> nature that it is capable of classwide resolution—which means that determination of
> its truth or falsity will resolve an issue that is central to the validity of each one of the
> claims in one stroke.

> "What matters to class certification . . . is not the raising of common 'questions'—
> even in droves—but, rather the capacity of a classwide proceeding to generate
> common *answers* apt to drive the resolution of the litigation."

*Wal-Mart*, 131 S. Ct. at 2551 (emphasis in original) (citations omitted).

   *Wal-Mart* itself demonstrates why Plaintiffs' effort to certify this class—based on oral

misrepresentations by hundreds of FAs in tens of thousands of private, individuals meetings with

investors—fails to satisfy this key threshold. In *Wal-Mart*, the plaintiffs sought to certify a class of

current and former female employees from over 3,400 Wal-Mart stores nationwide, alleging that the

company's "uniform" policy of leaving pay and promotion decisions to the discretion of local

managers resulted in a disparate impact upon female employees in violation of Title VII. *Id.* at 2546,

2548. The Supreme Court, however, found that the very fact that local managers made *individual*

employment decisions precluded class-wide resolution of the claims. As the Supreme Court

explained, the plaintiffs "wish to sue about literally millions of employment decisions at once," but

"[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible

---

[11] *See Dvorin v. Chesapeake Exploration, LLC*, Civil Action No. 3:12-CV-3728-G, 2013 WL 6003433, at
*5 (N.D. Tex. Nov. 13, 2013) ("The commonality prerequisite now requires 'more than the
presentation of questions that are common to the class.' . . . It is not sufficient merely to show that
the resolution of one issue 'will affect all or a significant number of the putative class members.'").

to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*" *Id.* at 2552 (emphasis in original).

This case is just like *Wal-Mart*, in that here, too, there are tens of thousands of separate investment decisions that were made by investors, each one based on a unique set of facts and circumstances. Paraphrasing the language from *Wal-Mart*, without some glue holding the alleged *reasons* for all those investment decisions together, it will be impossible to say that examination of all the putative class members' claims for relief will produce a common answer to the crucial question "*what representations made by whom caused me to invest in the CD?*"

And, here, there are two additional factors not present in *Wal-Mart* that further militate *against* class certification. *First*, in *Wal-Mart*, the moving parties there at least claimed their experience was similar to that of every other putative class member. Here, in contrast, Plaintiffs have *admitted* that their experience—informed by private, oral communications from their individual FAs—cannot be extrapolated to the class of more than 17,000 investors. Specifically, whether Plaintiffs have all suffered the same injury and in the same way, will depend on what the thousands of absent class members were told, orally, by their hundreds (if not thousands) of individual FAs over eight years, and what, if any, reliance on the Willis letters they placed, or whether they fully understood the CDs were *not* insured but bought them anyway. Yet the entirety of the evidence in this regard is the testimony of the five proposed Class Representatives (each of whom claims that he, she or it saw a Willis letter) as to what three FAs told them about insurance in private closed-door meetings. Plaintiffs have also submitted 85 *untested* boilerplate declarations from U.S.-based investors that they were generally misled about insurance by their "Stanford FA," without any

indication of what they were told or what written disclosures they received.[12] Nevertheless, all together they total approximately 0.5% of the entire proposed class.

      With regard to the accounts of the five proposed Class Representatives, even if they were similar (and, as discussed below, they vary in material respects), this provides no basis to conclude that hundreds of other FAs made "uniform" oral statements to more than 17,000 other investors in 100 countries over eight years in other closed-door meetings, and how, if at all, the Willis letters (or any other written material for that matter) played any role in these meetings and in the investors' investment decisions. *Plaintiffs themselves admit this.* The proposed Class Representatives all testified that, because their own individual meetings with their FAs occurred in person and in private, they do not know—and so obviously have not proved—that the absent class members were in fact told the same things by their FAs about insurance (or anything else). As Mr. Canabal succinctly put it: "I don't know what the advisors told other people whom I don't know." (APP. at 782 [Canabal Tr. 129:14-24].)[13]

---

[12] Plaintiffs submitted 85 declarations from persons who all say they bought CDs in the U.S. and that a "Stanford FA led me to believe, verbally, and/or via written materials, that my investments in the SIBL CDs were insured." (*See* Pls.' Br., Ex. 13.) However, they do not mention a Willis letter (or Willis at all) and the evidence shows that U.S. investors in particular may have received written disclosures disclaiming such insurance. (*See, e.g.,* APP. at 37, 44; *infra* at pp. 43-49.) Thus, if anything, the declarations further establish this case is based on oral representations and highlights why a class cannot be certified—each and every person in the proposed class needs to be examined and cross-examined to determine what they were told, considered, and relied upon. If a class is certified, Willis will be deprived of the opportunity to test the claims of thousands upon thousands of people who may not have been misled at all, which will obviously violate Willis's right to due process. *See, e.g., Carrera v. Bayer Corp.,* 727 F.3d 300, 307 (3d Cir. 2013) (noting a defendant has a due process right "to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates [that] right or masks individual issues.").

[13] *See also* APP. at 571 [Diaz Tr. 81:5-14] ("Q. Do you know what information Mr. Nanes provided to those other investors? A. No. Q. Do you know what questions those other investors may have asked Mr. Nanes? A. No. Q. And if they did ask any questions, you wouldn't know what answers Mr. Nanes gave; correct? A. No."); APP. at 516 [Troice Tr. 92:3-7] ("Q. . . . [Y]ou do not know the exact words Mr. Nanes used with other investors besides yourself in private meetings; correct? A. No."); APP. at 541-42 [Troice Tr. 193:15-25, 194:20-195:7]; APP. at 836 [Gomez Tr. 110:19-22]

*Second*, in *Wal-Mart*, the moving parties at least offered statistical evidence from which they (unsuccessfully) tried to show that it was possible to extrapolate from the named plaintiffs' situation to that of the absent class members. Here, Plaintiffs have not offered any statistical evidence purporting to demonstrate that, notwithstanding the individual oral communications, there are common threads tying the individual class members together. The Willis letters, Plaintiffs' only effort, plainly are not sufficient. Significantly, *the evidence demonstrates that the Willis letters were not common to the members of the putative class—based on the record evidence, they were only provided to approximately 1% of the putative class members at most.* The *only* "evidence" of who received a Willis letter beyond six of the named Plaintiffs is the 225 other individuals that have sued Willis, claiming, generally, to have received a letter between August 2004 and August 2006.[14] In his "responsive" declaration, Plaintiffs' expert, Prof. Sherman, conclusorily characterizes these 225 investors who have stepped forward and claimed to have seen a Willis letter (or knew of its contents) as only a "small fraction" of the actual proposed class members that fall into that category—estimated by him, vaguely, to be a "very large number of persons." (*See* Prof. Sherman Resp. Decl. at 3-4.) However, Prof. Sherman—like Plaintiffs—presents no evidence to support that claim, and his mere say-so is not evidence.[15] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

---

("Q. So you don't know what specifically Mr. Fiorillo told other investors; correct? A. No, I don't know what he said.").

[14] Ms. Baranoucky's testimony is that, while Willis was Stanford's insurance broker, she produced (to Stanford) approximately 100 letters each year from 2004 to 2006. (*See* APP. at 293 [Baranoucky Tr. 115:11-116:4].) By August 6, 2007, however, Ms. Fortin informed Ms. Baranoucky that Stanford no longer wanted insurance letters because it was ending the practice of using them. (*See* APP. at 206.) This record is consistent with the fact that only 225 other individuals have come forward to claim that they received Willis letters. There is no evidence in the record offered by Plaintiffs—and the burden is entirely theirs—that anyone else ever received a Willis letter.

[15] Prof. Sherman appears to make these statements in support of the certification of an alternative class of letter recipients. Even putting aside that such an alternative class is nowhere referenced, much less advocated for, in Plaintiffs' Motion, there is still no proof of who among the class actually would fall into that alternative definition. The number of letters created by Willis—whether "several hundred" or a more specific number in the hundreds—is not itself proof of how many investors in

(rejecting evidence "connected to existing data only by the *ipse dixit* of the expert"); *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 467 (5th Cir. 2012) (affirming exclusion of opinion when expert failed to present evidence upon which statements were based). Thus, Plaintiffs have offered not one iota of proof that anyone other than the 225 litigants in the individual suits against Willis ever received a Willis letter, and the burden is entirely theirs.

Plaintiffs, of course, have the burden under Rule 23 to demonstrate that Willis's letters were the crucial common underpinning tying together the entire 17,000-plus members of the proposed class, as they have long suggested. Because the evidence shows that Willis provided its letters to Stanford, not to individual investors, only the Receiver (standing in the shoes of Stanford) would know how many letters were sent and their economic impact on the Ponzi scheme. Yet he has not analyzed (or has simply hid behind privilege regarding): (i) who exactly in the proposed class saw a Willis letter, (ii) who of those decided to invest (or not to invest) because of the letter, (iii) how much money can be traced to the letters, or (iv) how that money was used by Stanford (*i.e.*, for misappropriation or to pay off other investors). (*See, e.g.*, APP. 887-88, 893-99, 903 [Janvey Tr. 12:2-14:22, 35:2-36:8, 41:4-46:5, 47:8-48:23, 50:19-55:5, 61:17-25, 77:6-18]; *see also* APP. at 977-81 (Janvey Dep. Ex. 37); APP. at 967.) Thus, Plaintiffs fail to meet their burden of proof that the entire class has suffered the same injury in the same way, such that a class can be certified.

In his "responsive declaration," Prof. Sherman asserts (as Plaintiffs presumably will in their reply) that whether an investor received a Willis letter is irrelevant to the certification of Plaintiffs' proposed class because it is enough to show that Willis aided the scheme by providing the letters to Stanford. (*See* Prof. Sherman Resp. Decl. at 2.) Setting aside that an expert opinion on

---

the proposed class actually received a Willis letter, given that it was Stanford who controlled distribution of the letters. In other words, it is irrelevant how many letters Willis provided to Stanford; all that matters is how many letters Stanford provided to investors. Plaintiffs have provided no proof whatsoever in this regard.

domestic law is improper and must be disregarded,[16] Prof. Sherman confuses what is at issue. The substantive standard for aiding and abetting liability is not the question before the Court on Plaintiffs' motion for class certification. Rather, the question is whether Plaintiffs have satisfied the "rigorous" requirements of Rule 23 by demonstrating that the claims of 17,000-plus investors—as to which there is no evidence that 99% of whom saw a Willis letter—are susceptible to class-wide resolution. The statement of Willis's expert, Prof. Fox, that Prof. Sherman took issue with merely notes that whether or not an investor saw a letter is an important factual issue that clearly varies between the proposed Class Representatives and the vast majority of absent class members.[17] In this proper context, Prof. Sherman's attempted rebuttal rings hollow: he nowhere addresses any of the Rule 23 requirements in regard to this factual disparity,[18] nor acknowledges, much less deals with, the substantial hurdles to class certification created by the proposed Class Representatives' own admissions; which are, among other things, that the named Plaintiffs admit their cases may be entirely different from the 17,000-plus other investors, and the only way to know is to ask each class member individually. Prof. Sherman does not purport to know anything about the absent class members and, instead of addressing Plaintiffs' critical admissions, ignores them entirely.

---

[16] Professor Sherman does not suggest his discussion of aiding and abetting law is not a pure legal standard that the Court alone is competent to determine. (*See* Prof. Sherman. Resp. Decl. at 2 (questioning what is or is not a "correct statement of the law.").) Thus, his opinion on the law of aiding and abetting must be disregarded. *See, e.g., Estate of Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999) (excluding expert testimony amounting to a legal opinion on the issue of "reasonable cause").

[17] *See* Prof. Sherman. Resp. Decl. at 2 (noting that Prof. Fox's argument was made "in reference to the opinion that this class action is not manageable because 'it will involve the *factual question*, with respect to each of the proposed class members, of whether he or she saw the Willis letter'") (emphasis added).

[18] Prof. Sherman does separately address the Rule 23(b)(3) "superiority" requirement in the context of discussing whether the claims are "negative value" cases and whether foreign courts would enforce a U.S. class-action judgment. (*See* Prof. Sherman Resp. Decl. at 3–9.) But as noted *infra* p. 58, there too he ignores the actual evidentiary record and instead relies solely on allegation and speculation, which are decidedly insufficient bases for certifying a class.

Prof. Sherman also completely relies on this Court's decision on the defendants' motion to dismiss, which was based on *allegations* this Court was required to accept as true. He ignores the factual record in this case. But class certification requires proof—not just allegations—and Prof. Sherman's contentions have no foundation in the evidence adduced in class discovery. For all the reasons previously stated, Plaintiffs' alleged "broader marketing scheme" based on the Willis letters has not materialized. Instead, the only thing discovery has shown is that five people—out of more than 17,000—claim to have been lied to by three FAs. There is no evidence that the vast majority of the remaining 17,000-plus putative class members were lied to at all, much less that they even claim to have been lied to in the same way so as to make class treatment of their claims appropriate under Rule 23.

Indeed, the record shows that many investors purchased CDs before Willis ever provided a single letter to Stanford in 2004 and that many continued to purchase CDs after Stanford stopped using the letters in 2007. Willis's actions obviously had no impact on those investors and Plaintiffs provide nothing to connect them to their allegations. As acknowledged by Isaac Green, the principal of named Plaintiff Punga, those who did not receive a Willis letter are obviously not in the same position as those who did, and it would not be fair to treat them as if they were:

> Q.      But if [other investors] never received or even heard about a Willis or BMB letter, how were they defrauded by Willis or BMB?
>
> . . . .
>
> A.      *If they didn't receive it,* I have the understanding that in some countries they didn't deliver those letters. *They—then they would have to file a suit regarding something else.* We're talking about what would be fair, right?

(APP. at 879 [Green Tr. 114:6-20] (emphasis added).)

## B.      Plaintiffs' Claims Are Not Typical of the Proposed Class

For many of these same reasons, Plaintiffs also cannot demonstrate that their claims or defenses are "typical" of the proposed class. First and foremost, by conceding that they have no

idea what Stanford's FAs told other investors—and that the only way to know would be to ask each one individually, which they have not done (and which they seek to deny Willis the opportunity to do through the misuse of the class action mechanism)—the proposed Class Representatives have admitted that they have no *proof*, which is required at this stage, that their claims are typical of the class they purport to represent. *Their testimony is dispositive of this issue.* They simply do not know, and so necessarily have not proved, that what they were told by their FAs, what questions they asked, and what answers they received, are typical of the same disclosures, questions and responses given to other class members. Plaintiffs' counsel's conjecture that what they were told is typical of the class because of an allegedly common training manual Stanford FAs used is not evidence. There is no actual evidence that the single training manual Plaintiffs cite, dated in December 2004 (*see* Pls.' Ex. 7), was in fact seen by the hundreds of Stanford FAs, let alone that each orally repeated verbatim what is in the manual to 17,000-plus investors in more than 100 countries over eight years.[19]

Second, *all five of the proposed Class Representatives*, unlike nearly 99% of the class members they purport to represent, received Willis letters. Their claims therefore necessarily are atypical of those class members who never saw a Willis letter. Those investors who never received a letter, of course, cannot allege, much less prove, that: they were misled by a Willis letter; they relied on a Willis letter; the Willis letter was material to their investment decisions; or they were injured or damaged by representations in a Willis letter (the same is true regarding any other insurance-related material). Plaintiffs therefore fail the typicality inquiry on this fundamental level: they seek to represent a class of people in a lawsuit against Willis who have absolutely no connection to Willis whatsoever. No class can be certified on this basis.[20]

---

[19] *See infra* pp. 42-43.

[20] The claims of Plaintiffs Diaz, Canabal, Gomez and Punga are atypical for the additional reason that these Plaintiffs are subject to a unique defense. *See Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) ("representation of a class will suffer if the named plaintiff is preoccupied with a

### C.    The Proposed Class Representatives Are Not Adequate Representatives

The proposed Class Representatives also cannot show that they are "adequate" representatives of the proposed class because they lack knowledge of the most basic facts and theories of the case and have relied almost entirely on counsel for the investigation and prosecution of the case. Rule 23 requires that "Plaintiffs should understand the actions in which they are involved, and that understanding should not be limited to derivative knowledge acquired solely from counsel." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 n.18 (5th Cir. 2001).[21] Like the other certification requirements, "Plaintiffs bear the burden of proof on the adequacy of representation of the proposed class." *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 302 (S.D. Tex. 2000). Because "[inadequacy] of . . . representation alone is sufficient basis for denial of . . . class certification," *Karnes v. Fleming*, No. H-07-0620, 2008 WL 4528223, at *3 (S.D. Tex. July 31, 2008), their Motion must be denied.

In *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532-33 (N.D. Tex. 2005), the court denied class certification after finding that the named plaintiff there was not an adequate representative because her deposition testimony indicated that "there [were] many instances in which she ha[d] little or no knowledge outside of that given to her by her attorneys." *Id.* at 533. In

---

defense which is applicable only to himself"; thus, the peculiar applicability of an affirmative defense "to the named plaintiff does present a sufficient question of typicality to justify a district court's decision to deny class certification."). This Court held the insurance letters actionable at the pleading stage, and held that Plaintiffs adequately alleged scienter against Willis, in large part based on allegations that Willis, but *not* Plaintiffs, knew about Stanford's supposedly secret real estate investments. (*See* APP. at 959 [Order on *Janvey* Mot. to Dismiss at 28].) Discovery has revealed, however, that Plaintiffs Diaz, Canabal, Gomez and Punga knew that Stanford was investing in real estate; in fact, Plaintiffs Canabal and Gomez, *who were themselves real estate developers*, personally toured Stanford's Antiguan real estate developments. (*See* APP. at 574 [Diaz Tr. 91:7-12, 92:6-9]; APP. at 874 [Green Tr. 94:8-13]; APP. at 786, 791-92 [Canabal Tr. 144:2-23, 165:8-166:19].) These Plaintiffs are thus subject to the unique defense that they "knew of the untruth or omission." Tex. Rev. Civ. Stat. art. 581-33A(2).

[21] While this "demanding" standard arose in the federal securities context, it has "since been applied to cases not involving securities fraud." *In re Enron Corp.*, 529 F. Supp. 2d at 692 n.43, 725.

that case, the plaintiff could not "articulate why the proposed class beg[an] and end[ed] when it [did]" and was "unable to identify who would be included within the putative class." *Id.* at 534. And courts have held that representatives are deficient when they rely completely and totally on counsel "for investigation and prosecution of the case," as evidenced by their inability "to articulate specific facts supporting their vague allegations." *In re Enron Corp.*, 529 F. Supp. 2d 644, 732 (S.D. Tex. 2006) (disqualifying six class representatives as inadequate).

Based on this well-reasoned law, the proposed Class Representatives here must be deemed inadequate class representatives. They admit that they had no original thought of suing Willis at all; instead, their lawyers investigated potential deep pocket defendants and ultimately identified Willis. (*See* APP. at 501-02 [Troice Tr. 33:6-35:20]; APP. at 762, 764 [Canabal Tr. 48:18-25, 54:3-56:7]; APP. at 229, 247 (attorney retainer contracts).) Plaintiffs also admit that they did not know when BMB and Willis started and stopped issuing letters or whether Stanford sold CDs before or after the letters were issued. (*See* APP. at 519-20 [Troice Tr. 104:18-106:3]; APP. at 589 [Diaz Tr. 151:20-153:2]; APP. at 844 [Gomez Tr. 142:5-18]; *see also* APP. at 875 [Green Tr. 100:12-101:21].) And, further, Plaintiffs admitted to the following deficiencies, making each of them inadequate representatives:

Plaintiff Diaz:

- Admitted that the first time she had read any complaint in this action was in preparation for her deposition on February 4, 2015, which occurred nearly four years after the operative complaint was filed on April 1, 2011 and five-and-a-half years after the original complaint was filed on July 2, 2009. (*See* TAC [Dkt. No. 115]; Pls.' Original Class Action Compl. [Dkt. No. 1].)

- Unable to identify the defendants in this case—when asked who the defendants were, responded, "Stanford, Willis, Willis and Brown. I'm not sure." (APP. at 554 [Diaz Tr. 13:11-13].)

- Admitted she could not read English (id. at 573 [Tr. 88:2]), did not recall whether she signed an English version of her declaration, and when asked whether the information in

her declaration was accurate, responded "I don't know." (Id. at 566 [Tr. 60:15-17; 60:23-61:5].)

Plaintiff Gomez:

- Grossly misunderstood the theory of the case, mistakenly believing this to be an insurance coverage action. (APP. at 835-36 [Gomez Tr. 109:10-110:1] ("Q. Mr. Gomez, is it because Willis and BMB did not pay you under the insurance policies applicable to your CDs that you decided to sue Willis and BMB? . . . A. Yes.")

- Admitted that prior to his deposition, he had only spoken to his attorney twice by telephone (and had never met with him in person) since the lawsuit was filed in 2009 (Id. at 812 [Tr. 16:23-17:2].)

- Testified that he communicated with his attorneys primarily through Mr. Canabal. (Id. at 812 [Tr. 17:7-9] ("I did not communicate with him. It was Mr. Canabal that communicated with him, but not me. And then later he would inform me.").)

- Admitted that Mr. Canabal recommended to him courses of action that should be taken in this lawsuit. (Id. at 816 [Tr. 31:9-13].)

- Testified that he generally signed whatever document Mr. Canabal put in front of him. (Id. at 813 [Tr. 20:6-21] ("Q. Mr. Gomez, do you recall whether you ever signed an agreement similar to the one that has been put in front of you as Defendants' Exhibit 16? . . . A. Well, if that document was sent to Caracas and Mr. Canabal told me to sign it, then yes. If not, then no.").)

- Could not identify any of the Mexican Plaintiffs or any of the Defendants by name. (Id. at 811-12 [Tr. 13:19-14:18].)

- Admitted he did not know how many people were in the proposed class or the criteria for being a member of the class he is seeking to represent. (Id. at 844 [Tr. 143:4-144:2].)

Plaintiff Punga Punga Financial, Ltd.:

- Testified that an investor who never saw a Willis letter could not be a member of the class and "would have to file a suit regarding something else." (APP. at 878-79 [Green Tr. 113:19-114:15].)

- Admitted that his declaration incorrectly stated Punga invested with Stanford from 1999 through 2009 because Punga was not formed until 2004. (Id. at 863 [Tr. 52:8-53:12].)

- Admitted that, although he reviewed drafts of his declaration in English, he did not provide any edits "because [his] English is not very good." (Id. [Tr. 50:20-:51:7].)

Plaintiff Canabal:

- When asked whether there were more than 15,000 class members, answered "I don't have any idea." (APP. at 795 [Canabal Tr. 180:11-14].)

- Did not know whether an investor who did not receive, was not shown, and did not hear about a Willis letter would be a member of the proposed class. (Id. at 796 [Tr. 182:24-183:12].)

- Could only name some of the named Plaintiffs and mistakenly believed that certain of the named Plaintiffs were from the United States. (*Id.* at 759-60 [Tr. 36:18-38:17].)

Plaintiff Troice:

- Did not know which countries class members were from or whether the class included United States citizens.22 (APP. at 539 [Troice Tr. 183:15-184:7].)

- Mistakenly believed that the purported class he sought to represent included only individuals who either received or saw a Willis letter. (Id. at 541 [Tr. 191:9-20].)

- Admitted that when he signed the retainer with his counsel, he did not know which third parties, if any, he would sue and "didn't know that there was a possibility to look for third parties until [he] spoke with [class counsel]." (Id. at 502 [Tr. 34:10-17].)

- Admitted he had no basis for the allegation that "Stanford's insurance brokers agreed to participate in a fraudulent and misleading insurance letter distribution campaign." (Id. at 508-09 [Tr. 60:13-19, 61:19-62:4].)

- Did not know the basis for the allegation that "perhaps no other third party had as much knowledge of Stanford Financial's worldwide operations as BMB and Willis." (Id. at 509 [Tr. 63:4-64:8].)

Accordingly, Plaintiffs lack the fundamental knowledge to act as class

representatives, and it appears to have been counsel, *not* Plaintiffs, who initially suggested suit against

Willis. Plaintiffs have therefore failed to carry the burden of establishing that their proposed

representatives are adequate under Rule 23, and certification should be denied on this basis alone.

## III.   Plaintiffs Have Not Proved the Additional Requirements of Rule 23(b)(3)

For many of the same reasons why Plaintiffs cannot satisfy any of the Rule 23(a)

prerequisites, Plaintiffs also cannot meet the additional requirements of Rule 23(b)(3). To certify a

---

22 In their class certification briefing, Plaintiffs claim that class members would include "investors from over 100 countries." (Pls.' Br. at 35.)

class under Rule 23(b)(3), as Plaintiffs here seek to do (*see* Pls.' Br. at 22, 27), Plaintiffs must establish that common issues predominate over individual ones and that a class action is a "superior" means of litigating this case. Plaintiffs have not and, based on the record here, cannot carry their burden of establishing, by a preponderance of the evidence, that either of these criteria is met.

### A.   Individual Inquiries Predominate Over Common Questions

The predominance requirement is an inquiry "far more demanding" than even the rigorous analysis courts must conduct in regard to the "commonality" prerequisite, as Plaintiffs themselves concede. (*See* Pls. Br. at 28 (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997).) In analyzing the predominance requirement, courts are directed to "consider how a trial on the merits would be conducted if a class were certified." *Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003). In order to find that common questions predominate, "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole must predominate over those issues that are subject only to individualized proof." *Nichols v. Mobile Board of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982); *see also Simms v. Jones*, 296 F.R.D. 485, 504 (N.D. Tex. 2013) ("In deciding which issues predominate, the Court conducts a *qualitative*, and not a quantitative, analysis.") (emphasis added). In particular, if the members of a proposed class will need to present evidence that varies from member to member, then there are individual questions that make the case not appropriate for class certification. *See Ticknor v. Rouse's Enters., L.L.C.*, No. 14–30550, 2014 WL 6440397, at *2 (5th Cir. Nov. 18, 2014).

As discussed further below, Plaintiffs fail to establish that common questions of fact or law predominate over individual questions for three core reasons: (i) Stanford's communications about insurance coverage from hundreds of different FAs to tens of thousands of investors were oral and private, and Plaintiffs themselves concede that individual inquiries will be required to determine what information was communicated in those meetings; (ii) the disclosures investors

received were so varied that, as Plaintiffs admit, individual inquiries will be required to determine who received what disclosures (some of which undermine Plaintiffs' allegations of misrepresentations); and (iii) there are individual questions concerning each individual's varying experiences with, and knowledge of, Stanford.

Given the factual record developed in this case, particularly the admissions of the proposed Class Representatives, there is no basis on which this Court could conclude that common questions predominate over individual inquiries.

1.    **Stanford's Oral Communications About Insurance Coverage for the CDs Were Verbal and Therefore Non-Uniform**

It is axiomatic that class certification is precluded when plaintiffs cannot establish that the communications to putative class members were uniform. As the Fifth Circuit has held, "[i]f there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action." *Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307-08 (5th Cir. 1977); *see also Simon*, 482 F.2d at 882–83 (same). Further, "the key concept in determining the propriety of class action treatment is the existence or nonexistence of material variations in the alleged misrepresentations." *Grainger*, 547 F.2d at 307–08; s*ee also Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 890 (5th Cir. 1987) (denying motion for class certification when plaintiffs "did not establish that Dean Witter uniformly failed to disclose account executive compensation. . . . Thus, we cannot fault the district court's conclusion that the critical fact of nondisclosure was not common to the putative class."); *In re Park Cent. Global Litig.*, No. 3:09-cv-765-M, 2014 WL 4261950, at *13 (N.D. Tex. Aug. 25, 2014) ("In light of the evidence of significant differences in the amount and substance of information received by the limited partners, the Court finds that individualized questions as to the receipt of false or misleading information by the investors will predominate."); *Burkett v. Bank of Am., N.A.*, No. 1:10CV68-HSO-JMR, 2012 WL 3811741, at *8 (S.D. Miss. Sept. 4, 2012) ("Class certification of misrepresentation claims involving

nonuniform representations and issues of individual reliance is generally inappropriate."); *Keyes v. Guardian Life Ins. Co. of Am.*, 194 F.R.D. 253, 256 (S.D. Miss. 2000) ("individual issues, particularly relating to the specific sales presentations to individual class members and individual class members' reliance, substantially predominate over those common issues and render class certification inappropriate"); *cf. Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, No. H-05-3394, 2008 WL 7356272, at *13 (S.D. Tex. Nov. 24, 2008) (denying motion for class certification when "Plaintiffs do not allege that the same statements were communicated to every putative class member; thus, proof of disparagement necessarily will be highly individualized and inherently unsuitable for class certification").

And, as particularly relevant here, the Fifth Circuit has expressly held that "courts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action." *Simon*, 482 F.2d at 882; *see also, e.g.*, *In re LifeUSA Holding Inc.*, 242 F.3d 136, 145–46 (3d Cir. 2001) (holding claims based on oral misrepresentations failed to satisfy predominance requirement where statements were made to over 200,000 people by over 30,000 individuals). Moreover, even when the misrepresentations are alleged to exist in written form only, individual issues still predominate "if the writings contain material variations, emanate from several sources, or do not actually reach the subject investors." *Simon*, 482 F.2d at 882.

The present action is precisely the type of case that the Fifth Circuit had in mind when articulating those standards. As is clear from the record, Plaintiffs' arguments for class certification are based on the oral representations made by Stanford FAs, not Willis's letters. The Plaintiffs' brief describes the conduct in this way: "All of the Named Plaintiffs were *told* by their Stanford financial advisors that their investments in the SIBL CDs were insured. . . ." (Pls.' Br. at 20 (emphasis added); *see also id.* at 12 (same).) Putting aside the fact that Plaintiffs cannot show that what the other 17,000-plus purported class members were told was uniform, there is no allegation in

the complaint, no argument in Plaintiffs' brief, and no evidence in the record, that Willis represented

that the CDs were insured, in the insurance letters or otherwise.

More important, because it is absolutely binding against Plaintiffs, the proposed

Class Representatives admit they formed their opinions about the security of the CDs *based on what*

*they were told by their Stanford FAs—not the Willis letters (or any other marketing material) themselves.* Mr.

Troice conceded that his "*complete* understanding for the insurance that was applicable" to his

Stanford investments was what he was told by his FA, David Nanes. (APP. at 533 [Troice Tr. 161:9-

14] (emphasis added).) Ms. Diaz testified that her understanding of the Willis letters—including the

meaning of "Directors and Officers Liability Insurance" and a "Banker's Blanket Bond"—was based

on what Mr. Nanes told her (in no small part because she does not read English, but was

nevertheless provided written materials *exclusively* in English). (*See* APP. at 581-82, 585-86 [Diaz Tr.

118:25–119:19; 121:22-122:5, 134:4-14; 139:5-19].) Mr. Gomez likewise testified that his FA, Mr.

Fiorillo, "orally said that these letters were guaranteeing, one way or another, our investments in the

CDs." (APP. at 838 [Gomez Tr. 121:14-20].)[23] Indeed, all 85 of the boilerplate declarations

submitted by Plaintiffs from U.S.-based investors each affirmatively assert that they were misled *by*

*their Stanford FA* into believing the CDs were insured. (*See* Pls.' Br., Ex. 13.)

And, of course, it should come as no surprise that the investors relied on their FAs'

communications—not the letters—to form their belief about insurance because, as the proposed

---

[23] *See also* APP. at 834, 836 [Gomez Tr. 104:20-25, 105:16-20, 110:3-14] ("Q. Mr. Gomez, did Mr. Fiorillo tell you that your CD investments were insured? A. Yes, he told me that because if he hadn't, I wouldn't have invested my money there."), APP. at 838-41 [Gomez Tr. 120:19-122:11, 128:23-129:4, 131:12-19]; APP. at 872 [Green Tr. 88:15-89:4] (". . . It doesn't say that in the letter, but—but when they gave us the letters and the insurance policies that they were selling, they said that those insurance policies were better than FDIC insurance policies. Q. Who is 'they'? A. David, David Nanes."), APP. at 877 [Green Tr. 106:22-107:12] (stating that he did not understand the letters, but David Nanes "sort of calmed me down, because he would explain to me what the letters meant and also about the insurance"); APP. at 769 [Canabal Tr. 77:12-18] (admitting his FAs were the ones who told him CDs were insured: "Yes. Every time that we touched on that point."); *see also* APP. at 776, 780-81, 782-83 [Canabal Tr. 104:20-25, 120:19-122:11, 128:23-129:4, 131:12-19].

Class Representatives also all admit, the letters themselves do not say they insure the CDs (or even mention the CDs at all). (*See, e.g.*, APP. at 583 [Diaz Tr. 128:20-129:17] ("Q. Ms. Diaz, does the letter that was just translated for you state that your CDs were insured? . . . A. Well, no.").)[24]

But perhaps most fatal to Plaintiffs' effort to certify this class is their common-sense admission that the only way to find out what happened in the tens of thousands of individual meetings they did not attend would be to ask each and every investor individually. (*See, e.g.*, APP. at 517 [Troice Tr. 96:15-20] ("Q. But if we really wanted to know what other investors were told about insurance with respect to their Stanford investors, we would have to talk to those other investors, wouldn't we? A. That's correct.").)[25] Indeed, testimony would be needed from each and every one of the more than 17,000 putative class members to see if they even claim to have been misled regarding insurance, let alone whether the Willis letters had anything to do with it. Here, as admitted by Plaintiffs themselves, it could not be any clearer that class issues do not predominate over individual issues. *See, e.g.*, *Ticknor*, 2014 WL 6440397, at *2 ("We have held that class issues do not predominate when 'transaction-by-transaction' determinations are required.") (citing *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 307 (5th Cir. 2009). Rather, as is apparent from the vague declarations made by the 85 additional persons in support of Plaintiffs' Motion (*see* Pls.' Br., Ex. 13), each and every

---

[24] *See also* APP. at 514 [Troice Tr. 82:21-83:2] ("Q. But the letters themselves . . . did not say anything about your investments being 100 percent insured, did they? A. No."); APP. at 513 [Troice Tr. 81:20-23 ("Q. . . . Where in the letter does it state that your investments were 100 percent insured? A. It doesn't say that in this letter."); APP. at 769 [Canabal Tr. 75:4-7 ("Q. Do the words 'CD' or 'certificate of deposit' appear anywhere in [the Willis letters] that you were just referring to? A. No."); APP. at 872 [Green Tr. 88:15-89] (". . . It doesn't say that in the letter . . . ."); APP. at 840 [Gomez Tr. 128:5-11] ("Q. But did the letters, as far as you are aware, state explicitly that your CDs were insured? . . . A. The letter—the letters don't say that explicitly. . . .").

[25] *See also* APP. at 542 [Troice Tr. 194:20-195:7]; APP. at 571 [Diaz Tr. 81:15-18] ("Q. If we wanted to know about the substance of those communications [with other investors] we would have to ask those other investors; correct? A. Yes."); APP. at 588-89 [Diaz Tr. 148:19-151:15]; APP. at 782 [Canabal Tr. 129:16-24]; APP. at 845 [Gomez Tr. 146:15-147:17]; APP. at 879-80 [Green Tr. 117:13-118:13].

investor would have to be examined and cross-examined in their own "mini-trial" to determine exactly what they were told.

Plaintiffs may try to fall back in their reply papers on the argument that the Willis letters themselves constitute uniform false statements holding the class together. But as stated above, they did not allege this in the complaint, did not argue this in their moving papers, and their testimony precludes this argument, clearly stating that the false statements about insurance were made by their FAs. Moreover, contrary to the allegations Plaintiffs haphazardly made at the beginning of this case, Plaintiffs have not offered a single piece of evidence with regard to how many investors received a Willis letter, and they have admitted that they do not know and did no analysis to determine as much. There is no evidence of anyone receiving a letter outside of six named Plaintiffs and the 225 individuals that have alleged as much in their own individual lawsuits. Because the record indicates that as little as 1% of the putative class[26] received a letter, and because the claims of an investor who received a Willis letter necessarily are materially different from the claims of investors who did not,[27] the Willis letters cannot be the uniform element holding this class together. In the case of this large majority of the putative class, it is solely the statements of the FAs that possibly could have misled them regarding insurance. And, again, we do not know exactly what the FAs said or did not say to all but five of the more than 17,000 class members (and potentially 85

---

[26] *See, supra,* note 14.

[27] The thousands of investors who did not get a letter could not have been misled by what they did not receive. *See Crescendo Invs., Inc. v. Brice,* 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied) ("Crescendo must introduce evidence of misleading statements by BFI/ICBIY that relate to the security purchased and *induced* the purchase thereof."); *see also Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1419 n.24 (5th Cir. 1993) ("Article 581–33A(2) has been construed to mean that the alleged misrepresentation must relate to the security and *'induce* the purchase thereof.'") (emphasis added). Indeed, the evidence shows some of the proposed Class Representatives themselves decided to invest before ever seeing a Willis letter. (*See* APP. at 583 [Diaz Tr. 126:22-128:2] (admitting all her CDs were purchased *before* receiving a Willis insurance letter); APP. at 838 [Gomez Tr. 119:19-22] (same).)

additional U.S. investors—constituting approximately 0.5% of the class), or if and how many of the FAs made use of the Willis letters (other than the 225 who allege they received one).

In any event, the fact that a tiny percentage of the class saw the letters, and had the letters described to them by the FAs, does not alter the fundamentally oral nature of the alleged fraud here. In *Simon v. Merrill Lynch*, the Fifth Circuit was presented with a case where misrepresentations were allegedly made both orally and in writing—and it affirmed denial of class certification when the named plaintiff's testimony in that case, just as here, revealed the claims were actually based primarily on the oral representations. 482 F.2d at 882-83.

This Court arrived at the same conclusion in *Gyarmathy & Assoc., Inc. v. TIG Ins. Co.*, 2003 WL 21339279. There, as here, the plaintiffs sought to certify a Rule 23(b)(3) class action based on alleged misrepresentations and omissions in written material provided to purchasers of insurance policies. *Id.* at *1. But the *factual record* demonstrated that, notwithstanding the alleged "identical" written material, many potential class members bought their policies through intermediaries who, like here, provided "varying representations . . . above and beyond what is contained" in the written materials. *Id.* at *3. Because the communications from the brokers occurred on an individual basis— much like the individual communications from Stanford FAs here—the Court found that individual issues predominated, precluding class certification. As the Court explained, in light of the individual brokers' communications, class certification would deny defendants the opportunity to "legitimately argue that in the context of a specific class member, the [written materials] were not misleading and did not omit material information or that the class member did not rely on the proposal in making its decision." *Id.* at *3. This case is precisely the same. Willis is entitled to argue that specific class members (the vast majority) never saw or knew about the Willis letter, let alone relied on it.

Plaintiffs also may fall back in reply on their conclusory argument that Stanford used a "uniform" sales pitch based on a "common training manual." (*See* Pls.' Br. at 33).[28] But, as stated previously, evidence is required at this stage, not mere allegation, and there is no evidence that each member of the *entire* 17,000-plus proposed class received uniform oral communications from FAs. Rather, Plaintiffs merely *assume* that hundreds of Stanford FAs, over eight years, and in 100 countries, all: (i) looked at a common Stanford training manual, (ii) gleaned the same exact information from the Stanford manual, and (iii) uniformly passed it along verbatim to every investor with whom they dealt. That attenuated chain of assumptions, completely devoid of record evidence, is insufficient to meet Plaintiffs' factual burden to prove by a preponderance of actual *evidence* that the proposed class received uniform oral communications regarding insurance.

The record in fact demonstrates the opposite of such assumptions—that Stanford's FAs made varying oral representations to investors, many of which contradict the allegations of fraud. Plaintiffs cite such proof in their own brief when noting that some FAs believed the CDs were "wholly insured," while others told clients they were protected only from "fraud and embezzlement," or that some clients were told the CDs were not insured at all. (*See* Pls.' Br. at 10-12.). Plaintiffs in fact repeatedly admitted that they have no idea what other FAs told other investors. There certainly is not the slightest bit of evidence about what transpired in the tens of thousands of meetings over eight years between putative class members and hundreds of FAs. The only evidence here at all concerns five investors and three FAs, with no basis to conclude (let alone to conclude by a preponderance of the evidence) that their experiences are representative of the tens

---

[28] In the complaint, Plaintiffs also ambiguously alleged there was a "script" that FAs were required to use for oral representations to investors, and noted the existence of a training manual. (*See* TAC ¶ 30.) In discovery, Willis specifically requested that Plaintiffs produce, among other things, all documents "supporting Plaintiffs' contention that the Court should certify a class of [CD purchasers]." In response, Plaintiffs confirmed they had produced all documents they intend to rely on to certify a class (*see* APP. at 993-94), which does not include any such "script."

of thousands of others. Indeed, contrary to Plaintiffs' contentions of common training, Danny Green, head of Stanford Group Company's retail operations, testified in the *Bogar* ALJ proceeding that "in the training sessions Green orally stressed that the insurance *does not provide depositor insurance*," which the court credited when it "found that Green did not tell clients to whom he sold the SIB CD that their investment was insured."(APP. at 396 [*Bogar* Decision at 11] (emphasis added).)[29] A class surely cannot include investors who knew the CDs were not insured. Yet there is no evidence that anyone other than the named Plaintiffs, a small amount of untested declarants, and the other individual investors who have sued Willis even claim they were not fully aware of that fact. Again, without asking each and every purported class member, the Court cannot make a finding that more than 17,000 people were orally misled by the same misrepresentations, and the proposed Class Representatives cannot represent them.

### 2.  Individual Inquiries Regarding the Written Disclosures Will Be Required

Individual inquiries also will be required to determine what written disclosures each investor received. Indeed, this Court recognized in its order on the defendants' motions to dismiss that those disclosures raise individualized fact questions, concluding that "there are too many factual issues surrounding the manner of distribution of the disclosure statements, including which investors received the statements and in what format, to support a dismissal of Plaintiffs' claims." (APP. at 921 [Order on Mot. to Dismiss at 12].) And the record shows that the Court's observation was right. Squarely refuting Plaintiffs' assertion that Stanford used "uniform" marketing materials, (*see* Pls.' Br. at 2), Stanford had "very strict mandates as to which client gets what information" (APP. at 16.) As the record shows, the marketing materials, provided to different investors in different languages, contained widely varying disclosure language, some of which expressly

---

[29] Although it was noted previously that this *Bolgar* decision itself is not binding and does not constitute evidence, Green's testimony under oath cited therein is nonetheless persuasive here.

confirmed the CDs *did not* carry insurance. (*See* APP. at 536 [Troice Tr. 173:16-21] (admitting that "[i]n English a brochure says one thing, but the brochure in Spanish lacks some information, it is missing some information").)

For example, one brochure had a disclosure plainly stating under the heading "Investment Risk . . . *You may lose your entire investment* (principal and interest) under circumstances were we may be financially unable to repay those amounts." (APP. at 37 (emphasis added).) A different pamphlet explicitly informs and warns:

> The insurance coverage held by SIBL includes . . . Bankers' Blanket Bond, Directors' and Officers' Liability, and Errors and Omissions Liability coverages. We also maintain Depository Insolvency Insurance. We maintain excess FDIC and Depository Insolvency insurance, currently in the amount of US$20 million, for each of our major U.S. and foreign correspondent banks. The latter insurance protects us against the possible insolvency of specified financial institutions where we may place our own funds. *This insurance does not insure customer deposits* and is not the equivalent of the FDIC insurance offered on deposits at many institutions in the United States.

(APP. at 196 (emphasis added).)

Similarly, other Stanford marketing material stated that "[c]onservation of principal . . . on the CD deposits are dependent upon returns in our investment portfolio. . . . If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD." (APP. at 217.) Later in those same materials, Stanford emphasized that "[t]here is *no guarantee investors will receive . . . the return of their principal.*" (*Id.* at 223 (emphasis added).) Indeed, the document Plaintiffs identify in their brief as "SIBL's principal marketing brochure" (Pls.' Br. at 9) itself does not state anywhere that investor CDs were insured. (*See* Pls.' Br., Ex. 11 at 171.) These risk disclosures are materially different from those that Plaintiffs allege to be "uniformly" misleading in their class certification brief. And, as described above, some of these materials clearly disclose that the CDs are not insured. That some of these materials clearly disclaim the insured and risk-free nature of the CDs is material because the proposed Class Representatives themselves admit they would not have invested had they received the Stanford

brochures described above. (*See* APP. at 781-82 [Canabal Tr. 125:25-126:17] ("we would not have

invested because it would be clear that the insurance policies would not cover the deposits. . . .");

APP. at 545 [Troice Tr. 207:13-25] (stating he "would not have invested" if he had seen risk

disclosures).) Surely, the proposed Class Representatives cannot represent investors who received

such materials and knew the CDs were not insured, but decided to invest anyway.

Moreover, the record reveals there is no way to uniformly determine on a class-wide

basis which investors received what specific marketing materials or written risk disclosures.

Although the named Plaintiffs claimed to have received and relied upon a host of written Stanford

materials over numerous years, they produced very little of such material; some produced nothing at

all. During depositions, the proposed Class Representatives by and large could not even remember

with any specificity what versions of the marketing materials they may or may not have received or

what those materials said. (*See, e.g.*, APP. at 570 [Diaz Tr. 76:2-77:7] (stating she was unable to recall

having seen documents produced from her own files for this litigation), 576 [Diaz Tr. 98:7-11] (did

not recall whether she reviewed materials sent to her by Stanford).) Moreover, none of them were

able to state, under oath, that they even read the materials they received cover-to-cover. (*See, e.g.*,

APP. at 832 [Gomez Tr. 97:10-17] ("[W]hatever I got as far as marketing materials, I would throw

them away"), 834 [Gomez Tr. 102:14-18] (admitting he did not read marketing materials).)[30] As

conceded by the proposed Class Representatives, if one wanted to know what different marketing

materials the thousands of putative class members received, then "you would have to ask *all* of

them." (APP. at 535 [Troice Tr. 168:4-22] (emphasis added); *see also, e.g.*, APP. at 781 [Canabal Tr.

---

[30] *See also* APP. at 529 [Troice Tr. 143:7-23] (stating he did not remember if English materials were
received), [Troice Tr. 145:5-13] (noting financial reports and other materials "would go into the trash
basically"); APP. at 780 [Canabal Tr. 120:16-121:4] (stating that marketing materials were thrown
away or not found for production); APP. at 869 [Green Tr. 75:24-76:8] (stating that, before 2009, he
threw away everything).

122:6-17, 123:11-21] (when asked if he knew what materials other investors received, stating: "No, I don't know. How could I know that?").

The widely varying written disclosures—together with the proposed Class Representatives' on-the-record admissions that they would not have invested had they seen disclosures provided to other investors—also demonstrates that individual inquiries will be required to adjudicate several of the essential elements and affirmative defenses of Plaintiffs' TSA and fraud claims.

*First*, determining whether any of the purported misrepresentations or omissions is "material" to any one investor will require individual inquiries in light of the different written disclosures and the varying "total mix" of information available to any particular investor. Materiality, of course, is an element of both Plaintiffs' burden to show a primary violation of the TSA and their general fraud claim. *See* Tex. Rev. Civ. Stat. art. 581-33A(2);[31] *Italian Cowboys Partners v. Prudential Ins.*, 341 S.W.3d 323, 337 (Tex. 2011). And in assessing whether a statement is material to an investor, particularly statements that can be characterized as opinions,[32] courts must assess "the statement's specificity and the *relative knowledge* of the speaker and the recipient," *In re Westcap Enterprises*, 230 F.3d 717, 726 (5th Cir. 2000) (emphasis added), and whether the statement would "significantly [alter] the total mix of information made available" to the investor. *Duperier v. Texas*

---

[31] To establish a primary violation under the TSA, Plaintiffs must prove that the CDs were sold "by means of an untrue statement of a *material fact* or an omission to state a *material fact* necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Tex. Rev. Civ. Stat. art. 581-33A(2) (emphasis added).

[32] Expressions of opinion are not actionable, but the determination in the first instance of whether a statement is material fact or an opinion requires consideration of the individual circumstances of each investor. *See Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995) ("Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made. Among the relevant circumstances are the statement's specificity, the speaker's knowledge, *the comparative levels of the speaker's and the hearer's knowledge*, and whether the statement relates to the present or the future.") (emphasis added).

*State Bank*, 28 S.W.3d 740, 745 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.).[33] Here, the widely varying disclosures—including disclosures received by some investors *disclaiming* insurance coverage for the CDs—and the fact that only an exceedingly small percentage of the putative class may have ever seen a Willis letter (which contains truthful statements itself), demonstrates that there was no uniform "total mix" of information available to all investors at the time each made their investment decisions.[34] Courts have held that where, as here, "'transaction-by-transaction' determinations are required" to assess what information each investor had access to, individual issues predominate and class certification must be denied. *Ticknor*, 2014 WL 6440397, at *2 (citing *Mims*, 590 F.3d at 307).[35] Again, sitting here today, it is entirely possible that the vast majority of the proposed class of 17,000-plus were fully aware the CDs were not insured.

  *Second*, and relatedly, the varying written disclosures mean that individual questions concerning each investor's knowledge—an affirmative defense under the TSA—will be required.[36] Willis cannot be liable to any investor who "knew of the misrepresentation or omission before" investing in CDs, *Inland Royalty Co. v. Heruth*, No. 05-99-01684-CV, 2000 WL 792406, at *2 (Tex.

---

[33] *See also Texas Instruments Inc. v. Citigroup Global Mkts., Inc.*, 266 F.R.D. 143, 153 (N.D. Tex. 2010) ("Any representations, misrepresentations, or omissions…made by any defendant would affect [plaintiff's] relative level of knowledge in its dealings with all defendants. Thus, any statements made by one of the defendants to [the plaintiff] could be used to prove [the plaintiff's] level of knowledge not only relative to that defendant but also relative to the other two defendants.").

[34] To the extent FAs made representations that could be considered puffery—for example, that Stanford's insurance was "better" than FDIC protection or that "no other offshore bank was good enough to qualify for it" (*see* Pls.' Br. at 2)—the law demands individual inquiries into the "relative knowledge" of each investor. *See Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 218-19 (Tex. App.—Austin 1999, writ denied).

[35] *See also Peltier Enterprises, Inc. v. Hilton*, 51 S.W.3d 616, 623 (Tex. App.—Tyler 2000, pet. denied) (individual issues predominate when determining the materiality of the omission "required [the] cross-examination of each plaintiff" to figure out what was important to each in making their decision).

[36] *See Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) ("[T]he predominance of individual issues necessary to decide an affirmative defense may preclude class certification.").

App.—Dallas June 21, 2000, no pet.), or who fully understood the CDs were not insured.[37] And the fact that investors received widely varying disclosures, including some clearly providing that "You may lose your entire investment," means that individual, case-by-case inquiries are required to determine what investors knew that might undermine their claim that supposed misrepresentations received from their FAs were untrue. In essence, this exercise would require thousands of "mini-trials with different witnesses and evidence for each plaintiff. Presenting and resolving this defense for each plaintiff is likely to be an overwhelming and unmanageable task for a single jury." *Id.*

*Third*, the varying written disclosures also mean that individual inquiries will be required concerning reliance and inducement, other critical elements of Plaintiffs' fraud and TSA claims.[38] As the Supreme Court has observed, "[i]f every plaintiff had to prove direct reliance on the defendant's misrepresentation, individual issues then would . . . overwhelm the common ones, making certification under Rule 23(b)(3) inappropriate." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) (editing and quotations omitted). As well, the Fifth Circuit has held numerous times that cases involving fraud claims are not suited for class treatment because each class member's reliance cannot be determined without individual inquiries, thereby failing the predominance test. *See Regents of Univ. of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 391 (5th Cir. 2007) ("A fraud class action cannot be certified when individual reliance will be an issue.").[39]

---

[37] *See also In re Kosmos Energy*, 299 F.R.D. at 152 ("affirmative defenses such as investor knowledge are clearly relevant to the predominance analysis"); *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 202 (W.D. Tex. 2004) ("Knowledge is highly individualistic and cannot be determined on a classwide basis."). In particular, Section 33(A)(2) of the TSA provides an affirmative defense when "the buyer knew of the untruth or omission" Tex. Rev. Civ. Stat. art. 581-33A(2).

[38] Plaintiffs' bold assertion that reliance is not an issue completely ignores the fact that they have also pled a cause of action for "participation in a fraudulent scheme." Reliance, of course, is a basic element of any fraud claim, and will therefore be a core issue in this litigation.

[39] *See also Sandwich Chef of Texas*, 319 F.3d at 211 ("Fraud actions that require proof of individual reliance cannot be certified as Fed. R. Civ. P. 23(b)(3) class actions because individual, rather than

Similarly, although the TSA does not have a reliance element, the TSA does provide for primary liability only when a person buys a security that was sold "by means of" an untruth or omission. Tex. Rev. Civ. Stat. art. 581-33A(2). Texas courts have interpreted that language to mean that the untruth or omission must have "induced" the purchase. *See Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 475 (Tex. App.—San Antonio 2001, pet. denied); *see also Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1419 n.24 (5th Cir. 1993).[40] Willis thus is entitled to pursue a defense that the Willis letters did not induce the purchase of the CDs (nor, indeed, could the misstatements made by Stanford FAs) for someone who read a disclosure saying that they could lose all of their principal, as the proposed Class Representatives have themselves admitted.

### 3.      Plaintiffs' Experiences with Stanford Are Unique and Individualized

Finally, in addition to any verbal communications and disclosures investors received, determining each putative class member's experience with and knowledge of Stanford and the CDs requires an individual inquiry. For example, the record shows that four of the five proposed Class

---

common, issues will predominate."); *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue."); *see also In re Park Cent. Global Litig.*, 2014 WL 4261950, at *13 ("Because there are individualized issues as to what information different limited partners received, and the extent to which they relied on such information, common issues do not predominate.").

[40] The cases cited by Plaintiffs are therefore inapposite because they each involve representations made by the primary violator and disseminated to a single purchaser or in a public fashion to all investors. *See Granader v. McBee*, 23 F.3d 120, 122 (5th Cir. 1994) (bank and its president making representations to an individual borrower/investor); *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 838 (Tex. 2005) (broker/business owner making misrepresentations to his personal clients and friends); *In re Enron Corp.*, 490 F. Supp. 2d 784, 820 (S.D. Tex. 2007) (misrepresentations made by Enron to the public in its financial reports); *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 97 S.W.3d 779 (Tex. App.—Dallas 2003), *rev'd in part*, 161 S.W.3d 482, 486 (Tex. 2005) (misrepresentation by seller of oil-and-gas interests to auction purchaser made by way of an auction catalog and accompanying well-data-profile sheet); *Duperier v. Texas State Bank*, 28 S.W.3d 740, 748 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr. (oral misrepresentations by a bond salesman to a bank client); *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 646 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.) (misrepresentations in prospectuses circulated in public offering); *Anheuser-Busch Cos., Inc. v. Summit Coffee Co.*, 858 S.W.2d 928, 932 (Tex. App.—Dallas 1993, writ denied) (misrepresentations in sale of company to purchaser).

Representatives knew that Stanford was investing in real estate: Plaintiffs Diaz and Punga learned as much from their FAs. (*See* APP. at 574 [Diaz Tr. 91:7-12, 92:6-9]; APP. at 874 [Green Tr. 94:8-13].) And Plaintiffs Canabal and Gomez, who were themselves real estate developers, personally *toured* Stanford's Antiguan real estate developments, including a cricket stadium and resort hotels, while visiting Stanford's headquarters in Antigua. (*See* APP. at 786, 791-92 [Canabal Tr. 144:2-23, 165:8-166:19]; APP. at 174-77 (travel itinerary).) Similarly, during their visit to Stanford's Antiguan operations (paid for and arranged by Stanford), Plaintiffs Canabal and Gomez met personally with several senior Stanford executives, including the President of SIB, and attended a presentation by the Chief Architect of Stanford Development Company. (*See* APP. at 176-77 (travel itinerary).)

Importantly, this Court allowed the complaint to survive the defendants' motions to dismiss in part because Plaintiffs alleged that Willis "knew 'Stanford's rampant spending on Antiguan real estate development projects was not consistent with what was being disclosed to Stanford International Bank's ("SIBL") clients.'" (APP. at 944 [*Janvey* Order on Mot. to Dismiss at 13].) But, as noted above, discovery has shown that some investors *did* have knowledge about Stanford's real estate activities, defeating any inference that Willis "had specialized knowledge that Class Plaintiffs lacked, including knowledge that the CD proceeds were being misused to invest in Antiguan real estate." (*Id.* at 959 [Order at 28].) Indeed, if, as Plaintiffs alleged and the Court assumed true at the pleading stage, Stanford's real estate investments were a "red flag" suggesting that "the statements in the letters were false," then individual inquiries will be needed to determine how many other investors knew about those investments. And given how varied the experiences of just the five proposed Class Representatives were regarding Stanford's investments, the detailed inquiry of every other class member would almost certainly reveal additional information relevant to investor knowledge of the truth.

### B.      Plaintiffs Fail to Demonstrate That a Class Action "Is Superior

Rule 23(b)(3) also requires Plaintiffs to demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiffs cannot meet this burden. Two recurrent scenarios in which class actions are often found not to meet the "superiority" test is when the individual damage amounts at issue are large and when foreign jurisdictions would not recognize a class action judgment from the United States, nor apply *res judicata* to bar re-litigation of class claims. Both considerations apply with special force here.

### 1.      The Large Alleged Value of Individual Claims Defeats Superiority

This case does not involve the typical class action where the persons harmed by the alleged fraud suffered such a small economic impact that it does not make economic sense to bring individual claims—where it would cost more to prosecute claims individually than could be recovered. To the contrary, as demonstrated by indisputable evidence, the vast majority of claims submitted to the Receiver are for large amounts. Furthermore, the evidence indicates that virtually all those to whom Stanford would have even considered giving an insurance letter had at least $1 million invested (or to invest). In such a case, the law counsels against certifying a class because individual litigation is a "feasible" alternative. And, here, we know it is feasible because 225 people have filed suit.

The Supreme Court has articulated, in regard to Rule 23(b)(3)'s superiority requirement, that "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quotations omitted). Indeed, the Supreme Court stated that the "policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* The Fifth Circuit, too, has recognized that "the

existence of a negative value suit"—*i.e.*, one that would cost more to prosecute than litigants could hope to recover—is the "most compelling rationale for finding superiority in a class action." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996)

      Accordingly, courts not only routinely find that small-value claims weigh in favor of class certification, *see, e.g.*, *Mabary v. Hometown Bank, N.A.*, No. 4:10-cv-2936, 2011 WL 5864325, at *4 (S.D. Tex. Nov. 22, 2011) ("Potential recovery is small, making class adjudication particularly appropriate."), they just as regularly find that large-value claims are inappropriate for class resolution. *See, e.g.*, *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577–78 (7th Cir. 2008) (class action not superior means of litigating Truth in Lending Act rescission claims worth more than $50,000 plus attorney's fees and costs); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 420 (5th Cir. 1998) (finding superiority not met where the "relatively substantial value of these claims (for the statutory maximum of $300,000 per plaintiff) and the availability of attorneys' fees eliminate financial barriers that might make individual lawsuits unlikely or infeasible.") *Castano*, 84 F.3d at 748 (same, when there was "reason to believe that individual suits are *feasible*," including because "individual damage claims are high, and punitive damages are available in most states" at issue).[41]

      Professor Merritt Fox, distinguished professor of law at Columbia University and holder of a Ph.D. in Economics, explains the history of the class action device in his declaration attached hereto as Exhibit BB (APP. at 705). Like the Fifth Circuit, he notes that the "unique U.S. Rule 23(b)(3) 'opt out' class action for damages was primarily designed by its drafters to address the problem of 'negative value' cases," *i.e.*, those that would be too costly to prosecute given the

---

[41] *See also Ticknor*, 2014 WL 6440397, at *3 (the "district court did not abuse its discretion by relying on these factors to find that superiority was lacking"); *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 305-06 (S.D. Tex. 2000) (denying class certification where "Plaintiffs claim substantial compensatory and punitive damages, as well as recovery of their expenses, including attorneys' fees. These factors 'eliminate financial barriers that might make individual lawsuits unlikely or infeasible.'") (citation omitted).

potential recovery, and, further, that it was the "most adventuresome innovation" in the 1966 amendments to Rule 23. (APP. at 709, 717 [Prof. Fox Decl. at 4, 12] (quoting *Amchem*).) Thus, rather than establishing a new norm, class actions were designed to be "exceptional in nature," and individual suits remain preferred if "practically feasible" because they are more in accord with the "deep-rooted historic tradition that everyone should have his own day in court." (*Id.* at 717-18 [Prof. Fox Decl. at 12-13] (*citing* Newberg on Class Actions).)

> **a.** **The average claim of an investor who received a Willis letter is over $1 million, and, even for those who did not receive a letter, the damages at issue are significant.**

In this case, the investments at issue and, thus, the proposed class members' individual damage claims, are very large. According to Plaintiffs, there are 17,023 claims approved by the Receiver for a total of $4,467,387,745.66, (*see* Pls. Br. at 23 (citing Pls.' Ex. 56 ¶ 13)), which averages to $262,432.16 per claim. Moreover, in the list of approved claims produced by the Receiver, the average claim amount per group is $341,295.74. (*See* APP. at 965; *see also* APP. at 7 [Fusco Aff. ¶ 4].) In addition, in the United States, CDs were sold only to accredited investors. (*See* APP. at 103, 365, 425.) Accordingly, those individuals in Plaintiffs' proposed class of 17,000-plus who truly had thought to blame Willis for their losses (and were not drummed up instead by the lawyers' proposals to sue tangential third parties like Willis),[42] certainly have claimed damages in an amount sufficient to incentivize them to bring their own suits and to attract individual counsel if their claims have any merit.[43]

---

[42] *See* APP. at 501-02 [Troice Tr. 33:12-34:17] (stating that one purpose of attorney's contract was to find third parties to sue and that he did not consider doing so until after attorney's contacted him).

[43] This is not intended to suggest that any members of the proposed class have meritorious claims. Rather, it is meant to highlight the fact that the vast majority of the proposed class *did not receive a Willis letter* and, thus, (i) would never have thought to blame Willis for their losses to begin with and (ii) probably could not attract an attorney to prosecute their claims individually precisely because they never received a Willis letter.

Moreover, according to Plaintiffs' allegations, the damages at issue are much higher as it pertains to Willis and the, at most, 225 other recipients of the Willis letters. Plaintiffs acknowledge in their petition that Stanford's policy was that "the insurance letters could only be sent to potential clients that had a [sic] least *$1 million* to invest in SIB." (TAC ¶ 101 (emphasis added).) Internal Stanford emails confirm as much. (*See* APP. at 20 (January 2004 email stating letters would only be sent to "a client that has at least $1,000,000 deposited with us"); APP. at 11, 13, 26 (same); *see also* APP. at 16 (October 2003 email directing BMB not to send insurance letter directly to inquirer because Stanford has "very strict mandates as to which client gets what information").) Thus, the typical investor who actually received an insurance letter on Willis letterhead certainly is not one whose damages are so small that there would be no incentive to bring an individual suit or to join with others who are already suing Willis.[44] Simply put, such investors do not need the likes of these five proposed Class Representatives to sue on their behalf. They can do it on their own if they are truly motivated to do so, and 225 have done so.

The proposed Class Representatives in this case prove the point. All but one has sought the recovery of over $1 million through the Receiver, ranging from $2,547,365 to $8,169,107. (*See* APP. at 467 (Troice Interrog. Resps.); APP. at 443 (Punga Interrog. Resps.).) The propose Class Representative who claims to have received a Willis letter and falls below that threshold—Ms. Diaz at $441,658 (*see* APP. at 491 (Diaz Interrog. Resps.))—is still not in the same ballpark as having a claim that could be characterized as a "negative value" suit. And Ms. Diaz was clear that she would continue to prosecute her individual claim against Defendants in the event that class certification is denied. (APP. at 590 [Diaz Tr. 155:19-156:3].)

---

[44] *See* APP. at 878 [Green Tr. 110:4-25] (testifying he knew an individual who invested $9,000 did not receive a letter).

**b.**      **The vast majority (or all) of those who potentially received a Willis letter have already brought individual suits.**

In addition, the evidence demonstrates that, in practice, those persons who received a Willis letter have a very strong incentive to prosecute their own claims, to attract their own counsel, and in fact seek to control their own individual claims. As acknowledged by Plaintiffs, there are already at least nine other litigations involving individual claimants bringing suit against Willis who claim to have received an insurance letter. (*See* Pls.' Br. at 36-37.)[45] As expected, all of those suits involve significant damage claims. For example, in the *Rishmague* suit, two plaintiffs allege $9.2 million in damages; in *Zacarias*, ten plaintiffs allege over $12.5 million in damages; and in *Rupert*, 94 plaintiffs allege $79 million in damages. Even the proposed Class Representatives in this case all unambiguously acknowledge they would continue to pursue their individual claims against Willis regardless of whether a class is certified here. (*See* APP. at 542 [Troice Tr. 195:13-17]; APP. at 590 [Diaz Tr. 155:19-156:3]; APP. at 798 [Canabal Tr. 190:3-11]; APP. at 845-46 [Gomez Tr. 149:15-150:8]; APP. at 880 [Green Tr. 119:2-6].)

Moreover, as Prof. Fox questions in his expert report: who among those that received a Willis insurance letter (other than the named Plaintiffs) would actually be left in this class if it is certified? (*See generally* APP. at 710 [Prof. Fox Decl. at 5].) There are approximately 225 Stanford investors already prosecuting individual claims against Willis, through the nine other lawsuits that have been filed around the country, on the basis that they received a letter. As far as the

---

[45] *Casanova, et al. v. Willis of Colorado, Inc., et al.*, No. 3:10-cv-01862 (N.D. Tex.) (7 plaintiffs); *Barbar, et al. v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05666CA27 (Miami-Dade County, FL) (34 plaintiffs); *Nuila de Gadala-Maria, et al. v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05669CA30 (Miami-Dade County, FL) (63 plaintiffs); *MacArthur v. Winter, et al.*, No. 2013-07840 (Harris County, TX) (2 plaintiffs); *Ranni v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05673CA06 (Miami-Dade County, FL) (2 plaintiffs); *Rishmague, et al. v. Winter, et al.*, No. 2011-CI-02585 (Bexar County, TX) (2 plaintiffs); *Rupert, et al. v. Winter, et al.*, No. 2009-CI-15137 (Bexar County, TX) (94 plaintiffs); *Tisminesky, et al. v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05676CA09 (Miami-Dade County, FL) (11 plaintiffs); *Zacarias, et al. v. Willis Group Holdings Public Ltd. Co., et al.*, No. 13-05678CA11 (Miami-Dade County, FL) (10 plaintiffs).

evidence is concerned, this encompasses the vast majority, if not all, of the investors who received or ever saw one of the letters created by Willis. That statistical overlap is compelling evidence that all of the investors who received a Willis letter and have some basis to want to sue Willis—keeping in mind that virtually all of those investors have over $1 million at stake—have already brought an individual suit in the traditional manner. Accordingly, there is no reason to think, and Plaintiffs provide absolutely no evidence to support the conclusory assertion, that a class action is superior or even helpful in this case.

To the contrary, as analyzed and summarized by Prof. Fox, "this is a case where individual actions or joinder would clearly be superior to the action proceeding on a class basis." (APP. at 711 [Prof. Fox Decl. at 6].) Prof. Fox concludes that, in his expert opinion, the evidence in this case not only shows that Plaintiffs have not met their burden to prove by a preponderance of the evidence that a class action is "superior" in the circumstances of this case, it actually proves the opposite—not only are individual lawsuits "practically feasible," they are the present reality. Accordingly, this Court must deny Plaintiffs' Motion to certify a class because they have failed to prove the "superiority" element of Rule 23(b)(3).

### 2.     A Class Action Is Not Superior Given the Significant Risk That Foreign Jurisdictions Would Not Recognize a Judgment

A class action is not a superior means of adjudicating this dispute because a large number of the proposed class members are citizens of countries that will likely not give preclusive effect to a U.S. class action judgment, exposing Willis to the possibility of having to re-litigate these issues in foreign courts.[46] In the superiority context, *res judicata* "becomes an issue when . . . the members of the prospective class are foreigners and conceivably could file separate suits against the

---

[46] The proposed class action consists of 8,405 members from Venezuela, 3,287 from Mexico, 860 from Colombia, 443 from Peru, 150 from Panama, 160 from El Salvador and 393 from Ecuador. (Pls.' Br. at 35.)

defendants in the courts of their home countries." *Ansari v. New York Univ.*, 179 F.R.D. 112, 116

(S.D.N.Y. 1998). Thus, as here, the question arises "whether the foreign courts will recognize the

preclusive effect of an 'opt-out' class action of the sort contemplated by Rule 23(b)(3)." *Id.* If the

foreign court "would refuse to recognize the preclusive effect of such an action, this fact, although

not dispositive, counsels against a finding that the class action is superior to other forms of

litigation." *Id.*; (*see also* APP. at 708 [Prof. Fox Decl. at 3] (noting that "the U.S. legal system has a

deep aversion to defendants facing double jeopardy, which is exactly what would happen if a

judgment in favor of the defendant (or one in favor of the plaintiff but for an amount smaller than

was sought) would not be recognized in a country should a class member choose to relitigate

there").) Accordingly, courts have found that if a meaningful number of the proposed class

members are citizens of foreign countries, class treatment will not be a superior method of

adjudication, at least as to the foreign claimants, unless the *plaintiff* can show that "it is more likely

than not" that the courts of the relevant foreign jurisdiction will give full preclusive effect to any

judgment entered in the class action.[47]

      Plaintiffs have again failed to carry that burden: their expert declarations do not

establish that foreign court recognition is more likely than not in this action or any class action for

that matter. (*See* APP. at 709 [Prof. Fox Decl. at 4] ("Tellingly, despite the centrality of the

preclusion issue to the Rule 23(b)(3) superiority inquiry in any proposed class that includes a

significant number of persons from abroad, neither of the plaintiffs' experts, Adjunct Professor

---

[47] *See, e.g., In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 282 (S.D.N.Y. 2008) (holding that "Plaintiffs carry the burden of demonstrating that foreign court recognition is more likely than not") (internal citation omitted); *see also In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007) ("Where plaintiffs are unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority").

Alejandro Garro and Professor Edward Sherman, chose to address the matter in their opinions.").)[48] The question is not whether a foreign court will enforce any judgment of a United States court, but whether a foreign court will give preclusive effect to an "'opt-out' class action of the sort contemplated by Rule 23(b)(3)." *Ansari*, 179 F.R.D. at 116; *see also Buettgen v. Harless*, 263 F.R.D. 378, 382 (N.D. Tex. 2009)(finding that proposed lead plaintiff was not the most adequate plaintiff because of the risk that Swiss citizens would not be bound by a class action judgment "unless they affirmatively opted out of the plaintiff class"). Indeed, Plaintiffs' own expert, Prof. Sherman, agrees in a rebuttal declaration that "a number of American cases have [] held" that class actions are not superior where, as here, foreign courts would not enforce U.S. class action judgments, but contends that there is "less certainty" on this issue "as time goes on" and that whether an American judgment will have preclusive effect is highly "uncertain." (Prof. Sherman Resp. Decl. at 8-9.) Plaintiffs cannot hide behind this supposed "uncertainty"; on class certification, they bear the burden to prove, with evidence, that the Rule 23 requirements are met. Uncertainty, if anything, militates against class certification.

Plaintiffs' comparative law expert, Professor Alejandro Garro, actually demonstrates that Plaintiffs have not carried their burden here.[49] He agrees that the fact this case is being pursued

---

[48] *See also* APP. at 655-56 [Prof. Gomez Decl. ¶¶ 28-31] (noting that, while Professor Garro acknowledges that, in addition to mere hospitality, "certain conditions must be met for foreign judgments to be recognized and enforced," his report does not address whether these conditions are likely to be met when the foreign judgment resolves a class action litigation).

[49] In discovery, Plaintiffs also served a declaration created over four years ago by Professor Michael Gordon that was filed in a completely different case in New York, and claimed that Professor Gordon was their "non-retained expert." Counsel for Willis contacted Professor Gordon to inquire about his designation and he stated unambiguously that (i) Plaintiffs never asked his permission, (ii) he knows nothing about the facts of this case, (iii) he is retired and does not consent to be an expert witness in this case, and (iv) he does not approve the use of conclusions he reached in a different case being offered as his opinions in this case, which he knows nothing about. (APP. at 996-97.) Plaintiffs' attempt to designate a non-fact witness such as Professor Gordon as their "non-retained" expert is improper. *See, e.g., Young v. United States*, 181 F.R.D. 344, 346 (W.D. Tex. 1997) (striking designation of treating physician as non-retained expert and stating: "In the absence of a statute to

as a class action is relevant to the question of whether a judgment of a United States court would be enforced in Latin America. (*See* APP. at 620 [Garro Tr. 80:20-23].) But, tellingly, Plaintiffs' counsel did not ask Prof. Garro to address this question in his primary report. (*Id.* at 605, 620 [Garro Tr. 18:3-8, 19:3-12, 78:8-20, 79:4-11].) Rather, when Prof. Garro initially raised this issue with Plaintiffs' counsel, he was specifically told to focus only on enforcement of foreign judgments generally and not enforcement of "opt-out" class action judgments. (*Id.* at 620, 637-38 [Garro Tr. 81:2-9; 148: 22-150-10].) It is only in a "second declaration," after Prof. Garro was deposed, that he considers the class action issue finds "disagreement" with the defendants' experts, asserting that he believes there is a "strong chance" an opt-out class action judgment would be enforced in Latin America because the class members submitted claims through the U.S.-based Receiver (and the form on the website apparently had a jurisdiction clause in small print). (*See* Prof. Garro Second Decl. ¶¶ 21-22.)[50] Yet, Prof. Garro appropriately had to note that he cannot be sure one way or the other "[d]ue to the absence of any judicial decision coming even close to considering the preclusive effect of U.S. class action judgments." (*Id.* ¶ 20.) Thus, Plaintiffs' Motion is facially deficient in this respect because Plaintiffs' own expert cannot provide a factual basis to conclude it is more likely than not that a class action judgment of the sort contemplated by Rule 23(b)(3) would be enforced in Latin America.

In the specific cases of Venezuela and Mexico, class action judgments will almost certainly not be recognized. (APP. at 651 [Prof. Gomez Decl. ¶ 13].) According to both Venezuelan

---

the contrary, a professional witness may not generally be compelled to testify as an expert at the request of a private litigant, as such testimony is a matter of contract or bargain."). Professor Gordon's four-year-old declaration—addressing a different case and a different factual scenario—should be disregarded.

[50] Prof. Garro also attempts to predict the future, based on some unspecified "facts furnished to me by Counsel for the Plaintiffs," that it is "highly unlikely . . . that the Latin American class members would ever re litigate [sic] these cases in their home countries." (Prof. Garro Second Decl. ¶ 10.) As with everything else in this case impacting the decisions made by individual investors, no one can know what any absent class member who turns out to be dissatisfied with the result in this case will attempt do in their home forum.

and Mexican law, final judgments have *res judicata* effect *only with respect to the named parties*—that is, those who were formally incorporated as full participants in the litigation and, thus, given an opportunity to present their case and have their day in court. (*Id.* [¶ 15].) As a matter of both Venezuelan and Mexican law, a judgment cannot have any effect on those who were not properly served, including any potential absent class members that have been merely given notice of the litigation. (APP. at 651-52 [¶ 15].)

Furthermore, the systematic dysfunction of the Mexican and Venezuelan judiciary systems, both in terms of undue delays, and manipulation and corruption by political forces make it virtually a certainty that a class action judgment will not be given preclusive effect in these countries.[51] As Prof. Gomez notes, numerous reports authored by reputable organizations have described in great detail the dire state of Venezuela's legal institutions, the rampant levels of corruption that affect all levels of government, and the political manipulation of the judiciary. (APP. at 665-72 [Prof. Gomez Decl. ¶¶ 53-69].) This latter problem has become evident through the constant "interference and public pressure that judicial officers have been subject to on the part of members of other branches of the State—including the President of the Republic." (APP. at 666 [Prof. Gomez Decl. ¶ 55] (citation omitted).) Indeed, the President of the United States recently issued an executive order declaring Venezuela in particular to be "an unusual and extraordinary threat to the national security and foreign policy of the United States" due to its rights abuses and corruption.[52]

---

[51] Prof. Garro's declaration does not even address this concern, despite his testimony that corruption is a significant issue in the judicial systems of any Latin American countries, including every country discussed in his declaration. (APP. at 628-29 [Garro Tr. 112:13-114:15].) In the specific case of Venezuela, for example, Prof. Garro stated in his deposition that it is "very well known" that "judicial independence has disappeared." (APP. at 629 [Garro Tr. 116:8-117:4].)

[52] *See* Betsy Klein, "White House sanctions Venezuela for rights abuses, corruption," CNN, Mar. 9, 2015, http://www.cnn.com/2015/03/09/politics/venezuela-sanctions-white-house/ (last visited Mar. 18, 2015).

The legal and practical impediments to enforcing a United States class action judgment in Mexico and Venezuela are such that, despite Prof. Gomez's exhaustive research, he was not able to find *a single* Venezuelan or Mexican case in which a United States class action judgment was enforced to bar re-litigation of the same claims by Venezuelan citizens in Venezuela or by Mexican citizens in Mexico. (APP. at 657, 673 [Prof. Gomez Decl. ¶¶ 32, 70].) Neither has Plaintiffs' expert, Prof. Garro. (APP. at 633 [Garro Tr. 132:2-12] (admitting he did not find any cases enforcing class action judgments in Venezuela); *see also* Prof. Gomez. Second Decl. ¶ 20.) Courts "evaluate the risk of nonrecognition along a continuum." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007). The "closer the likelihood of non-recognition is to being a 'near certainty,' the more appropriate it is for the Court to deny certification of foreign claimants." *Id.* It is hard to imagine two jurisdictions closer to the "near certainty" end of the spectrum than Venezuela and Mexico, where the vast majority of the putative class members reside, and where recognition of a United States class action judgment is unprecedented. Accordingly, the Court, at the very least, should deny certification of Venezuelan and Mexican claimants.

## CONCLUSION AND REQUESTED RELIEF

As shown above, Plaintiffs cannot and do not come even close to satisfying their burden of establishing the prerequisites for class certification under Rule 23. Plaintiffs' Motion should be denied. Willis further requests any other relief to which it may be justly entitled.

Dated:  March 20, 2015

Respectfully submitted,

s/ T. Ray Guy
T. Ray Guy
Texas Bar No. 08648500
ray.guy@weil.com
Sandra Y. Fusco
Texas Bar No. 24069744
sandra.fusco@weil.com

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201-6950
Telephone:      (214) 746-7700
Facsimile:      (214) 746-7777

OF COUNSEL:
Jonathan D. Polkes
jonathan.polkes@weil.com
Joshua S. Amsel
joshua.amsel@weil.com

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:      (212) 310-8000
Facsimile:      (212) 310-8007

**ATTORNEYS FOR DEFENDANTS WILLIS
OF COLORADO, INC. AND WILLIS
LIMITED**


s/ Mark D. Manela
Mark D. Manela
State Bar No. 12894500
mmanela@manelalawfirm.com

Manela Law Firm
440 Louisiana Street, Suite 2300
Houston, Texas  77002
Telephone:  (713) 240-4843
Facsimile:  (713) 228-6138

**ATTORNEY FOR DEFENDANT
AMY S. BARANOUCKY**

## CERTIFICATE OF SERVICE

On April 20, 2015, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that, on March 20, 2015, I served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


s/ Sandra Y. Fusco
Sandra Y. Fusco