UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SAMUEL TROICE, *et al.*, individually and on behalf of a class of all others similarly situated, | § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 3:09-cv-01274-N |
| v. | § § § | *In re: Stanford Entities Securities Litigation MDL 2099* |
| WILLIS OF COLORADO INC., et al., | § § | |
| Defendants. | § § | |

## WILLIS AND AMY BARANOUCKY'S SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

T. Ray Guy
Texas Bar No. 08648500
Jason E. Wright
Texas Bar No. 24063896
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201-6950
Telephone: (214) 746-7700
Facsimile: (214) 746-7777

OF COUNSEL:
Jonathan D. Polkes
Joshua S. Amsel
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**ATTORNEYS FOR DEFENDANTS WILLIS OF COLORADO, INC. AND WILLIS LIMITED**

Mark D. Manela
State Bar No. 12894500
Manela Law Firm
440 Louisiana Street, Suite 2300
Houston, Texas 77002

Telephone: (713) 240-4843
Facsimile: (713) 228-6138

**ATTORNEY FOR DEFENDANT
AMY S. BARANOUCKY**

WEIL:\95324071\10\81181.0008

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENTS AND AUTHORITY ........................................................................................... 6

I.    The New Evidence Confirms This Is an Oral Misrepresentation Case Concerning Non-Uniform Communications Unsuitable for Class Certification ....................................... 6

    A.    The New Evidence in Fact Confirms That Stanford FAs Delivered Oral, Non-Uniform Communications Concerning Insurance Coverage ................................ 7

    B.    Plaintiffs Fail to Confront Controlling Authority Holding That Class Certification Is Inappropriate in These Circumstances .................................... 11

II.    Plaintiffs' Reply Brief and New Evidence Cannot Overcome Their Failure to Prove the Willis Letters Are a Common Link Tying the Putative Class Together ................................... 15

III.    Plaintiffs' Reply Brief and New Evidence Do Not Refute that Individual Questions of Reliance, Knowledge and Materiality Predominate ....................................... 19

    A.    The New Evidence Shows That Reliance and Inducement Cannot Be Presumed for Any Class of Investors. .................................................. 19

    B.    The New Evidence Confirms That the Unique Experiences of Class Members Requires Individual Inquiries into Investor Knowledge. ............................ 22

    C.    The New Evidence Demonstrates Further That, in This Instance, Materiality Is an Issue Requiring Individual Inquiries. .................................................. 24

CONCLUSION AND REQUESTED RELIEF ........................................................................... 26

WEIL:\95324071\10\81181.0008

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972) ................................................................................................20

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,*
    140 F.R.D. 425 (D. Ariz. 1992) ................................................................... 13, 14

*In re Baldwin-United Corp. Litig.,*
    122 F.R.D. 424 (S.D.N.Y. 1986) ..........................................................................13

*Bell v. Ascendant Solutions, Inc.,*
    No. 301-cv-0166N, 2004 WL 1490009 (N.D. Tex. July 1, 2004) ....................................18

*Billitteri v. Sec. Am. Inc.,*
    Nos. 3:09-cv-01568-F, 3:10-cv-01833-F, 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ...............15

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ................................................................... 13, 15

*Bruhl v. Price Waterhousecoopers Int'l,*
    257 F.R.D. 684 (S.D. Fla. 2008) ........................................................... 13, 15, 20

*Carrera v. Bayer Corp.,*
    727 F.3d 300 (3d Cir. 2013) ................................................................................23

*Castano v. Am. Tobacco Co.,*
    84 F.3d 734 (5th Cir. 1996) ................................................................... 19, 22

*Comcast v. Behrend,*
    133 S. Ct. 1426 (2013) ................................................................................22

*Cooper v. Pac. Life Ins. Co.,*
    229 F.R.D. 245 (S.D. Ga. 2005) ................................................................... 13, 15

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.,*
    277 F.R.D. 586 (S.D. Cal. 2011) .........................................................................14

*Dolgow v. Anderson,*
    43 F.R.D. 472 (E.D.N.Y. 1968), *rev'd,* 438 F.2d 825 (2d Cir. 1970) ......................13

*Duperier v. Tex. State Bank,*
    28 S.W.3d 740 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.) .............................25

*In re Enron Corp. Sec.,*
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ..................................................................20

WEIL\95324071\10\81181.0008

*First Alliance Mortg. Co. v. Lehman Commercial Paper*,
    471 F.3d 977 (9th Cir. 2006) ................................................................. 4, 13, 14

*Grainger v. State Sec. Life Ins. Co.*,
    547 F.2d 303 (5th Cir. 1977) ................................................................................ 12

*Gruber v. Price Waterhouse*,
    117 F.R.D. 75 (E.D. Pa. 1987) .............................................................................. 22

*Gyarmathy Assocs. v. TIG*,
    No. Civ.A. 3:02-CV-1245, 2003 WL 21339279 (N.D. Tex. June 3, 2003) ............... *passim*

*Harris v. Palm Springs Alpine Estates, Inc.*,
    329 F.2d 909 (9th Cir. 1964) .......................................................................... 13, 15

*In re Hartford Sales Practices Litig.*,
    192 F.R.D. 592 (D. Minn. 1999) ............................................................................ 14

*In re HealthSouth Corp. Sec. Litig.*,
    261 F.R.D. 616 (N.D. Ala. 2009) .................................................................... 13, 15

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ................................................................................... 23

*Kaser v. Swann*,
    141 F.R.D. 337 (M.D. Fla. 1991) .......................................................................... 14

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir. 1987) .............................................................................. 13

*In re Kosmos Energy Ltd. Sec. Litig.*,
    299 F.R.D. 133 (N.D. Tex. 2014) .................................................................... 23, 24

*Longden v. Sunderman*,
    123 F.R.D. 547 (N.D. Tex. 1988) .......................................................................... 15

*McManus v. Fleetwood Enterprises, Inc.*,
    320 F.3d 545 (5th Cir. 2003) ................................................................................ 20

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998) ................................................................................. 13

*Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007) ................................................................................ 20

*Richardson v. Am. Home Shield of Tex., Inc.*,
    No. CIV.A. H-05-4029, 2006 WL 903721 (S.D. Tex. Apr. 7, 2006) ........................ 20

iv

*Seiden v. Nicholson,*
  69 F.R.D. 681 (N.D. Ill. 1976) ........................................................................22

*Shores v. Sklar,*
  647 F.2d 462 (5th Cir. 1981)............................................................................20

*Sibley v. Diversified Collection Servs., Inc.,*
  No. 396-cv-0816, 1998 WL 355492 (N.D. Tex. June 30, 1998)........................18

*Simon v. Merrill Lynch, Pierce, Fenner & Smith,*
  482 F.2d 880 (5th Cir. 1973)......................................................................*passim*

*Smith v. Xerox Corp.,*
  584 F. Supp. 2d 905 (N.D. Tex. 2008)..............................................................18

*Unger v. Amedisys Inc.,*
  401 F.3d 316 (5th Cir. 2005)............................................................................19

*Wal-Mart v. Dukes,*
  131 S. Ct. 2541 (2011) ................................................................................5, 17

*Walco Investments, Inc. v. Thenen,*
  168 F.R.D. 315 (S.D. Fla. 1996) ................................................................ 13, 20

*Young v. Nationwide Life Ins. Co.,*
  183 F.R.D. 502 (S.D. Tex. 1998) .....................................................................20

## Other Authorities

Fed. R. Civ. P. 23(a)..........................................................................................15, 17

Fed. R. Civ. P. 23(b)(3)......................................................................................15, 20

Defendants Willis of Colorado, Inc., Willis Limited, and Amy S. Baranoucky (together, Willis) respectfully submit this sur-reply in further opposition to Plaintiffs' Opposed Motion for Class Certification, for Designation of Class Representatives and Class Counsel [Dkt. No. 226] (the Motion).

## PRELIMINARY STATEMENT

Willis's Opposition to Class Certification [Dkt. No. 243] (the Opposition) demonstrated that Plaintiffs have failed to carry their burden of proving, by a preponderance of the evidence, that a class should be certified because the record—including the proposed Class Representatives' own admissions—unequivocally shows that the allegations of fraud concern *oral communications* by hundreds of different Stanford Financial Advisors (FAs)[1] with more than 17,000 putative class members in private, one-on-one meetings in more than one hundred different countries over the course of eight years. Yet Plaintiffs continue to press for class certification on the wholly unsupported theory that Stanford FAs used a "standardized sales pitch" to dupe investors into believing the CDs were insured and that Willis was the thread that tied all 17,000-plus victims of Stanford's Ponzi scheme together. But there is simply no evidentiary basis to find such a uniform, standardized scheme ever existed, or that the Willis letter was consistently used in that scheme even if it did; indeed, Plaintiffs do not address, much less refute, that only 1% of the purported class ever received a Willis letter.  In short, there is no basis to certify a class *against Willis* of the 17,000-plus victims of Stanford's fraud.

Indeed, there is no basis in this record for the Court to make the finding of fact that each of these tens of thousands of conversations contained uniform statements and understandings about the CDs being insured, let alone that they were all materially identical to those allegedly had by the five proposed Class Representatives and their particular FAs. To the contrary, the proposed

---

[1] Capitalized terms not defined herein are defined in Willis's Opposition.

Class Representatives made on-the-record admissions that because the Stanford FAs delivered the alleged oral misrepresentations in separate, individual private meetings, they have no idea—much less any *proof*—of what any other FA told any of the other 17,000-plus putative class members regarding any purported insurance for the Stanford CDs. The proposed Class Representatives further admitted that to find out what any of the other class members were told and understood, you would have to ask each putative class member, *one by one*. This is the very reason that the Fifth Circuit has made clear that cases based on individual alleged oral misrepresentations, such as this one, "cannot be maintained as a class action." *Simon v. Merrill Lynch, Pierce, Fenner & Smith*, 482 F.2d 880, 882 (5th Cir. 1973).

In a revealing move, Plaintiffs, having seen Defendants' opposition briefs, submitted new evidence just two business days before their reply brief was due in an effort to try to support their claim that the Stanford FAs utilized a standardized sales pitch. This new evidence, however, consists only of untested declarations from four (out of hundreds) of Stanford FAs and the deposition of a former Stanford employee.[2] This evidence therefore does not even come close to proving that Stanford (much less Willis) devised an allegedly "uniform" sales pitch and training program that every Stanford FA (again, not Willis) used every single time a CD was sold, to all 17,000-plus putative class members, to mislead all of them about insurance coverage of the CDs. The idea of a global scheme to misrepresent that the CDs were insured is a fabrication; there was never any evidence that it existed, let alone enough evidence to meet Plaintiffs' burden of proof. In fact, Plaintiffs' new evidence actually shows that there was no standardized sales pitch or common course of conduct by the Stanford FAs regarding insurance.

---

[2] Willis opposed Plaintiffs' submission of new evidence after the discovery deadline without an adequate opportunity to depose and/or address the new evidence. Plaintiffs refused to allow the new declarants to be deposed, but ultimately agreed to permit Willis to file this sur-reply addressing the new evidence and Plaintiffs' reply arguments, which was approved by the Court in the form of an agreed stipulation. (*See* Dkt. No. 252.)

Specifically, the new evidence demonstrates, among other things, that:

- *Not one* of the Stanford FAs asserts that Stanford required the FAs to make any representations about insurance, much less tell their clients that the CDs were secured by FDIC-like insurance.

- *Not one* of the Stanford FAs testified to using a "standardized sales pitch" concerning insurance coverage of the CDs. In fact, one of the Stanford FAs revealed that he did not discuss insurance *at all* with some of his clients.

- Tellingly, only *one* of the four Stanford FAs testified to consulting a generic Stanford training manual that referenced an insurance letter, and that letter was from *BMB*, not Willis.

- One of the four Stanford FAs admits that some clients did not ask about insurance for the CDs.

- Potential insurance coverage (of SIB, not the CDs) meant different things to different FAs. One Stanford FA thought the insurance was "very important," but another said it was relatively *unimportant*.

- The former Stanford employee, Patricia Maldonado, testified that she consistently told FAs that the Stanford CDs were *not* covered by FDIC-like insurance and that the insurance policies described in the BMB and Willis letters did *not* cover client accounts.

This new evidence not only fails to overcome the proposed Class Representatives' on-the-record admissions that other class members may have been told different things concerning insurance, but in fact confirms it. These four FAs (out of hundreds) delivered different messages about insurance (or no message at all about insurance) to their own respective clients from that claimed by the proposed Class Representatives. There is simply no evidence to support the idea of a uniform scheme to misrepresent that the CDs were insured, or that the Willis letters were a part of that scheme, or that 17,000-plus proposed class members were all told the same thing in private meetings over an 8-year period.

Controlling Fifth Circuit precedent—and a decision of this Court—confirm that a class cannot be certified in light of the oral and demonstrably *non-uniform* communications at issue here. *See Simon*, 482 F.2d at 882 (cases based on individual alleged oral misrepresentations "cannot

be maintained as a class action"); *Gyarmathy Assocs. v. TIG*, No. Civ.A. 3:02-CV-1245, 2003 WL 21339279, at *1 (N.D. Tex. June 3, 2003) (Godbey, J.). In *Gyarmathy*, this Court refused to certify a class notwithstanding the existence of some written material, because class members bought securities through intermediaries who, like the Stanford FAs here, provided "varying representations . . . above and beyond what is contained" in the written materials. *See* 2003 WL 21339279, at *3. Here, communications from the Stanford FAs occurred on an individual basis, orally and in private, and it was those oral communications—not the Willis letters—that are alleged to have contained the misleading representations concerning insurance coverage. Again, plaintiffs have not and cannot demonstrate what the Stanford FAs represented to each of the 17,000-plus investors and have not demonstrated a common pitch or scheme. A class, therefore, cannot be certified.

Plaintiffs instead rely on out-of-circuit cases in an effort to support their argument. But these cases offer no help. For example, in Plaintiffs' main authority, *First Alliance Mortg. Co. v. Lehman Commercial Paper*, 471 F.3d 977, 985 (9th Cir. 2006), the Ninth Circuit held a class could be certified based on oral communications because the defendants' sales agents utilized a standardized "script that was required to be *memorized*." But even assuming that the Ninth Circuit's law applied here—and, of course, it does not—there is no evidence of any sort of a standard, "memorized" script for Stanford FAs. To the contrary, the new evidence confirms what was already apparent: that there was no uniformity, and the proposed Class Representatives have testified that they have no evidence anyone was told the same things they were about insurance.

Furthermore, Plaintiffs do not address, much less refute, Willis's showing that only as few as 1% of the 17,000-plus putative class members ever received or saw a Willis letter. And the new evidence reinforces Willis's showing: one Stanford FA states that he never delivered or showed a Willis letter to his clients and another FA reports delivering only a single letter to one client on one occasion. As Willis showed, class certification demands that Plaintiffs produce evidence that each

class member suffered the same injury in the same way. *Wal-Mart v. Dukes*, 131 S. Ct. 2541 (2011). But, critically, Plaintiffs have not proved that those few class members who received (and allegedly relied on) a Willis letter suffered the same injury, in the same way, as the overwhelming majority who never got a letter and indeed never heard of Willis. As Plaintiffs do not contest, neither they nor the Receiver have done any analysis whatsoever—and so therefore have no evidence—to substantiate their allegations that the letters were the sustaining force behind the fraud such that those investors who never saw a letter, never considered insurance, or who even knew the CDs were *not* covered by insurance, nonetheless could maintain an individual (or class) suit against Willis. The "new evidence" on this score only undercuts Plaintiffs' attempt to certify a class.

Indeed, retreating from their application to certify a class of 17,000-plus investors, Plaintiffs—for the first time in their reply brief—ask the Court, in the alternative, to certify a class only of those "who received and were shown" a Willis letter. (*See* Pls.' Reply at 4.) Plaintiffs' attempt to redefine the class definition for the first time on reply is improper and should be rejected. But it fails in any event. For one thing, Plaintiffs have not shown that anyone other than the proposed Class Representatives would be in that class. There is no evidence about who received a letter and who did not—not the Receiver and not even the Plaintiffs have a clue—and as far as the record indicates, everyone who even claims to have received a letter is already proceeding in his or her own individual action. Moreover, as Willis explained, and as the new evidence only emphasizes, even for those who received Willis letters, this remains an oral communications case and each Plaintiff would have to prove his or her own case based on their own unique circumstances. The proposed Class Representatives admit that the letters on their face do not say the Stanford CDs were insured; instead, they each allegedly formed their beliefs about insurance based on what they were told by their Stanford FAs in individual, private meetings.

Finally, the new evidence only reinforces Willis's showing that, because of the widely varying written disclosures and oral communications, individual inquiries will be required to adjudicate essential issues, including: reliance and inducement; investors' knowledge; and materiality. Among other things, the declarations confirm that FAs gave varying disclosures about insurance: some not mentioning insurance at all to certain clients and some believing insurance was of varying importance for different FAs (from somewhat important to unimportant). Further, the declarations confirm some FAs and investors had varying knowledge about Stanford and the CDs, including some who themselves visited Stanford and spoke with Stanford executives.

At bottom, the notion that 300 different FAs, in 100 different countries, over 8 years would have made "uniform" communications in private meetings with 17,000-plus individuals, who each came to the same understandings, has always been far-fetched, even as an allegation. But class certification demands much more than mere allegations. It requires evidentiary proof and, notwithstanding Plaintiffs' last-minute submissions, there is and remains no evidence that could possibly justify findings of fact that sustain certifying a class in this case.

## ARGUMENTS AND AUTHORITY

I.     **The New Evidence Confirms This Is an Oral Misrepresentation Case Concerning Non-Uniform Communications Unsuitable for Class Certification**

Plaintiffs do not challenge that this is a case concerning alleged misrepresentations delivered orally by hundreds of Stanford FAs in tens of thousands of individual, closed-door meetings spread across one hundred different countries over eight years. As Willis showed, controlling Fifth Circuit law prohibits class certification based on oral communications in these circumstances, including even when some communications were written. *See Simon*, 482 F.2d at 883; *Gyarmathy*, 2003 WL 21339279, at *3. And this case is the poster child for why this rule exists: the proposed Class Representatives admitted that, because their meetings were conducted in private, they know only what they were told by their own individual Stanford FA. They do not know, and so

have not proved, that any of the other 17,000-plus class members were told the same thing. The proposed Class Representatives further admitted that the only way to find out what the other class members were told is to ask each one individually. This, of course, is the reason behind the Fifth Circuit's rule: baseless assertions by a plaintiff's counsel that the rest of the class received the same oral communications—and understood and relied on them in the same way—is not proof that can justify class-action treatment.

Plaintiffs claim that the new evidence demonstrates that Stanford FAs used a "standardized sales pitch and marketing campaign" in their private meeting with clients, allegedly uniformly representing that the Stanford CDs were protected with FDIC-like insurance. But Plaintiffs' claim about a "uniform" sales pitch has always been unsupported by any evidence—far from being a claim Plaintiffs have proven by a preponderance of the evidence. In fact, as demonstrated in detail below, the new evidence demolishes the false claim that there was a uniform strategy to misrepresent that the CDs were insured, and it only reinforces Willis's point that Stanford FAs told different things to different clients concerning insurance coverage for the CDs, if and when they discussed insurance at all.

Moreover, Plaintiffs are wrong on the law. Rather than take on the controlling Fifth Circuit authority, Plaintiffs instead rest on out-of-circuit cases that, when also examined on even a cursory level, demonstrate that a class cannot be certified here.

A.   **The New Evidence in Fact Confirms That Stanford FAs Delivered Oral, *Non-Uniform* Communications Concerning Insurance Coverage**

The core of Plaintiffs' reply brief is that the Stanford FAs utilized a "standardized sales pitch" and "uniform" marketing strategy to allegedly mislead clients that the Stanford CDs were protected with insurance.[3] Plaintiffs have the burden of proving this by a preponderance of the

---

[3] Plaintiffs' counsel, in a number of filings, referred to the letters as "safety and soundness letters." This is a false label. The letters do not say that the Stanford CDs are safe and sound, they do not say

evidence. But their claim is pure invention: there is no evidence of such uniform communications at all beyond Plaintiffs' bare assertions. Conspicuously, none of the Stanford FAs who submitted declarations discusses any standardized script or other formalized sales pitch that they were required to deliver to their clients and none of the FAs say they actually used a uniform sales pitch. Significantly, not one of the Stanford FAs asserts that Stanford required the FAs to say anything about insurance at all, much less to tell clients that the Stanford CDs were secured by FDIC-like insurance. Indeed, although the Stanford FAs recount certain information they were told by Stanford, the declarations are notably silent about—and so provide no evidence of—what the Stanford FAs told their clients, the putative class members here.

And where the Stanford FAs do provide scant details about what they told their clients, it conflicts with the notion of a uniform marketing scheme. In fact, some Stanford FAs revealed that they told some of their clients *nothing at all* about insurance coverage. Timothy A. Vanderver states he told clients about insurance only when they asked: "when a client did not ask about insurance," Vanderver stated, he still considered insurance as "part of the information I considered in making recommendations to clients," but he *does not* say that he nonetheless volunteered information about insurance to those clients who did not ask. (Pls.' APP. at 2638 [Vanderver Decl. ¶ 6].) Similarly, Elias Barbar states that he would "regularly show the letter to clients who expressed concerns or doubts about investing in the SIBL CDs," (Pls.' APP. at 2641 [Barbar Decl. ¶ 12]), but he *does not* say that he showed the letter, or otherwise discussed insurance, with those clients who did not voice those particular concerns. Those clients, the evidence suggests, heard nothing from Barbar about insurance. To put it another way, there is absolutely *no* evidence that any alleged insurance marketing scheme factored in any way into any of his discussions with

that anything is safe and sound, nor do they even mention CDs at all—as Plaintiffs have admitted.  They do accurately state the lines of insurance coverage that Stanford had obtained through Willis.

other clients about buying CDs. Therefore, not only does this new evidence demonstrate the lack of

a uniform sales pitch among even the select four out of hundreds of Stanford FAs, but it shows that

the same Stanford FA used different sales pitches and shared different information with different

clients.[4]

   Moreover, former Stanford executive Patricia Maldonado testified that she told FAs

that the Stanford CDs *were not* protected by FDIC-like insurance, but instead were like any

investment product traded without FDIC protection. As she testified:

> Q. And what did the letters say generally?
> A. Basically, saying that Stanford International Bank has the following policies in place, you know, directors and officers, errors and omissions, you know, like an umbrella coverage.
> Q. Were there any questions about the depositor's insurance?
> A. Like FDIC insurance? Is that what you're talking about?
> Q. Or its equivalent for SIB.
> A. Nothing of that sort was addressed in – in that – that original letter.
> Q. But those concerns were never communicated to you through FAs?
> A. They weren't concerns, but there was *always a point of clarification that these are investments just like any other investment that are not covered by FDIC insurance.*
>
>    * * *
>
> Q. Okay. I'm sorry. So, when -- when would the conversation happen about depositor's insurance?
> A. Let's see. So, I wouldn't have any conversations directly with clients about that. I just know that that was a -- a comment around that letter that *this letter, in no means, represents that the client's insurance – client's accounts are insured.*

(Pls.' APP. at 2587 [Maldonado Tr. 101:7-102:13] (emphasis added).) Of course, this testimony is

directly at odds with the testimony of the proposed Class Representatives, who testified they were

told by their FAs that the CDs were, among other things, "guaranteed," "protected and insured,"

---

[4] Indeed, one Stanford FA said that he took it on his *own initiative* to advise other FAs about the existence of the Willis letters, not because Stanford directed them to do so pursuant to a common marketing scheme or sales pitch, but because he personally "believed that the information should be one of the factors to consider when recommending the SIBL CD." (*See* Pls.' APP. at 2634 [Shaw Decl. ¶ 9].) There is no evidence what, if anything, these other FAs understood about the letters or, more importantly, told their clients about the letters or insurance. It also proves the *opposite* of a uniform sales pitch directed by Stanford; it shows, instead, that individual FAs decided to develop their own sales pitches, focusing on what they individually believed were important factors.

and that "insurance covered the 'total investment.'"[5] So, far from demonstrating that the different conversations among the 17,000-plus proposed class members and their FAs were "strikingly similar" (as Plaintiffs characterize it in their reply), the new evidence in facts confirms Willis's point: different FAs told different clients materially different things.

Plaintiffs' effort to unearth evidence of a "standardized sales pitch" in a Stanford training manual also fails. First, Plaintiffs' claim that the purported training manual was used as a script to misrepresent insurance coverage is a demonstrable fabrication: *the training manual itself says the CDs are __not__ protected by FDIC insurance and nowhere says that the CDs themselves (as distinct from SIBL) are insured*. (*See* Pls.' APP. at 37.)  Therefore, even if there was evidence that the Stanford FAs regularly used the Training Manual (and there is no such evidence), the Manual specifically informs investors that the CDs were not insured. So, the Manual is actually fatal to Plaintiffs' efforts to demonstrate a fraud to misrepresent insurance coverage for the CDs.

In any event, as Willis showed, there is no evidence that any FA used a training manual in private client meetings, how the manual was used, that the manual was followed, or any evidence whatsoever that use of the training manual was widespread or systematic. (*See* Willis Opp'n at 7, 30, 42.) In response, Plaintiffs cite *just one* of the four new FA declarations. Obviously, the claim of one FA out of hundreds does not establish a consistent pattern that would demonstrate a "standardized sales pitch." But even that declaration does not go far enough. That single FA does not even say that he used the training manual in his sales pitches or that the manual provided a script or any other standardized sales pitch to use with clients, or that it required FAs to tell investors the CDs were protected by insurance.[6]

---

[5] *See* Pls.' Reply at 17-18.

[6] Plaintiffs also refer to a "Standard Operating Procedure" for marketing which allegedly "touts Stanford's insurance as providing 'protection' for SIBL depositors while omitting to disclose that the insurance does not provide deposit insurance." (Pls.' Reply at 7.) The record—including the new

Despite the fact that there is no evidence of whether or how the Training Manual was used by the FAs, Plaintiffs argue that "plaintiffs' and the 85 U.S. investors' testimony about what they were told by their Stanford FAs *supports an inference* that the Training Manual was used to train FAs." (Pls.' Reply at 9 (emphasis added).) But *inferences* are not sufficient at this stage. To certify a class, Plaintiffs must satisfy a burden of proof by a preponderance of the evidence, and the Court must make factual findings, supported by actual evidence, not speculation.

Finally, the new evidence reflects the statements of only four FAs out of hundreds, all located in the U.S., who sold CDs over varying time periods across the globe. Even if these four FAs reported using a "standardized sales pitch"—which they do not—the experiences of a miniscule, unrepresentative fraction of FAs are not sufficient evidence to prove that a standardized pitch exists, much less that Willis played any meaningful role in it. In short, we simply do not know what, if anything, the vast majority of the 17,000-plus investors were told by their Stanford FAs about insurance. Plaintiffs' lawyers' mantra that there was a "standardized sales pitch" and Stanford "corporate policy" to market its CDs as insurance-protected cannot substitute for actual evidence of uniform communications, particularly when the only actual evidence in the record demonstrates that the communications were, in fact, *non-uniform*.

### B.    Plaintiffs Fail to Confront Controlling Authority Holding That Class Certification Is Inappropriate in These Circumstances

The controlling Fifth Circuit law, cited at length by Willis and all but ignored by Plaintiffs, highly disfavors, if not prohibits, class certification based on alleged oral misrepresentations. Plaintiffs' new evidence and their arguments in reply only reinforce that this case is an oral misrepresentation case. Yet they offer no direct response to Willis's showing that "an

---

evidence submitted by Plaintiffs—provides no evidence that this document ever was used or consulted by a single FA. And that document omits any discussion of Willis or insurance letters altogether, and so cannot be used as a basis to certify a class against Willis.

action based substantially, as here, on oral rather than written miscommunications cannot be maintained as a class action." *Simon*, 482 F.2d at 882; *see also Gyarmathy*, 2003 WL 21339279. Strikingly, Plaintiffs cite neither *Simon* nor *Gyarmathy* even *once* in their reply brief. Obviously, then, Plaintiffs make no effort to distinguish either case.

Rather, Plaintiffs pay lip service to the Fifth Circuit case law, quoting *Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307–08 (5th Cir. 1977) for the supposed proposition that "[c]lass actions are appropriately utilized in situations where a 'standard sales pitch' is employed." (Pls.' Reply at 15.) But Plaintiffs ignore the key lesson of *Grainger*: that its exception to the general rule is a narrow one indeed; one that has no application here. As the Fifth Circuit stated in *Grainger*:

> However, as this quote [from *Simon*] indicates,[7] *the key concept in determining the propriety of class action treatment is the existence or nonexistence of material variations in the alleged misrepresentations*. It is possible, *although unlikely*, that oral misrepresentations can be uniform, e.g., through use of a standardized sales pitch by all the company's salesmen. Plaintiffs in the present case should be given the opportunity to demonstrate the existence and use of such a device. *If plaintiffs cannot do this, then the district court may quite properly refuse to certify a class on the grounds that common questions of law or fact do not predominate.*

*Grainger*, 547 F.2d at 307–08 (emphasis added). So, while the Court, in dicta, left open the highly "unlikely" possibility that oral miscommunications could be uniform (and therefore potentially suitable for class-action treatment), it made clear that it was a movant's burden to demonstrate, with evidence, the existence of a standardized sales pitch that results in "no material variations in the alleged misrepresentations." Here, as discussed *supra*, Plaintiffs have been given the chance to demonstrate the existence of such a standardized sales pitch and, even with the benefit of new evidence, have failed to carry their burden. That being the case, the Court should "refuse to certify a

---

[7] The quote from *Simon* that the *Grainger* court referenced is: "If there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action. See Rule 23. Advisory Committee's Official Note, 39 F.R.D. 98, 107 (1966). Thus, courts usually hold that an action based substantially, as here, on oral rather than written misrepresentations cannot be maintained as a class action." 547 F.2d at 307-08.

class on the grounds that common questions of law or fact do not predominate." *Id.* And this should not be a surprising result: the Fifth Circuit has not once found a case that falls within this speculative, "unlikely" scenario.

With the controlling case law against them, Plaintiffs seek support from the Ninth Circuit. Plaintiffs rely on *In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006), and contend that a class may be certified where it is alleged that a fraud is based on a "common course of conduct." (*See* Pls.' Reply at 15–16, 28.) But, as *First Alliance* itself acknowledged, the Ninth Circuit's rule is an outlier, requiring a lesser showing of uniformity than required in other circuits, including the Fifth.[8] The Fifth Circuit in particular has never adopted a rule that a "common course of conduct" is sufficient to show the required uniformity in oral communications to get past class certification.[9] *See Simon*, 482 F.2d at 883 ("[Plaintiff's] failure to prove any standardized representations by [defendant] bars a class action."). Moreover, *First Alliance* is worlds apart from this case on its facts. In *First Alliance*, there was actual *evidence* of a "carefully orchestrated" scheme to mislead with "a *script that was required to be memorized,*" and the defendant there mandated "strict adherence to a specific method of hiding information and misleading borrowers." 471 F.3d at 991 (emphasis added). Nothing in the record here comes close to establishing that Stanford had a script,

---

[8] The Ninth Circuit explained that both the Second and Third Circuits require a stronger degree of "uniformity among misrepresentations" than that required in the Ninth Circuit. *Id.* at 990 & n.3. As noted *supra* note 7, the Fifth Circuit likewise has held that "if there is any material variation in the representations made or in the degrees of reliance thereupon, a fraud case may be unsuited for treatment as a class action." *Simon*, 482 F.2d at 882.

[9] For that reason, the other cases cited by Plaintiffs are also distinguishable, including *Blackie v. Barrack*, 524 F.2d 891, 903-04 (9th Cir. 1975); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 314 (3d Cir. 1998); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724 (11th Cir. 1987); *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 914 (9th Cir. 1964); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 626 (N.D. Ala. 2009); *Bruhl v. Price Waterhousecoopers Int'l*, 257 F.R.D. 684, 687, 696 (S.D. Fla. 2008); *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 261 (S.D. Ga. 2005); *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 333-34 (S.D. Fla. 1996); *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 430 (D. Ariz. 1992); *In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 426 (S.D.N.Y. 1986); *Dolgow v. Anderson*, 43 F.R.D. 472, 489 (E.D.N.Y. 1968), *rev'd*, 438 F.2d 825 (2d Cir. 1970).

required FAs to memorize and use it, or that FAs systematically used a memorized script concerning insurance. Indeed, as discussed *supra* Part I.A, the new evidence undermines any such showing.

Moreover, numerous courts, including those within the Ninth Circuit, have distinguished *First Alliance* where there is no evidentiary support for a standard memorized script utilized on a consistent basis across the class. For example, in *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 601 (S.D. Cal. 2011), the court found that a script used only as a "guideline" was insufficient to demonstrate uniform oral communications. Likewise, in *Kaser v. Swann*, 141 F.R.D. 337 (M.D. Fla. 1991), the court rejected the argument Plaintiffs make here, holding instead that general allegations about a "common scheme" are insufficient without demonstrating uniformity of actual communications to each investor in the proposed class. As *Kaser* held, "a common sales strategy might have been used in selling the notes, but this does not indicate whether the bank employees uniformly misrepresented the same facts . . . to induce the sale of the notes."[10]

Plaintiffs also heavily rely on a district court decision from Arizona for the proposition that an "underlying fraudulent scheme transcend[s] specific details of oral communications." *See In re Am. Cont'l Corp./Lincoln Sav. & Loans Sec. Litig. (ACC)*, 140 F.R.D. 425, 431 (D. Ariz. 1992). Again putting aside that *ACC* applied Ninth Circuit law, the case does not help Plaintiffs. In *ACC*, the court found sufficient evidence that the alleged misrepresentations in "sales presentations were uniformly patterned on a known model" and that "plaintiffs can establish that the sales agents' representations did not vary in material respects." *Id.* at 430. Here, as discussed *supra*

---

[10] *See also In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 606 (D. Minn. 1999) (denying certification and stating: "Although the Plaintiffs generally claim that ITT Hartford—rather than the individual sales agents—was responsible for the deceptive and fraudulent information conveyed to them, it is clear that the manner in which this information was conveyed to them was through the individual sales agents.").

Part I.A, Plaintiffs' new evidence actually undermines their ability to make a showing that the Stanford FAs' communications to their clients were "uniformly patterned on a known model."

Finally, Plaintiffs cite a handful of cases that concern *written*, rather than *oral* communications. *See, e.g., Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975).[11] Obviously, cases premised on fraud by uniform written communications do not apply here, where the representations were concededly oral and presented in private, individual meetings.

## II.     Plaintiffs' Reply Brief and New Evidence Cannot Overcome Their Failure to Prove the Willis Letters Are a Common Link Tying the Putative Class Together

As Willis explained in its Opposition, Plaintiffs' attempt to certify a class of more than 17,000 individuals against Willis, when there is no evidence that any more than 1% of them received a Willis letter or indeed had anything to do with Willis at all, fails on several grounds under the Rule 23 analysis. Willis argued that Plaintiffs had no *evidence* (and indeed never had any basis even to allege) that the Willis letters were so essential to the propagation of the fraud that the 99% of class members who had no connection to Willis or the letters nonetheless could pursue claims against Willis. Plaintiffs presented no analyses tracing funds from letter-recipients to show that the letters were the linchpin of the Ponzi scheme. This lack of evidence, Willis argued, demonstrated that Plaintiffs could not meet several of the Rule 23(a) and (b)(3) elements, including commonality, typicality and predominance. (*See* Willis Opp'n at 16-19, 26-27, 40-41, 54-55.) Plaintiffs cannot show that the Willis letters were the common glue that held together the vast 17,000-plus proposed class,[12] when only 1% of the proposed class had any arguable connection to those letters.

---

[11] *See also Longden v. Sunderman*, 123 F.R.D. 547 (N.D. Tex. 1988); *Billitteri v. Sec. Am. Inc.*, Nos. 3:09-cv-01568-F, 3:10-cv-01833-F, 2011 WL 3586217, at *1 (N.D. Tex. Aug. 4, 2011); *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir. 1964); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616 (N.D. Ala. 2009); *Bruhl v. Price Waterhouse Coopers Int'l*, 257 F.R.D.684 (S.D. Fla. 2008); *Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245 (S.D. Ga. 2005).

[12] The proposed class includes victims of Stanford's Ponzi scheme who invested *before* Willis became Stanford's insurance broker in 2004, or after 2007 when Willis was no longer issuing letters, people

Plaintiffs' reply brief and the new evidence it purports to rely on do not get them past these points. Plaintiffs do not challenge Willis's showing that 1% of the class, at most, received Willis letters and the new evidence only reinforces that point. One of the Stanford FAs reports delivering a letter to a single one of his clients on one occasion (*see* Pls.' APP. at 2633-34 [Shaw Decl. ¶¶ 6-7]); and one FA denies giving or even showing the letter to his clients. (*See* Pls.' APP. at 2637-38 [Vanderver Decl. ¶ 6].) Plaintiffs also have no response to Willis's showing that neither Plaintiffs nor the Receiver did any statistical analysis that would show that the few Willis letters were essential to sustaining the entire fraud. The anecdotal new evidence, of course, nowhere discusses, much less proves, how the letters themselves propped up the entire fraud. For example, there is still no proof as to how many letters were sent to Stanford; who among the putative class received a letter; whether the investors purchased CDs before or after receiving the letters (or not at all); and what anyone who received a letter actually understood the letter to mean (including whether and to what extent any members of the putative class correctly understood that the CDs were not insured).

Instead, the most Plaintiffs do is to assert, *ipse dixit*, that "the fraud was pervasive and the CDs would have been unmarketable but for the fraud." (Pls.' Reply at 32.) But bare assertions by Plaintiffs' lawyers are not evidence that the Court can rely on to certify this class. And these conclusory assertions cannot overcome the proposed Class Representatives' own admissions that they do not know, and have done no analysis to determine, who among the proposed class actually received letters (or were otherwise duped by an alleged insurance marketing fraud involving the Willis letters) and, of those, who invested and how much; how Stanford used funds invested by letter recipients; and what the economic impact of those fund were on the Ponzi scheme. (*See* Willis Opp'n at 18-19.). Rather than confront this lack of evidence, Plaintiffs simply repeat their allegation

who received no information about insurance and/or gave no thought at all to insurance and even people who invested despite fully understanding that the CDs were *not* insured.

that Willis can be liable to all investors for the whole fraud, even if 99% of the investors had no

connection to Willis whatsoever, or even knew, for all we know based on the record before the

Court, that the CDs were *not* protected by insurance. Plaintiffs' unsupported theory is insufficient to

certify a class.

Nor do Plaintiffs meaningfully respond to Willis's showing that the Supreme Court's

decision in *Wal-Mart* prevents Plaintiffs from satisfying the "commonality" requirement of Rule

23(a) because they cannot show that both letter recipients and non-letter recipients were allegedly

injured by Willis in the same way. (*See* Willis Opp'n 26-28 (citing and applying *Wal-Mart Stores, Inc. v.*

*Dukes*, 131 S. Ct. 2541 (2011).) Plaintiffs contend that they have shown "significant proof" of a

"general policy" and "common direction" connecting the class members that was supposedly

lacking in *Wal-Mart*. Plaintiffs contend, without record citation, that *Stanford* (not Willis) had a

"corporate policy to market SIBL CDs as safe investments comparable to U.S. bank CDs, and to do

so systematically and not merely sporadically." (Pls.' Reply at 10.) But that sleight of hand ignores

the core point: quite obviously there could not be a general corporate policy, "systematically"

implicating Willis or involving the Willis letters when 99% of the class members never even received

a communication from Willis or even heard of the company or were told the CDs were insured.

And the new evidence only buttresses that showing. Among other things, as noted *supra* pages 8-9,

some of the FAs disclosed that they did not mention insurance *at all* in their conversations with their

clients. At bottom, the new evidence demonstrates the *opposite* of a systematic "general policy" and

"common direction" to use the Willis letters to market the CDs as insured. No class can be certified

on that basis.

Finally, retreating, Plaintiffs ask the Court for the first time on reply as an alternative

to certify a class of only those who received or were shown a Willis letter. (*See* Pls.' Reply at 4.)

Plaintiffs' belated request, briefed only in one sentence of their reply, should be rejected. For one

thing, courts ordinarily reject a plaintiff's attempt to change the class definition for the first time on reply—and, indeed, this Court has done so previously. *See, e.g., Sibley v. Diversified Collection Servs., Inc.,* No. 396-cv-0816, 1998 WL 355492, at *5 n.4 (N.D. Tex. June 30, 1998) ("In their reply brief, plaintiffs attempt to change materially the proposed class . . . . Because these issues are raised for the first time in the reply brief and are inadequately briefed, the court declines to address them."); *see also cf. Bell v. Ascendant Solutions, Inc.,* No. 301-cv-0166N, 2004 WL 1490009, at *1 n.1 (N.D. Tex. July 1, 2004) (Godbey, J.) ("Plaintiffs in their reply for the first time offered expert testimony on market efficiency . . . . The Court disagrees with that practice.); *Smith v. Xerox Corp.,* 584 F. Supp. 2d 905, 915 n.18 (N.D. Tex. 2008) (Godbey, J.) ("The Court will not consider an argument raised for the first time in a reply.").

Nonetheless, Plaintiffs' request to certify a class of only letter recipients fails. As Willis explained, (*see* Willis Opp'n at 5), and as Plaintiffs do not contest in their reply, even the few putative class members who did receive letters nonetheless based their understanding about the insurance applicable to the CDs on what they were told, orally, by their Stanford FAs, not based on representations contained in the Willis letters. After all, as the proposed Class Representatives admitted, the letters do not say on their face that the CDs were insured—indeed, they say nothing about CDs at all. Rather, the letter recipients claim to have been misled by the oral representations from their Stanford FAs. So, for all of the reasons discussed *supra,* a class of only letter recipients cannot be certified because it, too, relies on the oral communications by Stanford FAs. Indeed, in *Gyarmathy,* this Court refused to certify a class notwithstanding the existence of some written material because class members bought securities through intermediaries who, like the Stanford FAs here, provided "varying representations . . . above and beyond what is contained" in the written materials. *See* 2003 WL 21339279, at *3. Here, communications from the Stanford FAs occurred on

an individual basis, orally and in private, and it was those communications—not the Willis letters—that are alleged to have contained the misleading representations concerning insurance coverage.

Moreover, there is no evidence that a class action is a superior method for resolving a dispute involving only letter recipients. Indeed, there is no evidence that anyone other than the named Plaintiffs would be members of that class. The 225 other known letter recipients have already instituted their own individual actions against Willis in nine other actions around the country. (*See* Willis Opp'n at 55–56.) As a matter of evidence, this constitutes the vast majority, if not all, of the investors who ever saw or received a Willis letter. The fact that all of these individual investors have brought their individual suits demonstrates that there is no reason to think that the class action device is a superior method for resolving these claims. The cases are obviously capable of resolution on an individual basis, and there is no evidence that these investors were deterred from bringing their cases because of the financial hurdles to doing so.

## III.   Plaintiffs' Reply Brief and New Evidence Do Not Refute that Individual Questions of Reliance, Knowledge and Materiality Predominate

Willis further demonstrated in its Opposition that the widely varying written disclosures, combined with the proposed Class Representatives' on-the-record admissions, showed that individual inquires would be required to adjudicate several of the essential elements and affirmative defenses of Plaintiffs' TSA and common-law fraud claims, including: (i) reliance and inducement; (ii) investors' knowledge; and (iii) materiality. (*See* Willis Opp'n at 46-49.) Plaintiffs' new evidence, far from rebutting Willis's showing, in fact reinforces it.

### A.   The New Evidence Shows That Reliance and Inducement Cannot Be Presumed for Any Class of Investors.

As Willis has shown (*see* Willis Opp'n at 48), "a fraud class action cannot be certified when individual reliance will be an issue." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) ("One of the lessons

emphasized by *Castano* and related cases is that a district court must perform sufficient analysis to determine that class members' fraud claims are not predicated on proving individual reliance. If the circumstances surrounding each plaintiff's alleged reliance on fraudulent representations differ, then reliance is an issue that will have to be proven by each plaintiff, and the proposed class fails Rule 23(b)(3)'s predominance requirement."); *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 391 (5th Cir. 2007) (same).

Ignoring this controlling Fifth Circuit law (and citing instead a district court case from Florida), Plaintiffs argue that under a so-called "common fraudulent scheme" theory, "a court may *presume* investor reliance where the 'same or substantially similar misrepresentations were made to the putative class,' and 'they were of such a nature that it can be *presumed* that all members of the class relied upon them.'" (Pls. Reply at 28 (citing *Bruhl v. Price WaterhouseCoopers Int'l*, 257 F.R.D. 684, 696 (S.D. Fla. 2008)) (emphasis added).) But the Fifth Circuit has already rejected the notion of presumed reliance, even when each of the class members is alleged to have received the same information: "Texas law does not permit the type of presumed reliance urged" by the Plaintiffs. *McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 549 (5th Cir. 2003).[13] Plaintiffs also urge the Court to apply a "fraud-created-the-market" presumption, and a presumption regarding omissions arising from *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). But to the extent either of those presumptions exist, courts have made clear that they apply only to cases alleging federal securities fraud because both presumptions arise out of the specific language of Rule 10b-5.[14] Thus, they are not available for state law claims. *See, e.g., Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315,

---

[13] *See also Richardson v. Am. Home Shield of Tex., Inc.*, No. CIV.A. H-05-4029, 2006 WL 903721, at *7 (S.D. Tex. Apr. 7, 2006) ("As *Bernal* and *Stromboe* make clear, Texas law does not permit implied reliance."); *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 507-08 (S.D. Tex. 1998) (noting "reliance is an essential element of Plaintiffs' state law fraud claims" in denying certification).

[14] *See, e.g., Shores v. Sklar*, 647 F.2d 462, 469 (5th Cir. 1981) ('fraud created the market" presumption based on "scheme to defraud" language of Rule 10b-5); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 680 (S.D. Tex. 2006) (noting *Affiliated Ute* presumption derived from "the language of Rule 10b-5").

335 (S.D. Fla. 1996) ("Since the Defendants under these Counts are not being sued for securities laws violations, the fraud-on-the-market and *Affiliated Ute* presumptions of reliance are not available to Plaintiffs here with regard to the RICO and common law fraud claims."). Plaintiffs decided at the outset of this case that they would not allege violations of Rule 10b-5, and would only base their claims on Texas state law, which provides no such presumptions.

In any event, the new evidence would preclude application of these presumptions even if they were available here because it makes clear that investors received different information about insurance from their FAs. Indeed, as discussed *supra* Part I.A, the new declarations make clear that some Stanford FAs did not tell clients anything at all about insurance, or did so only when the clients specifically asked about it. (*See* Pls.' APP. at 2638 [Vanderver Decl. ¶ 6]; Pls.' APP. at 2641 [Barbar Decl. ¶ 12].) Moreover, some Stanford FAs admitted that they believed information about insurance was relatively *unimportant* to their decision making. (*See* Pls.' APP. at 2634 [Shaw Decl. ¶ 8]; Pls.' APP. at 2629 [Vollmer Decl. ¶ 4].)

Furthermore, the FAs' views are significant to class certification because three of the FAs not only sold Stanford's CDs, but also *purchased* CDs for themselves or their families. (Pls.' APP. at 2630 [Vollmer Decl. ¶ 8], 2633 [Shaw Decl. ¶ 3], 2637 [Vanderver Decl. ¶ 6].) Contrary to the testimony of the proposed Class Representatives, not one of those FA purchasers asserts they were told the CDs were insured from loss or that they relied on insurance information in deciding to purchase. By their own admissions, the FAs weighed multiple "factors" and at least two of them considered something other than the insurance to be "more important" in their decision-making. At bottom, the fact that different FAs had different views as to what was important to their decision-making—and thus what information and recommendations they voiced to their clients—shows that the proposed class members relied in *different* ways on the information they were allegedly supplied,

upending any attempt to establish a presumption of common, class-wide reliance. Under well-established Fifth Circuit precedent, a class simply cannot be certified in this instance.[15]

### B. The New Evidence Confirms That the Unique Experiences of Class Members Requires Individual Inquiries into Investor Knowledge.

Willis also showed in its Opposition that individual inquiries concerning investors' knowledge, an affirmative defense under the TSA, predominate over common questions because different investors received different disclosures and had different individual experiences with Stanford. For example, some marketing brochures *disclaimed* that the CDs were protected by FDIC-like insurance; and some proposed Class Representatives personally visited Stanford and met with Stanford executives. (*See* Willis Opp'n at 49–50.) In reply, Plaintiffs argue that *Willis* has not *proven* that investors received varying disclosures or had different levels of knowledge of Stanford's operations. But, once again, Plaintiffs have unlawfully flipped the burden of proof: it is, without question, Plaintiffs' burden to prove, by a preponderance of the evidence, that their action meets the requirements for class certification, including predominance. *See, e.g., Comcast v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Plaintiffs' new submissions provide evidence that further demonstrates investors' varying knowledge, undermining class certification.

---

[15] Plaintiffs' final contention that their common law fraud claims should be certified on a "pendent" basis is inapplicable as well. The "pendent" line of cases cited by Plaintiffs (*see* Pls.' Reply at 30) all involve misrepresentations in publicly issued written reports or news releases; not private, oral communications to individuals. For those few courts that have applied the "pendent" theory to find that individual reliance issues do not predominate, the *non*-existence of oral communications is a distinguishing point. *See, e.g., Gruber v. Price Waterhouse*, 117 F.R.D. 75, 81 (E.D. Pa. 1987) (noting there were no "oral or personal representations" involved as justification for certifying "pendent" fraud claims); *see cf. Seiden v. Nicholson*, 69 F.R.D. 681, 686 (N.D. Ill. 1976) (one of many cases certifying federal securities law claims, but denying certification of common law fraud claims because they require individual proof of reliance, even when no oral representations are involved). Nonetheless, as held in *Castano*, the Fifth Circuit has emphatically stated that a fraud claim cannot be certified when individual reliance is an issue. The Fifth Circuit has never recognized an exception to that rule for so-called "pendent" claims.

Further, contrary to Plaintiffs' contentions, class certification is precluded when the evidence is sufficient to show that individual inquiries "might be necessary" to adjudicate a defendant's affirmative defense. "This proof need not be at the level required to prove the affirmative defense on the *merits* but must be adequate to satisfy the court at the *certification* stage that 'individual knowledge inquiries might be necessary.'" *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 152-53 (N.D. Tex. 2014) (emphasis in original). Requiring a defendant to *prove* which class members received what information to overcome class certification inverts the burden of proof at the class certification stage and effectively denies the defendant the chance to prove its affirmative defense on the merits by individually testing each class members' claimed knowledge. *See, e.g., Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) (noting a defendant has a due process right "to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates [that] right or masks individual issues.").[16] Rather, as Plaintiffs' own cases make clear, class certification is inappropriate in a fraud case when the evidence shows "opportunities . . . for potential class members to have acquired varying levels of knowledge." *In re Kosmos Energy*, 299 F.R.D. at 153. Here, this Court has already recognized those "opportunities": Stanford prepared written disclosures that disclaimed insurance coverage for the CDs, which this Court found to present "many factual issues surrounding the manner of distribution of the disclosure statements,

---

[16] Plaintiffs' assertion that Willis must bear the cost of independently investigating (apparently outside the discovery process of this case) who among the 17,000-plus absent members of the proposed class received risk disclosures, or otherwise had actual or constructive knowledge that the CDs were not insured, is not the law either. For their contention, Plaintiffs' cited a S.D.N.Y. district court case (*see* Pls.' Reply at 24 (citing *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 103 (S.D.N.Y. 2004))) that was vacated and remanded on appeal. *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006). And, in particular, the Second Circuit held on appeal: "Moreover, the exclusion of full participants from the class does nothing to lessen the broad extent of knowledge of the scheme throughout the community of market participants and watchers, and *it is this widespread knowledge that would precipitate individual inquiries* as to the knowledge of each member of the class, even as redefined." 471 F.3d at 43 (emphasis added).

including which investors received the statements and in what format." (Willis APP. at 921 [Order on Mot. to Dismiss at 12]).

Moreover, the new declarations provide evidence—not just "mere speculation"—underscoring that individual investors had varying levels of knowledge concerning Stanford and the CDs. And, as discussed *supra* Part I.A, none of these FAs report telling their clients that the CDs themselves were insured. In fact, some admit they did not tell some clients anything at all about insurance.

In addition, the new evidence reinforces the fact that some investors had their own opportunities to visit Stanford and conduct their own "due diligence" into its operations. Willis showed (*see* Willis Opp'n at 43–50) that certain proposed Class Representatives' trips to Antigua created very real and concrete "opportunities . . . for potential class members to have acquired varying levels of knowledge." *In re Kosmos Energy*, 299 F.R.D. at 153. Mr. Vollmer recalls taking some prospective investors to Antigua so they could conduct "due diligence" on Stanford before they would invest (*see* Pls.' APP. at 2629 [Vollmer Decl. ¶ 5]) and Mr. Vanderver admits some people invested without receiving any information about insurance at all. (*See* Pls.' APP. at 2638 [Vanderver Decl. ¶ 6].) As in *Kosmos Energy*, Willis's identification of evidence impacting investor knowledge—some of which has already been determined by the Court to raise individual fact issues—is "more than adequate" to alert the Court that individual inquiries regarding Willis's affirmative defense "might be necessary" such that a class cannot be certified. 299 F.R.D. at 153.

C. **The New Evidence Demonstrates Further That, in This Instance, Materiality Is an Issue Requiring Individual Inquiries.**

In their reply, Plaintiffs argue that individual inquiries regarding materiality are not necessary because materiality is judged from an "objective" point of view. (Pls.' Reply at 18-19.) Though that may be correct, there is no dispute that materiality depends on whether and how the allegedly misleading statements or omissions altered the "total mix" of information available. *See*

*Duperier v. Tex. State Bank*, 28 S.W.3d 740, 745 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.)

("An omission or misrepresentation is material if there is a substantial likelihood that proper

disclosure would have been viewed by a reasonable investor as s*ignificantly altering the total mix of*

*information* made available.") (emphasis added). Plaintiffs do not respond to Willis's showing that

here, the "total mix" of information available to investors was not uniform, but instead varied from

investor to investor, and therefore requires individual inquiries.

      The new evidence only reinforces Willis's showing. As noted throughout, Mr.

Vanderver admits there were investors who did not receive any information at all about insurance

and, further, the written materials reveal critical differences in the form of risk disclosures that belie

any insurance coverage for the CDs. (*See* Willis Opp'n at 43-49.)[17] Mr. Barbar makes it clear he

reviewed marketing brochures with his potential clients (*see* Pls.' APP. at 2642 [Barbar Decl. ¶ 10]),

but no other FA indicates they were so fastidious (and several of the proposed Class Representatives

simply threw all marketing materials directly into the trash without reading).[18] Mr. Vollmer notes he

even took some prospective investors to Antigua to conduct "due diligence" on Stanford before

they would invest (*see* Pls.' APP. at 2629 [Vollmer Decl. ¶ 5]) and all the FAs characterize Stanford's

insurance as just one of many "factors" they considered or told clients about.[19] These varying

---

[17] While Plaintiffs argue there is no evidence that any of the marketing materials with risk disclosures in them were ever disseminated to anyone in the class, the exact same can be said about many of the documents Plaintiffs submit in support of their Motion. For example, no one authenticates Plaintiffs' Exhibit 7 as *the* one and only training manual and the evidence indicates there were different versions (*see* Pls.' APP. at 2777-78 (indicating Stanford had materially different versions of training manuals)), and no evidence establishes the contention that Plaintiffs' Exhibit 11 was the "primary" marketing material. Nevertheless, Plaintiffs miss the point. The only way to know who saw what materials is, as the proposed Class Representatives themselves admit, to individually ask each and every person in the 17,000-plus proposed class.

[18] *See, e.g.*, Willis APP. at 832 [Gomez Tr. 97:10-17] ("[W]hatever I got as far as marketing materials, I would throw them away"), 834 [Gomez Tr. 102:14-18] (admitting he did not read marketing materials).

[19] Specifically, Mr. Vanderver states in his declaration that "I considered *many factors* when recommending the CD" and that Willis's "positive opinion of Stanford was *a factor* that I considered

experiences and levels of information among different members of the proposed class make it impossible to judge whether Willis's letter (or anything else Plaintiffs allege to be fraudulent) was objectively "material" to all 17,000-plus members of the proposed class.[20] At a minimum, the fact that some investors did not even ask about "insurance or references" for Stanford at all (*see* Pls.' APP. at 2638 [Vanderver Decl. ¶ 6]) means that any purported omissions on those topics could not have been material to those individuals. Again, the only way to know who among the 17,000-plus members of the proposed class did or did not receive such representations is to ask each and every one of them individually.

Therefore, because this is not a case based on a written prospectus or any one set of common documents distributed to the entire 17,000-plus proposed class members, no one can know what the "total mix" of information was for any one person without asking them individually. The new evidence submitted by Plaintiffs makes this abundantly clear. Thus, the issue of "materiality"—which is an element of both the TSA and common law fraud claims—is one that renders class treatment inappropriate in the circumstances of this particular case.

## CONCLUSION AND REQUESTED RELIEF

As shown above, Plaintiffs' new evidence and reply arguments fail to demonstrate that they have satisfied their burden of establishing the prerequisites for class certification under Rule 23. Plaintiffs' Motion should be denied. Willis further requests all other relief to which it may be justly entitled.

---

as part of my due diligence on Stanford." (Pls.' APP. at 2637-38 [Vanderver Decl. ¶¶ 3, 6] (emphasis added).)

[20] For example, a second-hand hearsay assertion by an FA to a client that an insurance broker (whom the client had never heard of) could "vouch" for Stanford or had placed D&O and Banker's Blanket Bond insurance for Stanford (*see, e.g.*, Pls.' APP. at 2637-38 [Vanderver Decl. ¶ 6] (stating he *told* a client about Willis's letter and its "references" for Stanford, and speculating the client relied on his hearsay) may not be material to those who received affirmative representations that the CDs were "guaranteed" or "100 percent insured."

Dated: June 4, 2015

Respectfully submitted,

s/ T. Ray Guy
T. Ray Guy
Texas Bar No. 08648500
ray.guy@weil.com
Jason E. Wright
Texas Bar No. 24063896
jason.wright@weil.com

WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201-6950
Telephone:      (214) 746-7700
Facsimile:      (214) 746-7777

OF COUNSEL:
Jonathan D. Polkes
jonathan.polkes@weil.com
Joshua S. Amsel
joshua.amsel@weil.com

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:      (212) 310-8000
Facsimile:      (212) 310-8007

**ATTORNEYS FOR DEFENDANTS WILLIS
OF COLORADO, INC. AND WILLIS
LIMITED**


s/ Mark D. Manela
Mark D. Manela
State Bar No. 12894500
mmanela@manelalawfirm.com

Manela Law Firm
440 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 240-4843
Facsimile: (713) 228-6138

**ATTORNEY FOR DEFENDANT
AMY S. BARANOUCKY**

## CERTIFICATE OF SERVICE

On June 4, 2015, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

s/ Jason E. Wright
Jason E. Wright